Andrew T. Ryan, Esq. (SBN 227700)
THE RYAN LAW GROUP
317 Rosecrans Ave.
Manhattan Beach, CA 90266
Tel: (310) 321-4800
Fax: (310) 496-1435
Andrew.ryan@theryanlawgroup.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JEREMIAH BALLEW and ELENI HONDERICH, on behalf of themselves and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HUUUGE, INC., a Delaware corporation,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>1. **Violation of California's Unfair Competition Law ("UCL")**<br>2. **Violation of California False Advertising Law ("FAL")**<br>3. **Violation of the California Consumer Legal Remedies Act ("CLRA")**<br>4. **Violation of Illinois Consumer Fraud and Deceptive Business Practices Act**<br>5. **Fraud**<br>6. **Negligent Misrepresentation**<br>7. **Unjust Enrichment**<br><br>**DEMAND FOR JURY TRIAL** |

Jeremiah Ballew ("Mr. Ballew"), a citizen of Los Angeles County, and Eleni Honderich ("Ms. Honderich"), a citizen of Illinois (collectively, "Plaintiffs"), hereby bring this Complaint on behalf of themselves and those similarly situated against Defendant Huuuge, Inc., a Delaware corporation ("Defendant"). Plaintiffs allege as follows:

## INTRODUCTION

1.     Defendant develops, distributes, and operates the mobile games Huuuge Casino Slots and Billionaire Casino (collectively, "Games") that compete in the so-called "social casino" market.

2.     The Games provide users with virtual slot machines that are played with virtual chips. Users bet the chips and win or lose those chips based on the randomized outcomes of the Game's slot machines and other games of chance.

3.     When users run out of chips – a highly likely outcome – users are unable to continue playing the Games' slot machines. At that time, the Games present users with prompts encouraging them to purchase more virtual chips in exchange for real world money to continue their gameplay. The shops where users are directed to purchase more chips purport to offer significant sales and discounts for the purchase of virtual chips with misleading chip quantity comparisons and countdown timers.

4.     The Ninth Circuit has held that earlier versions of Big Fish Casino, a mobile game that also offers virtual slot machines, "constitutes illegal gambling under Washington law." *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785 (9th Cir. 2018).

5.     This lawsuit is brought on behalf of Plaintiffs and those similarly situated who have had their money taken from the Games' illegal slot machines and who have been deceived into making in-game purchases of deceptively marketed chips in the Games.

6.      Defendant develops and publishes the Games, which are playable on various platforms, including iPhone and Android devices.

7.      On information and belief, the Games are distributed under developer agreements with Apple Inc. ("Apple") and Google, LLC ("Google"). On information and belief, Apple and Google are entities headquartered in California.

8.      The Games can be downloaded for free from the Apple App Store and Google Play store. The Games' simulated slot machines are akin to those found in real world casinos. The Games give new players an initial balance of virtual items, including chips allowing access to gameplay.

9.      After consumers lose their initial allotment of chips, the Games attempt to sell those consumers additional chips. Without additional chips, consumers cannot play the Games' slot machines.

10.     Freshly topped off with additional chips, consumers wager to win more chips in the Games' slot machines. The chips won by consumers playing the Games' slot machines are identical to the chips that are sold in the Games.

11.     The function of the Games' chips is to place bets in the Games' slot machines to access those games of chance and extend players' ability to play those slot machines.

12.     On information and belief, despite purporting to be free-to-play, Defendant reaps massive profits by selling "in-app" bundles of virtual chips. Players of the Games make these in-app purchases for the purpose of being able to continue playing the Games' slot machines when they lose their chips to those games of chance.

13.     In addition to the addictive nature of the slot machines themselves, in order to induce users to make in-game purchases, in its marketing to consumers at the time of purchase, the Games advertise sale deals for virtual chips that are false and misleading. The Games' shops provide comparisons to fictitious chip

quantities for chip bundles. In addition, some of the ads misleadingly communicated the duration of advertised sales.

**The Games Are Illegal Gambling Under California Law**

14.    By making, operating, giving away and entering into agreements related to the Games, Defendant has violated California's gambling laws, including the law prohibiting slot machines. In so doing, Defendant has illegally profited from thousands of consumers.

15.    California Penal Code §330b prohibits slot machines. Subsection (a) states that "[i]is unlawful for any person to manufacture, repair, own, store, possess, sell, rent, lease, let on shares, lend or give away, transport, or expose for sale or lease…any slot machine or device, as defined in this section." Cal. Penal Code §330b(a).

16.    Defendant manufactures, repairs, owns, rents, leases or gives away the Game and their slot machines.

17.    California Penal Code §330b(a) further provides that "[i]t is unlawful for any person to make or to permit the making of an agreement with another person regarding any slot machine or device, by which the user of the slot machine or device, as a result of the element of hazard or chance or other unpredictable outcome, may become entitled to receive money, credit, allowance, or other thing of value or additional chance or right to use the slot machine or device, or to receive any check, slug, token, or memorandum entitling the holder to receive money, credit, allowance, or other thing of value."

18.    On information and belief, Defendant made or permitted the making of agreements with others regarding the Games, including with its subsidiaries, Apple, Google and players of the Games.

19.    Users of the Games, as a result of the element of chance, may become entitled to receive virtual chips, which are a credit, allowance or other thing of

value or an additional chance or right to use the Games' slot machines. Specifically, players of the Games' slot machines receive virtual chips that provide players with the additional chance or right to continue playing slot machines in the Games. The slot machines in the Games are games of chance whose outcome does not depend on the skill of the players.

20.    California Penal Code 330b(d) provides: "For purposes of this section, 'slot machine or device' means a machine, apparatus, or device that is adapted, or may readily be converted, for use in a way that, as a result of the insertion of any piece of money or chip or other object, or by any other means, the machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any piece of money, credit, allowance, or thing of value, or additional chance or right to use the slot machine or device..."

21.    The Games falls within the definition of slot machine or device under section 330b(d). Users exchange real money for virtual chips in the Games. The Games' slot machines are games of chance in which the user may receive or lose additional virtual chips. Virtual chips are a thing of value or an additional chance to use the slot machines in the Games.

22.    The Ninth Circuit has found that virtual chips similar to those in the Games constitute a thing of value under Washington's gambling law: "The virtual chips, as alleged in the complaint, permit a user to play the casino Game inside the virtual Big Fish Casino. They are a credit that allows a user to place another wager or re-spin a slot machine. Without virtual chips, a user is unable to play Big Fish Casino's various Game.  Thus, if a user runs out of virtual chips and wants to continue playing Big Fish Casino, she must buy more chips to have the privilege of playing the game. Likewise, if a user wins chips, the user wins the privilege of

playing  Big Fish Casino without charge. In sum, these virtual chips extend the privilege of playing Big Fish Casino." *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 787 (9th Cir. 2018). The same is true for the Games here.

23.    In 2021, Defendant reached a $6.5 million settlement with Washington consumers regarding the Games' violation of Washington's gambling laws. Nonetheless, Defendant has persisted to violate gambling laws of other states, including California's.

**The Game Engages in False and Misleading Advertising**

24.    The Games present false and misleading advertising to induce players into spending money within the Games.

25.    The Games' respective stores where users purchase virtual chips are misleading by offering for sale a particular chip quantity for a listed price with a comparison to a lower stricken chip quantity. Consumers reasonably understand the stricken chip quantity in these advertisements to represent the ordinary or prevailing deal for chips offered to users of the Games on a regular basis for a reasonably substantial period of time.

26.    The stricken chip quantities presented to new users are fictitiously low and do not represent the ordinary or prevailing deal offered to other users of the Games on a regular basis for a reasonably substantial period of time. The Games only offer the stricken chip quantities for a trivial period of time of approximately 15 minutes day, often in the middle of the night. The rest of the time the Games offer a "sale" with significantly higher chip quantities.

27.    In so doing, the Games mislead consumers, particularly new players to the Games, into believing that the offered sales are providing an outsized value as compared to the ordinary or prevailing deal offered by the Games. This false belief is a material consideration for consumers to make in-game purchases and consumers reasonably relied on that belief in their purchase decision.

28.     Sale advertisements in the Games are also false and misleading because they purported to be offers available for only a limited duration of time. These offers included a countdown timer that reasonable consumers understood to mean the deal would only be available for the specified amount of time and not offered again in the near future.

29.     In truth, the same, substantially similar or better sale is be offered repeatedly and frequently. The non-sale offer is only available for a trivial period of time. Users, and in particular new users unfamiliar with the Games' scheme, are thereby misled into a false sense of urgency regarding the availability of these sale offers, not knowing that they have countless such sales (or better) offers in the future. This false sense of urgency is a material factor in players' decisions to make in-game purchases.

30.     The Federal Trade Commission ("FTC") describes various forms of false price comparison schemes as deceptive: "One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the 'bargain' being advertised is a false one; the purchaser is not receiving the unusual value he expects." 16 CFR §233.1(a). "The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for

the purpose of establishing a fictitious higher price on which a deceptive comparison might be based." 16 CFR §233.1(b). "Other illustrations of fictitious price comparisons could be given. An advertiser might use a price at which he never offered the article at all; he might feature a price which was not used in the regular course of business, or which was not used in the recent past but at some remote period in the past, without making disclosure of that fact; he might use a price that was not openly offered to the public, or that was not maintained for a reasonable length of time, but was immediately reduced. 16 CFR §233.1(d).

31.    California statutory and regulatory law also expressly forbids false discounted pricing schemes: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement."  Cal. Bus. & Prof. Code §17501. Section 17501 defines "prevailing market price" as "the worth or value of any thing advertised…at the time of publication of such advertisement in the locality wherein the advertisement is published."

32.    Defendant has control and knowledge over the pricing and advertisement of chips in the Games and therefore knew, or should reasonably have known, that its comparative chip quantity advertising and statements regarding sale duration were false, deceptive, misleading, and unlawful.

33.    Defendant fraudulently concealed from and intentionally failed to disclose to consumers the truth about its advertised discounts and purported limited time sales.

34.    Through this false and deceptive marketing, advertising, and pricing scheme, Defendant violated California law prohibiting the advertisement of goods for sale as discounted from false former prices and prohibiting misleading

statements about the existence and amount of price reductions.

## **PARTIES**

35.     Plaintiff Jeremiah Ballew is a citizen and resident of Los Angeles County, California. He downloaded Huuuge Casino on his iPhone from the Apple App Store in Los Angeles County. He played Huuuge Casino in this County. He accessed the Huuuge Casino's virtual store and saw its false advertising in this County. He was induced by this false advertising into making in-game purchases in this County from the in-game store. He made a purchase from Huuuge Casino through his Apple iPhone and Apple payment account.

36.     Plaintiff Eleni Honderich is a citizen of and resident of Illinois. She downloaded Huuuge Casino and Billionaire Casino on her iPhone from the Apple App Store. She was induced by the Games' false advertising into making in-game purchases from the Games' stores. She made purchases from the Games through her iPhone and through her Apple payment account.

37.     On information and belief, Defendant Huuuge Inc. is a corporation organized and existing under the laws of Delaware. On information and belief, Defendant's principal place of business is located at 2300 W Sahara Ave., Suite 680, Las Vegas, Nevada 89102.

38.     On information and belief, until March 2022 Defendant was registered to do business in California.

39.     According to Defendant's Annual Report, "Huuuge Group ('Group') comprised Huuuge, Inc. (the parent entity), six subsidiary companies wholly and directly controlled by Huuuge, Inc. and eight subsidiaries wholly controlled by the Company through Huuuge Global Ltd. with its registered seat in Cyprus."

40.     Upon information and belief and at all times relevant to this Complaint, Huuuge Inc. and its subsidiaries, including Huuuge Global Ltd. and

Billionaire Games Ltd., operated as one big company to market and sell the Games throughout the U.S., including California. The Huuuge Inc. subsidiaries (e.g., Huuuge Global Ltd. and Billionaire Games Ltd.) operate like divisions or departments within the larger Huuuge Inc. company.

41. Upon information and belief and at all times relevant to this Complaint, Defendant's subsidiaries, including Huuuge Global Ltd. and Billionaire Games Ltd., were agents, servants, employees, co-conspirator, partners, joint venturers, wholly owned and controlled subsidiaries and/or alter ego of Defendant, and was at all times acting within the course and scope of said agency, service, employment, conspiracy, partnership and/or joint venture.

42. Upon information and belief and at all times relevant to this Complaint, Defendant aided and abetted, encouraged and rendered substantial assistance in accomplishing the wrongful conduct and their wrongful goals and other wrongdoing complained of herein. In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, Defendant acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

## JURISDICTION AND VENUE

43. This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §1332(d)(2), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than Defendant.

44. This Court has personal jurisdiction over Defendant, because it conducts substantial business and directs its activities into California and this District, including activities that form the basis for the claims here, and a

substantial part of the acts and omissions complained of occurred in this District.

45.    Plaintiff further alleges, upon information and belief, that the claims asserted in this complaint arise out of or are related to Defendant's professional and commercial activities within California, and therefore the Defendant is subject to the specific jurisdiction of the courts of this state. Specifically, Defendant publishes, advertises, distributes and profits from the Games and directs activities for these Games through California entities, including Apple and Google.

46.    On information and belief, Defendant generates the majority of the Games' revenue through the publishing, distribution and monetization of the Games through contractual relationships with California entities, Apple and Google.

47.    On information and belief, Defendant collects its revenue through transactions with consumers that are completed through California entities (Apple and Google) and those financial transactions are executed through servers located in California.

48.    Further, Defendant advertises the Game through a Facebook account, a platform owned and operated by Meta Platforms Inc., an entity headquartered in California.

49.    Venue is proper in this court because at all relevant times Ballew resided in the County of Los Angeles, California and the claims asserted in this complaint arise out of acts, transactions, and conduct that occurred in whole or in part within the County of Los Angeles, California.

## **FACTS**

50.    The proliferation of internet-connected mobile devices has led to the growth of what are known in the industry as "free-to-play" videogames. The term is a misnomer. It refers to a model by which the initial download of the game is free, but companies reap huge profits by selling thousands of "in-app" items that start at $0.99 but can quickly escalate to hundreds or even thousands of dollars.

51.    The in-app purchase model has become particularly attractive to developers of games of chance (e.g., poker, blackjack, and slot machine mobile videogames, amongst others), because it allows them to generate huge profits. In 2022, the global social casino game market reached $6.83 billion and is projected to grow to $8.7 billion in 2026.[1]

52.    Academics have also studied the socioeconomic effect games that rely on in-app purchases have on consumers. In one study, the authors compiled several sources analyzing casino Game and stated that: "[Researchers] found that casino gamers share many similar sociodemographic characteristics (e.g., employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in casino Game. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino Game were their first experiences with gambling…According to [another study], the purchase of virtual credits or virtual items makes the activity of casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, only 1–5% of casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-

---

[1] *Global Social Casino Game Market Report 2022-2026 Featuring Caesars Entertainment, Aristocrat Leisure, Zynga, Playtika, Scientific Game Corp and DoubleU Game*, Research and Markets (April 26, 2022), available at: https://www.globenewswire.com/en/news-release/2022/04/26/2428795/28124/en/Global-Social-Casino-Game-Market-Report-2022-2026-Featuring-Caesars-Entertainment-Aristocrat-Leisure-Zynga-Playtika-Scientific-Game-Corp-and-DoubleU-Game.html (last accessed February 6, 2023).

transactions account for 60% of all casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits." Hyoun S. Kim, Michael J. A. Wohl, et al., *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming* (Nov. 14, 2014), available at http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf  (citations omitted).

53.    Many of the players of these social casino games likely have psychological addictions to playing. See August 1, 2018 letter from Natasha Dow Schüll, Ph.D. to Washington State Gambling Commission (available at https://www.wsgc.wa.gov/sites/default/files/public/news/big-fish/Dr.%20Schull%20Comments.pdf).

54.    Despite reaching a settlement on the same claims in 2021 in *Wilson v. Huuuge, Inc.*, No. 18-cv-5276, in the U.S. District Court for the Western District of Washington, Defendant has not made meaningful changes in the Games to comply with gambling laws. On information and belief, that settlement was limited to Washington residents.

**Consumers Do Not Consent To Any Terms of Service Before Playing the Games**

55.    Consumers can play the Games and their various slot machines by downloading them on an Apple iOS device or on an Android device.

56.    Consumers who download the Games and then purchase chips on their mobile devices are neither required to create an account with Defendant (or its subsidiaries) nor are they asked or required to agree to or consent to any terms of service before playing the Games or purchasing chips.

57.    Users are not presented with terms of any kind before downloading and playing the Games.

58.    Users are not required to manifest their assent to any terms relating to the Games.

59.    While the Games do purport to apply terms of service, the Ninth Circuit affirmed the denial of a motion to compel arbitration relating to the Games, finding that the terms were unenforceable browserwrap agreements. *Wilson v. Huuuge, Inc.*, No.18-36017, 2019 U.S. App. LEXIS 37952, *2 (9th Cir. Dec. 20, 2019).

**Overview of Huuuge Casino**

60.    Huuuge Casino is a mobile application casino-style game developed and distributed by Defendant. The game is available on iPhone and Android devices through the Apple App Store and Google Play platforms, respectively.

61.    Huuuge Casino was first released in 2015. Huuuge Casino provides users with a variety of slot machines on their mobile device in addition to other games of chance. Below is an example of one such slot machine in Huuuge Casino:



62.    In order to play the slot machines in Huuuge Casino, users must bet virtual chips, as can be seen at the bottom left in the image above where it says

"BET." The slot machines in Huuuge Casino require a minimum bet, such that if a user's chip balance is below that minimum, the user cannot play the slot machine. For example, in the slot machine depicted above, the minimum bet allowed is 5,000 chips. Other slot machines in Huuuge Casino may have other minimum bet requirements.

63.    The slot machines in Huuuge Casino have all the same trappings as real-world slot machines, including flashing graphics and sound effects. The slot machines in Huuuge Casino are games of chance. The outcome of any given spin is random and not dependent on the user's skills. Indeed, users can set the slot machines to "auto-spin" for unlimited consecutive spins to reduce or eliminate the need to interact with the game.

64.    Users are encouraged by Huuuge Casino to make as large a bet as possible through various user interfaces. For example, a "reward" a player obtains as he or she spends more time playing is an increase in the "MAX BET" he or she can make on a given spin. Other interfaces communicate that the user will get more and better rewards if he or she increases their bet.

65.    Users are allotted an amount of chips when they first download and play the game. They may be awarded more chips through playing the slot machine games in Huuuge Casino. When a user runs out of chips or attempts to spin a slot machine for a bet amount exceeding their balance of virtual chips, they are presented with one or more pop-up advertisements offering the sale of additional virtual chips in exchange for real world currency and directed to the game's store. While users may obtain additional chips by waiting for a periodic bonus, at times, users must purchase more chips to extend their play.

66.    The chips purchased by a user for real world money is used to extend their ability to play the slot machines in Huuuge Casino. These purchased virtual chips are identical to those bet in the slot machines and subject to the chance of

1   winning or losing of those slot machines.

2       67.    When a user attempts to play a slot machine in Huuuge Casino but has

3   an insufficient quantity of chips, the user is presented with the following message:



4

5

6

7

8

9

10

11      68.    When the user presses on the "Get Chips" button shown above, they

12  are directed to the game's "Shop." Without obtaining more chips, the user is

13  unable to continue playing. There are no immediate opportunities in Huuuge

14  Casino for a user that has insufficient chips to play that game to get more chips

15  other than buying them.

16      69.    Below is an image of the Huuuge Casino Level 1 Shop:

17

18

19

20

21

22      

23

24

25

26

27                              Figure 1

28

70.    The Shop purports to offer chips on "sale." At the top right corner of Figure 1, there is a countdown timer, communicating that the sale is of a limited duration. In Figure 1, which was taken at 10:59pm PST, there are 5 seconds left on the countdown timer.

71.    At each price point an offered chip quantity is presented above a stricken chip quantity, communicating that the stricken chip quantity is the ordinary, prevailing or standard quantity of chips for each price point offered in Huuuge Casino. For example, Figure 1 offers 121,200,000 chips for $1.99 with 24,240,000 stricken below and a banner saying +400%. A reasonable consumer, particularly one playing Huuuge Casino for the first, time, would reasonably understand this presentation to mean that the ordinary, prevailing or standard quantity of chips sold by Huuuge Casino for $1.99 is 24,240,000.

72.    In reality, Huuuge Casino only offers 24,240,000 chips at $1.99 in the Level 1 Shop and even then for only 15 minutes a day, often in the middle of the night (e.g. between 11 to 11:15pm shown above). Shops of higher levels offer much higher chip quantities. Accordingly, 24,240,000 is not the standard, prevailing, or ordinary quantity of chips offered by Huuuuge Casino for $1.99 for any substantial period of time. It is an artificially low chip quantity offered for a trivial amount of time of the purpose of making a misleading comparison. The same is true for the chips sold at the other price points.

73.    Below is a screen shot taken from the same user and device approximately 15 minutes after that of Figure 1, at approximately 11:15pm PST on the same night:



<u>Figure 2</u>

74.   Approximately 15 minutes after the expiration of the purported sale in Figure 1, the user is presented with a new sale in Figure 2 that is substantially similar – 109,080,000 coins for $1.99 with 24,240,000 coins stricken below, a purported 350% increase from the ordinary quantity of chips offered by the game.

75.   At times, the same coin quantities are offered in sequential "sales" with the only difference being the accompanying virtual items. In the screenshots below, the one on top was presented to the user at 720p, showing 3 hours and 39 minutes left for the sale. The screenshot on the bottom, taken a little over 6 hours later at 1:34a offers a near identical "sale":



<u>Figure 3</u>

76.    These sales offered in the Huuuge Casino shop then repeat day after day with only modest variations in the offers. The stricken chip values are only offered for trivial periods of time and do not represent the ordinary, prevailing or standard quantity of chips offered in Huuuge Casino.

77.    On information and belief, the stricken chip quantities presented in the Level 1 Shop are also fictitious, because they do not represent the ordinary, prevailing or standard chip quantity offered by Huuuge Casino to other users.

78.    Below is a screen shot from the Huuuge Casino shop taken from a different user who has reached a "Level 2 Shop":



Figure 4

79.     This user is being offered with 363,600,000 chips for $1.99 with 72,720,000 chips stricken – multiples more than the stricken quantity of 24,240,00 chips presented in the Level 1 shop shown in Figures 1-3. This further demonstrates the stricken chip quantities at lower-level shops in Huuuge Casino are fictitious references.

80.     Below is a screen shot from a "Level 3 Shop" in Huuuge Casino:



Figure 5

81.     This user is being offered 727,200,000 chips for $1.99 with 145,440,000 chips stricken below. Again, this multiples more than what is

presented in the Level 1 and Level 2 shops as the purported ordinary, prevailing or standard quantity of chips.

**Overview of Billionaire Casino**

82.     Billionaire Casino operates identically to Huuuge Casino in relevant part. Billionaire Casino is a mobile application casino-style game developed and distributed by Defendant. The game is available on iPhone and Android devices through the Apple App Store and Google Play platforms, respectively.

83.     Billionaire Casino was first released in 2016.

84.     Billionaire Casino provides users with a variety of slot machines on their mobile device in addition to other games of chance.

85.     In order to play the slot machines in Billionaire Casino, users must bet virtual chips, as can be seen at the bottom left in the image above where it says "MAX BET!" The slot machines in Billionaire Casino require a minimum bet, such that if a user's chip balance is below that minimum, the user cannot play the slot machine. For example, in the slot machine depicted above, the minimum bet allowed is 5,000 chips. Other slot machines in Billionaire Casino may have other minimum bet requirements.

86.     The slot machines in Billionaire Casino have all the same trappings as real-world slot machines, including flashing graphics and sound effects. The slot machines in Billionaire Casino are games of chance. The outcome of any given spin is random and not determined by the user's skills. Indeed, users can set the slot machines to "auto-spin" for unlimited consecutive spins to reduce or eliminate the need to interact with the game.

87.     Users are encouraged by Billionaire Casino to make as large a bet as possible through various user interfaces. For example, a "reward" a player obtains as he or she spends more time playing is an increase in the "MAX BET" he or she can make on a given spin. Other interfaces communicate that the user will get more

and better rewards if he or she increases their bet.

88.     Users are allotted an amount of chips when they first download and
play the game. They may be awarded more chips through playing the slot machine
games in Billionaire Casino. When a user runs out of chips or attempts to spin a
slot machine for a bet amount exceeding their balance of virtual chips, they are
presented with a message instructing them to get more chips and directing them to
the game's shop, where the player can buy additional virtual chips in exchange for
real world currency. While users may obtain additional chips by waiting for a
periodic bonus, when a user runs out sufficient chips to play, their only immediate
option to continue playing is to buy more chips.

89.     The virtual chips purchased by a user for real world money is used to
extend their ability to play the slot machines in Billionaire Casino. These
purchased virtual chips are identical to those bet in the slot machines and subject to
the chance of winning or losing of those slot machines.

90.     When a user attempts to play a slot machine in Billionaire Casino but
has an insufficient quantity of chips, the user is instructed to "Get more Chips":



91.     The user is then directed to the Billionaire Casino shop. Without
obtaining more chips, the user is unable to continue playing.

92.     The Billionaire Casino shop is similar to that of Huuuge Casino,

purporting to offer limited time sales that are false and misleading. An image of the Billionaire Casino shop is shown below:



<u>Figure 6</u>

93.    Similar to Huuuge Casino, the Billionaire Casino Shop presents purported sales on virtual chips at various price points, with the offered quantity of chips in bold and a stricken quantity of chips below. Users reasonably understand the stricken quantity of chips to represent the ordinary, prevailing or standard quantity of chips offered by Billionaire Casino at each given price point.

94.    For example, Figure 6 offers 109,080,000 chips at $1.99 with "24,240,000" below in strikethrough. A consumer would reasonably understand this to mean that the ordinary, prevailing and normal quantity of chips formerly offered by Billionaire Casino to its users for substantial periods of time is 24,240,000 chips for $1.99.

95.    The stricken quantity of chips show in the Level 1 shop of Billionaire Casino are fictitious for the same reasons as in Huuuge Casino. First, the stricken chip quantities are offered for only a trivial period of time, with the same or substantially similar purported sales offered again soon after. Second, the higher level shops in Billionaire Casino, similar to Huuuge Casino, offer chip quantities far exceeding those represented to be the standard offered chip quantities in the Level 1 shop. The image below is from the Billionaire Casino shop of a different

user taken at or around the same time as that in Figure 6:



Figure 7

96.    As with Huuuge Casino, the chip quantities in Figure 7 far exceed those stricken in Figure 6, indicating that the stricken chip quantities in Figure 6 are fictitiously low.

**Plaintiffs' Experience with Huuuge Casino and Billionaire Casino**

97.    Mr. Ballew found Huuuge Casino in the Apple App Store. In the absence of any disclaimers or warnings to the contrary, he reasonably believed Huuuge Casino complied with California law. Had Mr. Ballew known that Huuuge Casino was engaged in illegal gambling, he would not have downloaded and began playing it.

98.    On or about January 2023, Mr. Ballew entered the Huuuge Casino shop, and saw a presentation the same or substantially similar to that depicted in Figures 1 and 2. Mr. Ballew reasonably understood that the advertised sale would be available for only the amount of time shown in the countdown timer and that the same or similar sale would not be available again soon. Mr. Ballew also reasonably understood that the stricken chip quantities shown in the shop were the ordinary, normal and prevailing quantity of chips offered by Huuuge Casino to its users at each price point shown.

99.    Mr. Ballew purchased chip his first chip pack from Huuuge Casino priced at $2.99 on or around February 2023.

100.    Mr. Ballew's reasonable understanding that the advertised sales in the Huuuge Casino shop would expire in the time shown and that comparable sales would not be offered again soon, and his reasonable understanding that the chip quantities he was receiving represented a value far better than normally offered to users were material factors in his decision to make his in-game purchases.

101.    Had Mr. Ballew known that Huuuge Casino routinely offered the same or more chips at those same price points, he would not have made his purchase.

102.    Had Mr. Ballew known that there was no true urgency for taking advantage of the advertised sale, he would not have made his purchase.

103.    Mr. Ballew continued to play Huuuge Casino until he lost all his chips, at which time he was again prompted to purchase more chips purportedly on sale. Trapped by Huuuge Casino's addictive games of chance and having already been fraudulently induced to investing in the game, he made an additional purchase of virtual chips from Huuuge Casino's shop priced at $4.99 in February 2023.

104.    Ms. Honderich found Huuuge Casino in the Apple App Store. In the absence of any disclaimers or warnings to the contrary, she reasonably believed Huuuge Casino complied with California law. Had Ms. Honderich known that Huuuge Casino was engaged in illegal gambling, she would not have downloaded and began playing it.

105.    On or about August 2020, Ms. Honderich entered the Huuuge Casino shop, and saw a presentation the same or substantially similar to that depicted in Figures 1 and 2. Ms. Honderich reasonably understood that the advertised sale would be available for only the amount of time shown in the countdown timer and that the same or similar sale would not be available again soon. Ms. Honderich

also reasonably understood that the stricken chip quantities shown in the shop were the ordinary, normal and prevailing quantity of chips offered by Huuuge Casino to its users at each price point shown.

106.    Ms. Honderich purchased her first chip pack from Huuuge Casino priced at $39.99 on or around August 6, 2020.

107.    Ms. Honderich's reasonable understanding that the advertised sales in the Huuuge Casino shop would expire in the time shown and that comparable sales would not be offered again soon, and her reasonable understanding that the chip quantities she was receiving represented a value far better than normally offered to users were material factors in his decision to make his in-game purchases.

108.    Had Ms. Honderich known that Huuuge Casino routinely offered the same or more chips at those same price points, she would not have made her purchase.

109.    Had Ms. Honderich known that there was no true urgency for taking advantage of the advertised sale, she would not have made her purchase.

110.    Ms. Honderich continued to play Huuuge Casino until she lost all her chips, at which time she was again prompted to purchase more chips purportedly on sale. Having been fraudulently induced into spending money in Huuge Casino and trapped by its addictive games of chance and the resulting compulsion loop to continue spending money in the game, Ms. Honderich made additional purchases from Huuge Casino between August 2020 and February 2023 totaling over $70,000.

111.    Ms. Honderich found Billionaire Casino through advertisements in Huuuge Casino and in the Apple App Store. In the absence of any disclaimers or warnings to the contrary, she reasonably believed Billionaire Casino complied with California law. Had Ms. Honderich known that Billionaire Casino was engaged in illegal gambling, he would not have downloaded and began playing it.

112.   On or about September 2021, Ms. Honderich entered the Billionaire Casino shop, and saw a presentation the same or substantially similar to that depicted in Figure 6. Ms. Honderich reasonably understood that the advertised sale would be available for only the amount of time shown in the countdown timer and that the same or similar sale would not be available again soon. Ms. Honderich also reasonably understood that the stricken chip quantities shown in the shop were the ordinary, normal and prevailing quantity of chips offered by Billionaire Casino to its users at each price point shown.

113.   Ms. Honderich purchased her first chip pack from Billionaire Casino priced at $19.99 on or around September 17, 2021.

114.   Ms. Honderich's reasonable understanding that the advertised sales in the Billionaire Casino shop would expire in the time shown and that comparable sales would not be offered again soon, and her reasonable understanding that the chip quantities she was receiving represented a value far better than normally offered to users were material factors in her decision to make his in-game purchases.

115.   Had Ms. Honderich known that Billionaire Casino routinely offered the same or more chips at those same price points, she would not have made her purchase.

116.   Had Ms. Honderich known that there was no true urgency for taking advantage of the advertised sale, she would not have made her purchase.

117.   Ms. Honderich continued to play Billionaire Casino until she lost all her chips, at which time she was again prompted to purchase more chips purportedly on sale. Having been fraudulently induced into spending money in Billionaire Casino and trapped by its addictive games of chance and resulting compulsion loops to continue spending money in the game, Ms. Honderich made additional purchases from Billionaire Casino between September 2021 and

February 2023 totaling over $3,000.

118.   The advertising, pricing and quantity of chips in the Games is within Defendant's knowledge and control.

119.   Defendant had actual knowledge that the false strikethrough ads and false limited time sales contained false or misleading misrepresentations as to their prior values and as to their duration. Defendant designed and promoted these advertisements while having actual knowledge that these quantitative representations of sale values were false.

120.   Defendant promoted these advertisements to create a false sense of urgency in its players to induce those players into purchasing the chip bundles. Defendant did so while knowing that the bundles contained quantitative misrepresentations with respect to the comparative value of the chip quantities displayed and with respect to the duration of the availability of those deals.

121.   The amount of chips included in a bundle, and whether the bundle being offered for sale represents a good value and outsized amount of chips a player is receiving for his or her purchase with the corresponding bundle, is a material consideration when a player decides whether to purchase a bundle.

122.   Similarly, the urgency and duration of a purported sale for in-game items is material to a consumer's purchase decision.

123.   These pricing and advertising practices reflecting high-pressure fake sales are patently deceptive. They are intended to mislead customers into believing that they are getting a bargain by buying virtual chips on sale and at a substantial and deep discount.

**The Games Violate California Gambling Laws**

124.   The Games violate various California gambling laws, including California Penal Code §330b, which prohibits slot machines.

125.    California courts have observed that the plain text of this statute sets forth three key elements: payment, chance, and prize. *See People ex rel. Green v. Grewal*, 61 Cal.4th 544, 564, 189 Cal.Rptr.3d 686, 699, 352 P.3d 275, 286 (2015) (quoting *Trinkle v. Stroh*, 60 Cal.App.4th 771, 782, 70 Cal.Rptr.2d 661, 667 (1997). First, the machine or device must be activated by "the insertion of money or [some] other object." *Trinkle v. Cal. State Lottery*, 105 Cal.App.4th 1401, 1410, 129 Cal.Rptr.2d 904, 910 (2003). Second, "the operation of the machine [must be] unpredictable and governed by chance." *Id*. Third, "by reason of the chance operation of the machine, the user may become entitled to receive a thing of value." *Id*.

126.    Virtual currency in a mobile game, purchased with real money, has been found to be the insertion of money or some other object under §330b. *Soto v. Sky Union, LLC*, 159 F.Supp.3d 871, 878-89 (N.D. Ill. 2016) ("This argument disregards the plain language of section 330b(d), which provides that in addition to machines or devices that require the insertion of money or chips, the term 'slot machine or device' includes devices that may  be operated 'by any other means.' Cal. Penal Code § 330b(d). Moreover, it would make little sense to read the broad language of section 330b(d) to capture games operated by insertion of purchased physical tokens while excluding games operated by insertion of purchased virtual gems. For the purpose of determining whether Castle Clash is functionally a slot machine when players engage in Rolls, it does not matter that gems are imaginary currency.").

127.    Defendant manufactures, repairs, owns, rents, leases and gives away the slot machines in the Games. Defendant develops the software for the Games. Defendant provides updates to the Games' software to fix bugs and otherwise update the Game' slot machines. Defendant offers the Games for free through iOS and Android mobile storefronts. Defendant owns the Games. Defendant provides

the software for the Games to Apple and Google for players to download on their mobile devices.

128.   On information and belief, Defendant made or permitted the making of agreements with other people regarding the Games, including its subsidiaries, Apple, Google and players of the Game, by which users of the Games' slot machines, as a result of the element of hazard or chance or other unpredictable outcome, may become entitled to receive credit, allowance, or other thing of value or additional chance or right to use the Games' slot machines.

129.   The outcomes of the slot machines in the Games are the result of the element of chance. Depending on the outcome of a slot machine spin in the Games, a user may receive or lose virtual chips. That outcome is random and not determined by the player's skill.

130.   Virtual chips in the Games are a credit, allowance or other thing of value or an additional chance or right to use the slot machines in the Games.

131.   On information and belief, the Games are not located upon or are being transported by a vessel regularly operated and engaged in interstate or foreign commerce.

132.   On information and belief, Defendant does not conduct its business activities with respect to the Games in accordance with the terms of a license issued by a tribal gaming agency pursuant to the tribal-state gaming compacts entered into in accordance with the Indian Gaming Regulatory Act (18 U.S.C. Sec. 1166 to 1168, inclusive, and 25 U.S.C. Sec. 2701 et seq.).

133.   Each Game is an apparatus under §330b. Alternatively, mobile devices operating the Games are a machine, device or apparatus under §330b. Alternatively, mobile devices operating the Games together with servers are together a machine, device or apparatus under §330b.

134.    The Games adapt mobile phones into a device for use in a way that, as a result of the payment of money for virtual chips, the device is caused to be operated by reason of an element of chance in which the user may receive or become entitled to receive a thing of value or additional chance or right to use the Games' slot machines.

135.    The Games' software operating on a mobile device, such as an iPhone or Android smartphone, is a machine, device or apparatus.

136.    In order to download the Games onto their mobile devices, users must interact with the hardware features of their mobile devices, including using the touch screen and hard buttons to enter account information, password pin code and other button sequences required to confirm and execute the download.

137.    Further, in order to make purchases within the Games, users must interact with the hardware elements of their phones, including the touchscreen and hard buttons. Users must enter payment information into their mobile devices using hardware features, including a keyboard. Users must also enter a password or pin code, press buttons and provide other identifying information through their phone's hardware elements, such as the keyboard, camera or fingerprint reader, in order to purchase virtual coins from the Games.

138.    The Games are downloaded onto users' devices through servers owned, operated and/or controlled by Defendant. These servers have hardware components. When a user plays the Games through their mobile device, servers owned, operated and/or controlled by Defendant communicate with the user's mobile device. That communication between the servers owned, operated and/or controlled by Defendant and a user's mobile device takes place through hardware, including routers, switches, cables, and cell phone towers. Communication with the servers owned, operated or controlled by Defendant is required in order to provide users with the slot machines in the Games, update and repair the slot

machines in the Games, complete purchases of virtual coins used to play the slot machines in the Games and to record players' balance of virtual coins needed to play the slot machines in the Games.

139.   Users operate the Games through the hardware features of their mobile device, including the touch screen.

140.   The Games adapt mobile phones into a device for use in a way that, as a result of the payment of money for virtual coins, the device is caused to be operated by reason of an element of chance in which the user may receive or become entitled to receive a thing of value or additional chance or right to use the Games.

141.   California Penal Code §319 provides: "A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." The Games are illegal lotteries as defined by California Penal Code 319. Cal. Penal Code §§319, 322, 323, 326.

142.   The Games are a scheme for the disposal or distribution of property by chance among persons who have paid valuable consideration for the chance of obtaining such property. Specifically, players of the Games spend money to buy virtual coins. The Games dispose of those virtual coins by chance.

143.   The virtual coins in the Games are "property" under §319. Section 7 of the Penal Code provides that "the word 'property' includes both real and personal property" and "the words 'personal property' include money, goods, chattels, things in action, and evidences of debt." These definitions are not exclusive of anything else properly coming within the terms defined. "A thing in

action is a right to recover money or other personal property by a judicial proceeding." Civil Code, §953. "Property" is further defined in the Civil Code as a "thing of which there may be ownership." Civil Code, §654. There may be ownership, among other things, "of all obligations." Civil Code, §655. "An obligation is a legal duty by which a person is bound to do or not to do a certain thing." Civ. Code §1427. An obligation may arise from contract. Civ. Code §1428.

144.   Defendant's duty as the operator of the Games is to permit users to play further games in exchange for virtual coins. This is an obligation arising from contract and the right of the player in the matter is personal property and a thing in action. Cal. Civ. Code §663, §953.

145.   On information and belief, Defendant receives money, directly or indirectly, from the Games.

146.   The Ninth Circuit has found that virtual chips used to play mobile casino games similar to those in the Games constitute a thing of value under Washington's gambling law. *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 787 (9th Cir. 2018). California courts have held that a reward of extended play by a video game for winning is a thing of value within the meaning of the Penal Code definition. *See Merandette v. City & Cty. of San Francisco*, 88 Cal.App.3d 105, 114, 151 Cal.Rptr. 580, 586 (1979).

147.   To the extent the Games operating on mobile devices coupled to servers are not illegal slot machines or that the Games do not include an illegal lottery, the Games violate California Penal Code §337j as unlicensed controlled games. California Penal Code § 337j(a) provides:

>   (a) It is unlawful for any person, as owner, lessee, or employee, whether for hire or not, either solely or in conjunction with others, to do any of the following without having first procured and thereafter maintained in effect all federal, state, and local licenses required by law:

(1) To deal, operate, carry on, conduct, maintain, or expose for play in this state any controlled game.

(2) To receive, directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game.

(3) To manufacture, distribute, or repair any gambling equipment within the boundaries of this state, or to receive, directly or indirectly, any compensation or reward for the manufacture, distribution, or repair of any gambling equipment within the boundaries of this state.

148.    On information and belief, Defendant has not procured and thereafter maintained in effect all federal, state, and local licenses required by law to operate a controlled game.

149.    Defendant operates, carries on, conducts, maintains and exposes for play in California a controlled game through the Games. Defendant receives, directly or indirectly, compensation or reward of the revenue for keeping, running and carrying on the Games. Defendant manufactures, distributes and repairs the Games within the boundaries of California.

150.    California Penal Code §337j(e)(1) states that "[a]s used in this section, 'controlled game' means any poker or Pai Gow game, and any other game played with cards or tiles, or both, and approved by the Department of Justice, and any game of chance, including any gambling device, played for currency, check, credit, or any other thing of value that is not prohibited and made unlawful by statute or local ordinance." *Id*.

151.    To the extent the Games operating on mobile devices are not illegal under California's Penal Code (including §330b and §319), the Games are a controlled game under §337j(e)(1), because they are a game of chance played for credit or a thing of value not prohibited and made unlawful by statute of local

ordinance.

152.   The virtual coins in the Games are a credit to continue playing the Games' slot machines. The virtual coins in the Games are also a thing of value as held in *Kater*.

153.   Certain courts have found that in-game purchases in free-to-play mobile games that sell "loot boxes" are not things of value under California law, because the loot boxes and the virtual items they contain merely enhance gameplay and have no value outside of the game itself. *See, e.g. Soto v. Sky Union, LLC*, 159 F.Supp.3d 871 (N.D.Ill. 2016); *Mai v. Supercell OY*, Case No. 20-cv-05573-EJD, Doc. 62 (N.D.Cal. Jan. 3, 2023); *Coffee v. Google LLC*, No. 20-cv-03901, 2022 WL 94986, at *9 (N.D. Cal. Jan. 10, 2022); *Taylor v. Apple, Inc.*, No. 20-cv-03906-RS, 2022 WL 35601, at *2 (N.D. Cal. Jan. 4, 2022). In these cases, the courts found the virtual items in the loot boxes were not things of value, because they were not used to extend gameplay, but rather were mere enhancements to Game that were truly free to play in an unlimited way.

154.   The virtual chips at issue here in the Games are distinguishable from those cases, because the virtual chips in these Games are used, and at times are necessary, for players to extend their gameplay. In *Soto*, *Mai*, *Coffee* and *Taylor*, the underlying gameplay was playable without any purchase. The purchases at issue were for randomized packs of virtual goods (loot boxes) that were not needed to play the games, but merely provided virtual goods that enhanced the gameplay. Further, those games were ones of skill with the purported game of chance being a secondary feature.

155.   In contrast, the Games here have a primary gameplay mechanic that is itself a game of chance - slot machines. The purchase of virtual chips is used to extend that gameplay, not merely to enhance it. For these reasons, the Ninth Circuit *Kater* decision is more applicable than the District Court decisions in *Soto*,

*Mai*, *Coffee* and *Taylor*. Therefore, the virtual chips here are things of value and provide an additional chance to play the Games' slot machines.

156.    For these same reasons, the Games violate other California gambling laws as set forth below.

157.    In addition to being used to extend gameplay, the chips in the Games are things of value under California law.

158.    The Games are advertised and distributed through the App Store and Play Store alongside other social casino games that do not violate California gambling laws.

159.    The Games' descriptions in these advertisements and storefronts do not disclose that they violate California's or other state's gambling laws. Plaintiffs and other consumers reasonably rely on this omission to believe that the Games offer services that comply with the applicable laws. This belief is a material factor in their decision to download and play the Games, as opposed to another social casino game that does comply with gambling laws.

**The Games' Advertisements Violate The Law**

160.    Defendant's advertising of virtual chips in the Games violates 16 CFR §233.1(a) because the stricken deals displayed are not "actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time."  Rather, the stricken chip values in the Games' shops are "fictitious."  The false strikethrough ads promote a false bargain where "the purchaser is not receiving the unusual value he expects."

161.    These advertisements are also violative of Cal. Bus. & Prof. Code §17501, because the stricken chip values and dollar amounts were not "the prevailing market price … within three months next immediately preceding the publication of the advertisement."  Nor do the purported sale offers "clearly, exactly and conspicuously state[] in the advertisement" when such former prices

1   were prevailing.

2       162.   The effectiveness of Defendant's deceitful advertising scheme is

3   supported by longstanding scholarly research. In the seminal article entitled

4   *Comparative Price Advertising: Informative or Deceptive?* (cited in *Hinojos v.*

5   *Kohl's Corp.*, 718 F.3d 1098, 1106 (9th Cir. 2013), Professors Dhruv Grewal and

6   Larry D. Compeau write that, "[b]y creating an impression of savings, the presence

7   of a higher reference price enhances subjects' perceived value and willingness to

8   buy the product." Dhruv Grewal & Larry D. Compeau, *Comparative Price*

9   *Advertising: Informative or Deceptive?*, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring

10  1992). Thus, "empirical studies indicate that, as discount size increases,

11  consumers' perceptions of value and their willingness to buy the product increase,

12  while their intention to search for a lower price decreases." *Id*. at 56 (emphasis

13  added). For this reason, the Ninth Circuit in *Hinojos* held that a plaintiff making a

14  claim of deceptive pricing (strikingly similar to the claim at issue here) had

15  standing to pursue his claim against the defendant retailer. In doing so, the Court

16  observed that "[m]isinformation about a product's 'normal' price is . . . significant

17  to many consumers in the same way as a false product label would be." *Hinojos*,

18  718 F.3d at 1106.

19      163.   Professors Compeau and Grewal reached similar conclusions in a

20  2002 article: "decades of research support the conclusion that advertised reference

21  prices do indeed enhance consumers' perceptions of the value of the deal." Dhruv

22  Grewal & Larry D. Compeau, *Comparative Price Advertising: Believe It Or Not*, J.

23  of Consumer Affairs, Vol. 36, No. 2, at 287 (Winter 2002). The professors also

24  found that "[c]onsumers are influenced by comparison prices even when the stated

25  reference prices are implausibly high." *Id*. (emphasis added).

26      164.   In another scholarly publication, Professors Joan Lindsey-Mullikin

27  and Ross D. Petty concluded that "[r]eference price ads strongly influence

28

consumer perceptions of value . . . . Consumers often make purchases not based on price but because a retailer assures them that a deal is a good bargain. This occurs when . . . the retailer highlights the relative savings compared with the prices of competitors . . . [T]hese bargain assurances (BAs) change consumers' purchasing behavior and may deceive consumers." Joan Lindsey-Mullikin & Ross D. Petty, *Marketing Tactics Discouraging Price Search: Deception and Competition*, 64 J. of Bus. Research 67 (January 2011).

165.   Similarly, according to Professors Praveen K. Kopalle and Joan Lindsey-Mullikin, "research has shown that retailer-supplied reference prices clearly enhance buyers' perceptions of value" and "have a significant impact on consumer purchasing decisions." Praveen K. Kopalle & Joan Lindsey-Mullikin, *The Impact of External Reference Price On Consumer Price Expectations*, 79 J. of Retailing 225 (2003).

166.   The results of a 1990 study by Professors Jerry B. Gotlieb and Cyndy Thomas Fitzgerald, came to the conclusion that "reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product." Jerry B. Gotlieb & Cyndy Thomas Fitzgerald, *An Investigation Into the Effects of Advertised Reference Prices On the Price Consumers Are Willing To Pay For the Product*, 6 J. of App'd Bus. Res. 1 (1990). This study also concluded that "consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price." *Id*.

167.   The unmistakable inference to be drawn from this research and the Ninth Circuit's opinion in *Hinojos* is that the deceptive advertising through the use of false reference pricing employed here by Defendant is intended to, and does in fact, influence customer behavior—as it did Plaintiffs' purchasing decisions here— by artificially inflating customer perceptions of a given item's value and causing

customers to spend money they otherwise would not have, purchase items they otherwise would not have, and/or spend more money than they otherwise would have absent the deceptive advertising.

168. On information and belief, the Games and the false advertising presented to new users are designed to trap players in what is referred to in academia as a "compulsion loop." A compulsion loop is defined as habitual behavior that a human will repeat to gain a neurochemical reward: a feeling of pleasure and/or a relief from pain. Not doing the behavior causes discomfort. *Compulsion Loops: Compulsive Behavior As Mass Media* by Adam Crowe and Richard Buchanon (available at https://www.slideshare.net/adamcrowe/compulsion-loops#btnNext).

169. On information and belief, mobile games such as Huuuge Casino and Billionaire Casino maximize their profits by inducing players to enter into a compulsion loop. The Games here engage in misleading value and price comparison advertising to induce players into entering a compulsion loop of spending early in their interaction with the Games.

170. On information and belief, once games such as Huuuge Casino and Billionaire Casino are successful at deceiving users into believing they are receiving outsized values, those users are more likely to continue maintaining that belief despite evidence to the contrary. Man-Pui Sally Chan, et al, *Debunking: A Meta-Analysis of the Psychological Efficacy of Messages Countering Misinformation*, 28 Psychol. Sci. 1531, 1531 (2017), https://cite.law/U5QS-2NF4 (meta-analysis focusing on "false beliefs … [that] occur when the audience initially believes misinformation and that misinformation persists or continues to exert psychological influence after it has been rebutted").

171. Another cognitive bias exploited by the Games is known as "sunk cost" bias. Sunk cost bias describes a decision-making heuristic where an

individual escalates his or her commitment to a previously chosen, but unsuccessful course of action to justify the prior "investments" in purchasing chips. Thus, but inducing players into making purchases in the Game through deceptive advertisements, Defendant creates a higher likelihood that those players will be committed to the Games and continue spending money in the Games.

172.   A phenomenon known as "chasing" (continuing to gamble to recoup losses) is "one of the central characteristics of pathological gamblers." Chasing is "widely regarded as a defining feature in disordered gambling," is "the most commonly endorsed item in screening tools for disordered gambling," and its presence "establishes and maintains a downward spiral of negative consequences for the gambler's finances, relationships, and mental well-being." Ke Zhang and Luke Clark, *Loss-chasing in gambling behaviour: neurocognitive and behavioural economic perspectives*, Current Opinion in Behavioral Sciences, 31:1-7 (Feb. 2020). Therefore, by inducing players into making early purchases in the Games through misleading sale advertisements, the Games increase impact of their gambling mechanics to push players into an addictive "chasing" phenomenon.

173.   Further, by creating a false sense of urgency in their shops' sale offers, the Games increase the likelihood that players will make an impulse purchase.

## APPLICABLE LAW

174.   Mr. Ballew is a citizen and resident of Los Angeles County, California. He downloaded and played Huuuge Casino in California. He made purchases from Huuuge Casino in California. His purchases were processed by Apple, an entity headquartered in California.

175.   Ms. Honderich made purchases from the Games through Apple, an entity headquartered in California.

176.   California's substantive laws may be constitutionally applied to the

claims of Plaintiffs under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant contacts, or significant aggregation of contacts, to the claims asserted by Plaintiffs, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

177.    The application of California laws is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs, and California has a greater interest in applying its laws here than any other interested state.

178.    Though not binding on Plaintiffs or other consumers, Defendant acquiesces to the application of California law in its terms of service for the Games.

179.    California law may be used on a class-wide basis, because the interests of other states do not outweigh California's interest in having its law applied.

180.    California has a unique interest in having its laws apply to this case, including to non-residents. The Games are distributed primarily through the Apple and Google mobile stores. These mobile stores are owned and operated by Apple and Google, both companies having headquarters in California. On information and belief, in distributing its Games through the Apple and Google stores, Defendant entered into developer agreements with Apple and Google governing the development and distribution of the Games. Those agreements, which Defendant entered into for the purposes of distributing the Games in the United States apply California law.

181.    Consumers execute their transaction for the in-game chips in the Game with Apple and Google payment systems.

182.    Plaintiffs and other consumers enter into end user agreements with

Apple and Google, which require the application of California law.

183.    To the extent Ms. Honderich lacks standing to assert claims under California's consumer protection laws, Ms. Honderich alleges claims below under Illinois law. Illinois law may alternatively be applied for those claims for the classes defined below.

## CLASS ALLEGATIONS

184.    Plaintiffs bring this action on behalf of themselves and all persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure and seeks certification of the following class:

> All individuals located within the United States who, during the applicable limitations period, made a purchase of virtual chips in Huuuge Casino and Billionaire Casino using real-world currency.

185.    The above-described class of persons shall hereafter be referred to as the "Class." The following people are excluded from the Class: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; (6) the legal representatives, successors, and assigns of any such excluded persons; and (7) persons who have released the present claims against Defendant.

186.    In the alternative, Mr. Ballew seeks certification of the following class pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> All individuals located within the State of California who, during the applicable limitations period, made a purchase of virtual chips in Huuuge Casino using real-world currency.

187.    The above-described class of persons shall hereafter be referred to as the "California Class." The following people are excluded from the Class: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; (6) the legal representatives, successors, and assigns of any such excluded persons; and (7) persons who have released the present claims against Defendant.

188.    The Class and California Class are collectively referred to herein as "Classes." Plaintiffs reserve the right to expand, limit, modify, or amend the class definitions stated above, including the addition of one or more subclasses, in connection with his motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery.

189.    In the alternative, Ms. Honderch seeks certification of the following class pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> All individuals located within the State of Illinois who, during the applicable limitations period, made a purchase of virtual chips in Huuuge Casino and Billionaire Casino using real-world currency.

190.   The above-described class of persons shall hereafter be referred to as the "Illinois Class." The following people are excluded from the Class: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; (6) the legal representatives, successors, and assigns of any such excluded persons; and (7) persons who have released the present claims against Defendant.

191.   The Class, California Class and Illinois Class are collectively referred to herein as "Classes." Plaintiffs reserve the right to expand, limit, modify, or amend the class definitions stated above, including the addition of one or more subclasses, in connection with his motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery.

192.   This case is appropriate for class treatment because Plaintiffs can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

193.   **Adequacy**. Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other members of the Classes, and have the financial resources to do

so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

194.   **Numerosity**. The members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The membership of the Classes is unknown to Plaintiffs at this time; however, it is estimated the Classes number in the hundreds, if not thousands. The identity of such membership is readily ascertainable via inspection of Defendant's or third-party books and records or other approved methods.  Similarly, Members of the Classes may be notified of the pendency of this action by mail, email, internet postings, social media, publications and/or in-game messaging.

195.   **Common Questions of Law or Fact:** There are common questions of law and fact as to Plaintiffs and all other similarly situated persons, which predominate over questions affecting only individual class members, including, without limitation:

a.   Whether the Games violate California's gambling laws;

b.   Whether Defendant engaged in the conduct alleged in the Complaint;

c.   Whether Defendant violated the applicable statutes alleged herein;

d.   Whether Defendant designed, advertised, marketed, distributed, sold, or otherwise placed the Games into the stream of commerce in the United States and California;

e.   Whether Defendant engaged in conduct directed to the State of California;

f.   Whether the Games' presentation of stricken values in its advertising of in-game purchases are misleading to a reasonable consumer;

g.   Whether the Games' presentation of purported limited time sales for in-game purchases are misleading to a reasonable consumer;

h.      Whether Plaintiffs and members of the Classes were injured and harmed directly by the Games;

i.      Whether Plaintiffs and members of the Classes were injured and harmed directly by the Games' false advertising;

j.      Whether Plaintiffs and members of the Classes are entitled to damages due to Defendant's conduct as alleged in this Complaint, and if so, in what amounts;

k.      Whether Plaintiffs and members of the Classes are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint.

196.   **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, Plaintiffs and all members of the Classes were comparably injured through Defendant's misconduct described above.  As alleged herein, Plaintiffs, like the members of the Classes, made purchases they would not have otherwise made and were deprived of monies that rightfully belonged to them by Defendant.  Further, there are no defenses available to Defendant that are unique to Plaintiffs.

197.   **Superiority:** The nature of this action and the laws available to Plaintiffs and members of the Classes make the class action format a particularly efficient and appropriate procedure to redress the violations alleged herein. If each class member were required to file an individual lawsuit, Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual plaintiff with its vastly superior financial and legal resources. Moreover, the prosecution of separate actions by the individual class members, even if possible, would create a substantial risk of inconsistent or varying verdicts or adjudications with respect to the individual class members against Defendant, and which would establish potentially incompatible

standards of conduct for Defendant and/or legal determinations with respect to
individual class members which would, as a practical matter, be dispositive of the
interest of the other class members not parties to adjudications or which would
substantially impair or impede the ability of the class members to protect their
interests. Further, the claims of the individual members of the Classes are not
sufficiently large to warrant vigorous individual prosecution considering all of the
concomitant costs and expenses attending thereto.

**<u>FIRST CLAIM FOR RELIEF</u>**
**Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Profession Code §17200 *et seq.***
**Illegal Gambling**

198.   Plaintiffs incorporate by reference all allegations in this Complaint
and restates them as if fully set forth herein.

199.   Mr. Ballew brings this claim for relief on behalf of himself and all
Classes.

200.   The UCL defines unfair business competition to include any
"unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive,
untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

201.   A business act or practice is "unlawful" under the UCL if it violates
any other law or regulation.

202.   As a result of engaging in the conduct alleged in this Complaint,
Defendant has violated the UCL's proscription against engaging in "unlawful"
conduct by virtue of its violations of the following laws:

(a) **California's Gambling Control Act (Cal. Bus. & Prof. Code §§
19800, *et seq.*)**: Sections 19801 and 19850 of the Gambling Control
Act provide that unless licensed, state law prohibits commercially
operated gambling facilities; that no new gambling establishment may
be opened except upon affirmative vote of the electors; that all

gambling operations and persons having significant involvement therein shall be licensed, registered, and regulated; and that all persons involved in dealing, operating, carrying on, conducting, maintaining or exposing for play any gambling game shall apply for and obtain a valid state gambling license. The Game and their chips constitute a "gambling game" because they are a "controlled game," which is "any game of chance, including any gambling device…played for currency, check, credit, or any other thing of value that is not prohibited and made unlawful by statute or local ordinance." Cal. Penal Code § 337j(1). As alleged herein, Defendant operates, carries on, conducts, maintains, and exposes for play gambling activities. On information and belief, Defendant has not applied for or obtained any state gambling license, and therefore violates California's Gambling Control Act.

**(b) California Penal Code § 330a:** Titled "Possession or keeping of slot or card machine or card dice," section 330a declares that "[e]very person, who has in his or her possession or under his or her control…or who permits to be placed, maintained, or kept in any room, space, inclosure, or building owned, leased, or occupied by him or her, or under his or her management or control, any slot or card machine, contrivance, appliance or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded, and which is operated, or played, by placing or depositing therein any chips, checks, slugs, balls, or other articles or device, or in any other manner and by means whereof, or as a result of the operation of which any merchandise, money, representative or articles of value, checks, or tokens, redeemable in or exchangeable for money

or any other thing of value, is won or lost, or taken from or obtained from the machine, when the result of action or operation of the machine, contrivance, appliance, or mechanical device is dependent upon hazard or chance…is guilty of a misdemeanor." Defendant violates section 330a because as alleged, Defendant possesses or permits illegal slot machines where tokens or things of value are won or lost upon chance.

**(c) California Penal Code § 330b:** Titled "Possession or keeping of slot machines or devices," section 330b declares that "[i]t is unlawful for any person to manufacture, repair, own, store, possess, sell, rent, lease, let on shares, lend or give away, transport, or expose for sale or lease, or to offer to repair, sell, rent, lease, let on shares, lend or give away, or permit the operation, placement, maintenance, or keeping of, in any place, room, space, or building owned, leased, or occupied, managed, or controlled by that person, any slot machine or device, as defined in this section." It is also "unlawful for any person to make or permit the making of an agreement with another person regarding any slot machine or device, by which the user of the slot machine or device, as a result of the element of hazard or chance or other unpredictable outcome, may become entitled to receive money, credit, allowance, or other thing of value or additional chance or right to use the slot machine or device…" As alleged, Defendant makes, repairs, owns and gives away the Games' slot machines. Further, as alleged, Defendant has made agreements with its subsidiaries, Apple, Google, Plaintiffs, members of the Classes and others regarding slot machines or devices and permits the operation, placement, maintenance, or keeping of a slot machine or device as defined by Penal Code §

330b(d).

**(d) California Penal Code §§ 330.1 et seq.**: Titled "Manufacture, possession, or disposition of slot machines or device," section 330.1(a) declares that "Every person who manufactures, owns, stores, keeps, possesses, sells, rents, leases, lets on shares, lends or gives away, transports, or exposes for sale or lease, or offers to sell, rent, lease, let on shares, lend or give away or who permits the operation of or permits to be placed, maintained, used, or kept in any room, space, or building owned, leased, or occupied by him or her or under his or her management or control, any slot machine or device as hereinafter defined, and every person who makes or permits to be made with any person any agreement with reference to any slot machine or device as hereinafter defined, pursuant to which agreement the user thereof, as a result of any element of hazard or chance, may become entitled to receive anything of value or additional chance or right to use that slot machine or device, or to receive any check, slug, token, or memorandum, whether of value or otherwise, entitling the holder to receive anything of value, is guilty of a misdemeanor." Defendant violates section 330.1 because as alleged, Defendant has made agreements with others regarding slot machines or devices, or otherwise possess or permit illegal slot machines or devices where things of value are won as a result of chance "irrespective of whether it may, apart from any element of hazard or chance, also sell, deliver, or present some…entertainment, or other thing of value" (Cal. Penal Code § 330.1(f)). The virtual chips that may be won by paying to play the slot machines in the Games are a "token" or "thing of value" as used in section 330.1 and as defined by section 330.2.

**(e) California Penal Code § 337j(a)(1)**: By "operat[ing], carry[ing] on, conduct[ing], maintain[ing], or expos[ing] for play" unlicensed gambling in this state, Defendant violates Penal Code § 337j(a)(1).

**(f) California Penal Code § 337j(a)(2)**: By "receiv[ing], directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game," Defendant violates Penal Code § 337j(a)(2).

**(g) California Penal Code § 337j(a)(3)**: Through the "manufacture, distribut[ion], or repair [of] any gambling equipment within the boundaries of this state" or "receiv[ing], directly or indirectly, any compensation or reward for the manufacture, distribution, or repair of any gambling equipment within the boundaries of this state" Defendant violates Penal Code § 337j(a)(3).

**(h) California Penal Code §319:** "A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." The Games are illegal lotteries as defined by California Penal Code 319. Cal. Penal Code §§319, 322, 323, 326.

203.    Defendant has violated the "unlawful" prong under the UCL. Defendant has violated the above-identified California Penal Code sections by making, selling, distributing, entering into agreements relating to and profiting from the Game. Defendant has further violated the above-identified California

Penal Code sections through the sale of virtual chips in the Game.

204.   Because Defendant's profiting from the sale of virtual chips in the
Games is illegal, Plaintiffs and members of the Classes, who by definition
purchased such illegal virtual chips, have suffered a cognizable harm under UCL.
*Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1086 (11th Cir. 2019);
*Allergan U.S. v.Imprimis Pharm., Inc.*, 2019 U.S. Dist. LEXIS 163228, at *27 n.9
(C.D. Cal. Mar. 27, 2019); *Franz v. Beiersdorf, Inc.*, 745 F. App'x 47, 48 (9th Cir.
2018)).

205.   A business act or practice is "unfair" under the UCL if the reasons,
justifications, and motives of the alleged wrongdoer are outweighed by the gravity
of the harm to the alleged victims. A business act or practice is "fraudulent" under
the UCL if it is likely to deceive members of the consuming public.

206.   The sale of virtual chips in the Games is unfair and fraudulent under
the UCL, because Defendant failed to disclose to Mr. Ballew and members of the
Classes that the Games are illegal under California's gambling laws. That omission
was a material factor in Mr. Ballew's and class members' decision to download,
play and expend money purchasing virtual chips in the Games. Had they known
that the Games violated California's gambling laws, they would not have begun
playing those Games or spending money in those Games.

207.   As a result of these violations under each of the fraudulent, unfair, and
unlawful prongs of the UCL, Defendant has been unjustly enriched at the expense
of Plaintiffs and the putative class members. Specifically, Defendant has been
unjustly enriched by obtaining revenues and profits that they would not otherwise
have obtained absent their false, misleading, and deceptive conduct.

208.   Mr. Ballew enjoys playing mobile games and is continuously in the
market for lawful mobile games. As such, he is likely to continue to encounter
Defendant's unlawful Games absent injunctive relief.

209.   Through its unfair acts and practices, Defendant improperly obtained money from Mr. Ballew and members of the Classes and exposed them to addictive and predatory games of chance. The Games pose an ongoing threat to the class members and the public at large by continuing to be products openly available on mobile storefronts that include addictive and illegal games of chance. As such, Mr. Ballew requests that this Court enjoin Defendant from continuing to violate the UCL, and/or from violating the UCL in the future. Otherwise, Plaintiffs, members of the Classes and the public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

**SECOND CLAIM FOR RELIEF**
**Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Profession Code §17200 *et seq.***
**Unlawful, Unfair and Fraudulent Advertising**

210.   Plaintiffs incorporate by reference all allegations in this Complaint and restates them as if fully set forth herein.

211.   Mr. Ballew bring this claim for relief on behalf of themselves and all Classes.

212.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

213.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

214.   A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

215.   Defendant has violated the "unlawful" prong under the UCL and has engaged in "unfair, deceptive, untrue or misleading" advertising.

216.    The Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. §45(a)(1)) and specifically prohibits false advertisements. 15 U.S.C. §52(a). FTC Regulations describe false former pricing schemes-similar to those used in the Games' sale offers in all material respects-as deceptive practices that would violate the FTC Act.

217.    16 C.F.R. §233.1 states:

(a)  One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

(b)  A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $___"), unless substantial sales at that price were actually made.

(c)  The following is an example of a price comparison based on a fictitious former price. John Doe is a retailer of Brand X fountain pens, which cost him $5 each. His usual markup is 50 percent over cost; that is, his regular retail price is $7.50. In order subsequently to offer an unusual "bargain",

Doe begins offering Brand X at $10 per pen. He realizes that he will be able to sell no, or very few, pens at this inflated price. But he doesn't care, for he maintains that price for only a few days. Then he "cuts" the price to its usual level - $7.50 - and advertises: "Terrific Bargain: X Pens, Were $10, Now Only $7.50!" This is obviously a false claim. The advertised "bargain" is not genuine.

(d) Other illustrations of fictitious price comparisons could be given. An advertiser might use a price at which he never offered the article at all; he might feature a price which was not used in the regular course of business, or which was not used in the recent past but at some remote period in the past, without making disclosure of that fact; he might use a price that was not openly offered to the public, or that was not maintained for a reasonable length of time, but was immediately reduced.

(e) If the former price is set forth in the advertisement, whether accompanied or not by descriptive terminology such as "Regularly," "Usually," "Formerly," etc., the advertiser should make certain that the former price is not a fictitious one. If the former price, or the amount or percentage of reduction, is not stated in the advertisement, as when the ad merely states, "Sale," the advertiser must take care that the amount of reduction is not so insignificant as to be meaningless. It should be sufficiently large that the consumer, if he knew what it was, would believe that a genuine bargain or saving was being offered. An advertiser who claims that an item has been "Reduced to $9.99," when the former price was $10, is misleading the consumer, who will understand the claim to mean that a much greater, and not merely nominal, reduction was being offered.

218.    California law also prohibits false former pricing schemes. Cal. Bus. Code. §17501 entitled "Value determinations; Former price advertisements," states:

For the purpose of this article the worth or value of anything advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

No price shall be advertised as a former price of any advertised

thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

219. California's False Advertising Law also prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," Cal. Civ. Code §1770(a)(9), and prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." *Id*. §(a)(13).

220. The Games' use of strikethrough graphics and comparative values violate the unlawful prongs of the UCL, because they violate 16 C.F.R. §233.1, Cal. Bus. Prof. Code §1750, Cal. Civ. Code §§1770(a)(9) and (a)(13).

221. Defendant also violated the "unfair" prong of the UCL by falsely representing that its consumers received a more chips as compared to a referenced "original" chip quantity shown in the Huuuge Casino shop. In fact, Defendant displayed to new users a fictitious stricken reference chip quantity.

222. Defendant also violated the "unfair" prong of the UCL by falsely representing to consumers that the sales in the Huuuge Casino shop were limited in time, when in fact the same or similar offers would be presented frequently.

223. The gravity of the harm to Mr. Ballew and members of the Classes resulting from these unfair acts and practices outweighs any conceivable reasons, justifications, or motives that Defendant may have had for engaging in such deceptive acts and practices.

224. Additionally, Defendant violated the "fraudulent" prong of the UCL because its marketing and advertising materials included chip quantities that reasonable consumers understood to represent original, ordinary, prevailing or normal quantities of virtual chips in Huuuge Casino, whereas those chip quantities were fictious and deflated as compared to the prevailing offers Huuuge Casino

made to other users.

225.   Additionally, Defendant violated the "fraudulent" prong of the UCL because its sale offers in Huuuge Casino included countdown timers that reasonable consumers, including Mr. Ballew, understood to mean that the offers would be available for only limited duration. In reality, the same, similar or better offers would be offered in Huuuge Casino repeatedly and frequently and are only unavailable for trivial periods of time.

226.   Mr. Ballew and members of the Classes suffered cognizable harm as a result of these unfair acts and practices. Mr. Ballew and members of the Classes reasonably understood the strikethrough graphics in Huuuge Casino described herein as communicating the ordinary, normal, prevailing former pricing or value for virtual chips in Huuuge Casino. In reality, the stricken values were fictitious. Mr. Ballew and members of the Classes reasonably relied on their understanding in their decision to make in-game purchases in Huuuge Casino. But for Defendant's misleading and false advertising and Mr. Ballew's and class members' reasonable reliance thereon, Mr. Ballew and members of the Classes would not have made some or all of their purchases in Huuuge Casino.

227.   In addition, Mr. Ballew and members of the Classes reasonably understood that sale offers in Huuuge Casino would be available for only a limited duration of time. In reality, sale offers of the same, similar or better value were offered repeatedly and frequently. Mr. Ballew and members of the Classes reasonably relied on their understanding of the duration and urgency regarding sale offers in their decision to make in-game purchases in Huuuge Casino. But for Defendant's misleading and false advertising and Mr. Ballew's and class members' reasonable reliance thereon, Mr. Ballew and members of the Classes would not have made some or all of their purchases in Huuuge Casino.

228.   Mr. Ballew enjoys playing mobile games and is continuously in the

market for lawful mobile games. As such, he is likely to continue to encounter Defendant's unlawful Games absent injunctive relief.

229.   As a result of these violations under each of the fraudulent, unfair, and unlawful prongs of the UCL, Defendant has been unjustly enriched at the expense of Mr. Ballew and the Classes. Specifically, Defendant has been unjustly enriched by obtaining revenues and profits that it would not otherwise have obtained absent its false, misleading, and deceptive conduct.

230.   Through its unfair acts and practices, Defendant improperly obtained money from Mr. Ballew and members of the Classes. As such, Mr. Ballew, on behalf of himself, the putative Classes and the public, request that this Court cause Defendant to restore this money to Mr. Ballew and the members of the Classes, and to enjoin Defendant from continuing to violate the UCL, and/or from violating the UCL in the future. Otherwise, Mr. Ballew, members of the Classes and the public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## THIRD CLAIM FOR RELIEF
### Violation of California False Advertising Law ("FAL")
### Cal. Business & Professional Code §17500 *et seq.*

231.   Plaintiffs incorporate by reference all allegations in this Complaint and restates them as if fully set forth herein.

232.   The   FAL   prohibits unfair, deceptive, untrue, or misleading advertising, including, but not limited to, false statements as to worth, value, and former price.

233.   Furthermore, the FAL provides that: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the

advertisement." Cal. Bus. & Prof. Code §17501.

234.   The false strikethrough graphics and misleading timers in the Huuuge Casino shop misrepresents the existence of a sale whereby players can allegedly purchase more chips than they normally could for the same price for a limited time.

235.   Mr. Ballew enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, he is likely to continue to encounter Defendant's unlawful Games absent injunctive relief.

236.   Through its unfair acts and practices, Defendant has improperly obtained money from Mr. Ballew and members of the Classes. As such, Mr. Ballew, on behalf of himself, the putative Classes and the public, request that this Court cause Defendant to restore this money to Mr. Ballew and the members of the Classes, and to enjoin Defendant from continuing to violate the FAL, and/or from violating the FAL in the future. Otherwise, Mr. Ballew, members of the Classes and the public may be irreparably harmed and/or denied an effective and complete remedy if such an order is no granted.

## FIFTH CLAIM FOR RELIEF
### Violation of the California Consumer Legal Remedies Act ("CLRA")
### Cal. Civ. Code. §1750 *et seq.*
### Illegal Gambling

237.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

238.   Mr. Ballew and members of the Classes are consumers within the meaning of Cal. Civ. Code §1761(d) and have engaged in a transaction within the meaning of Cal. Civ. Code §§1761(e) and 1770.

239.   Defendant is a "person" within the meaning of Cal. Civ. Code §§1761(c) and 1770 and sells "goods or services" within the meaning of Cal. Civ. Code §§1761(b) and 1770.

240.   Huuuge Casino is a "service" within the meaning of Cal. Civ. Code.

§§1761(a) and (b). Specifically, Huuuge Casino provides online gaming services. The purchase of in-game chips for Huuuge Casino is a transaction for accessing those services. The purpose of the in-game chips is to access the gameplay services offered by Huuuge Casino and the purchase of in-game chips is at times necessary to access those services.

241.    Defendant's website itself describes the Games as services: "We provide mobile and online services, including but not limited to HUUUGE game applications…"

242.    By engaging in the conduct described herein, Defendant has violated subdivision (a)(14) of California Civil Code §1770 by: "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law." Under this provision, omissions are actionable.

243.    Defendant has advertised Huuuge Casino while omitting that it is engaging in illegal gambling.

244.    By engaging in the conduct described herein, Defendant has also violated subdivision (a)(26) of California Civil Code §1770 by "Advertising, offering for sale, or selling a financial product that is illegal under state or federal law.…"

245.    Defendant advertises Huuuge Casino and its illegal financial products on its website, through social media and through the App Store and Play Store. Defendant also advertises, offers for sale and sells virtual chips in Huuuge Casino that are illegal financial products.

246.    Defendant violated the CLRA by representing to or omitting from Mr. Ballew and members of the Classes that the transactions involving virtual chips in Huuuge Casino confer or involve rights to potentially valuable prizes, when in fact these transactions constitute unlawful gambling transactions that are prohibited by

law, foster compulsive and addictive behavior, and are a predatory form of duplicitously profiting from others. These omissions are material because a reasonable consumer would deem them important in determining how to act in the transaction at issue and, if prohibited by law, should not have been permitted to purchase virtual chips. Further, the omissions about virtual chips are misleading in light of other facts that Defendant did disclose.

247.   Defendant's violations of the CLRA proximately caused injury in fact to Mr. Ballew and the members of the Classes.

248.   Mr. Ballew and the members of the Classes transacted with Huuuge Casino on the belief that the transaction was lawful. Indeed, a reasonable consumer believes in the lawfulness of his or her transactions.

249.   Pursuant to Cal. Civ. Code § 1782(d), Mr. Ballew, individually, on behalf of the other members of the Classes and the public, seeks a Court order enjoining the above-described wrongful acts and practices of Defendant and attorneys' fees.

250.   Mr. Ballew enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, he is likely to continue to encounter Defendant's unlawful Games absent injunctive relief.

251.   Mr. Ballew, individually and on behalf of the other members of the Class, does not seek damages for this claim for relief.

## FIFTH CLAIM FOR RELIEF
**Violation of the California Consumer Legal Remedies Act ("CLRA")**
**Cal. Civ. Code. §1750 *et seq.***
**False and Misleading Sales**

252.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

253.   Mr. Ballew and members of the Classes are consumers within the meaning of Cal. Civ. Code §1761(d) and have engaged in a transaction within the

meaning of Cal. Civ. Code §§1761(e) and 1770.

254.   Defendant is a "person" within the meaning of Cal. Civ. Code §§1761(c) and 1770 and sells "goods or services" within the meaning of Cal. Civ. Code §§1761(b) and 1770.

255.   Huuuge Casino is a "service" within the meaning of Cal. Civ. Code. §§1761(a) and (b). Specifically, Huuuge Casino provides online gaming services. The purchase of in-game chips for Huuuge Casino is a transaction for accessing those services. The purpose of the in-game chips is to access the gameplay services offered by Huuuge Casino and the purchase of in-game chips is necessary at times to access those services.

256.   Defendant's website itself describes the Games as services: "We provide mobile and online services, including but not limited to HUUUGE game applications…"

257.   Defendant has violated §1770(a)(13)'s proscription against making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions by misrepresenting the existence of discounts for the purchase of gold chips via false strikethrough ads.

258.   Mr. Ballew and the putative Classes suffered actual damages as a direct and proximate result of Defendant's actions, concealment, and/or omissions in the advertising, marketing, and promotion of its bait apps, in violation of the CLRA, as evidenced by the substantial sums Defendant has pocketed.

259.   Mr. Ballew enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, he is likely to continue to encounter Defendant's unlawful Games absent injunctive relief.

260.   Mr. Ballew, on behalf of himself, the Classes and the public, demands judgment against Defendant for injunctive relief and attorney's fees.

261.   Mr. Ballew, individually and on behalf of the other members of the

Class, does not presently seek damages for this claim, but reserve the right to seek leave to amend pursuant to §1782(d) to add a claim for relief for damages.

## SIXTH CLAIM FOR RELIEF

### Illinois Consumer Fraud and Deceptive Business Practices Act

### (815 CS §§50/1, *et seq.*)

262.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

263.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (815 ILCS §§ 505/1, et seq.) protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

264.    The ICFA prohibits any unlawful, unfair, or fraudulent business acts or practices including the employment of any deception, fraud, false pretense, false promise, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact.

265.    The ICFA applies to Defendant's actions and conduct as described herein because it protects consumers in transactions that are intended to result, or which have resulted, in the sale of goods or services.

266.    Defendant is a "person" as defined under section 505/1(c) of the ICFA.

267.    Ms. Honderich and each member of the Classes are "consumers" as defined under section 505/1(e) of the ICFA.

268.    Chips in the Games are "merchandise" within the meaning of section 505/1(b) and the sale of the chips is considered "trade" or "commerce" under the ICFA.

269.    Defendant's false advertising practices, as described above were unfair within the meaning of the act because they were deceptive, unfair and otherwise unethical, oppressive and unscrupulous and caused substantial injury to

the consumers who purchased chips in the Games.

270.   Defendant caused substantial injury to consumers by inducing them to purchase chips by and through the design of their Games and their stores. The injury caused by Defendant's conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

271.   Defendant's unfair practices occurred during the marketing and sale of their Games' chips, and therefore, occurred in the course of trade and commerce.

272.   Ms. Honderich enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, she is likely to continue to encounter Defendant's unlawful Games absent injunctive relief.

273.   As a direct and proximate result of Defendant's violation of the ICFA, Ms. Honderich and each Class member have suffered harm in the form of monies paid for the Games' chips. Ms. Honderich, on behalf of herself and the Classes, seeks an order (1) requiring Defendant to cease the unfair practices described herein; (2) awarding damages, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable; and/or (3) requiring Defendant to restore to Ms. Honderich and each Class member any money acquired by means of unfair practices (restitution).

## SEVENTH CLAIM FOR RELIEF

### Fraud

### (California Common Law)

274.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

275.   Defendant advertised the Huuuge Casino to Mr. Ballew and members of the Classes and omitted that Huuuge Casino violated California's gambling laws.

276.   Defendant presented Huuuge Casino publicly as a free-to-play "social casino" game and omitted that it provided illegal slot machines under California law.

277.   These representations and omissions were false because Huuuge Casino violates California's gambling laws.

278.   On information and belief, Defendant knew, actually or constructively, that these representations and omissions were false following the Ninth Circuit decision in *Kater* and following Defendant's settlement in *Wilson*.

279.   These representations and omissions were material to the decision of Mr. Ballew and members of the Classes in downloading and playing Huuuge Casino.

280.   Mr. Ballew and members of the Classes reasonably relied on these representations and omissions in deciding to download and play Huuuge Casino.

281.   Had Mr. Ballew and members of the Classes known Huuuge Casino was engaging in illegal gambling, they would not have downloaded and played it.

282.   Mr. Ballew and members of the Classes were harmed, because if they had never downloaded and played Huuuge Casino they would not have played its illegal slot machines, been subjected to its false advertising, induced into making purchases of virtual chips and lost those chips to its slot machines.

283.   Defendant represented to Mr. Ballew and members of the Classes when they began playing Huuuge Casino that sale offers in the Games would be available for only a limited duration and that the stricken chip quantities represented the ordinary, normal and prevailing offer by Huuuge Casino.

284.   These representations were false because the prevailing quantity of chips was higher than represented by Defendant as a reference quantity to new users. These representations were also false because the same, similar or better sales would be offered repeatedly and frequently and unavailable for only trivial

periods of time.

285.   Defendant knew these representations were false, because it had knowledge of and control over Huuuge Casino's advertisements and offers for chips.

286.   Defendant designed the graphical images of the advertisements in a way that intentionally attracted Mr. Ballew and the members of the Classes to the enticing but false claims regarding gold amounts, pricing and the duration of sales.

287.   Mr. Ballew and the putative Classes reasonably relied upon the claims made in the advertisements in deciding to purchase the aforementioned chip bundles.

288.   Mr. Ballew and the putative Classes were harmed because, had Plaintiffs and class members known the claims were false, they would not have made some or all of those purchases.

289.   Mr. Ballew and class members' reliance on Defendant's misrepresentations in its advertisements was a substantial factor in causing harm to Plaintiffs and the putative Classes.

290.   Defendant's conduct has therefore caused and is causing immediate and irreparable injury to Mr. Ballew and members of the Classes and will continue to both damage Mr. Ballew and the Classes and deceive the public unless enjoined by this Court.

291.   Mr. Ballew, on behalf of himself and the Classes, demand judgment against Defendant for damages, injunctive relief, restitution and attorney's fees.

## EIGTH CLAIM FOR RELIEF

### Fraud

### (Illinois Common Law)

292.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

293.    Defendant advertised the Games to Ms. Honderich and members of the Classes and omitted that the Games violated California's gambling laws.

294.    Defendant presented the Games publicly as a free-to-play "social casino" game and omitted that it provided illegal slot machines under California law.

295.    These representations and omissions were false because the Games violate California's gambling laws.

296.    On information and belief, Defendant knew, actually or constructively, that these representations and omissions were false following the Ninth Circuit decision in *Kater* and following Defendant's settlement in *Wilson*.

297.    These representations and omissions were material to the decision of Ms. Honderich and members of the Classes in downloading and playing the Games. Ms. Honderich and members of the Classes had a reasonable expectation that Defendant, who was headquartered in California prior to 2002, complied with California law. Mr. Honderich and members of the Classes also had a reasonable expectation that the Games, which are published and distributed by California entities (Apple and Google) comply with California law.

298.    Ms. Honderich and members of the Classes reasonably relied on these representations and omissions in deciding to download and play the Games.

299.    Had Ms. Honderich and members of the Classes known the Games were engaging in illegal gambling, they would not have downloaded and played it.

300.    Ms. Honderich and members of the Classes were harmed, because if they had never downloaded and played the Games they would not have played their illegal slot machines, been subjected to their false advertising, induced into making purchases of virtual chips and lost those chips to their slot machines.

301.    Defendant represented to Ms. Honderich and members of the Classes when they began playing the Games that sale offers in the Games would be

available for only a limited duration and that the stricken chip quantities represented the ordinary, normal and prevailing offer by the Games.

302.   These representations were false because the prevailing quantity of chips was higher than represented by Defendant as a reference quantity to new users. These representations were also false because the same, similar or better sales would be offered repeatedly and frequently and unavailable for only trivial periods of time.

303.   Defendant knew these representations were false, because it had knowledge of and control over the Games' advertisements and offers for chips.

304.   Defendant designed the graphical images of the advertisements in a way that intentionally attracted Ms. Honderich and the members of the Classes to the enticing but false claims regarding gold amounts, pricing and the duration of sales.

305.   Ms. Honderich and the putative Classes reasonably relied upon the claims made in the advertisements in deciding to purchase the aforementioned chip bundles.

306.   Ms. Honderich and the putative Classes were harmed because, had Ms. Honderich and class members known the claims were false, they would not have made some or all of those purchases.

307.   Ms. Honderich and class members' reliance on Defendant's misrepresentations in its advertisements was a substantial factor in causing harm to Ms. Honderich and the putative Classes.

308.   Defendant's conduct has therefore caused and is causing immediate and irreparable injury to Ms. Honderich and members of the Classes and will continue to both damage Ms. Honderich and the Classes and deceive the public unless enjoined by this Court.

309.   Ms. Honderich, on behalf of herself and the Classes, demand judgment against Defendant for damages, injunctive relief, restitution and attorney's fees.

## NINTH CLAIM FOR RELIEF

### Negligent Misrepresentation

### (California Common Law)

310.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

311.   Defendant advertised the Huuuge Casino to Mr. Ballew and members of the Classes and omitted that Huuuge Casino violated California's gambling laws.

312.   Defendant presented Huuuge Casino publicly as a free-to-play "social casino" game and omitted that it provided illegal slot machines under California law.

313.   These representations and omissions were false because Huuuge Casino violates California's gambling laws.

314.   Defendant had a duty to know and should have known that these representations and omissions were false following the Ninth Circuit decision in *Kater* and following Defendant's settlement in *Wilson*.

315.   These representations and omissions were material to the decision of Mr. Ballew and members of the Classes in downloading and playing Huuuge Casino.

316.   Mr. Ballew and members of the Classes reasonably relied on these representations and omissions in deciding to download and play Huuuge Casino.

317.   Had Mr. Ballew and members of the Classes known Huuuge Casino was engaging in illegal gambling, they would not have downloaded and played it.

318.   Mr. Ballew and members of the Classes were harmed, because if they

had never downloaded and played Huuuge Casino they would not have played its illegal slot machines, been subjected to its false advertising, induced into making purchases of virtual chips and lost those chips to its slot machines.

319.   Defendant represented to Mr. Ballew and members of the Classes when they began playing Huuuge Casino that sale offers in the Games would be available for only a limited duration and that the stricken chip quantities represented the ordinary, normal and prevailing offer by Huuuge Casino.

320.   These representations were false because the prevailing quantity of chips was higher than represented by Defendant as a reference quantity to new users. These representations were also false because the same, similar or better sales would be offered repeatedly and frequently and unavailable for only trivial periods of time.

321.   Defendant knew these representations were false, because it had knowledge of and control over Huuuge Casino's advertisements and offers for chips.

322.   Defendant designed the graphical images of the advertisements in a way that intentionally attracted Mr. Ballew and the members of the Classes to the enticing but false claims regarding gold amounts, pricing and the duration of sales.

323.   Mr. Ballew and the putative Classes reasonably relied upon the claims made in the advertisements in deciding to purchase the aforementioned chip bundles.

324.   Mr. Ballew and the putative Classes were harmed because, had Plaintiffs and class members known the claims were false, they would not have made some or all of those purchases.

325.   Mr. Ballew and class members' reliance on Defendant's misrepresentations in its advertisements was a substantial factor in causing harm to Plaintiffs and the putative Classes.

326.    Defendant's conduct has therefore caused and is causing immediate and irreparable injury to Mr. Ballew and members of the Classes and will continue to both damage Mr. Ballew and the Classes and deceive the public unless enjoined by this Court.

327.    Mr. Ballew, on behalf of himself and the Classes, demand judgment against Defendant for damages, injunctive relief, restitution and attorney's fees.

## TENTH CLAIM FOR RELIEF

### Unjust Enrichment

### (Illinois Common Law)

328.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

329.    Ms. Honderich and the Classes have conferred a benefit upon Defendant in the form of the money Defendant received from them for the purchase of chips in Defendant's Games.

330.    Defendant appreciates and/or has knowledge of the benefits conferred upon it by Ms. Honderich and the Classes.

331.    Under principles of equity and good conscience, Defendant should not be permitted to retain the money obtained from Ms. Honderich and the members of the Classes, which Defendant has unjustly obtained as a result of its unlawful operation of the Games. As it stands, Defendant has retained millions of dollars in profits generated from its unlawful Games and should not be permitted to retain those ill-gotten profits.

332.    Accordingly, Ms. Honderich and the Classes seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

## PRAYER FOR RELIEF

Plaintiffs pray for relief and judgment against Defendant as follows:

A. Certifying the proposed Classes defined herein;

B. Appointing Plaintiffs as Class Representatives;

C. Appointing counsel for Plaintiffs as Class Counsel;

D. Declaring Defendant's conduct to be unlawful;

E. Awarding Plaintiffs and members of the Classes compensatory damages and actual damages in an amount to be determined by proof;

F. Awarding Plaintiffs and members of the Classes actual and statutory damages;

G. Disgorging Defendant of its unjust profits;

H. For punitive damages;

I. For civil penalties;

J. For declaratory and equitable relief, including restitution and disgorgement;

K. For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

L. Awarding Plaintiffs the costs of prosecuting this action, including expert witness fees;

M. Awarding Plaintiffs reasonable attorney's fees and costs as allowable by law;

N. Awarding pre-judgment and post-judgment interest; and

O. Granting any other relief as this Court may deem just and proper.

DATED: June 2, 2023                    THE RYAN LAW GROUP

_____
                                       Andrew T. Ryan
                                       Attorney for Plaintiffs

## <u>**JURY DEMAND**</u>

Plaintiffs hereby demand a jury trial on all issues and claims so triable.


DATED: June 2, 2023                    THE RYAN LAW GROUP

_____
                                       Andrew T. Ryan
                                       Attorney for Plaintiffs