1  Andrew T. Ryan (SBN
   The Ryan Law Group
2  317 Rosecrans Ave.
   Manhattan Beach, CA 90266
3  Tel: 310-299-9550
   Email: andrew.ryan@theryanlawgroup.com
4
   Attorneys for Plaintiffs
5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                          WESTERN DIVISION

11  JEREMIAH BALLEW and ELENI          CASE NO. 2:23-cv-04324-GW (AGR*x*)
    HONDERICH, on behalf of themselves
12  and those similarly situated,      Assigned to Judge George H. Wu

13          Plaintiffs,                **PLAINTIFFS' MEMORANDUM
                                       OF POINTS AND AUTHORITIES
14     v.                             FOR PRELIMINARY APPROVAL
                                       OF CLASS ACTION
15  HUUUGE, INC., a Delaware           SETTLEMENT, PROVISIONAL
    corporation,                       CERTIFICATION OF
16                                     SETTLEMENT CLASS, AND
            Defendant.                 APPROVAL OF PROCEDURE
17                                     FOR AND FORM OF NOTICE**

18                                     Date:        June 6, 2024
                                       Time:        8:30 a.m.
19                                     Courtroom:   9D
                                       Judge:       Hon. George H. Wu
20
                                       Action Filed: June 2, 2023
21

22

23

24

25              REDACTED VERSION OF DOCUMENT PROPOSED
26                    TO BE FILED UNDER SEAL
27

28

Introduction ...............................................................................................1
   I.    Procedural Background................................................5
        A. This Lawsuit ..................................................................5
        B. Earlier Related Cases ...................................................5
        C. Exchange of Information ..............................................6
        D. Settlement Negotiations...............................................7
   II.   The Terms of the Settlement .......................................8
        A. The Settlement Class ....................................................8
        B. Settlement Consideration .............................................8
           1. Monetary Benefits to the Class...............................9
           2. Injunctive Relief Benefits to the Class ...................9
           3. Attorneys' Fees, Costs, Incentive Awards, and Administration Costs .....................................10
           4. Release and Dismissal of Class Claims .................12
        C. Notice and Settlement Administration Program ........12
   III.  Legal Standard ...........................................................13
   IV.  The Court Should Grant Preliminary Approval ..........14
        A. The Proposed Settlement Is Fair and Reasonable............14
           1. The Class Is Adequately Represented By Plaintiffs and Counsel 15
           2. The Proposal Was Negotiated At Arms Length ...........16
           3. The Relief For The Class Is Adequate Under Rule 23(e)(2)(c) ...17
             a. The Costs, Risks, and Delay of Trial and Appeal ...............18
             b. The Claims Process and Distribution of Relief Are Effective 20
             c. The Attorneys' Fees Request is Reasonable ..........21
                i.     Class Counsel's Fee Request Is Not Disproportionate 23
                ii.    The Clear Sailing Provision Is Not Collusive ..............29
                iii.   There Is No Reversion Of Fees To The Defendant ......30
           4. The Proposal Treats Class Members Equally..............31
        B. Provisional Certification of the Settlement Class Should Be Granted ..............................................32
           1. The Proposed Class Satisfies The Prerequisites Of Rule 23(a)....32
           2. The Proposed Class Satisfies Rule 23 Predominance And Superiority ................................35
           3. Injunctive Relief Class Prerequisites Under Rule 23 Are Satisfied ............................................39
        C. The Notice Plan Should Be Approved.......................39
   V.    Conclusion ...............................................................41

1

2

**Cases**

3

*Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 957 (9th Cir. 2013) .........................36

4

*Ahmed v. HSBC BANK USA*, No. ED CV 15-2057 FMO (SPx), 2019 WL 13027266,

5

at *7 (C.D. Cal. Dec. 30, 2019).................................................................................34

6

*Bias v. Wells Fargo & Co.*, 312 F.R.D. 528, 543 (N.D. Cal. 2015)........................43

7

*Briseno v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021) .................................22

8

*Buechin v. Ogden Chrysler-Plymouth, Inc.*, 159 Ill. App. 3d 237, 250 (2d Dist.

9

1987) .........................................................................................................................37

10

*Chowning v. Kohl's Dep't Stores, Inc.*, No. CV 15-08673 RGK (SPx), 2016 WL

11

1072129, at *12 (C.D. Cal. Mar. 15, 2016) ...........................................................19

12

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)................13

13

*Comcast Corp. v. Behrend*, 569 U.S. 27, 35, 133 S.Ct. 1426, 1433 (2013)............42

14

*Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015).....................36, 41

15

*Elkies v. Johnson & Johnson Servs., Inc.*, No. CV 17-7320-GW(JEMX), 2020 WL

16

10055593, at *8 (C.D. Cal. June 22, 2020).............................................................24

17

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011).....................37

18

*Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012)........38

19

*Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 631 (9th Cir. 2020) ..........25

20

*Graves v. United Industries Corp.*, No. 2:17-cv-06983-CAS-SKx, 2020 WL

21

953210, at *7 (C.D. Cal. Feb. 24, 2020) ................................................................18

22

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)..........13, 14, 36, 38

23

*Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 6619983, at *8

24

(N.D. Cal. Dec. 18, 2018) .......................................................................................33

25

*Hilsley v. Ocean Spray Cranberries, Inc.*, No. 3:17-CV-2335-GPC-MDD, 2020

26

WL 520616, at *7 (S.D. Cal. Jan. 31, 2020)...........................................................34

27

*In re EasySaver Rewards Litig.*, 906 F.3d 747, 754–55 (9th Cir. 2018) (citing 28

28

U.S.C. § 1712) ...........................................................................................29, 30, 33

*In re Facebook Biometric Information Privacy Litig.*, 522 F. Supp. 3d 617, 622 (N.D. Cal. Feb. 26, 2021)........................................................................21

*In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1182–86 (9th Cir. 2013)................29

*In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558-60 (9th Cir. 2019) ......14

*In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 567 (9th Cir. 2019) ...........44

*In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD, 2013 WL 1120801, *7 (N.D. Cal. Mar. 18, 2013) ........................................................................26

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 950 (9th Cir. 2015)..30, 34

*In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009)................................................40

*Konik v. Cable*, No. CV 07-763 SVW (RZX), 2009 WL 10681970, at *18 (C.D. Cal., Dec. 2, 2009) .........................................................................41

*LaGarde v. Support.com, Inc.*, No. C12-0609 JSC, 2013 WL 1283325, at *10 (N.D. Cal. Mar. 26, 2013) ..................................................................32

*Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) ............42, 43

*Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013) .....................42

*Loreto v. Gen. Dynamics Info. Tech., Inc.*, No. 3:19-cv-01366-GPC-MSB, 2021 WL 1839989, at *7 (S.D. Cal. May 7, 2021)....................................15

*Martin v. Marriott Int'l, Inc.*, No. CV 18-00494 JAO-RT, 2021 WL 4888973, at *5 (D. Haw. Oct. 19, 2021) ....................................................................32

*Miguel-Sanchez v. Mesa Packing, LLC*, No. 20-CV-00823-VKD, 2021 WL 1736807, at *13 (N.D. Cal. May 3, 2021) ..........................................32

*Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 658 (1st Dist. 2001) ............................................................................................41

*Nunez v. BAE Sys. San Diego Ship Repair Inc.*, 292 F. Supp. 3d 1018, 1033 (S.D. Cal. 2017)...........................................................................15

*People v. Superior Court (J.C. Penney Corp.)*, 34 Cal. App. 5th 376, 409 (2019) 40

*Phillips v. Double Down Interactive, LLC*, 173 F.Supp.3d 731 (N.D. Ill. 2016).........35

*Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 (9th Cir. 2015)...36, 42

*Seegert v. Lamps Plus, Inc.*, 377 F. Supp. 3d 1127, 1130 (S.D. Cal. 2018)............29

*Shames v. Hertz Corp.*, No. 07-CV-2174-MMA (WMC), 2012 WL 5392159, at *13 (S.D. Cal. 2012) ...........................................................................................31

*Spann v. J.C. Penney Corp.*, 2015 WL 1526559, at *3-8 (C.D. Cal. Mar. 23, 2015) ................................................................................................................................42

*Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244, 1260–61 (C.D. Cal. 2016).....31

*Taylor v. Meadowbrook Meat Co., Inc.*, No. 3:15-cv-00132-LB, 2016 WL 4916955, at *5 (N.D. Cal. Sept. 15, 2016)........................................................25

*Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016)..................38

*Totz v. Continental Du Page Acura*, 236 Ill. App. 3d 891, 900 (2d Dist. 1992).....37

*True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1067 (C.D. Cal. 2010)........34

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) .................43

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 21 338, 350 (2011)...............................35

*Warner Const. Corp. v. City of Los Angeles*, 2 Cal.3d 285, 294 (1970)................36

*Williams v. Gerber Prods. Co.*, 552 F.3d 28 934, 938 (9th Cir. 2008)...................36

## I.      INTRODUCTION

On January 24, 2024, Plaintiffs Jeremiah Ballew and Eleni Honderich, on behalf of themselves and all others similarly situated ("Plaintiffs") and Defendant Huuuge, Inc. ("Defendant" or "Huuuge") entered into a Class Action Settlement Agreement (the "Settlement").  Ryan Decl.,[1] Ex. 1. Plaintiffs now move for preliminary approval of the Settlement.

Huuuge affiliates publish mobile games, including Huuuge Casino and Billionaire Casino (collectively, "Applications"), throughout the world, including the United States. The Applications allow users to play virtual slot machines through mobile devices using virtual chips. Players can either win or lose virtual chips in the Applications' slot machine games. The slot machines in the Applications are games of chance. Players receive free virtual chips upon beginning to play the Applications and then have opportunities to receive additional free virtual chips periodically or based on in-game events. Players can also purchase virtual chips and other virtual items in the Applications through an in-game store and through pop-up advertisements. This litigation arises out of the advertising practices in the Applications that Plaintiffs allege are misleading and certain mechanics of the Applications' slot machines that Plaintiffs allege render the games in the Applications to be illegal forms of gambling.

Plaintiffs contend that during the class period, Defendant advertised virtual chips in the Applications with deceptive original chip quantities ("reference chip quantities"). Plaintiffs allege the reference chip quantities are deceptive because Defendant rarely sells the reference chip quantities at the advertised prices. Instead, the Applications' reference chip quantities are significantly lower than the chip quantities offered on a daily basis in the Applications. Players of the Applications are thus deceived into a false belief that they are receiving a significantly higher

---

[1] Declaration of Andrew Ryan in Support of Preliminary Approval of Class Action Settlement, Provisional Certification of Settlement Class and Approval of Procedure and Form of Notice ("Ryan Decl."), filed concurrently herewith.

quantity of chips for a given price, when in reality, they are receiving no such bargain. As a result, Defendant has misled customers by falsely inflating the perceived value of their virtual chips and falsely inflating the perceived value of the Applications' sale offers, thereby inducing class members to buy items they would have never bought, or pay more than they otherwise would have paid, had they known the truth about Defendant's sale practices.

Further, the Applications also included countdown timers in presenting sales in the Applications' stores. Plaintiffs contend that these countdown timers are misleading, because the offered sales were not truly limited in time, but instead were offered daily. As a result, Defendant misled customers by creating a false sense of urgency and induced class members to buy items they would have never bought.

Plaintiffs also contend that the Applications violate California's gambling laws, including California's law prohibiting slot machines. Plaintiffs allege that in the absence of purchasing virtual chips in the Applications, players are unable to continue playing the slot machine games in the Applications for significant periods of time. Accordingly, the virtual chips wagered and lost in the Applications' slot machine games are things of value and extend players' ability to continue playing slot machines in the Applications. As explained below, Defendant denies all these claims and present a variety of legal and factual defenses.

Plaintiffs are pleased to present a Settlement that provides excellent relief for the classes of U.S. purchasers of virtual chips from the Applications (hereafter, the "Settlement Class," "Class Members" or the "Class"). The Settlement provides for each Class Member to receive 375 Virtual Diamonds in the Applications having a value of approximately $6 per Class Member. Joint Stipulation,[2] ¶4. The Virtual Diamonds in the Applications are usable to acquire and send virtual gifts within the

---

[2] Joint Stipulation in Support of Preliminary Approval of Class Action Settlement, filed concurrently herewith.

Applications and to unlock slot machines within the Applications. The Virtual Diamonds have no expiration dates, blackout dates or fees. The Applications consistently include many items and games available for 375 Virtual Diamonds or less, meaning that Class Members can use their Virtual Diamonds without incurring any out-of-pocket expense. The Class presently consists of more than ████████ and is growing. Thus, the monetary value of the Settlement based on the Virtual Diamonds will be in the range of approximately ████████████. Tregillis Decl.,[3] ¶¶29-30.

One of the most important features of the Settlement is that, unlike other settlements where receipt of the benefits are dependent on Class Members submitting a timely claim (usually resulting in less than 10% of the class benefiting), in this Settlement, all Class Members who do not affirmatively opt out will automatically receive the Virtual Diamonds within the Applications. Because the Virtual Diamonds never expire, the benefits of the Virtual Diamonds will forever remain with Class Members until they use them. There is no possibility of reversion to Defendant.

Even more importantly, the Settlement also provides impactful injunctive relief to prevent future harm to consumers. With respect to Plaintiffs' false advertising claims, Defendant is required to change the store in the Applications to offer for sale virtual items on an individual basis at their respective base price, thereby eliminating the use of the fictitious reference chip quantities. Settlement at §2.3.5. Defendant is also required to change the store in the Applications to remove any countdown timers for offered sales. Settlement at §2.3.6.

With respect to Plaintiffs' illegal gambling claims, Defendant is required to (1) change the mechanics for the Applications to provide notice to players who do not have sufficient virtual chips to access or continue playing the game they are

---

[3] Declaration of Christina Tregillis in Support of Plaintiff's Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of Settlement Class and Approval of Procedure for and Form of Notice, filed concurrently herewith.

attempting to access or play, that the player may access a lower stakes game for which the player has sufficient chips to continue playing (if applicable) or may access Lite Mode,[4] at the same time or before presenting the player with any prompt or notice to purchase additional virtual chips; (2) increase the number of games available in Lite Mode from one to four that are of similar type, quality and experience as other games within the Applications; (3) change the mechanics of the Applications to provide a notice to players who are playing in Lite Mode when their next free virtual chips bonus becomes available (that will allow them to play games in the Applications outside of Lite Mode); and (4) Defendant will move the internet links to resources relating to video game behavior disorders and Defendant's self-exclusion policy to a more prominent location within the Applications. Settlement at §2.3. These critical changes are not temporary; they must be maintained forever. Further, while difficult to calculate, these changes have a potential value for Class Members as high as ███████. Tregillis Decl., ¶45.

Class Counsels' proposed attorneys' fees and costs are a small fraction ██████ of the Settlement's monetary value – far less than the 25% benchmark – with no reversion to Defendant and a tiny fraction (███████ of the potential value of the injunctive relief. The proposed $5,000 incentive awards to the class representatives are within the norm.

In view of the risks of proceeding with this litigation through class certification, summary judgment, trial, and appeal, this is an excellent result for the Class. Plaintiffs therefore respectfully request the Court to enter an order granting preliminary approval of the Settlement, provisionally certifying the Settlement Class, directing notice of the Settlement in the manner proposed herein, and setting a schedule for final approval.

---

[4] "Lite mode" currently permits users to play a single slot machine game for free regardless whether users have any chips.  Joint Stipulation, ¶2.

1  **II.    PROCEDURAL BACKGROUND**

2      **A. <u>This Lawsuit</u>**

3      Plaintiffs filed this lawsuit on June 2, 2023. Plaintiffs assert claims for

4  violations of (1) the California Unfair Competition Law, Cal Bus. & Prof. Code §§

5  17200, *et seq*. ("UCL"), (2) the California False Advertising Law, Cal. Bus. &

6  Prof. Code §§ 17500, *et seq*. ("FAL"), and (3) the Consumer Legal Remedies Act,

7  Cal. Civ. Code §§ 1750 *et seq*. ("CLRA"), (4) Illinois Consumer Fraud and

8  Deceptive Business Practices Act, as well as (5) fraud, (6) negligent

9  misrepresentation, and (6) unjust enrichment. Plaintiffs seek damages and

10  injunctive relief. Informed by the Court's rulings in the ZGG Actions, the parties

11  here agreed to stay the case to engage in information discovery and settlement

12  discussions prior to Defendant's deadline to respond to the Complaint.

13      **B. <u>Earlier Related Case</u>**

14      The related action pending before this Court captioned *Ochoa v. Zeroo*

15  *Gravity Games LLC*, Case No. 2:22-cv-05896-GW-AS ("ZGG Action") was

16  removed from state court on August 19, 2022. The plaintiffs in the ZGG Action

17  raised claims similar to those asserted in this lawsuit, including allegations that the

18  ZGG mobile games used misleading reference prices and virtual currency

19  quantities and misleading countdown timers and that the ZGG games were illegal

20  gambling under California law.

21      Defendants in the ZGG Action filed multiple motions to dismiss on a wide

22  range of issues, including that (1) Plaintiffs' false advertising claims were

23  deficiently pled, (2) the games were not illegal gambling as a matter of law, (3) the

24  sale advertisements were not misleading as a matter of law, (4) the CLRA was

25  inapplicable to the mobile games and their virtual currency, and (5) monetary relief

26  for the illegal gambling claims was not available under California law as a matter

27  of public policy. On May 25, 2023, the Court ruled on ZGG's motion to dismiss

28  the third amended complaint. The Court dismissed with prejudice the illegal

5

gambling claims seeking monetary relief under California law, but allowed the claims for injunctive relief to proceed. The Court denied ZGG's motion to dismiss as to the California plaintiff's claims related to the false and misleading sale advertisement claims. ZGG Action at ECF No. 53.

### C. Exchange of Information

The parties scheduled a mediation with the Honorable Margaret Morrow (Ret.) for October 17, 2023. Ryan Decl., ¶22. The parties agreed that prior to mediation they would engage in informal discovery to facilitate settlement discussions. Prior the parties' mediation, Defendants provided the following information: (1) United States revenue for in-game purchases from the Applications' in-game store from 2019; (2) the history of the Applications' use of reference chip quantities and countdown timers in the Applications' in-game stores; (3) data regarding which users were presented with terms of service that included mandatory arbitration and class waiver; (4) details of what steps Defendant took to comply with the settlement agreement entered into in *Wilson v. Huuuge, Inc.*, Case No. 2:2018-cv-05276 (W.D. Wash.) ("*Wilson* Settlement"), which required Defendant to "change game mechanics for the Applications to ensure that players who run out of sufficient virtual chips to continue to play the game they are playing will be able to continue to play games within the Application they are playing without needing to purchase additional virtual chips or wait until they would have otherwise received free additional virtual chips in the ordinary course." *Id.*, ¶23.

In addition, Defendant, as a publicly traded company, provides consolidated financial statements providing financial details regarding the Applications, including by region. Plaintiff's counsel reviewed and collected that data in preparation for mediation. *Id.*, ¶24. In addition, Plaintiff's counsel conducted interviews of the class members and provided letters to the mediator from class members detailing their experience with the Applications and the harm they have

suffered. *Id.*, ¶25. The parties also exchanged detailed mediation briefs in advance of the mediation, wherein Defendant explained many of the defenses it intended to raise in the litigation, including (1) California gambling law bars monetary relief, (2) injunctive relief is barred for the gambling claims because Plaintiffs lack standing, (3) the Applications are not illegal gambling, (4) the alternative supply defense applies, (5) Plaintiffs' claims and class certification is limited by Defendant's Terms of Service, (6) Plaintiffs could never certify a national class, (7) Plaintiffs have sued the wrong entity, and (8) Plaintiffs would only be entitled to no or minimal amount of restitution or recovery for alleged false advertising. *Id.*, ¶26.

### D. Settlement Negotiations

The parties held a full-day mediation with Judge Morrow on October 17, 2023. Although the case did not settle that day, the parties narrowed the issues in dispute substantially. Specifically, the parties reached an agreement during mediation regarding the changes to the Applications' advertising practices and the game mechanics surrounding when a user runs out of chips, the availability of free-to-play options and the accessibility of gambling addiction resources. The parties also made significant progress towards narrowing the gap on monetary relief for class members. The parties did not discuss or negotiate plaintiffs' counsel's request for attorneys' fees and costs during the mediation. *Id.*, ¶27.

The parties then reengaged in direct settlement discussions in November 2023. Counsel for the parties then began an ongoing and regular dialogue over the remainder of 2023 in dozens of emails, video conferences and phone calls. In these direct sessions, the parties negotiated all the detailed and intricate aspects of the Settlement, provision by provision. In the interim, Defendants provided additional data regarding the pricing and value of various in-game items in the Applications and the number of users and potential class members. The parties continued intense back and forth dialogue and negotiations over numerous phone calls to address

additional details of the Settlement in December 2023 and reached an agreement on all material terms with respect to Class Members' relief, including the amount of Virtual Diamonds, distribution of Virtual Diamonds and guaranteed minimums of that distribution. *Id*., ¶¶28-29. Only after the material terms were agreed upon did the parties reach an agreement regarding plaintiffs' counsel request for attorneys' fees and costs. *Id*. at ¶30.

## III.    THE TERMS OF THE SETTLEMENT

### A.    <u>The Settlement Class</u>

The Settlement defines the classes whose claims are being resolved as follows: "all Persons who or which made any Qualifying Purchases in the United States or any of its territories on or before Preliminary Approval of the Settlement and who or which also meet any one of the following criteria: (1) If they made Qualifying Purchases from an IP address based in any state or United States territory where the longest statute of limitations for any of the Released Claims is three (3) years or less, made the Qualifying Purchase on or after[5] June 2, 2020; (2) If they made Qualifying Purchases from an IP address based in any state or United States territory where the longest statute of limitations for any of the Released Claims is four years, made the Qualifying Purchase on or after June 2, 2019; or (3) If they made Qualifying Purchases from an IP address based in any state or United States territory where the longest statute of limitations for any of the. Released Claims is longer than four years, made the Qualifying Purchase on or after June 2, 2017." The Settlement defines "Qualifying Purchase" to mean "any purchase of any virtual items or other services or benefits from one or more of the Applications or any other payment made through one or more of the Applications." Settlement at §§1.20, 1.26.

_____

[5] The parties initially inadvertently used the word "before" where the word is now "after," but agreed to fix the mistake.

**B.    Settlement Consideration**

**1.  Monetary Benefits to the Class**

Under the Settlement, each Class Member who does not timely opt out of the Settlement "shall automatically receive" 375 Virtual Diamonds in the Applications. Settlement at §2.1. Virtual Diamonds are digital items referred to as diamonds that are electronically presented, sold and distributed in the Applications. Virtual Diamonds may be used in the Applications to acquire and send virtual gifts to other players. Virtual Diamonds are also usable to unlock games within the Applications. Joint Stipulation, ¶3. The Virtual Diamonds do not have an expiration date and Defendants may not cancel the Virtual Diamonds. Virtual Diamonds will not revert to the Defendant. The Virtual Diamonds granted under the Settlement will have the same value and usability as other diamonds in the Application with no additional restrictions or use and no fees associated with the use or non-use of such Virtual Diamonds. Settlement at §2.11.

Defendant sells Virtual Diamonds in the Applications at a rate of 500 diamonds for $7.99. Joint Stipulation, ¶4. Accordingly, the 375 Virtual Diamonds provided to Settlement Class Members under the Settlement is approximately $6 in value to each Settlement Class Member. This represents a total potential value to Class Members in excess of ▮▮▮▮▮▮ Tregillis Decl., ¶30. Each Class Member who or which does not elect to opt out shall automatically receive the Virtual Diamonds from Defendant in one or both of the Applications, with no requirement for a claim to be submitted. Settlement at §2.2.

**2.  Injunctive Relief Benefits to the Class**

The Settlement provides for significant injunctive relief whereby Defendant agrees to implement, no later than 90 days after the Court's entry of an order granting Preliminary Approval the following changes to the Applications:

- Defendant will change the store in the Applications to offer for sale virtual items on an individual basis at their respective base price.

9

- Defendant will change the store in the Applications to remove any countdown timer for offered sales.
- Defendant will change the mechanics for the Applications to provide notice to players who do not have sufficient virtual chips to access or continue playing the game they are attempting to access or play, that the player may access a lower stakes game for which the player has sufficient chips to continue playing (if applicable) or may access Lite Mode, at the same time or before presenting the player with any prompt or notice to purchase additional virtual chips.
- Defendant will change the mechanics of the Applications to provide a notice to players who are playing in Lite Mode when their next free virtual chips bonus becomes available.
- Defendant will increase the number of games available in Lite Mode from one to four (4). The additional games that players will be able to continue to play in Lite Mode shall be of similar type, quality and experience as other games within the Applications.
- Defendant presently provides within the "FAQ" section of its Applications internet links to resources relating to video game behavior disorders and Defendant's self-exclusion policy. Defendant agrees to move these links to the "Terms, Policy & Consent" section of the Applications.

Settlement at §2.3. There is no end date to these changes to the Applications.

### 3. Attorneys' Fees, Costs, Incentive Awards, and Administration Costs

As noted, the Settlement provides a direct monetary value of approximately $6 per Class Member consisting of 375 Virtual Diamonds. ███████████████

███████████████████████████████████████████

███████████████ Joint Stipulation, ¶5; Tregillis Decl., ¶30. ██████

10

1 ███████████████████████████████████████████

2 ████████████████████████████████████████

3 ██████████████████████████████████. Tregillis

4 Decl., ¶29. ██████████████████████████████████████

5 ████████████████████████████████████████████

6 ██████████████████████████████████████

7 ███████████████████████. Tregillis Decl., ¶45.

8    In consideration of obtaining these significant benefits for the Class, the

9 many hours spent by Class Counsel, the significant funds Class Counsel has spent

10 on litigation costs, including experts, in litigating this case, and the risks taken by

11 Class Counsel, the Settlement provides that Class Counsel may seek an award of

12 attorneys' fees and costs up to $1,440,000 with no opposition from Defendants.

13 Settlement at § 2.5.2. Class Counsel estimates that their total litigation costs

14 through final approval will be approximately $100,000. (Ryan Decl., ¶19.)

15 Therefore, Class Counsel's fee request amounts ████████████████████████

16 ████████████████████████████████████████████

17 ████████████████████████████████████████

18 ██████████████████████████████████████. (*See id.*)

19 Counsel have spent considerable time and money working on the Action and will

20 provide an exact accounting of time and costs for the Court's consideration at final

21 approval. (*Id.*)

22    Furthermore, the parties agree that if the Court awards an amount less than

23 $1,440,000 in fees and costs, the difference will *not revert* to Defendants.

24 Settlement at §2.6. Instead, it will be donated to *cy pres*—either the National

25 Consumer Law Center (NCLC) (as proposed by Plaintiffs) or an organization

26 independently chosen by the Court.  The Settlement further provides that each of

27 the two class representatives may seek an incentive award not to exceed $5,000

28 with no opposition from Defendants. *Id*. at §2.4.



1    Defendant is also agreeing to pay out-of-pocket the costs of notice and

2    claims administration, which will not exceed $250,000.

3    **4. Release and Dismissal of Class Claims**

4    Defendant denies liability. *Id.* at 3. Thus, in exchange for the above-

5    described benefits of the Settlement, the individual Plaintiffs and all Class

6    Members who do not opt out agree to a standard release against Defendants and

7    other affiliated entities. *Id.* at §3. However, because the Class Members include

8    non-California and non-Illinois residents who may have monetary claims related to

9    the Applications' alleged violations of gambling laws in other states, the Released

10   Claims for Class Members explicitly exclude "claims that the Applications are

11   illegal gambling under state laws other than California or Illinois…" *Id.* at §1.21.

12   **C.    Notice and Settlement Administration Program**

13   Angeion Group will be the settlement administrator. *Id.* at §1.25. The notice

14   program tailored by the parties and Angeion Group to reach Class Members was

15   designed to give the best notice practicable. Indeed, the notice program is

16   reasonably calculated under the circumstances to apprise Class Members of the

17   Settlement, how they will automatically receive their Virtual Diamonds, and their

18   right to opt out or object. Weisbrot Decl.,[6] ¶¶18-48. The notice program consists of

19   (1) email notice to all Class Members at the email address obtained by subpoena of

20   the platform companies (i.e. Apple and Google), (2) an online media campaign

21   targeted towards Class Members, (3) publication notice in the California and

22   Illinois editions of USA Today for a four week period, (4) notice to the appropriate

23   federal and state officials as required by the Class Action Fairness Act, and (5)

24   notice of distribution of the Virtual Diamonds after final approval to all Class

25   Members, except those who have opted out. *Id.*; Settlement at §4.1.

26

27   _____

28   [6] Declaration of Steven Weisbrot of Angeion Group Re: Proposed Notice Plan, filed concurrently herewith.

Class Members will have 56 days from the date of the Email Notice to submit any objections or to opt out. Settlement at §§ 1.16, 4.3, 4.4. Instructions for submitting objections and opting out are described in detail in the Full Notice on the settlement website, which all Class Members via all forms of notice will be made aware of. *Id.* at §4.1; Ryan Decl., Exs. 2-4.

Finally, Angeion may also be involved in any effort by Defendant to determine if a Class Member has more than one user account with the Applications to avoid such a Class Member receiving more than 375 Virtual Diamonds under the Settlement. Defendant may choose not to engage in such a process. In no event will the total amount of Virtual Diamonds awarded to the Class Members be below 412,500,000. *Id.* at §2.1.

## IV.    LEGAL STANDARD

The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). Before a district court grants approval, it must determine that the settlement would be "fundamentally fair, adequate, and reasonable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). Congress amended Rule 23, which took effect on December 1, 2018. These amendments provide guidance on the "fair, adequate, and reasonable" standard at the preliminary approval stage. *See* Fed. R. Civ. P. 23(e)(2). The amended Rule 23 clarifies that courts must employ a two-step process in granting preliminary approval. Under the first step, the parties must show "that the court will likely be able to (i) approve the proposal under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B)(i). These factors are:

> (A)    the class representatives and counsel have adequately represented the class;
>
> (B)    the proposal was negotiated at arm's length;
>
> (C)    the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of

1

2

any proposed method of distributing relief; (iii) the terms of any proposed award of attorney's fees and costs; and (iv) any agreement required to be identified;

3

4

(D)    the proposal treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2).

5

6

7

8

9

10

The second step of the analysis requires a "showing that the court will likely be able to . . . (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(ii). Where, as here, the proponents of the proposed settlement seek certification of a settlement class seeking monetary remedies, they must demonstrate that they meet the prerequisites of Rule 23(a), as well as the requirements of Rule 23(b)(3). *See Hanlon*, 150 F.3d at 1019-1022.

11

12

13

14

15

16

17

18

19

20

21

Rule 23(a) requires the putative class to meet four threshold requirements: numerosity, commonality, typicality, and adequacy of representation. Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). But whether a proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed by whether certification is for litigation or settlement." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558-60 (9th Cir. 2019) (an individual question that "would only apply to a subset of the class and would primarily implicate trial management issues is not considered when conducting a predominance analysis for a settlement class").

22

## V.    THE COURT SHOULD GRANT PRELIMINARY APPROVAL

23

### A. <u>The Proposed Settlement is Fair and Reasonable</u>

24

25

26

27

28

As noted above, under the first step of the Court's analysis of whether preliminary approval of a class settlement should be granted, the parties must show "that the court will likely be able to (i) approve the proposal under [the final approval factors set forth in] Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B)(i). These factors are considered below, in turn.

14

**1.  The Class Is Adequately Represented by Plaintiffs and Counsel**

The first fairness factor under Rule 23(e)(2) is whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). "To determine legal adequacy, the Court must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Nunez v. BAE Sys. San Diego Ship Repair Inc.*, 292 F. Supp. 3d 1018, 1033 (S.D. Cal. 2017) (citations omitted). The analysis is also "redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively." *Loreto v. Gen. Dynamics Info. Tech., Inc.*, No. 3:19-cv-01366-GPC-MSB, 2021 WL 1839989, at *7 (S.D. Cal. May 7, 2021).

Here, there is no conflict between Class Members and the class representatives and counsel. Further, the class representatives and counsel have more than adequately represented the class.

The class representatives have cooperated in the pre-suit investigation, prosecution and settlement of this Action by producing documents, being interviewed and providing a detailed letter to the mediator explaining their experience with the Applications and the harm they have suffered. The class representatives have also been involved and kept up to date on all aspects of the case, including evaluation of the settlement terms. Ryan Decl., ¶10, 35; Ballew Decl.,[7] ¶¶7-12; Honderich Decl.,[8] ¶¶8-14.

Further, Class Counsel has vigorously prosecuted this case on behalf of the Class. Class Counsel investigated the Applications and the legality of their advertising and slot machine games under the laws of various states for over a year

---

[7] Declaration of Jeremiah Ballew in Support of Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of Settlement Class, and Approval of Procedure and Form of Notice, filed concurrently herewith,

[8] Declaration of Eleni Honderich in Support of Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of Settlement Class, and Approval of Procedure and Form of Notice, filed concurrently herewith.

prior to filing this Action. This has required Class Counsel to, among other things, investigate the validity of claims arising from Defendants' practices on two different Applications and across multiple platforms and user accounts over the course of several months to verify that presentation of sale advertisements in the Applications across different users and platforms. Class Counsel also had to investigate the Applications' presentation (or lack thereof) of Defendant's Terms of Service across platforms and for different users. Class Counsel also had to study the prior litigations and settlement involving the Applications in the *Wilson* litigation. Class Counsel also had to expend significant time and resources finding class representatives. Ryan Decl., ¶¶10-20.

Further, in connection with the ZGG Action, Class Counsel defeated challenges to the pleadings and claims that Defendant would have raised in this Action. Class Counsel also engaged in significant informal discovery with Defendant both before and after mediation to obtain complete and accurate information regarding Class Members and the Applications financial data. Further, Counsel's efforts also included lengthy settlement negotiations in a full day mediation session and through dozens of direct communications with counsel to achieve this Settlement. Ryan Decl., ¶¶14-15.

Finally, Class Counsel has extensive experience in complex litigation spanning 20 years, including numerous trials, a clerkship, complex litigation experience at large firms, including trials, and class action litigation experience. Ryan Decl., ¶¶4-9. In sum, the class representatives and counsel have more than adequately represented the class.

## 2.  The Proposal Was Negotiated at Arm's Length

The second Rule 23(e)(2) factor looks at whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). This is "described as [a] 'procedural' concern[], looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e)(2), 2018

Advisory Comm. Notes. "[T]he involvement of a neutral or court-affiliated mediator or facilitator in [settlement] negotiations may bear on whether th[ose] [negotiations] were conducted in a manner that would protect and further the class interests." Fed. R. Civ. P. 23(e), 2018 Advisory Comm. Notes.

The settlement here was the product of extensive and painstaking arm's length negotiations. The parties enlisted the assistance of Judge Margaret Morrow, a highly respected retired federal district judge. The parties initially participated in a full day mediation session with Judge Morrow. After a general framework for prospective measures that Defendant could undertake to address the allegations raised in the Action, the parties engaged in direct and frequent dialogue where they negotiated intensely all the detailed and intricate aspects of the settlement, provision by provision. The direct negotiations between counsel occurred over three (3) months in dozens of video conferences and phone calls. Ryan Decl., ¶¶21-29. Only after reaching an agreement on the material terms of the settlement covering benefits for the class and changes to the Applications did the parties negotiate the provisions in the Settlement regarding class counsel's fees and class representative fees. *Id*. at ¶30. The parties have satisfied the second Rule 23(e)(2) factor.

Further, the Settlement excludes from the release claims of illegal gambling under state laws other than California and Illinois, thereby preserving the rights of Class Members to pursue those claims under other state laws. Settlement at §1.21. This further demonstrates that the negotiations here were done at arm-length and were not a collusive effort to benefit either party at the expense of the class.

### 3.  The Relief for the Class is Adequate Under Rule 23(e)(2)(c)

Under the third Rule 23(e)(2) factor, the Court must consider whether "the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member

claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)[.]" Fed. R. Civ. P. 23(e)(2)(C). Under this factor, the relief "to class members is a central concern." Fed. R. Civ. P. 23(e)(2)(C), Advisory Comm. Notes. As shown below, the Settlement satisfies these factors.

### a.   The costs, risks, and delay of trial and appeal

A "central concern" when evaluating a proposed class action settlement "relate[s] to the cost and risk involved in pursuing a litigated outcome." Fed. R. Civ. P. 23(e), 2018 Advisory Comm. Notes; *see also Graves v. United Industries Corp.*, No. 2:17-cv-06983-CAS-SKx, 2020 WL 953210, at *7 (C.D. Cal. Feb. 24, 2020). Here, the risk, expense, complexity, and likely duration of further litigation all weigh in favor of approving the proposed Settlement. Plaintiffs are confident they would be able to obtain class certification and successfully prove their claims at trial. They are also confident that they have formulated a viable damages model based on a sound marketing survey and well-settled and accepted economic methodologies. (*See* Tregillis Decl.) However, juries are unpredictable and may not find Defendants' pricing and sales practices deceptive despite the evidence. There is also a small risk that Plaintiffs' model for computing class-wide damages would not be acceptable to the Court or the Ninth Circuit. *See, e.g., Chowning v. Kohl's Dep't Stores, Inc.*, No. CV 15-08673 RGK (SPx), 2016 WL 1072129, at *12 (C.D. Cal. Mar. 15, 2016) (granting summary judgment based on Plaintiffs' failure to demonstrate "a viable measure of restitution, such as a 'price premium' model in which an expert isolates the amount of the price attributable to the false representation.") While Plaintiffs here would have had a solid damage model consistent with *Chowning*, litigation inherently carries risk. *See* Tregillis Decl. ¶¶12-18, 44, 57.

Moreover, Plaintiffs would face years of litigation against experienced defense counsel. Among the defenses that defense counsel would have pursued are

that Plaintiffs lack standing to seek injunctive relief, the Applications do not

violate California gambling laws, class certification is inappropriate because

certain class members are subject to mandatory arbitration and class waiver

provisions, class certification is inappropriate because Plaintiffs could not show

that class members saw and relied on the alleged false advertising in a common

manner, Plaintiffs could never certify a national class because of differences in law

between the states, Huuuge, Inc. is the incorrect defendant, and Plaintiffs would

only be entitled to nor or only a minimal amount of restitution, because class

members received the benefit of the bargain. These, among other defenses, posed

potential risks to the viability and scope of Plaintiffs' claims, the litigation of

which would postpone relief to class members for potentially years.

Without a settlement, this case would force Plaintiffs to conduct further class

discovery, successfully prosecute a motion for class certification and potentially

oppose a Rule 23(f) petition to the Ninth Circuit, conduct merits discovery,

successfully oppose summary judgment, undertake expert discovery, make pretrial

disclosures and filings, and try the case. And, even if Plaintiffs prevail at trial, they

may have to oppose a lengthy appeal. In contrast, a settlement ensures Class

Members promptly receive the significant benefits negotiated for them and that the

Applications are promptly changed to eliminate their misleading advertisement and

most addictive game mechanics.

Further, the expert and case-related costs alone in this type of class action,

which is already expected to be approximately $100,000, would likely fall between

$500,000 to $1,000,000 based on Class Counsel's experience. Ryan Decl., ¶19.

Plaintiffs have obtained a significant benefit for all Class Members in the form of

sizable Virtual Diamonds that may be used in the Applications. These Virtual

Diamonds may be used by Class Members without a fee and without expiration.

Under the Settlement, the guaranteed, immediate, and automatic monetary benefit

to the Class ██████████████████████████ In contrast, the Class would have to

pursue a risky damages claim for their purchase and use of virtual items in the Applications after engaging in a lengthy discovery, motions, trial, and appeals process. *See* Tregillis Decl. ¶¶12-18, 44, 57.

Moreover, by virtue of Plaintiffs' lawsuits, Defendants have agreed to change their business practices. They will stop using the reference quantities and countdown timers that are the subject of the false advertising claims and will provide more robust changes to the game mechanics of the Applications than those provided in the prior *Wilson* litigation to address the illegal gambling claims. This injunctive relief, alone, creates a significant value to consumers and is directed to the heart of the issues raised in this Action. Tregillis Decl., ¶¶32-58. In sum, this first Rule 23(e)(2)(C) factor weighs heavily in favor of preliminary approval.

b.  <u>The Claims Process and Distribution of Relief Are Effective</u>

The Court must next consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C) and 2018 Advisory Comm. Notes. Additionally, "the court should be alert to whether the claims process is unduly demanding." *Id.* Here, Class Members face no obstacles to receiving the benefits of the Settlement because those who do not opt out will *automatically* (without the need to file a claim) receive their Virtual Diamonds with no fees, restrictions or expiration date. Because Defendant is a mobile games publisher, all their customers had to create accounts in the Applications. The Virtual Diamonds may thus be distributed to all Class Members within the Applications, eliminating the need for a claims process and guaranteeing that each Class Member will receive their Virtual Diamonds in the relevant account - the Applications themselves in which the Class Members made Qualified Purchases. Thus, this is far better than a traditional settlement where only a small fraction of class members benefit due to dependence on locating and reaching class members and requiring them to submit a claim with detailed information regarding their purchases. *See In re Facebook*

20

*Biometric Information Privacy Litig.*, 522 F. Supp. 3d 617, 622 (N.D. Cal. Feb. 26, 2021) (claims rate of "4-9% [] is typical for consumer class actions"). Moreover, the Virtual Diamonds give Class Members a variety of uses, including dozens of virtual gifts and the ability to unlock additional games in the Applications that would not require Class Members to incur any out-of-pocket cost.

c. The Attorneys' Fees Request Is Reasonable

The Court must consider "the terms of any proposed award of attorneys' fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). The Ninth Circuit has interpreted the amended Rule 23(e)(2) as imposing an obligation on district courts to "examine whether the attorneys' fees arrangement shortchanges the class. In other words, the new Rule 23(e) makes clear that courts must balance the 'proposed award of attorney's fees' vis-a-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members." *Briseno v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)(C)). In considering the proposed award of attorney's fees, the Court must scrutinize the settlement for any "subtle signs that class counsel have allowed pursuit of their own self-interests to infect the negotiations." *Id*. at 1023 (quoting *Bluetooth*, 654 F.3d at 947). Thus, the Court must evaluate the settlement for three such "subtle signs" of collusion between class and defense counsel: "(1) when counsel receives a disproportionate distribution of the settlement; (2) when the parties negotiate a 'clear sailing arrangement,' under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a 'kicker' or 'reverter' clause that returns unawarded fees to the defendant, rather than the class." *Id*. at 1023. Although this inquiry would normally occur at the final approval stage prior to the amendments to Rule 23(e), the rule now requires as the first step of the preliminary approval analysis to show "that the court will likely be able to (i) approve the proposal" under the final

21

1    approval factors of Rule 23(e)(2), *see* Fed. R. Civ. P. 23(e)(1)(B)(i), which

2    includes consideration of the factor under Rule 23(e)(2)(C)(iii).

3         Here, the proposed attorneys' fee arrangement does not "shortchange" the

4    class in any way. The monetary value of the settlement, before adding the value of

5    injunctive relief, is up to ███████ to date with a guarantee that the total value

6    will not drop below ████████ after any "deduplication" process. This is

7    calculated by multiplying the total number of class members to date (over

8    ████████ by the $5.99 value of the Virtual Diamonds. Joint Stipulation, ¶¶4-5.

9    Class Counsels' fees will not come out of the benefits to be paid to the Class,

10   meaning that Class Members will receive their full benefits regardless of the

11   attorneys' fees the Court allows. Moreover, the proposed fee amount is only ███

12   of the total monetary settlement value before accounting for the value of injunctive

13   relief. If injunctive relief is considered, the proposed fee amount will likely be less

14   than ██ of the total settlement value. In either case, the fee request is well under

15   the 25% "benchmark" for measuring presumptively acceptable fees in the Ninth

16   Circuit. *Bluetooth*, 654 F.3d at 942. There is thus no concern here that Class

17   Counsels' fees would reduce Class benefits or are otherwise unreasonable.

18        In addition, there is no reversion of any benefits payable under the

19   Settlement to Defendants. Settlement at §§ 2.1.1; 2.4; 2.6. Every Class Member

20   who does not opt out will automatically receive unrestricted Virtual Diamonds that

21   will never expire. There is thus no risk of any benefit not being distributed to Class

22   Members due to the failure to make a claim. Because there is no expiration date,

23   there is also no risk that unredeemed Virtual Diamonds will be returned to

24   Defendants. Also, any unawarded attorneys' fees and costs *will not* revert to

25   Defendants. Rather, they will be awarded to a *cy pres* recipient connected to the

26   claims at issue.

27        The proposed award of fees also does not "shortchange" the class and is

28   properly balanced against the relief provided for the Class because, as explained

above, Class Counsel have worked substantial hours, including an extensive pre-filing investigation and intensive settlement discussions. Class Counsel have also taken an enormous risk by pursuing this case on contingency and advancing substantial costs— expected to be $100,000 through settlement, if approved. *See Elkies v. Johnson & Johnson Servs., Inc.*, No. CV 17-7320-GW(JEMX), 2020 WL 10055593, at *8 (C.D. Cal. June 22, 2020) (awarding 33 percent of the common fund because performance of work "on a contingency basis (for nearly two years) is an always-risky practice, particularly in a case that had to survive the number of challenges, and incur the amount of expenses").

There is also nothing unusual about the timing of payment of attorneys' fees. Defendants are not obligated to pay fees until after the Settlement becomes final. For these initial reasons, the proposed award of fees is properly balanced vis-à-vis the relief provided to the Class. There is no concern about disproportionality between the proposed fee award and benefits to be paid to the class because, the fee does not affect the Class benefits and there are no subtle signs of collusion under *Bluetooth*.

> i. *Class Counsel's Fee Request Is Not Disproportionate*

The Settlement satisfies the first *Bluetooth* factor because Class Counsel will not be receiving a "disproportionate distribution of the settlement," *Bluetooth*, 654 F.3d at 947, as demonstrated by four points.

First, the attorneys' fees and costs are not coming out of the monetary benefits that will be distributed to the Class and, thus, do not at all reduce the benefits to the Class.

Second, the fee request is approximately ███ of the Settlement's monetary value alone, when the accepted benchmark in the Ninth Circuit taking into consideration both monetary and non-monetary relief is 25%. *See id*. at 942. Here, Class Counsel have worked hard to negotiate a settlement whereby each Class Member in each of the three cases will *automatically* receive—without the need to

file a claim— unrestricted Virtual Diamonds for a total value of $5.99 per Class

Member. Defendant estimates that there are ███████ members of the putative

classes, and the classes continue to grow. Joint Stipulation, ¶5. Multiplying the

value of Virtual Diamonds ($5.99) by the total number of class members to date

(yields a total monetary value alone of approximately ██████████ with no

reversion to Defendant.

     Plaintiffs' proposed attorneys' fees and costs of $1.44 Million is thus a

reasonable figure that is not disproportionate to the ████████ recovery for the

Class. Of the requested amount, Plaintiffs estimate their costs of litigation—which

include expert fees,  mediation costs, and other fees and costs—to be

approximately $100,000. Ryan Decl., ¶19. That leaves attorneys' fees of $1.34

Million, which is only ██████ of the monetary value of the Settlement, independently

paid without any adverse effect on Class Members' benefits. This is well within

the accepted benchmark award of 25% in the Ninth Circuit for attorneys' fees even

for "common fund" or "constructive common fund" cases where the benefit to the

class is reduced by the fee award. *Id.*

     Third, when the significant injunctive relief negotiated by Class Counsel is

considered, as it should be, the attorneys' fees requested amount to less than ████ of

total recovery, removing any concern of disproportionality, especially in light of

the 25% customary benchmark in such cases. "When determining the value of a

settlement, courts consider the monetary and non-monetary benefits that the

settlement confers." *Taylor v. Meadowbrook Meat Co., Inc.*, No. 3:15-cv-00132-

LB, 2016 WL 4916955, at *5 (N.D. Cal. Sept. 15, 2016); *see also Farrell v. Bank

of Am. Corp., N.A.*, 827 F. App'x 628, 631 (9th Cir. 2020) (upholding district

court's approval of attorneys' fees where it was apparent that injunctive relief

offered "generated benefits far beyond the cash settlement fund"); *In re Netflix

Privacy Litig.*, No. 5:11-CV-00379 EJD, 2013 WL 1120801, *7 (N.D. Cal. Mar.

18, 2013) (settlement value includes injunctive relief). Thus, for example, in *Miller*

*v. Ghirardelli Chocolate Co.*, the Court included the value of Ghirardelli Chocolate removing various terms from its labels as part of the common fund from which to calculate attorneys' fees. No. 12-cv-04936-LB, 2015 WL 758094, at *1, 5 (N.D. Cal. Feb. 20, 2015). Here, the Settlement provides for significant and meaningful injunctive relief. It requires Defendants to discontinue using fictitious reference quantities in advertising virtual items in the Applications' stores and to change the Applications to address Plaintiffs' gambling claims.

The crux of each of Plaintiffs' false advertising claims is that Defendants' sale advertisements using reference quantities of virtual chips is misleading because the reference prices signal to consumers that they are recent, former offers when they are not. As a result, customers were/are misled to believe that they were/are receiving a bargain or genuine discount from the ordinary and prevailing offers when this is not true. Under the Settlement, Defendant must change the store in the Applications to offer for sale virtual items on an individual basis at their respective base price. Further, Defendant must change the store in the Applications to remove any countdown timer for offered sales. In short, Defendant has agreed to discontinue the sale advertising practices that were at the center of Plaintiffs' false advertising claims.

Further, the core issue on which Plaintiffs' illegal gambling claims were predicated is that the mechanics of the slot machines in the Applications rendered the virtual chips things of value and/or extended the ability of users to continue playing the slot machine games in the Applications. For example, when a user ran out of virtual chips sufficient to continue playing the slot machine games in the Applications, the user may have to wait until the exit day until receiving the next set of free virtual chips sufficient to continue playing. The user's only option to continue playing any game in the Application at that point would be to either purchase chips or to play the Applications' "Lite Mode" that was implemented as

part of the *Wilson* settlement. Under "Lite Mode," the Applications offered a single version of a slot machine game.

Under the Settlement, Defendant will increase the number of games available in Lite Mode from one to four (4). The Settlement further requires that the additional games that players will be able to continue to play in Lite Mode shall be of similar type, quality and experience as other games within the Applications. In this way, the Settlement provides players with true free-to-play options without interruption of same type and quality as provided throughout the Applications without requiring the purchase of additional virtual chips.

Further, the Settlement provides for significant provisional measures that are directed to reducing the addictive mechanics of the slot machine games in the Applications. Specifically, the Settlement requires Defendant to provide notice to players who do not have sufficient virtual chips to access or continue playing the game they are attempting to access or play of their free-to-play options within the Applications. Further, players who are playing in Lite Mode will be notified of when their next free virtual chips will become available in the Applications, to provide predictability and transparency of when free chips will become available in making any purchase decision.

Finally, the Settlement requires that the links provided in the Applications relating to video game behavior disorders and Defendant's self-exclusion policies (e.g. for users who seek to prevent themselves from being able to continue playing games to which they are addicted) be moved from their current location within the FAQ section of the Applications to the more prominent and easy to find "Terms, Policy & Consent" section of the Applications.

There is no time limit or expiration for these changes to the Applications. The changes to the game mechanics, advertising and availability of user resources are permanent. In sum, the Settlement achieves fundamental and enduring changes to the core practices complained about in Plaintiffs' lawsuit, namely by rectifying

1  the most addictive mechanics of the Applications and eliminating the misleading

2  forms of advertisement.

3       As far as the value, according to Plaintiffs' highly experienced and qualified

4  damages expert, the injunctive relief, while difficult to measure, has a potential

5  impact of $███████████ over six years. Tregillis Decl., ¶45. This figure is based

6  on respected studies showing the impact of false reference pricing on purchase

7  decisions and other studies demonstrating the disproportionate revenues mobile

8  games obtains from converting a user into a paying user early in their interaction

9  with the game. Tregillis Decl., ¶¶44-45. While calculating the precise impact the

10  changes to the Applications may have on consumer decisions would require an

11  expensive survey, the changes to the Applications are meaningful, because they

12  provide users with increased options to play the Applications for free and eliminate

13  (or significantly reduce) the impulse to purchase virtual chips by eliminating the

14  use of countdown timers, informing users of when they will next receive free chips

15  and eliminating misleading chip quantity comparisons in the game store. The

16  collective impact of these changes on the Applications' ███████████ in U.S. sales

17  is clearly significant, even if difficult to calculate with precision. *Id.* Notably,

18  because Defendants are required to maintain these changes perpetually, the

19  injunctive relief negotiated in the Settlement is actually worth much more.

20  Therefore, even if a nominal value is attributed to the injunctive relief (e.g. 1% of

21  U.S. sales) and is combined with the minimum value of monetary relief (███████

22  ███████, the proposed attorneys' fees and costs of $1.44 Million amount to less

23  than █████ of the value provided to the Class, which is clearly not disproportionate

24  under the current acceptable benchmark of 25%.

25       Fourth, the proposed fee award is also not disproportionate to the amount of

26  the Settlement because the Virtual Diamonds are not "coupons" within the

27  meaning of the Class Action Fairness Act (CAFA), 28 U.S.C. § 1711, *et seq.*

28  CAFA requires courts (1) to apply "heightened scrutiny" to settlements that award

27

"coupons" to class members, and (2) to base fee awards on the redemption value of the coupons, rather than on their face value. *In re EasySaver Rewards Litig.*, 906 F.3d 747, 754–55 (9th Cir. 2018) (citing 28 U.S.C. § 1712). "Thus, delineating settlements that award cash or cash-equivalent certificates from those awarding coupons affects the calculation of attorneys' fees." *Seegert v. Lamps Plus, Inc.*, 377 F. Supp. 3d 1127, 1130 (S.D. Cal. 2018) (citing *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1182–86 (9th Cir. 2013)). The determination that the class is being provided with "coupon" relief may also bear upon the overall fairness and adequacy of the settlement at preliminary approval. *See id.* at 1133; *see also In re HP Inkjet*, 716 F.3d at 1178 (CAFA "invites increased judicial scrutiny of coupon settlements generally"); 28 U.S.C. § 1712(e) ("In a proposed settlement under which class members would be awarded coupons, the court may approve the settlement only after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable, and adequate for class members.").

Congress did not define the term "coupon" when promulgating CAFA. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 950 (9th Cir. 2015). However, the Ninth Circuit has since outlined three factors to guide the inquiry of whether proposed class relief is a coupon: "(1) whether class members have to 'hand over more of their own money before they can take advantage of' a credit, (2) whether the credit is valid only 'for select products or services,' and (3) how much flexibility the credit provides, including whether it expires or is freely transferrable." *Easysaver*, 906 F.3d at 755 (quoting *Online DVD*, 779 F.3d at 951). Applying this inquiry, the Virtual Diamonds here are clearly not "coupons."

Here, Class Members do not have to hand over more of their own money before they are able to take advantage of the Virtual Diamonds. There is no minimum purchase requirement. Moreover, the Virtual Diamonds are usable for a dozens of virtual gifts and access to several games in the Applications. Settlement at §2.1 The Virtual Diamonds awarded to Class Members are not restricted in any

1   away but are freely usable within the Applications as purchased Virtual Diamonds.

2   The Virtual Diamonds are entirely flexible in how a user may use them. There are

3   no expiration dates, minimum purchase requirements or blackout dates. *Id*. at 2.1.1.

4        Because the Virtual Diamonds are not "coupons," the calculation of Class

5   Counsels' attorneys' fees should be based on the monetary value of the Virtual

6   Diamonds, which, at a minimum, is ▮▮▮▮▮▮▮ without accounting for the

7   benefits conferred on the Class from injunctive relief.

8                    ii. *The Clear Sailing Provision Is Not Collusive*

9        As concerning the second *Bluetooth* factor, while the Settlement contains a

10  "clear sailing" provision whereby Defendants agree not to oppose Class Counsels'

11  request for attorneys' fees and costs in an amount that does not exceed $1.44

12  Million, the mere presence of such a provision does not render a settlement

13  collusive. *See*, *e.g.*, *Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244, 1260–61

14  (C.D. Cal. 2016). To the contrary, several facets of the Settlement in this case

15  demonstrate that there was no collusion whatsoever. First, as discussed above, this

16  Settlement was negotiated at arms-length through four-plus months of direct

17  negotiations between counsel and with the assistance of a highly respected retired

18  district judge. Second, the parties negotiated attorneys' fees only after the material

19  terms of the Settlement covering benefits for the Class had been agreed upon by

20  the parties. Ryan Decl., ¶¶22-30; *see Shames v. Hertz Corp.*, No. 07-CV-2174-

21  MMA (WMC), 2012 WL 5392159, at *13 (S.D. Cal. 2012) (objection to clear

22  sailing agreement overruled because fee amount was negotiated separately and

23  after the class settlement was finalized).

24       Third, under the Settlement, unawarded fees do not revert to Defendants.

25  Instead, if the Court decides not to award class counsel the full amount of fees and

26  costs, any remaining amount will be awarded to a *cy pres* organization proposed by

27  Plaintiffs, or if found by the Court not to be acceptable, to a *cy pres* organization

28  selected by the Court. This, too, is a factor courts find is an indication of an

1  absence of collusion even where the class settlement has a clear sailing provision.

2  *See, e.g.*, *Spann*, 211 F. Supp. 3d at 1260–61 (even though the settlement contained

3  a clear sailing provision, "the absence of a kicker provision stating that all fees not

4  awarded would revert to defendant[ ], weighs against a finding of collusion")

5  (internal quotations omitted). Therefore, there was no collusion under the second

6  *Bluetooth* factor.

7              iii. *There is No Reversion of Fees to Defendant*

8              The third and final *Bluetooth* factor also does not support a finding of

9  collusion because, as already discussed in the previous section, the Settlement does

10  not contain a "kicker" or "reverter" clause that returns unawarded fees to the

11  defendant. *Bluetooth*, 654 F.3d at 947. Rather, any unawarded fees will be paid to a

12  *cy pres* recipient. Designating a *cy pres* beneficiaries in a class settlement for

13  attorneys' fees not awarded by the Court is one well established method of

14  mitigating against collusion between class counsel and defense counsel. *See id.*

15  (provision whereby "all fees not awarded would revert to defendants *rather than*

16  *be added to the cy pres fund* or otherwise benefit the class" was an indicia of

17  collusion) (emphasis added); *Martin v. Marriott Int'l, Inc.*, No. CV 18-00494 JAO-

18  RT, 2021 WL 4888973, at *5 (D. Haw. Oct. 19, 2021) (no collusion in part

19  because unawarded fees designated to *cy pres* beneficiary); *Miguel-Sanchez v.*

20  *Mesa Packing, LLC*, No. 20-CV-00823-VKD, 2021 WL 1736807, at *13 (N.D.

21  Cal. May 3, 2021) (same); *LaGarde v. Support.com, Inc.*, No. C12-0609 JSC, 2013

22  WL 1283325, at *10 (N.D. Cal. Mar. 26, 2013) (danger of collusion undercut by

23  plaintiff's counsel's offer to reduce fee request by directing $200,000 to *cy pres*);

24  *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 4831157, at *7

25  (N.D. Cal. Oct. 12, 2011) (inference of unfairness could have been avoided by

26  diverting unawarded attorney's fees to *cy pres*). In addition, given that there are

27  over ████████ class members, dividing unawarded attorneys' fees equally among

28  class members would result in *de minimis* additional recovery for each class

member. *See Easysaver,* 906 F.3d at 761-62 (no abuse of discretion in approval of distribution of $3 million in unclaimed settlement funds to *cy pres* recipients where distribution of this amount to more than 1 million class members would result in "de minimis" recovery) Directing any such funds to a *cy pres* recipient thus puts them to a more beneficial use for consumers similarly situated to the Class.

### 4.  The Proposal Treats Class Members Equally

The final Rule 23(e)(2) factor turns on whether the proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  Fed. R. Civ. P. 23(e)(2)(D), 2018 Advisory Committee Notes. Thus, under this factor, courts consider whether the Settlement "improperly grant[s] preferential treatment to class representatives or segments of the class." *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 6619983, at *8 (N.D. Cal. Dec. 18, 2018); *see also True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1067 (C.D. Cal. 2010). No such concerns exist in this case. All Class Members, no matter which of the Applications they bought from, what they bought, or whether they still have their order confirmations, will all be treated the same: they will each receive 375 Virtual Diamonds. *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 3:17-CV-2335-GPC-MDD, 2020 WL 520616, at *7 (S.D. Cal. Jan. 31, 2020) (factor met at preliminary approval because "the settlement treats each class member equally" where each class member could make the same claim). Thisequal treatment makes sense because all Class Members were uniformly exposed to the same deceptive discounting practice during the respective class period.

That the Settlement provides for the class representatives to each receive a $5,000 incentive award does not improperly grant them preferential treatment. Rather,

31

1  it is an appropriate amount to compensate them for their time and dedication to the

2  case, and the total payment for the two class representatives of $10,000 constitutes a

3  miniscule fraction of the total minimum monetary value of the Settlement. *See Online*

4  *DVD*, 779 F.3d at 947-48 (upholding $5,000 incentive awards that were 417 times

5  larger than $12 gift cards because the awards were only 0.17% of the total $27 Million

6  settlement fund); *Ahmed v. HSBC BANK USA*, No. ED CV 15-2057 FMO (SPx), 2019

7  WL 13027266, at *7 (C.D. Cal. Dec. 30, 2019) ($5,000 incentive award

8  "presumptively reasonable").

9      Finally, the Settlement excludes from the release claims for illegal gambling

10  under state laws other than California and Illinois. Therefore, Class Members who

11  have claims for illegal gambling under other state laws, including those for monetary

12  relief, are free to pursue those claims. This Court ruled in the ZGG Action that under

13  California law, plaintiffs could not seek monetary relief for illegal gambling claims.

14  Further, the court in *Phillips v. Double Down Interactive, LLC*, 173 F.Supp.3d 731

15  (N.D. Ill. 2016) ruled that players of games similar to the Applications could not

16  recover losses under the Illinois Loss Recovery Act. The Settlement accordingly

17  recognizes that the state law of the named plaintiffs here may not adequately represent

18  the entirety of the Class Members and appropriately limits the scope of the release.

19      **B. <u>Provisional Certification of the Settlement Class Should Be Granted</u>**

20          **1.  The Proposed Class Satisfies the Prerequisites of Rule 23(a)**

21      **Numerosity.** Under Rule 23(a)(1), a class must be "so numerous that joinder

22  of all members is impracticable . . ." Here, this requirement is easily met because

23  there are in excess of ▮▮▮▮ class members. Joint Stipulation, ¶5.

24      **Commonality.** Rule 23(a)(2) requires that the case present "questions of law

25  or fact common to the class." The putative class must show that their claims

26  "depend upon a common contention of such a nature that it is capable of classwide

27  resolution—which means that determination of its truth or falsity will resolve an

28  issue that is central to the validity of each one of the claims in one stroke." *Wal-*

32

*Mart Stores, Inc. v. Dukes*, 564 U.S. 21 338, 350 (2011). Commonality has been "construed permissively," and its requirements deemed "minimal." *Hanlon*, 150 F.3d at 1019-20. It does not "mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single significant question of law or fact." *Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 957 (9th Cir. 2013) (internal quotations omitted).

For their claims under the UCL, FAL, and CLRA, Plaintiffs need only "show that members of the public are likely to be deceived." *Williams v. Gerber Prods. Co.*, 552 F.3d 28  934, 938 (9th Cir. 2008) (internal quotations omitted). "This inquiry does not require individualized proof of deception reliance and injury." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 (9th Cir. 2015) (internal quotations omitted). Similarly, Plaintiffs' California consumer protection claims based on the *omission* of material information are also actionable. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015); *see also Warner Const. Corp. v. City of Los Angeles*, 2 Cal.3d 285, 294 (1970) (summarizing the three situations under California law where there is a duty to disclose in the absence of fiduciary or confidential relations).

Similarly, Illinois' Consumer Fraud and Deceptive Business Practices Act broadly prohibits the use of any deception, fraud, false pretenses or promises, concealment, suppression, or omission of any fact that is material to a business dealing or transaction. 815 ILCS 505/2; *Totz v. Continental Du Page Acura*, 236 Ill. App. 3d 891, 900 (2d Dist. 1992); *Buechin v. Ogden Chrysler-Plymouth, Inc.*, 159 Ill. App. 3d 237, 250 (2d Dist. 1987) ("The majority of the traditional common law elements have been virtually eliminated by the [Act].").

Within this legal framework, Plaintiffs' claims share numerous overarching questions of law or fact. The key common questions driving this litigation include whether Defendants advertised using fictitious reference quantities and limited time sales during the class periods, whether Defendants' representations and

omissions were likely to deceive, whether they were material, whether Defendants owed a duty to disclose, and whether Plaintiffs and the Class are entitled to restitution or damages. Complaint at ¶195.  These questions are capable of class-wide resolution. In other words, determining the truth or falsity of one or more of these questions will resolve issues "central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. This case, therefore, satisfies commonality.

 ***Typicality.***   Rule 23(a)(3) requires the putative class to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." To meet the typicality requirement, Plaintiffs must show that: (1) "other members have the same or similar injury"; (2) "the action is based on conduct which is not unique to the named plaintiffs"; and (3) "other class members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). Here, Plaintiffs' and the putative class members' claims all arise from Defendants' misrepresentations, game mechanics and/or failures to disclose material facts. Each of the class representatives, just like all other Class Members, purchased Defendants' virtual items during the class period, were exposed to deceptive reference quantities and promotions on Defendants' Applications, did not receive the truth from Defendants about the reference quantities and promotions, relied on the deflated reference quantities and promotions in making their purchases, relied on the misleading countdown timers in making their purchases and were subjected to the inability to continue playing the games of chance in the Applications when they ran out of virtual chips.

 ***Adequacy.***   Rule 23(a)(4) requires the representative parties to "fairly and adequately protect the interests of the class." "In making this determination, courts must consider two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Evon v.*

1    *Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012) (quoting

2    *Hanlon*, 150 F.3d at 1020).

3        As explained above and established by the declarations of the class

4    representatives and Class Counsel, both questions are easily satisfied.

5        **2.  The Proposed Class Satisfies Rule 23 Predominance and Superiority**

6        ***Predominance.*** As noted, Rule 23(b)(3) requires that "questions of law or

7    fact common to class members predominate over any questions affecting only

8    individual members . . . ." This "inquiry asks the court to make a global

9    determination of whether common questions prevail over individualized ones."

10   *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). "[A]n

11   individual question is one where members of a proposed class will need to present

12   evidence that varies from member to member, while a common question is one

13   where the same evidence will suffice for each member to make a *prima facie*

14   showing or the issue is susceptible to generalized, class-wide proof."   *Id*. "When

15   common questions present a significant aspect of a case and they can be resolved

16   for all members of the class in a single adjudication, there is clear justification for

17   handling the dispute on a representative rather than an individual basis." *Hanlon*,

18   150 F.3d at 1022. Here, common issues predominate both as to questions of

19   liability and damages.

20       <u>Common Issues Relating to Liability Predominate</u>

21       Common issues predominate over individualized inquiries as it relates to

22   Defendants' liability for Plaintiffs' claims for violation of the UCL, FAL, CLRA,

23   and Illinois Consumer Fraud and Deceptive Business Practices Act and for

24   common law fraud. As alleged in the Complaint, Plaintiffs' claims are premised on

25   whether the sale advertisements on each of the Applications at issue are false or

26   misleading. Complaint at ¶¶24-34. According to Plaintiffs, the reference quantities

27   advertised on the Applications are misleading and deceptive because they do not

28   represent the prevailing or ordinary quantities of virtual chips sold at each

respective price point. *Id*. Here, misleading reference quantities and countdown

timers were displayed on the Applications across all price points for virtual chips

sold during the class periods at issue. Complaint at ¶¶69-81, 92-96.

The daily sale or promotion Defendant typically advertise on their

Applications are across all price points for virtual chips (e.g., "+300%"). *Id*.

Moreover, the Applications' stores consistently displayed a countdown timer for

all users indicating that the promotion was of a limited duration, only for the

countdown timer to reset minutes later for the next day's promotion. *Id*. In short,

massive sales of limited duration were perpetually run on the Applications across

the U.S.

Also important to the predominance analysis, no consumers received any

disclosure telling them the truth, namely, that the advertised reference quantities

are not the prevailing or ordinary quantity of virtual chips sold at each respective

price point and that the advertised specials are not truly limited in time, but are

available virtually perpetually. As a result, relevant to Plaintiffs' claims based on

affirmative misrepresentations, all putative class members were exposed to the

same false representations. Likewise, relevant to Plaintiffs' claims on omissions of

material facts, no putative class members were exposed to any disclosures

explaining the truth about the advertised reference quantities and promotions on

the Applications.

Further, common issues predominate, because the virtual chips in the

Applications are sold exclusively within the Applications. Defendant sets the

prices and quantities for these virtual chips. Thus, the misleading reference

quantities had the same effect on all users of the Applications, as there is no source

external to the Applications themselves that formed the basis for users'

understanding of the value of the virtual chips. *People v. Superior Court (J.C.

Penney Corp.)*, 34 Cal. App. 5th 376, 409 (2019) ("[W]hen a retailer sells in-house

goods, the retailer's *actual* prices regarding those goods constitute their market

1  prices" and hence, the retailer's actual prices "provide an adequate basis for

2  determining whether the retailer's advertised former price claims comply with

3  section 17501.") (emphasis in original).

4       Finally, although each of Plaintiffs' claims require proof of reliance, it is

5  well-settled  that Plaintiffs need not demonstrate individualized  reliance on

6  specific misrepresentations. *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009).

7  Rather, "a presumption, or at least an inference, of reliance arises wherever there is

8  a showing that a misrepresentation was material." *Id.* The test for materiality is

9  whether "a reasonable man would attach importance to its existence or

10  nonexistence in determining his choice of action in the transaction in question." *Id.*

11  at 327. These principles also apply to Plaintiffs' common law and statutory claims

12  premised on omissions. *See Daniel,* 806 F.3d at 1225. Illinois similarly does not

13  require individualized reliance. *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill.

14  App. 3d 642, 658 (1st Dist. 2001).

15       Here, there is no dispute that Defendant engaged in the pricing and discount

16  practices at issue in this case. The findings of Plaintiffs' marketing expert also

17  confirms that Defendants' representations concerning their pricing and discounts

18  are material to customers' purchasing decisions, a concept confirmed by previous

19  studies and literature. Tregillis Decl. at ¶44. Indeed, there is no plausible argument

20  that pricing is not material to purchasing decisions. *Konik v. Cable*, No. CV 07-763

21  SVW (RZX), 2009 WL 10681970, at *18 (C.D. Cal., Dec. 2, 2009) ("Certainly an

22  objectively reasonable man would consider the price of the cable service as a

23  critical factor in deciding whether to become a TWC subscriber.") (citing *Donovan

24  v. RRL Corp.*, 26 Cal. 4th 261, 277 (2001) ("The price almost always is the most

25  important term of the bargain.")); *see also* Ballew Decl., ¶¶4-6; Honderich Decl.,

26  ¶¶5-7.

27

28

**MEMO ISO PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT - 2:23-CV-04324**

1    <u>*Common Issues Relating to Damages Predominate*</u>

2    At least where class certification is contested, the plaintiffs are merely

3    required to show that class damages match their theory of liability. *See Comcast*

4    *Corp. v. Behrend*, 569 U.S. 27, 35, 133 S.Ct. 1426, 1433 (2013); *see also Lambert*

5    *v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) (explaining that

6    *Comcast* stands "only for the proposition that 'plaintiffs must be able to show that

7    their damages stemmed from the defendant's actions that created the legal

8    liability'" and any "[u]ncertainty regarding class members' damages does not

9    prevent certification of a class as long as a valid method has been proposed for

10   calculating those damages.") (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510,

11   513-14 (9th Cir. 2013). "[T]he mere fact that there might be differences in damage

12   calculations is not sufficient to defeat class certification." *Pulaski,* 802 F.3d at 987.

13   "Class wide damages calculations under the UCL, FAL, and CLRA are particularly

14   forgiving. California law 'requires only that some reasonable basis of computation

15   of damages be used, and the damages may be computed even if the result reached

16   is an approximation.'" *Lambert*, 870 F.3d at 1183 (quoting *Pulaski*, 802 F.3d at

17   989).

18   Here, the available acceptable damages models attributable to the form of

19   advertisement Plaintiffs allege against the Zeroo Gravity Mobile Games are well-

20   established. *See Spann v. J.C. Penney Corp.*, 2015 WL 1526559, at *3-8 (C.D. Cal.

21   Mar. 23, 2015). Similarly, the potential impact of false comparison advertising on

22   estimated price premium between what consumers who were exposed to the

23   deceptive reference quantities and discount promotions would be willing to pay for

24   versus what they would pay if they were told the true reference price and true

25   discount have been well researched. Tregillis Decl., ¶44. These studies and

26   potential impact on consumer purchase decisions and price premiums are tied to

27   Plaintiffs' theory of liability. *Id.* The damages methodology for Plaintiffs' claims

28   therefore satisfies the predominance requirement under *Comcast. See Lambert*, 870

F.3d at 1184 (the question at class certification is only whether the plaintiff "has presented a workable method."); *Bias v. Wells Fargo & Co.*, 312 F.R.D. 528, 543 (N.D. Cal. 2015) ("At class certification, Plaintiffs need only show that damages can be determined and attributed to their theory of liability.").

*Superiority.* Rule 23(b)(3) also requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The class action method is considered superior if "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Here, due to the sheer number of Class Members (███████████) combined with the amount of damages at issue for each Class Member as compared to the cost and burden of litigation, it is not economically feasible to litigate this case through individual lawsuits.

For the foregoing reasons, Plaintiffs have satisfied the requirements of Rule 23(a) and (b)(3). Plaintiff's request to certify the proposed settlement classes should be granted.

### 3. Injunctive Relief Class Prerequisites Under Rule 23 Are Satisfied

Plaintiffs also meet the requirements of Rule 23(b)(2), which permits certification for injunctive relief where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Predominance and superiority are self-evident" under Rule 23(b)(2). *Dukes*, 564 U.S. at 363. Here, Plaintiffs' available remedies include injunctive relief. Cal. Bus. & Prof. Code §§ 17203, 17535; Cal. Civ. Code § 1780(a)(2). Because Defendants are required to make changes to the Applications that would be uniformly applicable to every Class Member who plays the Applications, the injunctive relief here applies "generally to the class." The Settlement thus provides meaningful injunctive relief to redress Plaintiffs' claims.

1  Absent the Settlement, this type of relief would only be available to the Class after

2  prevailing at trial.

3      **C. <u>The Notice Plan Should Be Approved.</u>**

4      "Before the district court approves a class settlement under Rule 23(e), it is

5  'critical' that class members receive adequate notice." *In re Hyundai & Kia Fuel*

6  *Econ. Litig.*, 926 F.3d 539, 567 (9th Cir. 2019). For notice to a class proposed to be

7  certified for purposes of settlement under Rule 23(b)(3), "the court must direct to

8  class members the best notice that is practicable under the circumstances, including

9  individual notice to all members who can be identified through reasonable effort."

10 Fed. R. Civ. P. 23(c)(2)(B). Notice may be made by United States mail, electronic

11 means, or another type of appropriate means. *Id*. "The notice must clearly and

12 concisely state in plain, easily understood language: (i) the nature of the action; (ii)

13 the definition of the class certified; (iii) the class claims, issues, or defenses; (iv)

14 that a class member may enter an appearance through an attorney if the member so

15 desires; (v) that the court will exclude from the class any member who requests

16 exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding

17 effect of a class judgment on members under Rule 23(c)(3)." *Id*.

18     The Settlement's notice program satisfies these requirements. Angeion

19 Group, a highly experienced class administration firm, will be the settlement

20 administrator. Settlement at §1.25. Because Defendant is a mobile game publisher,

21 Class Members can be adequately notified of the Settlement by email at the

22 address on file with the platform providers on which the Applications are

23 distributed. Settlement at §4; Weisbrot Decl., ¶¶23-30. Publication notice will also

24 be disseminated in the California and Illinois editions of USA Today for four

25 consecutive weeks to satisfy the CLRA requirements. Settlement at §4.1.5;

26 Weisbrot Decl., ¶¶31-32; Cal. Civ. Code § 1781(d).

27     The administrator will also create a settlement website posting a copy of the

28 Full Notice, operative complaints for each of the Actions, Settlement, and

40

Preliminary Approval Order. Settlement at §4.1.3; Weisbrot Decl., ¶¶49-53. The administrator will also create an internet campaign targeted at users of the Applications to provide further reach and awareness of the Settlement notice. Weisbrot Decl., ¶¶31-48. Finally, the settlement administrator will handle dissemination of the notice to public officials required by CAFA. Settlement at §4.1.4.

The notice procedures will accurately inform Class Members of the salient terms of the Settlement, the Class to be certified, the final approval hearing, and the rights of all parties. The various notices all provide information on how Class Members can object and opt out of the Class, along with information about appearing at the final approval hearing. Weisbrot Decl., Ex. A. Class Members are informed about how they will receive Virtual Diamonds—namely, that they will automatically receive them if they do not opt out. *Id.* The notice also provides the contact information of Class Counsel. *Id*. The Parties here together with the administrator have created the forms of notice, which will satisfy both the substantive and manner of distribution requirements of Rule 23 and due process. Ryan Decl., ¶36.

Therefore, these proposed methods of giving notice are appropriate because they provide a fair opportunity for Class Members to obtain full disclosure of the conditions of the Settlement and to make an informed decision regarding the proposed Settlement. Thus, the notices and notice procedures amply satisfy the requirements of due process.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the [Proposed] Preliminary Approval Order lodged concurrently herewith.

41

1  Respectfully submitted,

2                                              THE RYAN LAW GROUP

3

4  Dated: April 30, 2024                       By: */s/Andrew T. Ryan*

5                                                   Andrew T. Ryan, Esq.
                                                    Counsel for Plaintiffs Jeremiah Ballew
6                                                   and Eleni Honderich

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMO ISO PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT - 2:23-CV-04324**