Andrew T. Ryan (SBN
The Ryan Law Group
317 Rosecrans Ave.
Manhattan Beach, CA 90266
Tel: 310-299-9550
Email: andrew.ryan@theryanlawgroup.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| JEREMIAH BALLEW and ELENI HONDERICH, on behalf of themselves and those similarly situated,<br><br>       Plaintiffs,<br><br>       v.<br><br>HUUUGE, INC., a Delaware corporation,<br><br>       Defendant. | CASE NO. 2:23-cv-04324-GW (AGR*x*)<br><br>Assigned to Judge George H. Wu<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES FOR RENEWED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, PROVISIONAL CERTIFICATION OF SETTLEMENT CLASS, AND APPROVAL OF PROCEDURE FOR AND FORM OF NOTICE**<br><br>Date:      January 16, 2024<br>Time:     8:30 a.m.<br>Courtroom: 9D<br>Judge:    Hon. George H. Wu<br><br>Action Filed: June 2, 2023 |

# **TABLE OF CONTENTS**

I.     INTRODUCTION .............................................................................. 1

II.    PROCEDURAL BACKGROUND ....................................................... 6

  A.    This Lawsuit ................................................................................. 6

  B.    Earlier Related Case .................................................................... 6

  C.    Exchange of Information .............................................................. 6

  D.    Settlement Negotiations ............................................................... 7

  E.    Preliminary Approval .................................................................. 8

III.   THE TERMS OF THE SETTLEMENT ............................................. 8

  A.    The Settlement Class ................................................................... 8

  B.    Settlement Consideration ............................................................ 9

    1.    Monetary Benefits to the Class ......................................... 9

    2.    Injunctive Relief Benefits to the Class ............................. 10

    3.    Release and Dismissal of Class Claims ........................... 12

  C.    Notice and Settlement Administration Program ......................... 13

IV.    LEGAL STANDARD ........................................................................ 14

V.     THE COURT SHOULD GRANT PRELIMINARY APPROVAL ........ 15

  A.    The Proposed Settlement is Fair and Reasonable ..................... 15

    1.    The Class Is Adequately Represented by Plaintiffs and Counsel ... 15

    2.    The Proposal Was Negotiated at Arm's Length ............... 17

    3.    The Relief for the Class is Adequate Under Rule 23(e)(2)(c) ... 18

    4.    The Proposal Treats Class Members Equally .................. 23

  B.    Provisional Certification of the Settlement Class Should Be Granted . 25

    1.    The Proposed Class Satisfies the Prerequisites of Rule 23(a) ... 25

    2.    The Proposed Class Satisfies Rule 23 Predominance and Superiority ... 27

    3.    Injunctive Relief Class Prerequisites Under Rule 23 Are Satisfied ... 31

  C.    The Notice Plan Should Be Approved. ....................................... 31

VI.    SUMMARY OF ISSUES ADDRESSED AS A RESULT OF THE PREVIOUS HEARINGS ................................................................... 33

  A.    Injunctive Relief for False Advertising. ..................................... 33

  B.    Injunctive Relief for Gambling. ................................................. 35

  C.    Benefits of In-Game Virtual Diamonds ...................................... 38

  D.    Clear Sailing ............................................................................. 39

  E.    Notice ........................................................................................ 39

VII.   CONCLUSION .................................................................................. 39

1

2
<u>CASES</u>

3
*Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 957 (9th Cir. 2013) -------------------26

4
*Ahmed v. HSBC BANK USA*, No. ED CV 15-2057 FMO (SPx), 2019 WL 13027266,

5
   at *7 (C.D. Cal. Dec. 30, 2019)---------------------------------------------------------25

6
*Bias v. Wells Fargo & Co.*, 312 F.R.D. 528, 543 (N.D. Cal. 2015)------------------31

7
*Buechin v. Ogden Chrysler-Plymouth, Inc.*, 159 Ill. App. 3d 237, 250 (2d Dist.

8
   1987)-------------------------------------------------------------------------------------27

9
*Chowning v. Kohl's Dep't Stores, Inc.*, No. CV 15-08673 RGK (SPx), 2016 WL

10
   1072129, at *12 (C.D. Cal. Mar. 15, 2016) -----------------------------------------19

11
*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) ------------14

12
*Comcast Corp. v. Behrend*, 569 U.S. 27, 35, 133 S.Ct. 1426, 1433 (2013) --------30

13
*Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) -------------------26

14
*DiCicco v. PVH Corp.*, No. 19 CIV. 11092, 2020 WL 5237250, at *6 (S.D.N.Y.

15
   Sept. 2, 2020)---------------------------------------------------------------------------23

16
*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) ---------------27

17
*Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012)------28

18
*Gerboc v. ContextLogic, Inc.*, 867 F.3d 675, 679–81 (6th Cir. 2017) ---------------23

19
*Graves v. United Industries Corp.*, No. 2:17-cv-06983-CAS-SKx, 2020 WL

20
   953210, at *7 (C.D. Cal. Feb. 24, 2020)--------------------------------------------19

21
*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). ------ 14, 15, 26, 28

22
*Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 6619983, at *8

23
   (N.D. Cal. Dec. 18, 2018) ------------------------------------------------------------25

24
*Hilsley v. Ocean Spray Cranberries, Inc.*, No. 3:17-CV-2335-GPC-MDD, 2020

25
   WL 520616, at *7 (S.D. Cal. Jan. 31, 2020) --------------------------------------25

26
*In re Facebook Biometric Information Privacy Litig.*, 522 F. Supp. 3d 617, 622

27
   (N.D. Cal. Feb. 26, 2021)-------------------------------------------------------------24

28

*In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558-60 (9th Cir. 2019) ---- 15

*In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 567 (9th Cir. 2019) -------- 32

*In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) ------------------------------- 29

*Kater v. Churchill Downs Inc.*, 886 F.3d 784, 787-88 (9th Cir. 2018) -------------- 21

*Kelly v. First Astri Corp.*, 72 Cal. App. 4th 462 (1999) ------------------------------ 22

*Kim v. Carter's Inc.*, 598 F.3d 362, 364 (7th Cir. 2010) ----------------------------- 23

*Konik v. Cable*, No. CV 07-763 SVW (RZX), 2009 WL 10681970, at *18 (C.D.
    Cal., Dec. 2, 2009) ------------------------------------------------------------------- 30

*Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) -------- 30, 31

*Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013) ---------------- 30

*Loreto v. Gen. Dynamics Info. Tech., Inc.*, No. 3:19-cv-01366-GPC-MSB, 2021
    WL 1839989, at *7 (S.D. Cal. May 7, 2021) ---------------------------------------- 16

*Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 658 (1st Dist. 2001)
    ------------------------------------------------------------------------------------------- 29

*Nunez v. BAE Sys. San Diego Ship Repair Inc.*, 292 F. Supp. 3d 1018, 1033 (S.D.
    Cal. 2017) ------------------------------------------------------------------------------- 16

*People v. Super. Ct.*, 35 Cal. App. 5th 376, 409 (2019) ------------------------------ 35

*People v. Superior Court (J.C. Penney Corp.)*, 34 Cal. App. 5th 376, 409 (2019) 29

*Phillips v. Double Down Interactive LLC*, 173 F.Supp.3d 731 (N.D.Ill. 2016) ---- 20

*Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 (9th Cir. 2015)-- 26,
    30

*Rael v. Children's Place, Inc.*, 16-cv-370-GPC-LL, 2021 WL 1226475 (N.D. Cal.
    2021)------------------------------------------------------------------------------------- 23

*Spann v. J.C. Penney Corp.*, 2015 WL 1526559, at *3-8 (C.D. Cal. Mar. 23, 2015)
    ----------------------------------------------------------------------------------------- 23, 30

*Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016)-------------- 28

*Totz v. Continental Du Page Acura*, 236 Ill. App. 3d 891, 900 (2d Dist. 1992) --- 27

*True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1067 (C.D. Cal. 2010)------ 25

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ------------- 31

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 21 338, 350 (2011) ---------------------- 26

*Warner Const. Corp. v. City of Los Angeles*, 2 Cal.3d 285, 294 (1970) ----------- 26

*Williams v. Gerber Prods. Co.*, 552 F.3d 28 934, 938 (9th Cir. 2008) ------------- 26

## STATUTES

Cal Bus. & Prof. Code §§ 17200, *et seq*. ------------------------------------------- 6

Cal. Bus. & Prof. Code §§ 17500, *et seq*. ------------------------------------------ 6

Cal. Civ. Code §§ 1750 *et seq*. ------------------------------------------------------- 6

Cal. Penal Code §330b(d) ------------------------------------------------------------- 21

## RULES

Fed. R. Civ. P. 23(e)(1)(B)(i) ------------------------------------------------------- 14

Fed. R. Civ. P. 23(e)(2) --------------------------------------------------------- 14, 15

Fed. R. Civ. P. 23(e)(2)(C) ----------------------------------------------------- 19, 23

## I.      INTRODUCTION

On January 24, 2024, Plaintiffs Jeremiah Ballew and Eleni Honderich, on behalf of themselves and all others similarly situated ("Plaintiffs") and Defendant Huuuge, Inc. ("Defendant" or "Huuuge") entered into a Class Action Settlement Agreement (the "Settlement"). Ryan Decl.,[1] Ex. 1. Plaintiffs moved for preliminary approval of the Settlement on April 30, 2024. After three hearings that addressed in detail various issues with the approval, the Court ordered Plaintiff to file a renewed motion for preliminary approval by December 27, 2024 that would include information about the issues addressed in the previous hearings.

Huuuge affiliates publish mobile games, including Huuuge Casino and Billionaire Casino (collectively, "Applications"), throughout the world, including the United States. The Applications allow users to play virtual slot machines through mobile devices using virtual chips. Players can either win or lose virtual chips in the Applications' slot machine games. The slot machines in the Applications are games of chance. Players receive free virtual chips upon beginning to play the Applications and then have opportunities to receive additional free virtual chips periodically or based on in-game events. Players can also purchase virtual chips and other virtual items in the Applications through an in-game store and through pop-up advertisements. This litigation arises out of the advertising practices in the Applications that Plaintiffs allege are misleading and certain mechanics of the Applications' slot machines that Plaintiffs allege render the games in the Applications to be illegal forms of gambling.

Plaintiffs contend that during the class period, Defendant advertised virtual chips in the Applications with deceptive original chip quantities ("reference chip quantities"). Plaintiffs allege the reference chip quantities are deceptive because Defendant rarely sells the reference chip quantities at the advertised prices. Instead,

---

[1] Declaration of Andrew Ryan in Support of Preliminary Approval of Class Action Settlement, Provisional Certification of Settlement Class and Approval of Procedure and Form of Notice ("Ryan Decl."), Dkt. 44.

the Applications' reference chip quantities are significantly lower than the chip quantities offered on a daily basis in the Applications. Players of the Applications are thus deceived into a false belief that they are receiving a significantly higher quantity of chips for a given price, when in reality, they are receiving no such bargain. As a result, Defendant has misled customers by falsely inflating the perceived value of their virtual chips and falsely inflating the perceived value of the Applications' sale offers, thereby inducing class members to buy items they would have never bought, or pay more than they otherwise would have paid, had they known the truth about Defendant's sale practices.

Further, the Applications also included countdown timers in presenting sales in the Applications' stores. Plaintiffs contend that these countdown timers are misleading, because the offered sales were not truly limited in time, but instead were offered daily. As a result, Defendant misled customers by creating a false sense of urgency and induced class members to buy items they would have never bought.

Plaintiffs also contend that the Applications violate California's gambling laws, including California's law prohibiting slot machines. Plaintiffs allege that in the absence of purchasing virtual chips in the Applications, players are unable to continue playing the slot machine games in the Applications for significant periods of time. Accordingly, the virtual chips wagered and lost in the Applications' slot machine games are things of value and extend players' ability to continue playing slot machines in the Applications. As explained below, Defendant denies all these claims and present a variety of legal and factual defenses.

Plaintiffs are pleased to present a Settlement that provides excellent relief for the classes of U.S. purchasers of virtual chips from the Applications (hereafter, the "Settlement Class," "Class Members" or the "Class").

With respect to the gambling claims, the Settlement provides for robust injunctive relief that changes the Applications far beyond prior settlements

2

involving social casino games. Specifically, and as detailed below, the changes Defendants will implement pursuant to the Settlement will allow all games in the Applications to be played continuously for free without material interruption. In contrast, in a lawsuit involving the Applications in Washington, the Applications were only changed to allow for a single game in the Applications to be played continuously. As one of the issues addressed in the three previous hearings, the parties have provided more specifics about the changes in game play, which are detailed below.

Plaintiffs asserted gambling claims only under California law. Plaintiffs did not assert gambling claims under Illinois law in view of legal precedent in that state on the issue of social casino games. The settlement specifically preserves gambling claims that any class members may have under the laws of states other than California and Illinois. In view of the Court's prior order in the related case of *Ochoa v. Zeroo Gravity Games, LLC* holding that monetary relief is not available for illegal gambling claims under California law and prior rulings from Illinois foreclosing monetary relief for illegal gambling claims under Illinois law, injunctive relief was likely the only available remedy for Plaintiffs in this case. Accordingly, the injunctive relief provided for in the Settlement to address the illegal gambling claims is adequate and does not undermine Class Members' rights to bring illegal gambling claims under their state laws.

The Settlement also provides for each Class Member to receive 375 Virtual Diamonds in the Applications having a value of approximately $6 per Class Member. Joint Stipulation,[2] ¶4. The Court had earlier inquired whether this relief was a remedy for the gambling or false advertising claims. Because injunctive relief is likely the only available remedy for the California and Illinois law gambling claims, the parties agree that the Virtual Diamonds (along with the

---

[2] Joint Stipulation in Support of Preliminary Approval of Class Action Settlement, Dkt. 56.

agreed changes in advertising practices) are in exchange for resolving the false advertising claims. The Virtual Diamonds in the Applications are usable to acquire and send virtual gifts within the Applications and to unlock slot machines and a bonus wall within the Applications. The Virtual Diamonds have no expiration dates, blackout dates or fees. The Applications consistently include benefits available for 375 Virtual Diamonds or less, meaning that Class Members can use their Virtual Diamonds without incurring any out-of-pocket expense. That the Virtual Diamonds have real value to players is confirmed by the data. Tregillis Decl. [Dkt. 55], ¶¶ 20-21. The number of Virtual Diamonds purchased by players has increased dramatically since 2020. *Id.*

As of April 2024, the Class consisted of more than 1.2 million individuals and is growing. Thus, the monetary value of the Settlement based on the Virtual Diamonds will be in the range of approximately $6.6 million to $7.6 million. Tregillis Decl. [Dkt. 55],[3] ¶¶29-30.

In-store credits are a common form of compensation for false advertising claims such as those at issue here. This is because unlike other settlements where receipt of the benefits are dependent on Class Members submitting a timely claim (usually resulting in less than 10% of the class benefiting), in this Settlement, all Class Members who do not affirmatively opt out will automatically receive the Virtual Diamonds within the Applications. Because the Virtual Diamonds never expire, the benefits of the Virtual Diamonds will forever remain with Class Members until they use them. There is no possibility of reversion to Defendant.

Moreover, the Settlement also provides impactful injunctive relief to prevent the false advertising at issue. The parties provided additional details, confirmed below, about those changes in advertising practices during the three previous hearings. In brief, though, Defendant is required to change the store in the

---

[3] Declaration of Christina Tregillis in Support of Plaintiff's Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of Settlement Class and Approval of Procedure for and Form of Notice, Dkt. 55.

1  Applications to offer for sale virtual items on an individual basis at their respective

2  base price, thereby eliminating the use of the fictitious reference chip quantities.

3  Settlement at §2.3.5. In other words, the reference chip quantities will no longer be

4  fictitious, but will be bona fide offers for chips in the Applications. Defendant is

5  also required to change the store in the Applications to remove any countdown

6  timers for offered sales. Settlement at §2.3.6.

7       Defendant is also required to move the internet links to resources relating to

8  video game behavior and gambling disorders and Defendant's self-exclusion

9  policy to a more prominent location within the Applications. Settlement at §2.3.[4]

10  These critical changes are not temporary; they must be maintained forever. While

11  difficult to calculate, the injunctive relief required by the Settlement has a potential

12  value for Class Members as high as $163.2 million. Tregillis Decl. [Dkt. 55], ¶45.

13       Class Counsels' proposed attorneys' fees and costs are a small fraction

14  (~20%) of the Settlement's monetary value – far less than the 25% benchmark –

15  with no reversion to Defendant and a tiny fraction (less than 1%) of the potential

16  value of the injunctive relief. The proposed $5,000 incentive awards to the class

17  representatives are within the norm. The Court had earlier been concerned that the

18  Settlement included a clear-sailing provision, under which Huuuge agreed not to

19  opposed the request for attorneys' fees. As explained below, the parties have

20  agreed to delete that provision from the Settlement.

21       In view of the risks of proceeding with this litigation through class

22  certification, summary judgment, trial, and appeal, and as further explained and

23  detailed in the three previous hearings, this is an excellent result for the Class.

24  Plaintiffs therefore respectfully request the Court to enter an order granting

25  preliminary approval of the Settlement, provisionally certifying the Settlement

26  _____

27  [4] The Court had questioned during one of the hearings whether these materials included information about gambling addictions. As the parties demonstrated, they already did. *See* Dkt. 71-1, Chuvaieva Decl., ¶¶ 3-7; Exs. 1-5. Plaintiffs did not

28  question the adequacy of the materials to address gambling, but did believe the materials should be more easily accessible. The settlement does that.

1  Class, directing notice of the Settlement in the manner proposed herein, and setting

2  a schedule for final approval.

3  **II.     PROCEDURAL BACKGROUND**

4       **A.     <u>This Lawsuit</u>**

5       Plaintiffs filed this lawsuit on June 2, 2023. Plaintiffs assert claims for

6  violations of (1) the California Unfair Competition Law, Cal Bus. & Prof. Code §§

7  17200, *et seq*. ("UCL"), (2) the California False Advertising Law, Cal. Bus. &

8  Prof. Code §§ 17500, *et seq*. ("FAL"), and (3) the Consumer Legal Remedies Act,

9  Cal. Civ. Code §§ 1750 *et seq*. ("CLRA"), (4) Illinois Consumer Fraud and

10  Deceptive Business Practices Act, as well as (5) fraud, (6) negligent

11  misrepresentation, and (6) unjust enrichment. Plaintiffs seek damages and

12  injunctive relief. Informed by the Court's rulings in the ZGG Actions, the parties

13  here agreed to stay the case to engage in information discovery and settlement

14  discussions prior to Defendant's deadline to respond to the Complaint.

15       **B.     <u>Earlier Related Case</u>**

16       The related action pending before this Court captioned *Ochoa v. Zeroo*

17  *Gravity Games LLC*, Case No. 2:22-cv-05896-GW-AS ("ZGG Action") was

18  removed from state court on August 19, 2022. The plaintiffs in the ZGG Action

19  raised claims similar to those asserted in this lawsuit, including allegations that the

20  ZGG mobile games used misleading reference prices and virtual currency

21  quantities and misleading countdown timers and that the ZGG games were illegal

22  gambling under California law. The Court issued various rulings in that action that

23  informed the Settlement in this case, which will be discussed in context below.

24       **C.     <u>Exchange of Information</u>**

25       The parties scheduled a mediation with the Honorable Margaret Morrow

26  (Ret.) for October 17, 2023. Ryan Decl. [Dkt. 44], ¶22. The parties agreed that

27  prior to mediation they would engage in informal discovery to facilitate settlement

28  discussions. Prior the parties' mediation, Defendants provided the following

1  information: (1) United States revenue for in-game purchases from the

2  Applications' in-game store from 2019; (2) the history of the Applications' use of

3  reference chip quantities and countdown timers in the Applications' in-game

4  stores; (3) data regarding which users were presented with terms of service that

5  included mandatory arbitration and class waiver; (4) details of what steps

6  Defendant took to comply with the settlement agreement entered into in *Wilson v.*

7  *Huuuge, Inc.*, Case No. 2:2018-cv-05276 (W.D. Wash.) ("*Wilson* Settlement"). In

8  addition, Plaintiff's counsel conducted an extensive investigation of Defendant's

9  publicly available financial statements, interviews of class members, and analysis

10 of defenses raised by counsel for Defendant. Ryan Decl. [Dkt. 44], ¶¶24-26.

11      **D.    Settlement Negotiations**

12      The parties held a full-day mediation with Judge Morrow on October 17,

13 2023. Although the case did not settle that day, the parties narrowed the issues in

14 dispute substantially. Specifically, the parties reached an agreement during

15 mediation regarding the changes to the Applications' advertising practices and the

16 game mechanics surrounding when a user runs out of chips, the availability of free-

17 to-play options and the accessibility of gambling addiction resources. The parties

18 also made significant progress towards narrowing the gap on monetary relief for

19 class members. The parties did not discuss or negotiate plaintiffs' counsel's request

20 for attorneys' fees and costs during the mediation. *Id.*, ¶27.

21      The parties then reengaged in direct settlement discussions in November

22 2023. Counsel for the parties then began an ongoing and regular dialogue over the

23 remainder of 2023 in dozens of emails, video conferences and phone calls. In these

24 direct sessions, the parties negotiated all the detailed and intricate aspects of the

25 Settlement, provision by provision. In the interim, Defendants provided additional

26 data regarding the pricing and value of various in-game items in the Applications

27 and the number of users and potential class members. The parties continued intense

28 back and forth dialogue and negotiations over numerous phone calls to address

1  additional details of the Settlement in December 2023 and reached an agreement

2  on all material terms with respect to Class Members' relief, including the amount

3  of Virtual Diamonds, distribution of Virtual Diamonds and guaranteed minimums

4  of that distribution. *Id.*, ¶¶28-29. Only after the material terms were agreed upon

5  did the parties reach an agreement regarding plaintiffs' counsel request for

6  attorneys' fees and costs. *Id.* at ¶30.

7        **E.**    <u>**Preliminary Approval**</u>

8        Plaintiffs moved for preliminary approval on April 30, 2024. The Court

9  issued several tentative rulings and held multiple hearings regarding concerns with

10  the Settlement. During those hearings and in related briefing, the parties addressed

11  the Court's concerns about various aspects of the settlement and provided

12  additional details about how, under the Settlement, Defendant would make changes

13  in advertising practices and game play.

14        On December 6, 2024, the Court ordered that Plaintiffs file a renewed

15  motion for preliminary approval that concisely again addresses, in one place, issues

16  thoroughly aired during previous hearings: "(1) how the games will comply with

17  the gambling laws of California and Illinois; (2) how the in-app credits are valued

18  in relation to the settlement; (3) any cost prohibitive considerations for issuing cash

19  relief; (4) illustrations (including screenshots and/or the video prototype) of how

20  the games will offer continuous free play; and (5) how the identified revisions to

21  the notice plan and settlement have been incorporated."

22  **III.**   **THE TERMS OF THE SETTLEMENT**

23        **A.**    <u>**The Settlement Class**</u>

24        The Settlement defines the classes whose claims are being resolved as

25  follows: "all Persons who or which made any Qualifying Purchases in the United

26  States or any of its territories on or before Preliminary Approval of the Settlement

27  and who or which also meet any one of the following criteria: (1) If they made

28  Qualifying Purchases from an IP address based in any state or United States

territory where the longest statute of limitations for any of the Released Claims is three (3) years or less, made the Qualifying Purchase on or after[5] June 2, 2020; (2) If they made Qualifying Purchases from an IP address based in any state or United States territory where the longest statute of limitations for any of the Released Claims is four years, made the Qualifying Purchase on or after June 2, 2019; or (3) If they made Qualifying Purchases from an IP address based in any state or United States territory where the longest statute of limitations for any of the. Released Claims is longer than four years, made the Qualifying Purchase on or after June 2, 2017." The Settlement defines "Qualifying Purchase" to mean "any purchase of any virtual items or other services or benefits from one or more of the Applications or any other payment made through one or more of the Applications." Settlement at §§1.20, 1.26.

### B.    Settlement Consideration

#### 1.    Monetary Benefits to the Class

Under the Settlement, each Class Member who does not timely opt out of the Settlement "shall automatically receive" 375 Virtual Diamonds in the Applications. Settlement at §2.1. Virtual Diamonds are digital items referred to as diamonds that are electronically presented, sold and distributed in the Applications. Virtual Diamonds may be used in the Applications to acquire and send virtual gifts to other players. Virtual Diamonds are also usable to unlock games within the Applications. Joint Stipulation [Dkt. 56], ¶3. The Virtual Diamonds do not have an expiration date and Defendants may not cancel the Virtual Diamonds. Virtual Diamonds will not revert to the Defendant. The Virtual Diamonds granted under the Settlement will have the same value and usability as other diamonds in the Application with no additional restrictions or use and no fees associated with the use or non-use of such Virtual Diamonds. Settlement at §2.11.

---

[5] The parties initially inadvertently used the word "before" where the word is now "after," but agreed to fix the mistake.

Defendant sells Virtual Diamonds in the Applications at a rate of 500 diamonds for $7.99. Joint Stipulation [Dkt. 56], ¶4. Accordingly, the 375 Virtual Diamonds provided to Settlement Class Members under the Settlement is approximately $6 in value to each Settlement Class Member. This represents a total potential value to Class Members in excess of $7.5 million. Tregillis Decl. [Dkt. 55], ¶30. Each Class Member who or which does not elect to opt out shall automatically receive the Virtual Diamonds from Defendant in one or both of the Applications, with no requirement for a claim to be submitted. Settlement at §2.2. Users of the games regularly and in increasing numbers have purchased Virtual Diamonds at the $7.99 price, thus demonstrating their value to class members. *Id.*

### 2.    Injunctive Relief Benefits to the Class

The Settlement provides for significant injunctive relief whereby Defendant agrees to implement, no later than 90 days after the Court's entry of an order granting Preliminary Approval the following changes to the Applications:

- Defendant will change the store in the Applications to offer for sale virtual items on an individual basis at their respective base price. As explained below, and as a result of the previous hearings, the parties have fleshed out in greater detail exactly how these changes will address the alleged advertising concerns, and are incorporating those specific details into a clarifying amendment to the Settlement.
- Defendant will change the store in the Applications to remove any countdown timer for offered sales.
- Defendant will change the mechanics for the Applications to provide continuous free play in each and every game offered in the application. Again, and as a result of the previous hearings, the parties have provided more details (explained below) about how precisely free play will work, and will also be incorporating those specifics into a clarifying amendment to the Settlement.

10

- Defendant presently provides within the "FAQ" section of its Applications internet links to resources relating to gambling addiction and video game behavior disorders and Defendant's self-exclusion policy. Defendant agrees to move these links to a more prominent location, the "Terms, Policy & Consent" section of the Applications.

Settlement at §2.3. There is no end date to these changes to the Applications.

## 1. Attorneys' Fees, Costs, Incentive Awards, and Administration Costs

As noted, the Settlement provides a direct monetary value of approximately $6 per Class Member consisting of 375 Virtual Diamonds. For the estimated 1,264,407 Class Members as of April 2024, this computes to a total monetary value of the Settlement in excess of $7.6 million. Joint Stipulation [Dkt. 56], ¶5; Tregillis Decl. [Dkt. 55], ¶30. In the event that the number of Class Members is less than currently estimated, the Settlement guarantees that Defendant will distribute no less than 412,500,000 Virtual Diamonds to Class Members, having a value of $6,591,750.  Tregillis Decl. [Dkt. 55], ¶29. Injunctive relief, which includes providing Class Members' with true free play in every game within the Applications (thereby eliminating their need to spend money to continue playing games in the Application) has a potential impact of approximately $163.2 million. Tregillis Decl. [Dkt. 55], ¶45.

In consideration of obtaining these significant benefits for the Class, the many hours spent by Class Counsel, the significant funds Class Counsel has spent on litigation costs, including experts, in litigating this case, and the risks taken by Class Counsel, the Settlement provides that Class Counsel may seek an award of attorneys' fees and costs up to $1,440,000 Settlement at § 2.5.2. While originally, the Settlement provided for "free sailing" for that request to be made without opposition, the parties have agreed to eliminate the "free sailing" provision in response to the Court's concerns. Class Counsel estimates that their total litigation

1  costs through final approval will be approximately $100,000. (Ryan Decl. [Dkt.

2  44], ¶19.) Therefore, Class Counsel's fee request amounts to 19-21% of the $6.6 -

3  7.6 million monetary value recovered for the Class, not considering the value of

4  the injunctive relief. (*See id.*) If the value of the injunctive relief is considered,

5  Class Counsel's request for fees is less than 1% of the overall value provided to the

6  Class. (*See id.*) Counsel have spent considerable time and money working on the

7  Action and will provide an exact accounting of time and costs for the Court's

8  consideration at final approval. (*Id.*)

9      Furthermore, the parties agree that if the Court awards an amount less than

10  $1,440,000 in fees and costs, the difference will *not revert* to Defendants.

11  Settlement at §2.6. Instead, it will be donated to *cy pres*—either the National

12  Consumer Law Center (NCLC) (as proposed by Plaintiffs) or an organization

13  independently chosen by the Court. The Settlement further provides that each of

14  the two class representatives may seek an incentive award not to exceed $5,000

15  with no opposition from Defendants. *Id.* at §2.4.

16      Defendant is also agreeing to pay out-of-pocket the costs of notice and

17  claims administration, which will not exceed $250,000.

18                    **3.      Release and Dismissal of Class Claims**

19      Defendant denies liability. *Id.* at 3. Thus, in exchange for the above-

20  described benefits of the Settlement, the individual Plaintiffs and all Class

21  Members who do not opt out agree to a standard release against Defendants and

22  other affiliated entities. *Id.* at §3. However, because the Class Members include

23  non-California and non-Illinois residents who may have monetary claims related to

24  the Applications' alleged violations of gambling laws in other states, the Released

25  Claims for Class Members explicitly exclude "claims that the Applications are

26  illegal gambling under state laws other than California or Illinois.…" *Id.* at §1.21.

27

28

C.   <u>Notice and Settlement Administration Program</u>

Angeion Group will be the settlement administrator. *Id.* at §1.25. The notice program tailored by the parties and Angeion Group to reach Class Members was designed to give the best notice practicable. Angeion Group also administered the notice program in the previous Washington state class settlement, and so has proven the efficacy of the notice program. The program is reasonably calculated under the circumstances to apprise Class Members of the Settlement, how they will automatically receive their Virtual Diamonds, and their right to opt out or object. Weisbrot Decl. [Dkt. 48],[6] ¶¶18-48. The notice program consists of first of email notice to all Class Members at the email address obtained by subpoena of the platform companies (i.e. Apple and Google). Because of stringent European data privacy restrictions, Defendant does not itself have email addresses of other contact information for class members, but rather must obtain that information through the platforms. Class members obtained the Applications through the platforms, which do have class member email addresses, and can obtain those when provided by Defendant with each class members account number for the Applications. Again, this was the exact process successfully used in the Washington state settlements. Angeoin also has means to check and confirm the email addresses of class members obtained through the platforms. *See* Dkt. 48, ¶¶28-30.

In addition to direct email, which alone should be effective to reach most all class members, the notice program will also include extra notice efforts, specifically: (1) an online media campaign targeted towards Class Members, (2) publication notice in the California and Illinois editions of USA Today for a four week period, (3) notice to the appropriate federal and state officials as required by the Class Action Fairness Act, and (4) notice of distribution of the Virtual

---

[6]

**MEMO ISO PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT - 2:23-CV-04324**

1  Diamonds after final approval to all Class Members, except those who have opted

2  out. *Id.*; Settlement at §4.1.

3      Class Members will have at least 56 days from the date of the Email Notice

4  to submit any objections or to opt out. Settlement at §§ 1.16, 4.3, 4.4. Instructions

5  for submitting objections and opting out are described in detail in the Full Notice

6  on the settlement website, which all Class Members via all forms of notice will be

7  made aware of. *Id.* at §4.1; Ryan Decl. [Dkt. 44], Exs. 2-4.

8      Finally, Angeion may also be involved in any effort by Defendant to

9  determine if a Class Member has more than one user account with the Applications

10  to avoid such a Class Member receiving more than 375 Virtual Diamonds under

11  the Settlement. Defendant may choose not to engage in such a process. In no event

12  will the total amount of Virtual Diamonds awarded to the Class Members be below

13  412,500,000. *Id.* at §2.1.

14  **IV.    LEGAL STANDARD**

15      The Ninth Circuit maintains a "strong judicial policy" that favors the

16  settlement of class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276

17  (9th Cir. 1992). Before a district court grants approval, it must determine that the

18  settlement would be "fundamentally fair, adequate, and reasonable." *Hanlon v.*

19  *Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). Congress amended Rule 23,

20  which took effect on December 1, 2018. These amendments provide guidance on

21  the "fair, adequate, and reasonable" standard at the preliminary approval stage. *See*

22  Fed. R. Civ. P. 23(e)(2). The amended Rule 23 clarifies that courts must employ a

23  two-step process in granting preliminary approval. Under the first step, the parties

24  must show "that the court will likely be able to (i) approve the proposal under Rule

25  23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B)(i). These factors are set forth in Rule

26  23(e)(2).

27      The second step of the analysis requires a "showing that the court will likely

28  be able to . . . (ii) certify the class for purposes of judgment on the proposal." Fed.

R. Civ. P. 23(e)(1)(B)(ii). Where, as here, the proponents of the proposed settlement seek certification of a settlement class seeking monetary remedies, they must demonstrate that they meet the prerequisites of Rule 23(a), as well as the requirements of Rule 23(b)(3). *See Hanlon*, 150 F.3d at 1019-1022.

Rule 23(a) requires the putative class to meet four threshold requirements: numerosity, commonality, typicality, and adequacy of representation. Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). But whether a proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed by whether certification is for litigation or settlement." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558-60 (9th Cir. 2019).

## V.    THE COURT SHOULD GRANT PRELIMINARY APPROVAL

### A.    <u>The Proposed Settlement is Fair and Reasonable</u>

As noted above, under the first step of the Court's analysis of whether preliminary approval of a class settlement should be granted, the parties must show "that the court will likely be able to (i) approve the proposal under [the final approval factors set forth in] Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B)(i). These factors are considered below, in turn.

#### 1.    The Class Is Adequately Represented by Plaintiffs and Counsel

The first fairness factor under Rule 23(e)(2) is whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). "To determine legal adequacy, the Court must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Nunez v. BAE Sys.*

1   *San Diego Ship Repair Inc.*, 292 F. Supp. 3d 1018, 1033 (S.D. Cal. 2017) (citations

2   omitted). The analysis is also "redundant of the requirements of Rule 23(a)(4) and

3   Rule 23(g), respectively." *Loreto v. Gen. Dynamics Info. Tech., Inc.*, No. 3:19-cv-

4   01366-GPC-MSB, 2021 WL 1839989, at *7 (S.D. Cal. May 7, 2021).

5       Here, there is no conflict between Class Members and the class

6   representatives and counsel. Further, the class representatives and counsel have

7   more than adequately represented the class.

8       The class representatives have cooperated in the pre-suit investigation,

9   prosecution and settlement of this Action by producing documents, being

10  interviewed and providing a detailed letter to the mediator explaining their

11  experience with the Applications and the harm they have suffered. The class

12  representatives have also been involved and kept up to date on all aspects of the

13  case, including evaluation of the settlement terms. Ryan Decl. [Dkt. 44], ¶10, 35;

14  Ballew Decl. [Dkt. 45],[7] ¶¶7-12; Honderich Decl. [Dkt. 46],[8] ¶¶8-14.

15      Further, Class Counsel has vigorously prosecuted this case on behalf of the

16  Class. Class Counsel investigated the Applications and the legality of their

17  advertising and slot machine games under the laws of various states for over a year

18  prior to filing this Action. This has required Class Counsel to, among other things,

19  investigate the validity of claims arising from Defendants' practices on two

20  different Applications and across multiple platforms and user accounts over the

21  course of several months to verify that presentation of sale advertisements in the

22  Applications across different users and platforms. Class Counsel also had to

23  investigate the Applications' presentation (or lack thereof) of Defendant's Terms

24  of Service across platforms and for different users. Class Counsel also had to study

25  _____

26  [7] Declaration of Jeremiah Ballew in Support of Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of Settlement Class, and Approval of Procedure and Form of Notice, Dkt 45.

27  [8] Declaration of Eleni Honderich in Support of Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of Settlement Class, and

28  Approval of Procedure and Form of Notice, Dkt 46.

the prior litigations and settlement involving the Applications in the *Wilson* litigation. Class Counsel also had to expend significant time and resources finding class representatives. Ryan Decl., ¶¶10-20.

Further, in connection with the ZGG Action, Class Counsel defeated challenges to the pleadings and claims that Defendant would have raised in this Action. Class Counsel also engaged in significant informal discovery with Defendant both before and after mediation to obtain complete and accurate information regarding Class Members and the Applications financial data. Further, Counsel's efforts also included lengthy settlement negotiations in a full day mediation session and through dozens of direct communications with counsel to achieve this Settlement. Ryan Decl., ¶¶14-15.

Finally, Class Counsel has extensive experience in complex litigation spanning 20 years, including numerous trials, a clerkship, complex litigation experience at large firms, including trials, and class action litigation experience. Ryan Decl., ¶¶4-9. In sum, the class representatives and counsel have more than adequately represented the class.

### 2. The Proposal Was Negotiated at Arm's Length

The second Rule 23(e)(2) factor looks at whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). This is "described as [a] 'procedural' concern[], looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e)(2), 2018 Advisory Comm. Notes. "[T]he involvement of a neutral or court-affiliated mediator or facilitator in [settlement] negotiations may bear on whether th[ose] [negotiations] were conducted in a manner that would protect and further the class interests." Fed. R. Civ. P. 23(e), 2018 Advisory Comm. Notes.

The settlement here was the product of extensive and painstaking arm's length negotiations. *See supra* at II.C-D. Further, the Settlement excludes from the release claims of illegal gambling under state laws other than California and

1    Illinois, thereby preserving the rights of Class Members to pursue those claims

2    under other state laws. Settlement at §1.21. This further demonstrates that the

3    negotiations here were done at arm-length and were not a collusive effort to benefit

4    either party at the expense of the class.

5              **3.      The Relief for the Class is Adequate Under Rule 23(e)(2)(c)**

6         Under the third Rule 23(e)(2) factor, the Court must consider whether "the

7    relief provided for the class is adequate, taking into account: (i) the costs, risks, and

8    delay of trial and appeal; (ii) the effectiveness of any proposed method of

9    distributing relief to the class, including the method of processing class-member

10   claims; (iii) the terms of any proposed award of attorney's fees, including timing of

11   payment; and (iv) any agreement required to be identified under Rule 23(e)(3)[.]"

12   Fed. R. Civ. P. 23(e)(2)(C). Under this factor, the relief "to class members is a

13   central concern." Fed. R. Civ. P. 23(e)(2)(C), Advisory Comm. Notes. As shown

14   below, the Settlement satisfies these factors.

15              **a.      The costs, risks, and delay of trial and appeal**

16        A "central concern" when evaluating a proposed class action settlement

17   "relate[s] to the cost and risk involved in pursuing a litigated outcome." Fed. R.

18   Civ. P. 23(e), 2018 Advisory Comm. Notes; *see also Graves v. United Industries*

19   *Corp.*, No. 2:17-cv-06983-CAS-SKx, 2020 WL 953210, at *7 (C.D. Cal. Feb. 24,

20   2020). Here, the risk, expense, complexity, and likely duration of further litigation

21   all weigh in favor of approving the proposed Settlement. *See, e.g., Chowning v.*

22   *Kohl's Dep't Stores, Inc.*, No. CV 15-08673 RGK (SPx), 2016 WL 1072129, at

23   *12 (C.D. Cal. Mar. 15, 2016). While Plaintiffs here would have had a solid

24   damage model consistent with *Chowning*, litigation inherently carries risk. *See*

25   Tregillis Decl. [Dkt. 55], ¶¶12-18, 44, 57. Moreover, Plaintiffs would face years of

26   litigation against experienced defense counsel. Among the defenses that defense

27   counsel would have pursued are that Plaintiffs lack standing to seek injunctive

28   relief, the Applications do not violate California gambling laws, class certification

is inappropriate because certain class members are subject to mandatory arbitration and class waiver provisions, class certification is inappropriate because Plaintiffs could not show that class members saw and relied on the alleged false advertising in a common manner, Plaintiffs could never certify a national class because of differences in law between the states, Huuuge, Inc. is the incorrect defendant, and Plaintiffs would only be entitled to nor or only a minimal amount of restitution, because class members received the benefit of the bargain.

Without a settlement, this case would force Plaintiffs to conduct further class discovery, successfully prosecute a motion for class certification and potentially oppose a Rule 23(f) petition to the Ninth Circuit, conduct merits discovery, successfully oppose summary judgment, undertake expert discovery, make pretrial disclosures and filings, and try the case. And, even if Plaintiffs prevail at trial, they may have to oppose a lengthy appeal. In contrast, a settlement ensures Class Members promptly receive the significant benefits negotiated for them and that the Applications are promptly changed to eliminate their misleading advertisement and most addictive game mechanics.

Further, the expert and case-related costs alone in this type of class action, which is already expected to be approximately $100,000, would likely fall between $500,000 to $1,000,000 based on Class Counsel's experience. Ryan Decl. [Dkt. 44], ¶19. Moreover, by virtue of Plaintiffs' lawsuits, Defendants have agreed to change their business practices in a fundamental and robust way. This injunctive relief, alone, creates a significant value to consumers and is directed to the heart of the issues raised in this Action. Tregillis Decl. [Dkt. 55], ¶¶32-58. In sum, this first Rule 23(e)(2)(C) factor weighs heavily in favor of preliminary approval.

### b. Compliance with California and Illinois Gambling Laws

In *Phillips v. Double Down Interactive LLC*, 173 F.Supp.3d 731 (N.D.Ill. 2016), the court held that under Illinois Loss Recovery Act, the operator of the

social casino game (Double Down) is not a "winner" as required by the statute. *Id.* at 740. On this basis, the court dismissed the plaintiff's claims under Illinois gambling laws. In view of this precedent, Plaintiffs here did not allege a claim for illegal gambling under Illinois law for Ms. Honderich, an Illinois resident.

In *Kater*, the Ninth Circuit held that a social casino game was an illegal form of gambling because the virtual chips used in the game were a "thing of value" under Washington law, because the virtual chips extended gameplay. The Court reasoned that "if a user runs out of virtual chips and wants to continue playing [the game], she must buy more chips to have 'the privilege of playing the game.'" *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 787-88 (9th Cir. 2018). California's gambling statute has similar language that a "thing of value" or "additional chance to use the slot machine or device" that is lost to a game of chance constitutes illegal gambling. Cal. Penal Code §330b(d).

With the changes Defendants will make to the Applications pursuant to the Settlement, Plaintiffs believe that the virtual chips in the Applications will no longer constitute a "thing of value" or "additional chance to use the slot machine or device" under California law. This is because, as explained more fully below, the Applications will automatically and without material interruption provide users who run out of virtual chips with enough free virtual chips to continue playing each of the games in the Applications. In this way, all of the games in the Applications will be playable continuously without the need to purchase any chips. The chips will therefore no longer be needed to extend gameplay for any of the games in the Applications, and this will resolve any gambling concerns under Illinois or California law.

These changes far exceed those approved in other class action settlements involving social casino games. For example, in *Wilson v. Huuuge Inc.*, which involved the same Applications as those at issue here, the settlement only required that "players who rung out chips will be able to continue to play at least one game

1  within the Application they are playing." *Wilson v. Huuuge, Inc*, Case No. 3:18-cv-

2  05276-RSL (W.D.Wash.), Dkt. 99-1 at 15. As a result, Defendant implemented a

3  "Lite Mode" that only offered a single degraded version of the slot machines

4  offered in the Applications, removed of many features and functions. In contrast,

5  pursuant to the Settlement here, the Applications will allow all of the games in the

6  Applications to be available for continue play without purchase by pushing users

7  free chips when they run out of chips sufficient to keep playing without material

8  interruption. Accordingly, the injunctive relief with respect to the gambling claims

9  provided in the Settlement is robust.

10          c.      **The Virtual Diamonds Are Adequate Compensation**

11                  **for Plaintiffs' False Advertising Claims**

12          In the related case of *Ochoa v. Zeroo Gravity Games, LLC*, this Court ruled

13  that monetary relief was not available under California's gambling laws, relying on

14  *Kelly v. First Astri Corp.*, 72 Cal. App. 4th 462 (1999). As discussed above,

15  Illinois law also does not support monetary relief for illegal gambling claims.

16  Further, the Settlement does not release Class Members' claims for illegal

17  gambling under any state law other than California or Illinois. Accordingly, to the

18  extent any Class Member has an illegal gambling claim against Defendant under

19  their respective state law, the Settlement does not foreclose their ability to pursue

20  those claims.

21          The monetary relief provided in the Settlement, therefore, is directed to

22  compensating Class Members for the false advertising claims brought by Plaintiffs.

23  Those claims are based on allegations that the Applications used false reference

24  pricing by displaying fictitious chip quantities as a comparison for advertising

25  purported sales. While Plaintiffs believe those claims to be meritorious, litigating

26  those claims to trial would have faced several challenges, most notably challenges

27  in (1) certifying a national class and (2) measuring damages.

28

With respect to the challenges regarding national class certification, in the related *Ochoa* litigation, this Court ruled that non-California resident cannot bring claims under California's consumer protection laws. Because Defendant is a Delaware corporation with foreign affiliates that operate the Applications, there was a potential risk that Plaintiffs would have needed to bring claims under individual state laws. State law differs with respect to false reference pricing claims, particularly as to damages. *Compare Spann v. J.C. Penney Corp.*, 2015 WL 1526559, at *3-8 (C.D. Cal. Mar. 23, 2015) *with DiCicco v. PVH Corp.*, No. 19 CIV. 11092, 2020 WL 5237250, at *6 (S.D.N.Y. Sept. 2, 2020)*; Gerboc v. ContextLogic, Inc.*, 867 F.3d 675, 679–81 (6th Cir. 2017)*; Kim v. Carter's Inc.*, 598 F.3d 362, 364 (7th Cir. 2010). In view of these complexities, false reference pricing claims are often resolved with class benefits in the form of in-store credits. *See Kahn v. Boohoo.com USA, Inc., et al.*, Case No. 20-3332-GW-JEMx (C.D. Cal.); *Rael v. Children's Place, Inc.*, 16-cv-370-GPC-LL, 2021 WL 1226475 (N.D. Cal. 2021).

Accordingly, the Settlement's monetary relief to Class Members represents a reasonably compromise. Further, in view of the changes to the Applications discussed above, which provides users with unlimited free chips whenever needed, the form of in-game credit (Virtual Diamonds) is superior and provides more value than providing Class Members with virtual chips. Further, the Virtual Diamonds have not been the subject of the false reference pricing alleged in the Complaint and their historic sale price has been stable. Still further, the data shows that Class Members utilize the Virtual Diamonds at a high rate. Taken together, this supports a finding that the $6 per Class Member valuation of the Virtual Diamonds provided under the Settlement is reliable and reasonably accurate.

              **d.**       **The Claims Process and Distribution of Relief Are Effective**

1    The Court must next consider "the effectiveness of any proposed method of

2    distributing relief to the class, including the method of processing class-member

3    claims." Fed. R. Civ. P. 23(e)(2)(C) and 2018 Advisory Comm. Notes.

4    Additionally, "the court should be alert to whether the claims process is unduly

5    demanding." *Id.* Here, Class Members face no obstacles to receiving the benefits of

6    the Settlement because those who do not opt out will *automatically* (without the

7    need to file a claim) receive their Virtual Diamonds with no fees, restrictions or

8    expiration date. Because Defendant is a mobile games publisher, all their

9    customers had to create accounts in the Applications. The Virtual Diamonds may

10   thus be distributed to all Class Members within the Applications, eliminating the

11   need for a claims process and guaranteeing that each Class Member will receive

12   their Virtual Diamonds in the relevant account - the Applications themselves in

13   which the Class Members made Qualified Purchases. Thus, this is far better than a

14   traditional settlement where only a small fraction of class members benefit due to

15   dependence on locating and reaching class members and requiring them to submit

16   a claim with detailed information regarding their purchases. *See In re Facebook*

17   *Biometric Information Privacy Litig.*, 522 F. Supp. 3d 617, 622 (N.D. Cal. Feb. 26,

18   2021) (claims rate of "4-9% [] is typical for consumer class actions"). Moreover,

19   the Virtual Diamonds give Class Members a variety of uses, which are discussed

20   below.

21           a.  The Attorneys' Fees Clear Sailing Provision Has Been Removed

22           The parties' have agreed to amend the Settlement to delete the clear sailing

23   provision with respect to attorneys' fees. Plaintiffs will submit their application for

24   attorneys' fees in conjunction with Final Approval together with evidence and

25   argument for why their application is reasonable and warranted.

26           **4.    The Proposal Treats Class Members Equally**

27           The final Rule 23(e)(2) factor turns on whether the proposed settlement "treats

28   class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D).

23

"Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23(e)(2)(D), 2018 Advisory Committee Notes. Thus, under this factor, courts consider whether the Settlement "improperly grant[s] preferential treatment to class representatives or segments of the class." *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 6619983, at *8 (N.D. Cal. Dec. 18, 2018); *see also True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1067 (C.D. Cal. 2010). No such concerns exist in this case. All Class Members, no matter which of the Applications they bought from, what they bought, or whether they still have their order confirmations, will all be treated the same: they will each receive 375 Virtual Diamonds. *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 3:17-CV-2335-GPC-MDD, 2020 WL 520616, at *7 (S.D. Cal. Jan. 31, 2020). This equal treatment makes sense because all Class Members were uniformly exposed to the same deceptive discounting practice during the respective class period.

That the Settlement provides for the class representatives to each receive a $5,000 incentive award does not improperly grant them preferential treatment. Rather, it is an appropriate amount to compensate them for their time and dedication to the case, and the total payment for the two class representatives of $10,000 constitutes a miniscule fraction of the total minimum monetary value of the Settlement. *See Online DVD*, 779 F.3d at 947-48 (upholding $5,000 incentive awards that were 417 times larger than $12 gift cards because the awards were only 0.17% of the total $27 Million settlement fund); *Ahmed v. HSBC BANK USA*, No. ED CV 15-2057 FMO (SPx), 2019 WL 13027266, at *7 (C.D. Cal. Dec. 30, 2019) ($5,000 incentive award "presumptively reasonable").

Finally, the Settlement excludes from the release claims for illegal gambling under state laws other than California and Illinois. Therefore, Class Members who

24

1  have claims for illegal gambling under other state laws, including those for monetary

2  relief, are free to pursue those claims. The Settlement accordingly recognizes that the

3  state law of the named plaintiffs here may not adequately represent the entirety of the

4  Class Members and appropriately limits the scope of the release.

5      **B.**  **Provisional Certification of the Settlement Class Should Be**

6          **Granted**

7          1.      **The Proposed Class Satisfies the Prerequisites of Rule 23(a)**

8      **Numerosity.** Under Rule 23(a)(1), a class must be "so numerous that joinder

9  of all members is impracticable . . ." Here, this requirement is easily met because

10 there are in excess of 1.2 million class members. Joint Stipulation [Dkt. 56], ¶5.

11     **Commonality.** Rule 23(a)(2) requires that the case present "questions of law

12 or fact common to the class." The putative class must show that their claims

13 "depend upon a common contention of such a nature that it is capable of classwide

14 resolution—which means that determination of its truth or falsity will resolve an

15 issue that is central to the validity of each one of the claims in one stroke." *Wal-*

16 *Mart Stores, Inc. v. Dukes*, 564 U.S. 21 338, 350 (2011). Commonality has been

17 "construed permissively," and its requirements deemed "minimal." *Hanlon*, 150

18 F.3d at 1019-20. It does not "mean that every question of law or fact must be

19 common to the class; all that Rule 23(a)(2) requires is a single significant question

20 of law or fact." *Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 957 (9th Cir. 2013)

21 (internal quotations omitted).

22         For their claims under the UCL, FAL, and CLRA, Plaintiffs need only

23 "show that members of the public are likely to be deceived." *Williams v. Gerber*

24 *Prods. Co.*, 552 F.3d 28  934, 938 (9th Cir. 2008) (internal quotations omitted).

25 "This inquiry does not require individualized proof of deception reliance and

26 injury." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 (9th Cir.

27 2015) (internal quotations omitted). Similarly, Plaintiffs' California consumer

28 protection claims based on the *omission* of material information are also

1  actionable. *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015); *see*

2  *also Warner Const. Corp. v. City of Los Angeles*, 2 Cal.3d 285, 294 (1970)

3  (summarizing the three situations under California law where there is a duty to

4  disclose in the absence of fiduciary or confidential relations).

5      Similarly, Illinois' Consumer Fraud and Deceptive Business Practices Act

6  broadly prohibits the use of any deception, fraud, false pretenses or promises,

7  concealment, suppression, or omission of any fact that is material to a business

8  dealing or transaction. 815 ILCS 505/2; *Totz v. Continental Du Page Acura*, 236

9  Ill. App. 3d 891, 900 (2d Dist. 1992); *Buechin v. Ogden Chrysler-Plymouth, Inc.*,

10  159 Ill. App. 3d 237, 250 (2d Dist. 1987) ("The majority of the traditional common

11  law elements have been virtually eliminated by the [Act].").

12      Within this legal framework, Plaintiffs' claims share numerous overarching

13  questions of law or fact. The key common questions driving this litigation include

14  whether Defendants advertised using fictitious reference quantities and limited

15  time sales during the class periods, whether Defendants' representations and

16  omissions were likely to deceive, whether they were material, whether Defendants

17  owed a duty to disclose, and whether Plaintiffs and the Class are entitled to

18  restitution or damages. Complaint at ¶195. These questions are capable of class-

19  wide resolution. In other words, determining the truth or falsity of one or more of

20  these questions will resolve issues "central to the validity of each one of the claims

21  in one stroke." *Dukes*, 564 U.S. at 350. This case, therefore, satisfies commonality.

22      ***Typicality.*** Rule 23(a)(3) requires the putative class to show that "the claims

23  or defenses of the representative parties are typical of the claims or defenses of the

24  class." To meet the typicality requirement, Plaintiffs must show that: (1) "other

25  members have the same or similar injury"; (2) "the action is based on conduct

26  which is not unique to the named plaintiffs"; and (3) "other class members have

27  been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657

28  F.3d 970, 984 (9th Cir. 2011). Here, Plaintiffs' and the putative class members'

claims all arise from Defendants' misrepresentations, game mechanics and/or failures to disclose material facts. Each of the class representatives, just like all other Class Members, purchased Defendants' virtual items during the class period, were exposed to deceptive reference quantities and promotions on Defendants' Applications, did not receive the truth from Defendants about the reference quantities and promotions, relied on the deflated reference quantities and promotions in making their purchases, relied on the misleading countdown timers in making their purchases and were subjected to the inability to continue playing the games of chance in the Applications when they ran out of virtual chips.

*Adequacy.* Rule 23(a)(4) requires the representative parties to "fairly and adequately protect the interests of the class." "In making this determination, courts must consider two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1020).

As explained above and established by the declarations of the class representatives and Class Counsel, both questions are easily satisfied.

## 2.    The Proposed Class Satisfies Rule 23 Predominance and Superiority

*Predominance.* As noted, Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members . . . ." This "inquiry asks the court to make a global determination of whether common questions prevail over individualized ones." *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). "[A]n individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a *prima facie*

showing or the issue is susceptible to generalized, class-wide proof." *Id*. "When common questions present a significant aspect of a case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." *Hanlon*, 150 F.3d at 1022. Here, common issues predominate both as to questions of liability and damages.

Common Issues Relating to Liability Predominate

Common issues predominate over individualized inquiries as it relates to Defendants' liability for Plaintiffs' claims for violation of the UCL, FAL, CLRA, and Illinois Consumer Fraud and Deceptive Business Practices Act and for common law fraud. Here, the alleged false advertising was displayed on the Applications across all price points to all users for virtual chips sold during the class periods at issue. Complaint at ¶¶69-81, 92-96. Also, no consumers received any disclosure telling them the truth, namely, that the advertised reference quantities are not the prevailing or ordinary quantity of virtual chips sold at each respective price point and that the advertised specials are not truly limited in time, but are available virtually perpetually. As a result, all putative class members were exposed to the same false representations. Further, common issues predominate, because the virtual chips in the Applications are sold exclusively within the Applications. Defendant sets the prices and quantities for these virtual chips. Thus, the misleading reference quantities had the same effect on all users of the Applications, as there is no source external to the Applications themselves that formed the basis for users' understanding of the value of the virtual chips. *People v. Superior Court (J.C. Penney Corp.)*, 34 Cal. App. 5th 376, 409 (2019) ("[W]hen a retailer sells in-house goods, the retailer's *actual* prices regarding those goods constitute their market prices" and hence, the retailer's actual prices "provide an adequate basis for determining whether the retailer's advertised former price claims comply with section 17501.") (emphasis in original). Finally, Plaintiffs need

1    not demonstrate individualized  reliance on specific misrepresentations. *In re*

2    *Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009). Illinois similarly does not require

3    individualized reliance. *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d

4    642, 658 (1st Dist. 2001).

5         The findings of Plaintiffs' marketing expert also confirms that Defendants'

6    representations concerning their pricing and discounts are material to customers'

7    purchasing decisions, a concept confirmed by previous studies and literature.

8    Tregillis Decl. [Dkt. 55], ¶44. Indeed, there is no plausible argument that pricing is

9    not material to purchasing decisions. *Konik v. Cable*, No. CV 07-763 SVW (RZX),

10   2009 WL 10681970, at *18 (C.D. Cal., Dec. 2, 2009); *see also* Ballew Decl. [Dkt.

11   45], ¶¶4-6; Honderich Decl. [Dkt. 46], ¶¶5-7.

12        <u>*Common Issues Relating to Damages Predominate*</u>

13        At least where class certification is contested, the plaintiffs are merely

14   required to show that class damages match their theory of liability. *See Comcast*

15   *Corp. v. Behrend*, 569 U.S. 27, 35, 133 S.Ct. 1426, 1433 (2013); *see also Lambert*

16   *v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) (explaining that

17   *Comcast* stands "only for the proposition that 'plaintiffs must be able to show that

18   their damages stemmed from the defendant's actions that created the legal

19   liability'" and any "[u]ncertainty regarding class members' damages does not

20   prevent certification of a class as long as a valid method has been proposed for

21   calculating those damages.") (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510,

22   513-14 (9th Cir. 2013). "[T]he mere fact that there might be differences in damage

23   calculations is not sufficient to defeat class certification." *Pulaski*, 802 F.3d at 987.

24   "Class wide damages calculations under the UCL, FAL, and CLRA are particularly

25   forgiving. California law 'requires only that some reasonable basis of computation

26   of damages be used, and the damages may be computed even if the result reached

27   is an approximation.'" *Lambert*, 870 F.3d at 1183 (quoting *Pulaski*, 802 F.3d at

28   989).

1    Here, the available acceptable damages models attributable to the form of

2    advertisement Plaintiffs allege against the Zeroo Gravity Mobile Games are well-

3    established. *See Spann v. J.C. Penney Corp.*, 2015 WL 1526559, at *3-8 (C.D. Cal.

4    Mar. 23, 2015). Similarly, the potential impact of false comparison advertising on

5    estimated price premium between what consumers who were exposed to the

6    deceptive reference quantities and discount promotions would be willing to pay for

7    versus what they would pay if they were told the true reference price and true

8    discount have been well researched. Tregillis Decl. [Dkt. 55], ¶44. These studies

9    and potential impact on consumer purchase decisions and price premiums are tied

10   to Plaintiffs' theory of liability. *Id.* The damages methodology for Plaintiffs'

11   claims therefore satisfies the predominance requirement under *Comcast*. *See*

12   *Lambert*, 870 F.3d at 1184 (the question at class certification is only whether the

13   plaintiff "has presented a workable method."); *Bias v. Wells Fargo & Co.*, 312

14   F.R.D. 528, 543 (N.D. Cal. 2015) ("At class certification, Plaintiffs need only

15   show that damages can be determined and attributed to their theory of liability.").

16   **Superiority.** Rule 23(b)(3) also requires "that a class action is superior to

17   other available methods for fairly and efficiently adjudicating the controversy."

18   The class action method is considered superior if "classwide litigation of common

19   issues will reduce litigation costs and promote greater efficiency." *Valentino v.*

20   *Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Here, due to the sheer

21   number of Class Members (over 1.2 million) combined with the amount of

22   damages at issue for each Class Member as compared to the cost and burden of

23   litigation, it is not economically feasible to litigate this case through individual

24   lawsuits.

25   For the foregoing reasons, Plaintiffs have satisfied the requirements of Rule

26   23(a) and (b)(3). Plaintiff's request to certify the proposed settlement classes

27   should be granted.

28

1         **3.**    **Injunctive Relief Class Prerequisites Under Rule 23 Are**

2                **Satisfied**

3        Plaintiffs also meet the requirements of Rule 23(b)(2), which permits

4    certification for injunctive relief where "the party opposing the class has acted or

5    refused to act on grounds that apply generally to the class, so that final injunctive

6    relief or corresponding declaratory relief is appropriate respecting the class as a

7    whole." Fed. R. Civ. P. 23(b)(2). "Predominance and superiority are self-evident"

8    under Rule 23(b)(2). *Dukes*, 564 U.S. at 363. Here, Plaintiffs' available remedies

9    include injunctive relief. Cal. Bus. & Prof. Code §§ 17203, 17535; Cal. Civ. Code

10    § 1780(a)(2). Because Defendants are required to make changes to the

11    Applications that would be uniformly applicable to every Class Member who plays

12    the Applications, the injunctive relief here applies "generally to the class." The

13    Settlement thus provides meaningful injunctive relief to redress Plaintiffs' claims.

14    Absent the Settlement, this type of relief would only be available to the Class after

15    prevailing at trial.

16        **C.**    <u>**The Notice Plan Should Be Approved.**</u>

17        "Before the district court approves a class settlement under Rule 23(e), it is

18    'critical' that class members receive adequate notice." *In re Hyundai & Kia Fuel*

19    *Econ. Litig.*, 926 F.3d 539, 567 (9th Cir. 2019). For notice to a class proposed to be

20    certified for purposes of settlement under Rule 23(b)(3), "the court must direct to

21    class members the best notice that is practicable under the circumstances, including

22    individual notice to all members who can be identified through reasonable effort."

23    Fed. R. Civ. P. 23(c)(2)(B). Notice may be made by United States mail, electronic

24    means, or another type of appropriate means. *Id.* "The notice must clearly and

25    concisely state in plain, easily understood language: (i) the nature of the action; (ii)

26    the definition of the class certified; (iii) the class claims, issues, or defenses; (iv)

27    that a class member may enter an appearance through an attorney if the member so

28    desires; (v) that the court will exclude from the class any member who requests

1   exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding

2   effect of a class judgment on members under Rule 23(c)(3)." *Id.*

3        The Settlement's notice program satisfies these requirements. Angeion

4   Group, a highly experienced class administration firm, will be the settlement

5   administrator. Settlement at §1.25. Because Defendant is a mobile game publisher,

6   Class Members can be adequately notified of the Settlement by email at the

7   address on file with the platform providers on which the Applications are

8   distributed. Settlement at §4; Weisbrot Decl. [Dkt. 48], ¶¶23-30. The administrator

9   working with the Defendant will subpoena the platform providers for the

10  Applications, including Apple and Google, to provide email addresses for each of

11  the Class Members based on Defendants' records of user identifiers. The

12  administrator will then provide direct notice to each Class Member via email. The

13  timeline provided in the Settlement includes sufficient time to allow for those

14  email addresses to be subpoenaed.

15       Publication notice will also be disseminated in the California and Illinois

16  editions of USA Today for four consecutive weeks to satisfy the CLRA

17  requirements. Settlement at §4.1.5; Weisbrot Decl. [Dkt. 48], ¶¶31-32; Cal. Civ.

18  Code § 1781(d). The administrator will also create a settlement website posting a

19  copy of the Full Notice, operative complaints for each of the Actions, Settlement,

20  and Preliminary Approval Order. Settlement at §4.1.3; Weisbrot Decl. [Dkt. 48],

21  ¶¶49-53. The administrator will also create an internet campaign targeted at users

22  of the Applications to provide further reach and awareness of the Settlement

23  notice. Weisbrot Decl., ¶¶31-48. Finally, the settlement administrator will handle

24  dissemination of the notice to public officials required by CAFA. Settlement at

25  §4.1.4.

26       Further, the notice procedures will accurately inform Class Members of the

27  salient terms of the Settlement, the Class to be certified, the final approval hearing,

28  and the rights of all parties. The long form and short form notice have been

modified to include text indicating that Class Members may view on the settlement website (and the link provided above) illustrations of how the Applications will be modified. Exhibit A. The various notices all provide information on how Class Members can object and opt out of the Class, along with information about appearing at the final approval hearing. Weisbrot Decl., Ex. A. Class Members are informed about how they will receive Virtual Diamonds—namely, that they will automatically receive them if they do not opt out. *Id.* The notice also provides the contact information of Class Counsel. *Id.* The Parties here together with the administrator have created the forms of notice, which will satisfy both the substantive and manner of distribution requirements of Rule 23 and due process. Ryan Decl., ¶36.

Therefore, these proposed methods of giving notice are appropriate because they provide a fair opportunity for Class Members to obtain full disclosure of the conditions of the Settlement and to make an informed decision regarding the proposed Settlement. Thus, the notices and notice procedures amply satisfy the requirements of due process.

**VI.    SUMMARY OF ISSUES ADDRESSED AS A RESULT OF THE PREVIOUS HEARINGS**

As mentioned, during the three previous hearings and in supplemental briefings for those hearings, the parties addressed and believed they have resolved issues about the Settlement raised by the Court. The Court asked that the parties incorporate some discussion of those issues in this unified, renewed motion for preliminary approval. We summarize those issues and their resolution below, to the extent not already addressed above.

### A.    <u>Injunctive Relief for False Advertising.</u>

The Settlement as originally drafted called for two changes in advertising practices: (a) elimination of the count-down clocks; and (b) that "Defendant will

change the store in the Applications to offer for sale virtual items on an individual basis at their respective base price."  Settlement §2.3.

At one of the hearings, the Court expressed that it would like to have a better understanding of how the second change would address the alleged false reference prices. As Defendant explained in one of its supplemental filings in support of preliminary approval [See Dkt 71, pp. 11-12], this provision is intended provide fully transparent strike-through pricing. Suppose, hypothetically, Defendant has virtual items A, B, and C. In the Settlement Agreement, Defendant agrees to continuously offer each item at individual prices, e.g. virtual item A at $10 for 100 (or a 10 cent base unit price); virtual item B at $5 per 100 (or a 5 cent base unit price); and virtual item C at $15 for 100 (or a 15 cent base unit price). Suppose Defendant now offers a sale on a "bundle" consisting of 50 virtual items A ($5 at the individual base unit price); 20 virtual items B ($1 at the individual base unit price); and 10 virtual items C ($1.50 at the individual base unit price). The aggregate price of the bundle at the respective unit base prices would be $7.50. If Defendant offers the bundle at $6.50, the strike through price would be $7.50. In other words, any strike through price will be based on the separate offering prices for the bundled items. Defendant will also provide a clarifying note on the shop pages that "strike through pricing represents the total price of the bundled items calculated at the prevailing unit price for the individual items in the bundle over the previous three months."

Theses changes will make any reference pricing fully compliant. Plaintiffs have referenced 6 C.F.R. §233.1, which provides that any advertised former price must be "one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent regular course of business." *Id.* Plaintiffs have also referenced California Business and Professions Code section 17501, which requires any advertised reference price be the "prevailing market price … within the three months next preceding the publication of the

34

advertisement." Cal. Bus. & Prof. Code § 17501; *See also People v. Super. Ct.*, 35 Cal. App. 5th 376, 409 (2019) ("prevailing market price" for in-house goods can be the retailer's own prices). These provisions will be satisfied because the discount will be against the prevailing individual base unit prices offered over the previous three months.

The parties will incorporate these specifics into a clarifying written amendment to the Settlement, which the parties intend to lodge before the continued hearing on preliminary approval.

### B.    Injunctive Relief for Gambling.

The Settlement originally contemplated that Defendant would provide at least 4 separate games that were free to play, and provide notice to players when they would obtain more free chips to allow them to play other games that required additional chips. Settlement §2.3. At the Court's request for a more detailed explanation of the intended game changes, Defendant has provided specific details about the mechanics of its intended changes, which will go far beyond the base requirements of the Settlement by permitting continuous free play in all games in the Applications and not just in four, separate free to play games.

Specifically, as Defendant described in Dkt. 84, Defendant will provide full free play in the very same games available for those who pay for chips, and in each and every one of those games. That will work as follows. Every game has different levels with higher levels generally requiring more chips. If a player does not have enough chips to play the selected game at the selected current level, the game will automatically project an "Out of Chips?" pop-up that will look essentially as shown in the screenshot below.

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15

16    If the player pushes the "Free!" button, the game will automatically and for

17    no charge provide the player with the number of chips required for the minimum

18    bet at the lowest level within the current game. The "Free!" button also states the

19    number of chips to be received, and reads above the button that the player can "get

20    free chips to keep playing without missing a beat!" The number of chips awarded

21    for free will depend upon the minimum bet for the lowest level of the current

22    game.

23    If with the additional chips, the player has a chip balance insufficient to

24    make the minimum required bet at the current level in a game, the player will be

25    taken a screen that allows him or her to select a lower level (with a lower minimum

26    bet) of the same game.

27    After receiving free chips, and alternatively to choosing a lower level of the

28    same game, the player may exit to the game lobby, showing a selection of other

games. Within the lobby, the player may elect to play another game at a level where the minimum bet is within their current chip balance. The game lobby would remain the same as the game lobby in the current games.

As a result of this process, the player can keep continuously playing any game for free and forever merely by hitting the "Free!" button. The player may have to play a lower level of the current game, or may elect to choose a different game, if his or her balance drops below the required minimum for a specified level in a particular game. However, players will continue to have the other existing free means to acquire even more chips. These include free additional chip allotments every 15 minutes; every 8 hours; upon advancing levels; through joining game clubs; through so-called "lottery tickets"; and through winning at any level. See Dkt. 71 2 (Wronowski Declaration), p. 2, ¶ 4. Thus, even without paying for any chips, a player may never be relegated to a lower level of the existing game or another game with a lower minimum bet.

Again, the games that the player may play with free chips acquired after pushing the "Free!" button would be exactly the same as the games played by players who have paid for chips. The game lobby would also be exactly the same for all players – whether they do or do not purchase chips. Also, all the rewards and benefits within the game would be exactly the same whether playing with purchased chips, or chips gifted by pushing the "Free!" button.

Defendant provided further details and screen shots explaining these changes in Dkt. 84. Also, linked below is an interactve video showing, with an illustrative game, how this process will work in each game. Defendant's earlier filing provides, if needed, a step-by-step explanation of what occurs in the video. See Dkt. 84, pp. 6-7. Here is the link to the video of the prototype:

https://www.figma.com/proto/nMxbJmzLemmaV789k2Ikto/Lite-Mode-2.0?node-id=2-1645&node-type=canvas&t=k9t45LIEH3evyx8I-1&scaling=min-

zoom&content-scaling=fixed&page-id=0%3A1&starting-point-node-id=2%3A1645

Because these changes provide true and continuous free play for all games in the Applications, the games no longer will present any issues under the gambling laws of Illinois or California.

Again, the parties will incorporate these specifics into a written clarifying amendment.

## C.    Benefits of In-Game Virtual Diamonds

The Court had also inquired about the adequacy of in-game Virtual Diamonds, as opposed to a cash settlement, and specifically noted that class members who do not play the games will not benefit from the Virtual Diamonds. However, as the parties have explained in their other filings:

- Cash settlements customarily reach only 4 to 9% of class members. See above p. 26. More class members than that can expected to take advantage of Virtual Diamonds.

- To the extent class members were previously deterred from using games by allegedly false advertising or gambling concerns, the changes in game mechanics and advertising practices have resolved those concerns, which means more class members are likely to play the games.

- The Virtual Diamonds have real value, as shown by the statistics showing increased purchases of them. See above p. _.

- Coupon settlements are common resolutions to claims for false advertising and other consumer claims, and likewise are beneficial only to those class members who continue to use the product or service at issue. See Dkt. 71, p. 14. Yet those settlements are commonly approved. *Id.*

- Class members who are dissatisfied with the Virtual Diamonds of course ultimately have the right to opt out, and the Court can further assess the

desirablity of the settlement at the final approval hearing in light of any class member comments or opt outs.

•    A cash settlement would pose significant increased costs of claims administration, as demonstrated in the filings of Zero Gravity in the analogous Ochoa case. *See Ochoa v. Zeroo Gravity*, Case No. 2:22-cv-05986-GHW-AS, Dkt. 102, p. 25.

•    Ultimately, injunctive relief alone can be an adequate remedy where (as here) there are challenges to monetary relief (see Dkt. 71, p. 13), and as the Court has noted the Settlement Agreement provides "meaningful injunctive relief" that will "make impactful changes to the Huuuge Games." See Dkt. 62, p. 11-12. Here, the Settlement provides not only that robust injunctive relief, but the added benefit of Virtual Diamonds.

### D.    Clear Sailing

The Court had earlier expressed concern about the "clear-sailing" provision, which the parties will remove in the Settlement amendment. In any event, clear-sailing or no, ultimately, the Court will determine the reasonableness of fees, and that issue need not preclude preliminary approval. See Dkt. 71, pp. 21-22.

### E.    Notice

The Court has earlier expressed that it wanted to be sure that any notice to the class: (a) adequately described the changes in game play and advertising practices; and (b) prominently mentioned that the settlement did not bar claims under laws of states other than California or Illinois. The parties will submit a proposed notice before the hearing, that includes those details.

## VII.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the [Proposed] Preliminary Approval Order lodged concurrently herewith.

1

2  Respectfully submitted,

3

4                                              THE RYAN LAW GROUP

5  Dated: December 27, 2024          By: /s/Andrew T. Ryan
                                                   Andrew T. Ryan, Esq.
6                                              Counsel for Plaintiffs Jeremiah Ballew
                                                   and Eleni Honderich
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28