# Attachment 2

1  NICHOLAS W. BROWN
   Attorney General
2  ALISON E. CORDOVA, SBN #284942
   Assistant Attorney General
3  Complex Litigation Division
   800 Fifth Avenue, Suite 2000
4  Seattle, WA 98104-3188
   206-464-7744
5  Alison.Cordova@atg.wa.gov
   Attorneys for State of Washington
6
   **Redacted Version of Document**
7  **Filed Pursuant to ECF No. 114**

8            **UNITED STATES DISTRICT COURT**
             **CENTRAL DISTRICT OF CALIFORNIA**
9                  **WESTERN DIVISION**

10 JEREMIAH BALLEW and ELENI          NO. 2:23-cv-04324-GW-AGR
   HONDERICH, on behalf of themselves
11 and those similarly situated,        Assigned to Judge George H. Wu

12              Plaintiffs,             DECLARATION OF ALISON E.
                                        CORDOVA IN SUPPORT OF
13     v.                               BRIEF OF AMICUS CURIAE
                                        ATTORNEY GENERAL OF
14 HUUUGE, INC., a Delaware             WASHINGTON STATE IN
   corporation,                         OPPOSITION TO CLASS
15                                      ACTION SETTLEMENT
                Defendant.
16

17        I, Alison E. Cordova, declare as follows:

18        1.    I am over the age of 18, competent to testify as to the matters herein,

19 and make this declaration based on my personal knowledge.

20        2.    I am an Assistant Attorney General with the Washington State Office

21 of the Attorney General and one of the attorneys representing Amicus Curiae State

22 of Washington in the above-captioned matter.

DECLARATION OF ALISON E. CORDOVA
IN SUPPORT OF BRIEF OF AMICUS
CURIAE ATTORNEY GENERAL OF
WASHINGTON STATE IN OPPOSITION TO
CLASS ACTION SETTLEMENT
NO. 2:23-cv-04324                        1          ATTORNEY GENERAL OF WASHINGTON
                                                         Complex Litigation Division
                                                         800 Fifth Avenue, Suite 2000
                                                           Seattle, WA 98104-3188
                                                               206-464-7744

1    3.    In 2021, Huuuge, Inc. (Huuuge) reached a settlement with Washington

2    consumers on allegations that Huuuge's casino apps violate Washington gambling

3    and consumer protection laws. The State of Washington was not a party to and did

4    not participate in the case or settlement.

5    4.    In October 2024, as part of a broader investigation into casino apps, the

6    Attorney General of Washington State launched an independent civil investigation

7    into Huuuge, Inc. (Huuuge) concerning potential violations of Washington's

8    gambling and consumer protection laws. As part of that investigation, the Attorney

9    General of Washington State learned the following information:

10    a.    Between January 1, 2022, and December 31, 2024, Huuuge

11    earned ███████ in revenue from in-app purchases by

12    Washington players, which averages to ██████ per month.

13    b.    Between January 1, 2019, and December 31, 2021, Huuuge

14    earned ███████ from in-app purchases by Washington

15    players, which averages to █████ per month.

16    c.    Between June 2, 2019 and April 29, 2025, Washington

17    consumers lost over ██ million in illegal gambling activities

18    within Huuuge's casino apps.

19    5.    On February 13, 2025, the Attorney General for Washington State

20    sought clarity from counsel for Huuuge on the scope of the claims being released

21    under the proposed class action settlement in this case (Settlement). Attached hereto

22    as **Exhibit A** is a true and correct copy of Washington's correspondence with

DECLARATION OF ALISON E. CORDOVA
IN SUPPORT OF BRIEF OF AMICUS
CURIAE ATTORNEY GENERAL OF
WASHINGTON STATE IN OPPOSITION TO
CLASS ACTION SETTLEMENT
NO. 2:23-cv-04324

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

1   counsel for Huuuge regarding the scope of claims being released by the proposed

2   Settlement.

3        6.     Per the Class Action Fairness Act (CAFA) notice received by the State

4   of Washington, the estimated size of the Washington class for the proposed

5   Settlement is 96,853, and the estimated sized of the nationwide class is 1,264,407.

6        7.     There are current nationwide class actions filed against Apple, Google,

7   Facebook and Amazon (Platforms) relating to casino apps and asserting consumer

8   protection claims, which would be extinguished under the proposed Settlement. One

9   suit in the Western District of Washington is a class action against Amazon, alleging

10   violations of Washington's Consumer Protection Act (CPA) and Washington's

11   Recovery of Money Lost at Gambling Act, Wash. Rev. Code § 4.24.070. *See Horn*

12   *v. Amazon.com, Inc*., No. 2:23-cv-01727. Another suit in the Northern District of

13   California consists of three consolidated multi-district litigation cases against Apple,

14   Google, and Facebook. *See In re: Apple Inc. App Store Simulated Casino-Style*

15   *Games Litigation*, No. 5:21-md-02985-EJD; *In re: Google Play Store Simulated*

16   *Casino-Style Games Litigation*, No. 5:21-md-03001-EJD; *In re: Facebook*

17   *Simulated Casino-Style Games Litigation*, No. 5:21-cv-02777-EJD. These suits

18   bring claims alleging violations of Washington's CPA and Washington's Recovery

19   of Money Lost at Gambling Act, Wash. Rev. Code § 4.24.070. Attached hereto as

20   **Exhibit B** is a true and correct copy of the original complaint filed in each of these

21   matters. All four complaints specifically name and identify Huuuge's casino apps.

22

DECLARATION OF ALISON E. CORDOVA
IN SUPPORT OF BRIEF OF AMICUS
CURIAE ATTORNEY GENERAL OF
WASHINGTON STATE IN OPPOSITION TO
CLASS ACTION SETTLEMENT
NO. 2:23-cv-04324

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

1    I declare under penalty of perjury under the laws of the State of California

2    and the United States of America that the foregoing is true and correct.

3    DATED and SIGNED this 14th day of August 2025, at Seattle, Washington.

4    _/s/ Alison E. Cordova_
     ALISON E. CORDOVA, SBN #284942

5    Assistant Attorney General

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

DECLARATION OF ALISON E. CORDOVA
IN SUPPORT OF BRIEF OF AMICUS
CURIAE ATTORNEY GENERAL OF
WASHINGTON STATE IN OPPOSITION TO
CLASS ACTION SETTLEMENT
NO. 2:23-cv-04324

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

# Exhibit A

| From: | Chuvaieva, Stacey |
|---|---|
| To: | Cordova, Alison (ATG); "Chait, Michael" |
| Cc: | Pagnanelli, Karin; Buswell, Jessica D. (ATG); Hand, Amy (ATG); Perkins, Tony (ATG); Simpson, July (ATG); Wolf, Lucy (ATG); Wuco, Jamie (ATG) |
| Subject: | RE: Release language proposed in Ballew, et al. v. Huuuge, Inc. (and WA AGO CID) |
| Date: | Thursday, March 6, 2025 11:53:16 AM |

[EXTERNAL]

Dear Ms. Cordova,

We apologize, but our intention was to respond to the hypothetical you provided. Our response to another particular claim would depend on the details.  But generally, the release does bar by its express language claims for misrepresentations or omissions about the applications that in any manner relate to the allegations in the Action. Therefore, we would need to review the particular claims in order to respond.

Best regards,
Stacey Chuvaieva

msk

**Stacey Chuvaieva, CIPP/US/E | Attorney-at-Law**
T: 310.312.3749 | stc@msk.com
**Mitchell Silberberg & Knupp LLP | www.msk.com**
2049 Century Park East, 18th Floor, Los Angeles, CA 90067

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

**From:** Cordova, Alison (ATG) <alison.cordova@atg.wa.gov>
**Sent:** Thursday, March 6, 2025 9:39 AM
**To:** Chuvaieva, Stacey <stc@msk.com>; 'Chait, Michael' <mchait@fennemorelaw.com>
**Cc:** Pagnanelli, Karin <KGP@msk.com>; Buswell, Jessica D. (ATG) <jessica.buswell@atg.wa.gov>; Hand, Amy (ATG) <amy.hand@atg.wa.gov>; Perkins, Tony (ATG) <tony.perkins@atg.wa.gov>; Simpson, July (ATG) <july.simpson@atg.wa.gov>; Wolf, Lucy (ATG) <lucy.wolf@atg.wa.gov>; Wuco, Jamie (ATG) <jamie.wuco@atg.wa.gov>
**Subject:** [EXTERNAL] RE: Release language proposed in Ballew, et al. v. Huuuge, Inc. (and WA AGO CID)

Sorry, we were not requesting your legal analysis. Clearly the example provided by the State is bare bones because it was provided for the purposes of trying to assess what the language of the release means to your client – not assert causes of action or claims against your client. Therefore, if the State were to make a claim of the nature we have described (whether accompanied by a misrepresentation

or concealment of fact, or not), would your client argue that it is covered by the release?

Best,
Alison Cordova

**From:** Chuvaieva, Stacey <stc@msk.com>
**Sent:** Wednesday, March 5, 2025 7:17 PM
**To:** Cordova, Alison (ATG) <alison.cordova@atg.wa.gov>; 'Chait, Michael' <mchait@fennemorelaw.com>
**Cc:** Pagnanelli, Karin <KGP@msk.com>; Buswell, Jessica D. (ATG) <jessica.buswell@atg.wa.gov>; Hand, Amy (ATG) <amy.hand@atg.wa.gov>; Perkins, Tony (ATG) <tony.perkins@atg.wa.gov>; Simpson, July (ATG) <july.simpson@atg.wa.gov>; Wolf, Lucy (ATG) <lucy.wolf@atg.wa.gov>; Wuco, Jamie (ATG) <jamie.wuco@atg.wa.gov>
**Subject:** RE: Release language proposed in Ballew, et al. v. Huuuge, Inc. (and WA AGO CID)

[EXTERNAL]

Dear Ms. Cordova,

Regarding the additional question, please see our response below:

While we do think that the release generally applies to omissions, it is our understanding that this would not be a viable claim under Washington law, as even an affirmative misrepresentation of the law is not typically actionable, let alone a purported omission regarding the law. *Bonded Adjustment Co. v. Anderson*, 186 Wash. 226, 233 (1936) ("misrepresentations as to the law, unaccompanied by any misrepresentation or concealment of the fact, cannot be made the basis of a fraud charge.").  As such, we think the issue is moot.

Best regards,
Stacey Chuvaieva

msk

**Stacey Chuvaieva, CIPP/US/E | Attorney-at-Law**
T: 310.312.3749 | stc@msk.com
**Mitchell Silberberg & Knupp LLP | www.msk.com**
2049 Century Park East, 18th Floor, Los Angeles, CA 90067

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

**From:** Cordova, Alison (ATG) <alison.cordova@atg.wa.gov>
**Sent:** Monday, March 3, 2025 5:41 PM
**To:** Chuvaieva, Stacey <stc@msk.com>; 'Chait, Michael' <mchait@fennemorelaw.com>

**EXHIBIT A**
**3**

**Cc:** Pagnanelli, Karin <KGP@msk.com>; Buswell, Jessica D. (ATG) <jessica.buswell@atg.wa.gov>; Hand, Amy (ATG) <amy.hand@atg.wa.gov>; Perkins, Tony (ATG) <tony.perkins@atg.wa.gov>; Simpson, July (ATG) <july.simpson@atg.wa.gov>; Wolf, Lucy (ATG) <lucy.wolf@atg.wa.gov>; Wuco, Jamie (ATG) <jamie.wuco@atg.wa.gov>
**Subject:** [EXTERNAL] RE: Release language proposed in Ballew, et al. v. Huuuge, Inc. (and WA AGO CID)

Thank you Stacey. Really appreciate the timely response and information.

The State has one follow-up, clarifying question in regard to your #1 and #2 responses below. One of the allegations in the *Ballew* complaint is that it was a false and/or improper omission of Huuuge to not have told consumers that the games were illegal gambling under California law. Complaint ¶¶ 206 and 243. What is your position on whether the release applies to the same claim for Washingtonians? (i.e. that it was unfair and/or deceptive to not tell consumers that the games were illegal gambling under Washington laws). While this is an omission (#2 below), the underlying premise is the contention that the games violate Washington state gambling laws (#1 below).

Please advise if you need any clarification on what we are asking here. Thank you!

Best,
Alison

**From:** Chuvaieva, Stacey <stc@msk.com>
**Sent:** Monday, February 24, 2025 8:39 AM
**To:** Cordova, Alison (ATG) <alison.cordova@atg.wa.gov>; 'Chait, Michael' <mchait@fennemorelaw.com>
**Cc:** Pagnanelli, Karin <KGP@msk.com>; Buswell, Jessica D. (ATG) <jessica.buswell@atg.wa.gov>; Hand, Amy (ATG) <amy.hand@atg.wa.gov>; Perkins, Tony (ATG) <tony.perkins@atg.wa.gov>; Simpson, July (ATG) <july.simpson@atg.wa.gov>; Wolf, Lucy (ATG) <lucy.wolf@atg.wa.gov>; Wuco, Jamie (ATG) <jamie.wuco@atg.wa.gov>
**Subject:** RE: Release language proposed in Ballew, et al. v. Huuuge, Inc. (and WA AGO CID)

[EXTERNAL]

Dear Ms. Cordova,

Please see below our responses to the additional questions.

1. We do not contend that the settlement would bar any past or future claims based on the contention that the games violate Washington state gambling laws. However, we do think that the changes to game play that Huuuge agrees to make in the settlement should resolve any residual issue that the games violate Washington gambling laws, but we acknowledge that the settlement does not bar others from making a contrary contention.
2. We do contend that the settlement would resolve any past claims, brought before the date of preliminary approval, based on any contention (whether under Washington law or otherwise) that the Games involve false or improper misrepresentations, omissions, or advertising, Including because they used sale countdown clocks or because they used allegedly false

reference prices.  *See* Section 1.21 of the releases. The effect of the settlement, if any, on future claims for false advertising or other non-gambling claims would depend significantly on the details of the claims and the then operation of the games.

3. We do believe that the releases would resolve any past claims against the platforms based on allegations that the Games involved false advertising, misrepresentations or omissions, or constitute illegal gambling under Illinois or California law.  It could also bar certain future claims, as noted in 2 above.

Kind regards,
Stacey Chuvaieva



**Stacey Chuvaieva, CIPP/US/E | Attorney-at-Law**
T: 310.312.3749 | stc@msk.com
**Mitchell Silberberg & Knupp LLP | www.msk.com**
2049 Century Park East, 18th Floor, Los Angeles, CA 90067

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

**From:** Chuvaieva, Stacey
**Sent:** Friday, February 21, 2025 4:17 PM
**To:** 'Cordova, Alison (ATG)' <alison.cordova@atg.wa.gov>; Chait, Michael <mchait@fennemorelaw.com>
**Cc:** Pagnanelli, Karin <KGP@msk.com>; Buswell, Jessica D. (ATG) <jessica.buswell@atg.wa.gov>; Hand, Amy (ATG) <amy.hand@atg.wa.gov>; Perkins, Tony (ATG) <tony.perkins@atg.wa.gov>; Simpson, July (ATG) <july.simpson@atg.wa.gov>; Wolf, Lucy (ATG) <lucy.wolf@atg.wa.gov>; Wuco, Jamie (ATG) <jamie.wuco@atg.wa.gov>
**Subject:** RE: Release language proposed in Ballew, et al. v. Huuuge, Inc. (and WA AGO CID)

Dear Ms. Cordova,

We wanted to inform you that we are in the process of addressing the additional questions you provided. We will send you the substantive responses later today, or by Monday at the latest.

Kind regards,
Stacey Chuvaieva



**Stacey Chuvaieva, CIPP/US/E | Attorney-at-Law**
T: 310.312.3749 | stc@msk.com
**Mitchell Silberberg & Knupp LLP | www.msk.com**

2049 Century Park East, 18th Floor, Los Angeles, CA 90067

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION, AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU.

**From:** Cordova, Alison (ATG) <alison.cordova@atg.wa.gov>
**Sent:** Thursday, February 13, 2025 5:54 PM
**To:** Chait, Michael <mchait@fennemorelaw.com>
**Cc:** Pagnanelli, Karin <KGP@msk.com>; Chuvaieva, Stacey <stc@msk.com>; Buswell, Jessica D. (ATG) <jessica.buswell@atg.wa.gov>; Cordova, Alison (ATG) <alison.cordova@atg.wa.gov>; Hand, Amy (ATG) <amy.hand@atg.wa.gov>; Perkins, Tony (ATG) <tony.perkins@atg.wa.gov>; Simpson, July (ATG) <july.simpson@atg.wa.gov>; Wolf, Lucy (ATG) <lucy.wolf@atg.wa.gov>; Wuco, Jamie (ATG) <jamie.wuco@atg.wa.gov>
**Subject:** [EXTERNAL] Release language proposed in Ballew, et al. v. Huuuge, Inc. (and WA AGO CID)

We are writing today to seek clarification relating to the release language contained in the proposed and preliminarily approved class action settlement in *Ballew, et al. v. Huuuge, Inc.*, Case No. 2:23-cv-04324 (Central District of CA). Before the State of Washington decides whether to file an objection to said settlement, the State would like a better understanding of your client's position on what claims will be released pursuant to that proposed settlement.

With that in mind, **can your client please address the following questions on or before Friday, February 21st**:

- If the settlement receives final approval, is it your client's position that the following claims would be released or would not be released:

    o Claims (whether Past or Future) against Huuuge that their Casino apps violate Washington's gambling laws?

    o Claims (whether Past or Future) against Huuuge that their Casino apps are unfair and/or deceptive in violation of Washington's Consumer Protection Act because the apps violate Washington's gambling laws?

    o Claims (whether Past or Future) against Huuuge that their Casino apps violate Washington's Consumer Protection Act because of unfair and/or deceptive acts and/or practices wholly unrelated to violations of Washington's gambling laws?

    o Claims (whether Past or Future) against the Platforms relating to, arising out of, or concerning their collection of fees on in-app transactions within Huuuge's Casino apps?

For ease of reference, the State means the following when it uses said terms above:

- Casino apps = Huuuge Casino and Billionaire Casino (our understanding is that the *Ballew* case and proposed settlement does not cover Stars Slots Casino, but if your client has a

different perspective, please advise.)

- Future claims = claims that have not accrued prior to the effective date of the settlement

- Past claims = claims that have accrued prior to the effective date of the settlement

- Platforms = Google, Apple, Meta, Microsoft and Amazon

Please advise **asap** if you have any questions or if your client refuses to respond to this request. Thank you!

Best,

**Alison Cordova | Assistant Attorney General**
Complex Litigation Division
Washington State Office of the Attorney General
Office Tel: 206.326.5492
Cell: 206.507.3691
Fax: 206.587.4229
alison.cordova@atg.wa.gov
*Pronouns: she/her*

The material contained herein may be subject to the Attorney/Client or Work-Product Privilege. It is intended only for the review and use of named addressee(s). If you are not the intended recipient, any distribution, dissemination or copying may be prohibited. If you receive this message in error, please delete it.

# Exhibit B

1

2

3

4

5

6

7

8

9

10

11

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

12 | STEVEN HORN, individually and on behalf of all others similarly situated,

Case No.

13 | *Plaintiff*,

**COMPLAINT—CLASS ACTION**

14 | *v.*

**JURY DEMAND**

15

16 | AMAZON.COM, INC., a Delaware corporation,

17 | *Defendant.*

18

19    Plaintiff Steven Horn brings this Class Action Complaint against Defendant Amazon.com,

20 Inc. seeking restitution, damages, injunctive relief, and other appropriate relief from Amazon's

21 ongoing participation in an illegal internet gambling enterprise. Plaintiff alleges as follows:

22                              <u>**INTRODUCTION**</u>

23    1.    Over the last decade, the world's leading Las Vegas slot machine makers have

24 teamed up with technology start-ups to develop a new product line: so-called "social casinos."

25    2.    Social casinos are apps, playable from smartphones, tablets, and internet browsers,

26 that make the experience of slot machine gambling available to consumers anywhere and anytime.

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300 • Fax: 415 373 9435

By moving their casino games directly onto the phones and computers of players, and by leveraging an innocuous-sounding "free-to-play" model,[1] social casino companies, along with Defendant Amazon, have found a way to smuggle slot machines into the homes of consumers throughout the United States, 24 hours a day, 7 days a week, and 365 days a year.

3. Defendant Amazon owns and operates an app store where users can gamble on their mobile devices in Vegas-Style social casino apps. Amazon aggressively markets and distributes these social casino apps to consumers' Amazon and Android devices.

4. Just like Las Vegas slot machines, social casinos allow users to purchase virtual "chips" in exchange for real money, and then gamble those chips at slot machine games in hopes of winning still more chips to keep gambling. In High 5 Casino, for example, players purchase virtual coins for use in betting, with set packages costing up to $99.99. But unlike Las Vegas slots, social casinos do not allow players to cash out their chips. Instead, purchased chips and won chips alike can be used only for more slot machine "spinning." *See* Figures 1-2.



(**Figure 1**, showing High 5 Casino gameplay, one of the social casinos available for download from Amazon.)

---

[1]    This term is a misnomer. It refers to a business model by which the initial download of the game is free, but companies reap huge profits by selling "in-game" items (known generally as "in-app purchases").

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300 • Fax: 415 373 9435

**EXHIBIT B**
**3**

(**Figure 2**, showing an offer to purchase virtual currency with real money in High 5 Casino.)

5.      Nevertheless, like Las Vegas slots, social casinos are extraordinarily profitable and highly addictive. Social casinos are so lucrative because they mix the addictive aspects of traditional slot machines with the power of Amazon to leverage big data and social network pressures to identify, target, and exploit consumers prone to addictive behaviors.[2]

6.      Simply put, the social casino apps do not, and cannot, operate and profit at such a high level from these illegal games on their own. Their business of targeting, retaining, and collecting losses from addicted gamblers is inextricably entwined with Amazon. Not only does Amazon retain full control over allowing social casinos into its store, and their distribution and promotion therein, but it also shares directly in a substantial portion of the gamblers' losses, which are collected and controlled by Amazon.

7.      Because Amazon is the center for distribution and payment, social casinos gain a critical partner to retain high-spending users and collect player data, a trustworthy marketplace to conduct payment transactions, and the technological means to update their apps with targeted new content designed to keep addicted players spending money.

---

[2]   *See, e.g., How social casinos leverage Facebook user data to target vulnerable gamblers,* PBS NEWSHOUR (Aug. 13, 2019), https://bit.ly/3tSHqMI.

CLASS ACTION COMPLAINT      3

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300 • Fax: 415 373 9435

8.    In 2020 alone, consumers purchased and gambled away an estimated $6 billion in social casino virtual chips.[3]

9.    By utilizing Amazon for distribution and payment, the social casinos entered into a mutually beneficial business partnership. In exchange for distributing the casino games, providing them valuable data and insight about their players, and collecting money from consumers, Amazon takes a *30-percent* commission of every wager, earning billions in revenue. By comparison, the "house" at a traditional casino only takes 1 to 15 percent, while also taking on significant risk of loss in its operation. Amazon's 30 percent take, on the other hand, is guaranteed for its ability to act as the casino "house" and broker.

10.   The result (and intent) of this dangerous partnership is that consumers become addicted to social casino apps, maxing out their credit cards with purchases amounting to tens or even hundreds of thousands of dollars. Consumers addicted to social casinos suffer a variety of non-financial damages ranging from depression to divorce to attempted suicide.

11.   Unsurprisingly, social casino apps are illegal under Washington gambling laws.

12.   As the Ninth Circuit held in *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785 (9th Cir. 2018):

> In this appeal, we consider whether the virtual game platform "Big Fish Casino" constitutes illegal gambling under Washington law. Defendant-Appellee Churchill Downs, the game's owner and operator, has made millions of dollars off of Big Fish Casino. However, despite collecting millions in revenue, Churchill Downs, like Captain Renault in Casablanca, purports to be shocked—shocked!—to find that Big Fish Casino could constitute illegal gambling. We are not. We therefore reverse the district court and hold that because Big Fish Casino's virtual chips are a "thing of value," Big Fish Casino constitutes illegal gambling under Washington law.

13.   In other words, despite knowing that social casinos are illegal, Amazon continues to maintain a 30% financial interest in the upside by brokering the slot machine games, driving

---

[3]    *Social casino market size worldwide from 2014 to 2026,* STATISTA (June 2021), https://www.statista.com/statistics/374575/social-casino-worldwide-market-size/.

EDELSON PC
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300  •  Fax: 415 373 9435

1   customers to them, and acting as the bank.

2       14.     As such, Amazon is liable as a co-conspirator to an illegal gambling enterprise and

3   conspiracy.

4       15.     Defendant Amazon, for its part, is a direct participant in an informal association and

5   enterprise of individuals and entities with the explicit purpose of knowingly devising and operating

6   an online gambling scheme to exploit consumers and reap billions in profits (the "Social Casino

7   Enterprise" or "Enterprise").

8       16.     This ongoing Enterprise necessarily promotes the success of each of its members:

9   social casino operators need Amazon to access consumers, promote their games, and broker all

10  payments for virtual chips. Amazon, for its part, needs developers to create profit-driven and

11  addictive applications on its platform to generate massive revenue streams.

12      17.     Through this case, Plaintiff seeks to force Amazon to stop participating in, and to

13  return to consumers the money it has illegally profited from, the Social Casino Application

14  Enterprise.

15      18.     Plaintiff, on behalf of the putative Class, brings claims for damages and for

16  injunctive relief under the Washington Return of Money Lost at Gambling Act, RCW § 4.24.070, *et*

17  *seq.* ("RMLGA"), the Washington Consumer Protection Act, RCW § 19.86.010, *et seq.* ("CPA"),

18  and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO").

19                              **<u>PARTIES</u>**

20      19.     Plaintiff Steven Horn is a natural person and a citizen of the State of Nevada.

21      20.     Defendant Amazon.com, Inc. is a corporation existing under the laws of the State of

22  Delaware with its principal place of business located at 410 Terry Avenue N., Seattle, WA 98109.

23  Amazon regularly conducts and transacts business in this District, as well as throughout the United

24  States.

25

26

CLASS ACTION COMPLAINT                    5

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300  •  Fax: 415 373 9435

## JURISDICTION AND VENUE

21.     Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the proposed class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

22.     The Court has personal jurisdiction over Defendant because Defendant is headquartered in this District and Defendant's alleged wrongful conduct occurred in and emanated from this District.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in and emanated from this District. Further, Defendant Amazon's Conditions of Use specifically require Plaintiff to bring any claims in this District and state ("any dispute or claim relating in any way to your use of any Amazon Service will be adjudicated in the state or Federal courts in King County, Washington, and you consent to exclusive jurisdiction and venue in these courts.").

## GENERAL ALLEGATIONS

### I.     Social Casino Applications Constitute Illegal Gambling Under Washington Law

24.     Under Washington law, social casino applications—which are playable from smartphones, tablets, and internet browsers—constitute illegal gambling.

25.     In *Kater*, for example, the Ninth Circuit held that social casino applications are illegal under Washington law because, while users cannot win money, social casino chips are "things of value" given that they can be purchased for money, are awarded as prizes in social casino slot machines, and then can be used to allow players to keep spinning social casino slot machines.

26.     Washington aggressively regulates all forms of gambling and prohibits online gambling. One reason it does so is to prevent consumers from being cheated by professional gambling operations.

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300  •  Fax: 415 373 9435

27.     Because social casinos have previously operated as if they were not subject to gambling regulations, they do not comply with any of the regulations that govern the operation of physical casinos or slot machines.

28.     Notably, while any legitimately operated slot machine must randomize its results, social casino applications do not randomize their results. Instead, these tailor "wins" and "losses" in such a way as to maximize addiction (and, in turn, revenues). A CEO of one social casino once explained, "[o]ur games aren't built to be bulletproof like you'd need to be if you're a real gambling company. We can do things to make our games more [fun] that if you were an operator in Vegas you'd go to jail for, because we change the odds just for fun."

29.     In other words, social casinos are not just illegal under Washington law, but they would not be legal slot machines under any state law as they cheat players out of a legitimately randomized slot machine experience. Not only can players never actually win money, but their financial losses are maximized by deceptive gameplay tweaks that would never be allowed in a physical slot machine.

## II.     *Amazon Promotes, Brokers Transactions On, and Profits From Illegal Social Casinos.*

30.     Defendant Amazon has directly assisted in creating the unregulated market of virtual casino games from the outset of the industry.

31.     Before gaining access to Amazon's app distribution platform, the Illegal Slots used methods like loyalty cards to track data on how much gamblers spent, how frequently they played, or how often they bet. The Amazon partnership upgraded their business model to an in-app payment system and provided additional user data—which caused skyrocketing revenue for the Illegal Slots by providing them with access to a whole new market of consumers.

32.     The core marketing for the Illegal Slots is accomplished in concert with Amazon, and their systems are inextricably linked. For example, according to SEC filings by SciPlay Corporation ("SciPlay"), a subsidiary of Light & Wonder, Inc. (f/k/a Scientific Games Corp.) and

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300  •  Fax: 415 373 9435

**EXHIBIT B**
**8**

operator of the Illegal Slot game Quick Hit Slots, the company "reli[es] on third-party platforms and [its] ability to track data on those platforms" in the operation of its social casino app business.[4] SciPlay's reliance on the platforms is so significant that its "expansion and prospects … depend on [its] continued relationships with these providers."[5]

33. Access to data through these app platforms and their tools is essential to the hyper-targeted nature of the social casino business model. For example, according to li

34. 's CEO, the company uses its access to a large, platform-derived player base in order to mine them for data, analyze it, and use it to keep them addicted:

> The secret sauce of Playtika is our ability to work with AI. We know exactly when a player is going to stop playing. We know exactly when they're going to pay. We know how many times they come in each day. I can't say we can predict with 100 percent accuracy, but we can predict, for most of our players, their activities in our games. That's the real power behind the operations side. When you can predict this, you can find solutions to problems. If someone wants to move on from your game, to delete your app, you know how to handle that player. We sound the alarm. We know how to operate and make sure a player retains in the game.[6]

35. By moving to online platforms for marketing, distribution, and payments, the Illegal Slots entered into a mutually beneficial business partnership with Defendant Amazon. In exchange for pushing and distributing the social casino apps and collecting money from consumers, Amazon takes a 30-percent commission from every in-app purchase of, and Amazon Coin redemption for, virtual chips—earning them billions in revenue.

---

[4] SciPlay Corporation, Form 10-K at 3 (Mar. 1, 2022), https://www.sec.gov/Archives/edgar/data/1760717/000176071722000018/scpl-20220331.htm.
[5] Light & Wonder, Inc., Form 10-K at 28 (Mar. 1, 2023), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://app.quotemedia.com/data/downloadFiling?webmasterId=90423&ref=117301795&type=PDF&symbol=LNW&companyName=Light+%26+Wonder+Inc.&formType=10-K&formDescription=Annual+report+pursuant+to+Section+13+or+15%28d%29&dateFiled=2023-03-01.
[6] Dean Takahashi, *Playtika CEO Robert Antokol interview— Why player retention matters now*, VENTUREBEAT (Jan. 6, 2022), https://venturebeat.com/games/playtika-ceo-robert-antokol-interview-why-player-retention-matters-now/.

8 EDELSON PC
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300 • Fax: 415 373 9435

36. Prior to being featured in the Amazon Appstore, developers must submit their app for review. In this process, Amazon examines whether the app violates any company policies and demands that apps comply with all relevant laws within the jurisdiction where the app is available. Apps may be, and often are, removed at Amazon's discretion for violating its policies and can be audited at any time.

37. Amazon purports to heavily regulate applications that involve gambling, providing a list of specific requirements that must be met by developers to permit a gambling-focused app in its Appstore. For example, Amazon prohibits apps from using its in-app purchasing to fund "an in-app wallet of real money" and requires the app to be rated as "Adult." Nevertheless, Amazon fatures and profits from social casino apps.

38. As such, Defendant Amazon has an active role in reviewing and profiting from gambling apps. Amazon, through its app review process, is keenly aware of the illegal and deceptive nature of the Illegal Slots. Amazon knew of the unlawful nature of the Illegal Slots and nonetheless knowingly promoted the unlawful gambling apps, brokered illegal gambling payments, and reaped financial benefits from those illegal payments.

39. Furthermore, on information and belief, in the wake of the *Kater* decision, Amazon did not remove any social casinos from its offerings, signaling that it will continue to offer illegal social casino games.

A. **The Illegal Slots**

40. Each of the following non-exhaustive list of social casinos, among others offered by Amazon, constitutes illegal online gambling under Washington law.

| # | Game Title | qui |
|---|---|---|
| 1 | Jackpot Party | https://www.amazon.com/Jackpot-Party-Casino-Slots-Vegas/dp/B00C7X0ZNU/ |
| 2 | Goldfish Casino Slot Games | https://www.amazon.com/Gold-Fish-Casino-Slots-HD/dp/B00KCYMAWK/ |
| 3 | MONOPOLY Slots - Casino Games | https://www.amazon.com/SG-Interactive-MONOPOLY-Slots/dp/B07229WRY6/ |

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300 • Fax: 415 373 9435

| 4 | 88 Fortunes Slots Casino Games | https://www.amazon.com/88-FortunesTM-Free-Slots-Casino/dp/B073ZLCVFY/ |
|---|---|---|
| 5 | Hot Shot Casino Slot Games | https://www.amazon.com/SG-Interactive-Shot-Casino-SlotsTM/dp/B01HBX2W2C/ |
| 6 | Lotsa Slots | https://www.amazon.com/Lotsa-Slots-Vegas-Casino-SLOTS/dp/B07PFXRD9G/ |
| 7 | Jackpot World™ - Slots Casino | https://www.amazon.com/Grande-Games-Limited-DAFUTM-Casino/dp/B07WCW5BJZ/ |
| 8 | Cash Frenzy | https://www.amazon.com/Cash-Frenzy-Casino-Slots-Games/dp/B07JHXZZKS/ |
| 9 | Vegas Friends | https://www.amazon.com/Vegas-Friends-Casino-Slots-Free/dp/B08TZV96J5/ |
| 10 | Jackpot Crush | https://www.amazon.com/Jackpot-Crush-Free-Vegas-Machines/dp/B08S2XBXBQ/ |
| 11 | POP! Slots Vegas Casino Games | https://www.amazon.com/Slots-Play-Vegas-Casino-Machines/dp/B08KTDZM1N/ |
| 12 | myVEGAS Slots | https://www.amazon.com/PlayStudios-Inc-myVEGAS-Slots/dp/B00GXH3TGG/ |
| 13 | MyKONAMI Slots | https://www.amazon.com/PlayStudios-Inc-KONAMI-Slots/dp/B016FO3PVU/ |
| 14 | Huuuge Casino Slots | https://www.amazon.com/Slots-Huuuge-Casino-Blackjack-Baccarat/dp/B015Q1RD0W/ |
| 15 | Billionaire Casino | https://www.amazon.com/Billionaire-Casino-Slots-Games-Poker/dp/B01MEGJKCD/ |
| 16 | Lightning Link Casino Slots | https://www.amazon.com/Lightning-Link-Casino-Slots-Games/dp/B07R2FPB34/ |
| 17 | Cashman Casino Las Vegas Slots | https://www.amazon.com/Product-Madness-Cashman-Casino/dp/B01HBJ4MPQ/ |
| 18 | Slots: Heart of Vegas Casino | https://www.amazon.com/Heart-Vegas-Free-Slots-Casino/dp/B0108G1FOA/ |
| 19 | Jackpot Magic Slots | https://www.amazon.com/Big-Fish-Games-Jackpot-SlotsTM/dp/B071JWLHY6/ |
| 20 | Big Fish Casino | https://www.amazon.com/Big-Fish-Casino-Vegas-Machines/dp/B0070YDOT8/ |
| 21 | Jackpot Master | https://www.amazon.com/Zeroo-Gravity-Games-LLC-MasterTM/dp/B09M3P3S83/ |
| 22 | Cash Tornado | https://www.amazon.com/Cash-Tornado-Slots-Vegas-Casino/dp/B081GVL84B/ |
| 23 | DoubleU Casino | https://www.amazon.com/DoubleU-Casino-Vegas-Bonuses-Jackpot/dp/B00KQHVWWC/ |
| 24 | Take 5 Vegas Slots | https://www.amazon.com/Take5-Vegas-Slots-Free-Casino/dp/B01N9E7GUU/ |
| 25 | Black Diamond Casino | https://www.amazon.com/Zynga-Game-Network-SLOTS-Diamond/dp/B01A7HXF7U/ |

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300  •  Fax: 415 373 9435

**EXHIBIT B**
**11**

| 26 | Game of Thrones Slots Casino | https://www.amazon.com/Game-of-Thrones-Slots-Casino/dp/B07P6YKMV3/ |
| 27 | Hit it Rich! | https://www.amazon.com/Hit-Rich-Free-Casino-Slots/dp/B00KSOQ66K/ |
| 28 | Wizard of Oz Slots | https://www.amazon.com/Wizard-Oz-Magic-Match/dp/B01BPPA75Q/ |
| 29 | Willy Wonka Vegas Casino Slots | https://www.amazon.com/Willy-Wonka-Slots-Machines-Classic/dp/B01C381NS4/ |
| 30 | Slotomania Slots | https://www.amazon.com/Slotomania-Free-Slots-Casino-Games/dp/B007TBAQCK/ |
| 31 | Caesar's Slots | https://www.amazon.com/Caesars-Slots-Free-Casino-Games/dp/B00GMIB0O4/ |
| 32 | House of Fun | https://www.amazon.com/House-Fun-Vegas-Casino-Slots/dp/B00EC5ZFL8/ |
| 33 | Slots and Words | https://www.amazon.com/Vegas-Downtown-Slots-Machines-Puzzle/dp/B019ZRIB3Q/ |
| 34 | Quick Hit Slots | https://www.amazon.com/Quick-Hit-Slots-Free-Vegas/dp/B00XGNNN52/ |

41. The Illegal Slots all have the same thing in common: they allow users to purchase virtual "chips" or "tokens" with real money and then gamble those chips at slot machine games in hopes of winning still more chips to keep gambling.

42. Consumers may purchase "chips" or "tokens" directly through the Illegal Slots mobile apps.

43. Amazon has also minted its own currency called "Amazon Coin" that consumers can purchase and redeem at the Illegal Slots for "chips" and "tokens." According to Amazon, Amazon Coins have real value and consumers "can spend them the same as cash." For example, Amazon sells 1,000 Amazon Coins for $9.70. Consumers can then redeem 199 Amazon Coins to purchase 5,600,000 chips for use at High 5 Casino, or, alternately, can directly pay High 5 Casino $1.99 for that coin package. *See* **Figure 3** below. As such, each Amazon Coin has roughly a USD value of approximately $0.01.

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300 • Fax: 415 373 9435



(**Figure 3**, showing Amazon's offer to sell Amazon coins in lieu of High 5 Casino coins.)

44.     As explained above, Amazon collects 30% of each in-app purchase and Amazon Coin redemption at the Illegal Slots.

**B.      Amazon's Brokering Of, Promotion Of, and Control Over the Illegal Slots**

45.     As a preliminary matter, Amazon heavily promotes the download of the Illegal Slots via the Amazon Appstore and encourages consumers to spend money on "chips" and "tokens." Indeed, Amazon created a category on the Amazon Appstore titled "The best casino games for Amazon Coins," indicating to consumers that they can purchase Amazon Coins and redeem its cash value on "chips" and "tokens" for use on the Illegal Slots.

46.     Amazon routinely brokers the success of the Illegal Slots by counseling the app developers through the app launch process and providing them with resources and business tools necessary to maximize their success on the Amazon Appstore. For instance, initiation on Amazon as an app developer includes immediate access to "Program Materials" including software, software development kits, libraries, application programing interfaces, sample code, templates, documentation, and more.[7]

---

[7]      *Amazon Developer Service Agreement*, AMAZON (Apr. 3, 2023), https://developer.amazon.com/support/legal/da.

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300 • Fax: 415 373 9435

47. The Illegal Slot companies and Amazon monitor the game activity and use the collected data to increase user spending. This access to Amazon's data is critical for the developers since all financial transactions for virtual chips occur through third-party platforms exactly like Amazon.

48. Indeed, Amazon obtains granular data about customers' behavior on its platform and provides developers like the Illegal Slot companies such data including past purchases, browsing history, and, *inter alia*, consumer subscriptions (such as tiered levels of membership in the social casinos).[8]

49. Because the Illegal Slots depend on the spending of a small, targeted audience, the Illegal Slot companies and Amazon work together to target and exploit high-spending users, or "whales," as Illegal Slot companies refer to their top spenders. This exploitation is intentional and openly flaunted: Zynga—one of the Illegal Slot companies—admits that "a small portion of our players have historically been payers"[9] and reveals that "[i]n order to sustain and grow our revenue levels, we must attract, retain and increase the number of paying players or more effectively monetize our players through advertising and other strategies."[10]

50. The data that the Illegal Slot companies and Amazon collect on monetization necessarily contributes to the structure and success of the Social Casino Enterprise.

51. Amazon encourages Illegal Slot companies to target high-spending users and activate non-users alike. Amazon aids in the design and direction of targeted advertising through its massive advertising platform which includes in-app advertising, display advertisements, video advertisements, and sponsored display advertisements—all aimed at driving new customers to the Illegal Slots and retaining current gamblers.

52. Likewise, because it acts as the "bank" for the Illegal Slots, Amazon is entirely

---

[8]    *Reporting Overview*, AMAZON, https://developer.amazon.com/docs/reports-promo/UI-reports-dashboard.html (last visited November 10, 2023).
[9]    Zynga, Inc., Form 10-K at 3 (Feb. 26, 2021), available at https://www.sec.gov/Archives/edgar/data/1439404/000156459021009477/znga-10k_20201231.htm.
[10]    *Id.* at 14.

EDELSON PC
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300  •  Fax: 415 373 9435

EXHIBIT B
14

aware that some consumers spend *hundreds of thousands* on the Illegal Slots. Amazon's consumer spending metrics are spectacularly comprehensive: there is no high-spending consumer whose habits, buys, and losses are not intimately tracked by Amazon.

53. Additionally, because the Illegal Slots are required to use Amazon's payment system to process all in-game purchases, Amazon collects a 30 percent portion of every transaction. As such, Amazon takes a portion of, and profits from, the same consumer cash that the Illegal Slots extract from users.

54. If Amazon ever discovers an illegal or fraudulent transaction in breach of its terms or policies, it can deny developers from redeeming the proceeds in its active balance. And yet, the profits from Illegal Slots persist and only increase year-to-year.[11]

55. Amazon has used its developer tools to take advantage of users with severe gambling problems and as a result, has unlawfully made billions of dollars on the backs of consumers.

## FACTS SPECIFIC TO PLAINTIFF HORN

56. Plaintiff Steven Horn purchased virtual "chips" and "tokens" from the Illegal Slots as well as Amazon Coins which he redeemed on the Illegal Slots. When Steven Horn purchased chips or tokens or redeemed Amazon Coins at the Illegal Slots, Amazon collected 30% of the transaction value.

57. Plaintiff Horn has been addicted to various Illegal Slots such as Take 5 Vegas Slots, Lightning Link Casino, and Quick Hit Slots. Plaintiff Horn would often play Quick Hit Slots for several hours per day and spend large amounts of money to do so.

58. Plaintiff Horn made over 320 digital transactions for virtual chips on the Illegal Slots between October 2022 and September 2023.

59. Playing the Illegal Slots has had a devastating impact on Plaintiff Horn's life.

---

[11] *Annual revenue generated by DoubleDown Interactive from 2018 to 2022*, STATISTA, April 2023, https://www.statista.com/statistics/513782/doubledown-interactive-annual-revenue/.

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300 • Fax: 415 373 9435

60.     Playing the game and its related losses has also placed a significant strain on his personal relationships and caused him great financial hardship.

## CLASS ALLEGATIONS

61.     **Class Definition:** Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All persons in the United States who purchased and lost chips by wagering at any Illegal Slots through the Amazon platform.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

62.     **Numerosity:** On information and belief, tens of thousands of consumers fall into the definition of the Class. Members of the Class can be identified through Defendant's records, discovery, and other third-party sources.

63.     **Commonality and Predominance:** There are many questions of law and fact common to Plaintiff's and the Class's claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

A.     Whether the Illegal Slots are illegal under Washington gambling law;

B.     Whether Defendant is liable for managing, possessing, controlling, brokering transactions on, and/or profiting from the Illegal Slots;

C.     Whether Defendant's participation in operating the Illegal Slots constitutes an unfair and/or unlawful business practice under the CPA;

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300  •  Fax: 415 373 9435

D.      Whether Defendant should be enjoined from further participation in the Social Casino Enterprise;

E.      Whether Defendant agreed to participate in the Social Casino Enterprise; and

F.      Whether Defendant agreed to commit and/or has committed illegal predicate acts under RICO, 18 U.S.C. § 1961, *et seq.*

64.      **Typicality:** Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff and the members of the Class sustained damages arising out of Defendant's wrongful conduct.

65.      **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class, as Plaintiff and each member of the Class lost money playing the Illegal Slots. Plaintiff also has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the Class.

66.      **Policies Generally Applicable to the Class:** This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies that Plaintiff challenges apply and affect members of the Class uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class are the same.

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300 • Fax: 415 373 9435

67.     **Superiority:** This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be difficult for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

68.     Plaintiff reserves the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## FIRST CAUSE OF ACTION
### Violations of Revised Code of Washington § 4.24.070
### (On behalf of Plaintiff and the Class)

69.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

70.     Plaintiff, members of the Class, and Defendant are all "persons" as defined by RCW § 9.46.0289.

71.     The state of Washington's "Recovery of money lost at gambling" statute, RCW § 4.24.070, provides that "all persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

72.     "Gambling," defined by RCW § 9.46.0237, "means staking or risking something of

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300  •  Fax: 415 373 9435

value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence."

73. The "chips" sold for use in the Illegal Slots are "things of value" under RCW § 9.46.0285.

74. The Illegal Slots are illegal gambling games because they are online games at which players wager things of value (the chips), and by an element of chance (*e.g.*, by spinning an online slot machine), are able to obtain additional entertainment and extend gameplay (by winning additional chips).

75. Defendant Amazon is a proprietor for whose benefit the Illegal Slot online gambling games are played because it realizes a significant profit from Plaintiff and the Class, who stake or risk chips in the Illegal Slot games.

76. As such, Plaintiff and the Class gambled when they purchased chips to wager at one of the Illegal Slot company's online gambling games. Plaintiff and each member of the Class staked money, in the form of chips purchased with money, at the Illegal Slot company's games of chance for the chance of winning additional things of value (*e.g.*, chips that extend gameplay without additional charge).

77. In addition, the Illegal Slots are not "pinball machine[s] or similar mechanical amusement device[s]" as contemplated by the statute because:

    A. the games are electronic rather than mechanical;

    B. the games confer replays but they are recorded and can be redeemed on separate occasions (i.e., they are not "immediate and unrecorded"); and

    C. the games contain electronic mechanisms that vary the chance of winning free games or the number of free games which may be won (*e.g.*, the games allow for different wager amounts).

78. RCW § 9.46.0285 states that a: "'thing of value,' as used in this chapter, means any money or property, any token, object or article exchangeable for money or property, or any form of

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300 • Fax: 415 373 9435

credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."

79.     The "chips" Plaintiff and the Class had the chance of winning at the Illegal Slots are "things of value" under Washington law because they are credits that involve the extension of entertainment and a privilege of playing a game without charge.

80.     The Illegal Slots are "Contest[s] of chance," as defined by RCW § 9.46.0225, because they are "contest[s], game[s], gaming scheme[s], or gaming device[s] in which the outcome[s] depend[] in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." The Illegal Slots are programmed to have outcomes that are determined entirely upon chance and a contestant's skill does not affect the outcomes.

81.     RCW § 9.46.0201 defines "Amusement game[s]" as games where "[t]he outcome depends in a material degree upon the skill of the contestant," among other requirements. The Illegal Slots games are not "Amusement games" because their outcomes are dependent entirely upon chance and not upon the skill of the player and because the games are contests of chance, as defined by RCW § 9.46.0225.

82.     As a direct and proximate result of the Illegal Slots, Plaintiff and each member of the Class have lost money wagering at the Illegal Slot companies' games of chance and enriched Defendant Amazon. Plaintiff, on behalf of himself and the Class, seeks an order awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

**SECOND CAUSE OF ACTION**
**Violations of the Washington Consumer Protection Act, RCW § 19.86.010, *et seq.***
**(On behalf of Plaintiff and the Class)**

83.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

---

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300  •  Fax: 415 373 9435

84.     Washington's Consumer Protection Act, RCW § 19.86.010, *et seq.* ("CPA"), protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

85.     To achieve that goal, the CPA prohibits any person from using "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" RCW § 19.86.020.

86.     The CPA states that "a claimant may establish that the act or practice is injurious to the public interest because it . . . [v]iolates a statute that contains a specific legislative declaration of public interest impact." *Id.* § 19.86.093.

87.     Defendant violated RCW § 9.46.010, *et seq.* which declares:

> The public policy of the state of Washington on gambling is to keep the criminal element out of gambling and to promote the social welfare of the people by limiting the nature and scope of gambling activities and by strict regulation and control.
>
> It is hereby declared to be the policy of the legislature, recognizing the close relationship between professional gambling and organized crime, to restrain all persons from seeking profit from professional gambling activities in this state; to restrain all persons from patronizing such professional gambling activities; to safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling; and at the same time, both to preserve the freedom of the press and to avoid restricting participation by individuals in activities and social pastimes, which activities and social pastimes are more for amusement rather than for profit, do not maliciously affect the public, and do not breach the peace.

88.     Defendant has violated RCW § 9.46.010, *et seq.*, because the Illegal Slot games are illegal online gambling games which are played for Defendant's benefit as described herein.

89.     Defendant's wrongful conduct occurred in the conduct of trade or commerce— i.e., while Defendant was engaged in promoting and brokering for the Illegal Slots.

90.     Defendant's acts and practices were and are injurious to the public interest because Defendant, in the course of its business, continuously advertised to and solicited the general public

CLASS ACTION COMPLAINT                    20                    **EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300  •  Fax: 415 373 9435

**EXHIBIT B**
**21**

in Washington state and throughout the United States to play the Illegal Slots. This was part of a pattern or generalized course of conduct on the part of Defendant. Many consumers have been adversely affected by Defendant's conduct and the public is at risk.

91.     Defendant has profited immensely from the operation of unlawful games of chance, amassing hundreds of millions of dollars from the losers of its games of chance.

92.     As a result of Defendant's conduct, Plaintiff and the Class members were injured in their business or property—i.e., economic injury—in that they lost money wagering on the Illegal Slots.

93.     Defendant's unfair or deceptive conduct proximately caused Plaintiff's and the Class members' injury because, but for the challenged conduct, Plaintiff and the Class members would not have lost money wagering at or on the Illegal Slots, and they did so as a direct, foreseeable, and planned consequence of that conduct.

94.     Plaintiff, on their own behalf and on behalf of the Class, seeks to enjoin further violation and recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

**THIRD CAUSE OF ACTION**
**Violations of 18 U.S.C. § 1962(c)**
**Racketeering Activities and Collection of Unlawful Debts**
**(On behalf of Plaintiff and the Class)**

95.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

96.     At all relevant times, Defendant Amazon is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because it is capable of holding, and does hold, "a legal or beneficial interest in property."

97.     Plaintiff is a "person," as that term is defined in 18 U.S.C. § 1961(3), and has standing to sue as he was injured in his business and/or property as a result of the Social Casino Enterprise's wrongful conduct described herein, including but not limited to Defendant Amazon and the Illegal Slots (1) having unlawfully taken and received money from Plaintiff and the Class; (2) having never provided Plaintiff and members of the Class a fair and objective chance to win—they

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300 • Fax: 415 373 9435

could only lose; and (3) having directly and knowingly profited from, on information and belief, rigged and manipulated slot machines.

98. Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

99. 18 U.S.C. § 1961(1) defines "racketeering activity" to include, among other things, (i) any act which is indictable under Title 18, Section 1084 of the United States Code (relating to the transmission of gambling information); and (ii) any act which is indictable under Title 18, Section 1955 of the United States Code (relating to the prohibition of illegal gambling businesses).

100. Because illegal gambling is indictable under both Section 1084 and Section 1955 of Title 18 of the United States Code, the Social Casino Enterprise is engaged in "racketeering activity."

101. 18 U.S.C. § 1961(6) defines "unlawful debt" as a debt "(A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof," and "(B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof."

102. Because the Social Casino Enterprise collects debts incurred from gambling activity in violation of Washington law, as described herein, its profits derived from its ownership and maintenance constitute "unlawful debt" as defined in Section 1961(6).

103. Amazon violated 18 U.S.C. § 1962(c) and § 1962(d) by participating in, brokering, or conducting the affairs of the Social Casino Enterprise through a pattern of racketeering activity composed of indictable offenses under the Revised Code of Washington § 4.24.070 and § 19.86.010.

104. The affiliation between the Defendant Amazon and the Illegal Slot companies constitutes a conspiracy to use an enterprise for the collection of unlawful debt in violation of 18

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300 • Fax: 415 373 9435

U.S.C. § 1962(d).

## The Social Casino Enterprise

105.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

106.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

107.    The Social Casino Enterprise is an association-in-fact composed of at least Amazon and the Illegal Slot companies who are engaged in, and whose activities affect, interstate commerce, and which have affected and damaged interstate commercial activity. This Enterprise exists separately from the otherwise legitimate business operations of each individual participant and separately from legitimate portions of Amazon's and the developers' business relationship. For example, at least some of the developers of the Illegal Slots also create legal apps that are available on Amazon's platform.

108.    The pattern of racketeering activity conducted by the members of the Social Casino Enterprise is distinct from the Social Casino Enterprise itself, as each act of racketeering is a separate offense committed by an entity while the Social Casino Enterprise itself is an association-in-fact of legal entities. The Social Casino Enterprise has an informal structure of app developers and platforms (like Amazon) with continuing functions or responsibilities.

109.    For approximately a decade, the Social Casino Enterprise has collaborated together to operate and broker transactions on Illegal Slots and to target and retain high-spending users in its online gambling scheme throughout the country.

110.    At the very latest, following the Ninth Circuit's March 28, 2018 holding in *Kater*, Defendant Amazon and the Illegal Slot companies, on information and belief, mutually agreed to

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300  •  Fax: 415 373 9435

continue their Enterprise through their ongoing collection of unlawful debts, functioning as a cohesive unit with the purpose of gaining illicit gambling profits.

### Structure of the Social Casino Enterprise

111. The Social Casino Enterprise consists of the Illegal Slot companies and Amazon. Each participant agreed to conduct and carry out the affairs and goals of the Social Casino Enterprise:

A. The Illegal Slot companies agreed to conduct the affairs of the Social Casino Enterprise by developing, updating, and operating the Illegal Slot machines: the "gambling devices." The Illegal Slot companies operate as the principals, forming the necessary business partnerships with Amazon for the successful execution of their unlawful gambling scheme. The Illegal Slot companies fundamentally rely on Amazon to broker their games, access consumers, and collect revenue. Upon constructive notice of the unlawful nature of the virtual social gambling applications, the Illegal Slot companies agreed with all Enterprise participants to uphold their roles in the Social Casino Enterprise and to continue functioning as a single unit with the common purpose of collecting unlawful debts from online gambling activity.

B. Amazon agreed to conduct the affairs of the Social Casino Enterprise by serving as the gambling premises, brokering the virtual social gambling applications and profiting from all in-app transactions in exchange for a share in the gamblers' losses. Additionally, upon notice of the unlawful nature of the virtual social gambling applications, Amazon agreed with all participants to uphold their roles in the Social Casino Enterprise and to continue functioning as a single unit with the common purpose of collecting unlawful debts from online gambling activity.

112.    At all relevant times, each Social Casino Enterprise participant was aware of the conduct of the Social Casino Enterprise, was a knowing and willing participant in that conduct, and reaped profits from that conduct through in-app sales.

113.    The persons engaged in the Social Casino Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities.

114.    All members of the Social Casino Enterprise coordinate and maintain their respective roles in order to enrich themselves and to further the common interests of the whole.

115.    Each Social Casino Enterprise participant participated in the operation and management of the Social Casino Enterprise by directing its affairs as described herein.

116.    The wrongful conduct of the Social Casino Enterprise has been and remains part of the Social Casino Enterprise's ongoing way of doing business and constitutes a continuing threat to the Plaintiff's and the Class's property. Without the repeated illegal acts and intentional coordination between all participants, the Social Casino Enterprise's scheme would not have succeeded and would not pose a threat to Plaintiff and the Class into the future.

**Pattern of Racketeering Activity**

117.    The affairs of the Social Casino Enterprise were conducted in such a way as to form a pattern of racketeering activity. The Social Casino Enterprise's general pattern of activity consists of designing and operating illegal internet-based slot machines and repeatedly violating public policy against gambling by:

A.   Developing Illegal Slot machine games and disguising them as innocuous video game entertainment;

B.   Distributing and operating Illegal Slot machine games that are, on information and belief, rigged and manipulated;

C.   Concealing the scope and deceptive nature of their gambling applications despite knowledge of their predatory design and business model;

D.   Providing virtual place for unlicensed gambling activity;

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300  •  Fax: 415 373 9435

E. Injuring the public interest by continuously advertising to, and soliciting the general public to play, Illegal Slot machines;

F. Conspiring to uphold the Social Casino Enterprise; and

G. Unjustly collecting unlawful debts and retaining the profits from their illegal social gambling applications.

118. Pursuant to and in furtherance of their fraudulent scheme, Amazon committed multiple predicate act violations of Washington law as previously alleged herein, including violations of RCW § 4.24.070 and § 19.86.010.

**FOURTH CAUSE OF ACTION**
**Violations of 18 U.S.C. § 1962(d)**
**Conspiracy to Engage in Racketeering Actives and Collection of Unlawful Debts**
**(On behalf of Plaintiff and the Class)**

119. Plaintiff incorporates by reference the foregoing allegations as fully set forth herein.

120. 18 U.S.C. § 1962(d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

121. As described throughout, and in detail in the First Cause of Action, even if it did not direct or manage the affairs of the Social Casino Enterprise, Defendant Amazon conspired to commit predicate acts in violation of § 1962(c), including violations of RCW § 4.24.070 and § 19.86.010.

122. Defendant Amazon acted knowingly at all times when agreeing to conduct the activities of the Social Casino Enterprise. Amazon agreed to and indeed did participate in the requisite pattern of racketeering activity which constitutes this RICO claim, collected unlawful debts, engaged in racketeering activities, and intentionally acted in furtherance of the conspiracy by conducting the pattern of racketeering and unlawful debt collection as described above.

123. At the very latest, Amazon had notice of the illegality of the Social Casino Enterprise as of the Ninth Circuit's 2018 holding in *Kater*. Amazon's post-*Kater* participation in the Social

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300 • Fax: 415 373 9435

Casino Enterprise demonstrates its commitment to upholding and operating the structure of the Social Casino Enterprise.

124.    As a result of Amazon's conduct, Plaintiff and Members of the Class were deprived of money and property that they would not otherwise have lost.

125.    Under 18 U.S.C. § 1964(c), the Class is entitled to treble their damages, plus interest, costs, and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

Plaintiff Steven Horn, individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

A.  Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Horn as representative of the Class, and appointing his counsel as Class Counsel;

B.  Declaring that Defendant's conduct, as set out above, is unlawful under the RCW;

C.  Declaring that Defendant's conduct, as set out above, constitutes racketeering activities, collection of unlawful debts, and conspiracy to engage in the same;

D.  Entering judgment against Defendant Amazon, in the amount of the losses suffered by Plaintiff and each member of the Class;

E.  Enjoining Defendant from continuing the challenged conduct;

F.  Awarding damages to Plaintiff and the Class members in an amount to be determined at trial, including trebling as appropriate;

G.  Awarding restitution to Plaintiff and Class members in an amount to be determined at trial;

H.  Requiring disgorgement of all of Amazon's ill-gotten gains;

I.  Awarding reasonable attorneys' fees and expenses;

J.  Awarding pre- and post-judgment interest, to the extent allowable;

K.  Requiring injunctive and/or declaratory relief as necessary to protect the interests of

EDELSON PC
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415 212 9300  •  Fax: 415 373 9435

Plaintiff and the Class; and

L.  Awarding such other and further relief as equity and justice require, including all forms of relief provided for under the RCW.

## **JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**STEVEN HORN**, individually and on behalf of all others similarly situated,

By: /s/ Todd Logan
    *One of Plaintiff's Attorneys*

EDELSON PC
Todd Logan, WSBA #60698
tlogan@edelson.com
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

TOUSLEY BRAIN STEPHENS, PLLC
Cecily C. Jordan, WSBA #50061
cjordan@tousley.com
1200 Fifth Avenue, Suite 1700
Seattle Washington 98101-3147
Tel: 206.682.5600
Fax: 206.682.2992

*Counsel for Plaintiff and the Proposed Class*

1  Rafey S. Balabanian (SBN 315962)
   EDELSON PC
2  150 California Street, 18th Floor
   San Francisco, California 94111
3  Tel: 415.212.9300
   Fax: 415.373.9435
4

5  *Interim Lead Counsel*

6  **[Additional Counsel Listed on Signature Page]**

7
                    **UNITED STATES DISTRICT COURT**
8                 **NORTHERN DISTRICT OF CALIFORNIA**
                          **SAN JOSE DIVISION**
9

10 | IN RE: APPLE INC. APP STORE | Case No. 5:21-md-02985-EJD |
   | SIMULATED CASINO-STYLE GAMES | |
   | LITIGATION | **PLAINTIFFS' MASTER COMPLAINT** |
11
                                      **CLASS ACTION**
12
                                      **JURY DEMAND**
13

14

15

16      Plaintiffs Robert Alldis, Cheree Bibbs, Michael Helsel, Teresa Larsen, Karen Workman,

17 Janice Hill, Vickie Payton, Ernestine Thompson, Rebecca Vincent, Jennifer Andrews, Amy

18 Hoven, Lue Stephens, Frankie Killings-Larkin, Mary Lancaster, Juliana Wisher, Jennifer Hoose,

19 Sean McCloskey, Joshua McDonald, Deborah Steese, John Viglietti, Kai Griffin, Sheri Miller,

20 Connie Zilbert, Ben Kramer, Ashley Honeysuckle, Frank Custodero, Saundra Rogers, and

21 Sheera Harris, individually and on behalf of the proposed classes, bring this Class Action

22 Complaint against Defendant Apple Inc. ("Defendant" or "Apple") seeking restitution, damages,

23 injunctive relief, and other appropriate relief from Apple's ongoing participation in an illegal

24 internet gambling enterprise. Plaintiffs allege as follows upon personal knowledge as to

25 themselves and their own acts and experiences, and on information and belief derived from

26 investigation of counsel, and review of public documents as to all other matters.

27

28

## **INTRODUCTION**

1.      Over the last decade, the world's leading slot machine makers—companies like International Game Technology, Scientific Games Corporation, and Aristocrat Leisure—have teamed up with American technology companies to develop a new product line: social casinos.

2.      Social casinos are apps—playable from smartphones, tablets, and internet browsers—that make the "authentic Vegas-style[1]" experience of slot machine gambling available to consumers anywhere and anytime. *See* Figure 1 (Screenshot of DoubleDown Casino Gameplay). By moving their casino games directly onto the phones, tablets, and computers of players, and by leveraging an innocuous-sounding "free-to-play" model,[2] social casino companies, along with Apple, Facebook, and Google (the "Platforms"), have found a way to smuggle slot machines into the homes of consumers nationwide, twenty-four hours a day and three-hundred-sixty-five days a year.

3.      Just like Las Vegas slot machines, social casinos allow users to purchase virtual "chips" in exchange for real money and then gamble those chips at slot machines games in hopes of winning still more chips to keep gambling. In DoubleDown Casino, for example, players purchase "chip packages" costing up to $499.99. *See* Figure 2 (Screenshot of "Popular" Chip Packages in DoubleDown Casino). But unlike Las Vegas slots, social casinos do not allow players to cash out their chips. Instead, purchased chips and won chips alike can be used only for more slot machine "spinning."

---

[1]      Form F-1/A Doubledown Interactive Co., Ltd. at 87, https://sec.report/Document/0001193125-20-183157/.

[2]      This term is a misnomer. It refers to a business model by which the initial download of the game is free, but companies reap huge profits by selling "in-game" items (known generally as "in-app purchases").

**Figure 1**     **Figure 2**




4.      Like Las Vegas slots, social casinos are extraordinarily profitable and highly addictive. Social casinos are so lucrative because they mix the addictive aspects of traditional slot machines with the power of the Platforms, including Defendant Apple, to leverage big data and social network pressures to identify, target, and exploit consumers prone to addictive behaviors.[3]

5.      Simply put, the social casino apps do not, and cannot, operate and profit at such a high level from these illegal games on their own. Their business of targeting, retaining, and collecting losses from addicted gamblers is inextricably entwined with the Platforms. Not only do the Platforms retain full control over allowing social casinos into their stores, and their distribution and promotion therein, but they also share directly in a substantial portion of the gamblers' losses, which are collected and controlled by the Platforms themselves.

6.      Because the Platforms are the centers for distribution and payment, social casinos gain a critical partner to retain high-spending users and collect player data, a trustworthy marketplace to conduct payment transactions, and the technological means to update their apps with targeted new content designed to keep addicted players spending money.

---

[3]     *See, e.g.*, *How social casinos leverage Facebook user data to target vulnerable gamblers*, PBS NEWS HOUR, youtube.com/watch?v=FFtkFLNJZfM.

7.      Last year alone, consumers purchased and gambled away an estimated *$6 billion* in social casino virtual chips.[4]

8.      By utilizing Apple for promotion, distribution, and payment processing, the social casinos entered into a mutually beneficial business partnership. In exchange for promoting and distributing the casino games, providing them valuable data and insight about their players, and collecting money from consumers, Apple (and the other Platforms) take a *30 percent* commission off of every wager, earning them billions in revenue. By comparison, the "house" at a traditional casino only takes 1 to 15 percent, while also taking on significant risk of loss in its operation. Apple's 30 percent commission, on the other hand, is guaranteed for its ability to act as a casino "host" and bankroll.

9.      The result (and intent) of this dangerous partnership is that consumers become addicted to social casino apps, maxing out their credit cards with purchases amounting to tens or even hundreds of thousands of dollars. Consumers addicted to social casinos suffer a variety of non-financial damages ranging from depression to divorce to attempted suicide.

10.     These devastating consequences are not hypothetical or hyperbole: below are excerpts of sworn testimony from individuals describing their experiences with social casinos:

- "There is no way to escape. . . . I actually was able to stop playing DoubleDown once, but I relapsed. DoubleDown has affected my life in so many ways. . . . Overall, I believe that I have spent well over $220,000 playing DoubleDown. . . . My husband and I dreamed of paying off our house and retiring at age 60. My addiction to DoubleDown likely ruined that plan. *The financial consequences have caused a lot of strain in our relationship. When I got hooked on DoubleDown again, I lied to my husband about the total amount I had spent because I was afraid he would divorce me if he were to find out the real amount.* He found out anyway, and when he did, he contacted a divorce attorney to start the process of separation. Luckily for me, he decided to give me another chance. I am so thankful for his patience with me, but I feel terrible that I have put him through all this." Exhibit 1, Declaration of Ben Kramer ¶¶ 3-4, 7 (emphasis added).

---

[4]      Devin O'Connor, *SciPlay Net Income Skyrockets 127 Percent, as Social Gaming Embraced by Americans Sheltered at Home*, CASINO.ORG (May 13, 2020), https://www.casino.org/news/sciplay-net-income-skyrockets-127-percent-as-social-gaming-embraced.

EXHIBIT B
33

- "It is no exaggeration to say that social casinos consume my life. . . . *I have missed out on outings with friends, family vacations, and even holidays because I was playing social casinos.* I have even missed out on special milestones in my son's life. I feel terrible about it. The financial toll has been devastating to me and my family. Overall, I believe that I have spent more than $30,000 in social casinos. . . . *I had great credit before I started playing social casinos, but not anymore. My budget is so tight, and my addiction so strong, that I have delayed several medical appointments and procedures so I can spend the money in social casinos instead. We've even turned to people we know to borrow money to make ends meet, and our dream of buying a home appears unrealistic now.* I have a lot of guilt over my addiction to social casinos and the amount of time and money I have lost in them. I have trouble talking about it because *the guilt is so bad that it makes me physically ill when I think about how much money I've spent. I also have frequent insomnia from constantly worrying about how to pay our bills and make ends meet* because of the strain social casinos have put on my finances. Exhibit 2, Declaration of Ashley Honeysuckle ¶¶ 2, 5-8 (emphasis added).

12.     Unsurprisingly, social casinos are illegal under many states' gambling laws.

13.     As the Ninth Circuit held in *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785 (9th Cir. 2018):

> In this appeal, we consider whether the virtual game platform "Big Fish Casino" constitutes illegal gambling under Washington law. Defendant–Appellee Churchill Downs, the game's owner and operator, has made millions of dollars off of Big Fish Casino. However, despite collecting millions in revenue, Churchill Downs, like Captain Renault in *Casablanca*, purports to be shocked—shocked!—to find that Big Fish Casino could constitute illegal gambling. We are not. We therefore reverse the district court and hold that because Big Fish Casino's virtual chips are a "thing of value," Big Fish Casino constitutes illegal gambling under Washington law.

14.     As an instructive example, DoubleDown Casino is illegal both in Washington and here in California (where the Platforms, including Defendant Apple, host it and collect their 30% commission). This year, consumers will purchase approximately $400 million worth of virtual casino chips in DoubleDown Casino. That $400 million will be divided up approximately as follows: $240 million to DoubleDown; $40 million to International Game Technology ("IGT") (a multinational slot machine manufacturer that licenses slot machine game IP to DoubleDown); and—as particularly relevant here—the remaining $120 million to Apple and the other Platforms (for hosting the app, driving vulnerable consumers to it, and processing the payments for those consumers' virtual chip purchases).

15.     In other words, despite knowing that DoubleDown Casino is illegal, Apple and the other Platforms continue to maintain a major (30%) financial interest by hosting the game, driving customers to it, and acting as the bank.

16.     As such, DoubleDown, Apple, and the other Platforms are all liable as co-conspirators to an illegal gambling enterprise. Moreover, DoubleDown Casino is just one of more than fifty social casino apps (the "Illegal Slots") that the Platforms illegally host, promote, and profit from.

17.     Consequently, Apple and the other Platforms—alongside the Illegal Slot companies—are liable as co-conspirators to an illegal gambling conspiracy.

18.     Defendant Apple, for its part, is a direct participant in an informal association and enterprise of individuals and entities with the explicit purpose of knowingly devising and operating an online gambling scheme to exploit consumers and reap billions in profits (the "Social Casino Enterprise").

19.     This ongoing Enterprise necessarily promotes the success of each of its members: Social casino operators need Platforms like Apple, Google, and Facebook, to access consumers, host their games, and process payments. The Platforms, for their part, need developers like DoubleDown to publish profit-driven and addictive applications on their platforms to generate massive revenue streams.

20.     Through this case, Plaintiffs seek to force Apple to stop participating in, and to return to consumers the money it has illegally profited from, the Social Casino Enterprise.

21.     Plaintiffs, on behalf of the putative Classes, bring claims for damages and for injunctive relief under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"); California's Unfair Competition Law, Business and Professions Code § 17200, *et seq.* ("UCL"); state gambling laws; state consumer protection statutes; and unjust enrichment.

## **PARTIES**

22.     Plaintiff Robert Alldis is a natural person and a citizen of the State of California.

23.     Plaintiff Cheree Bibbs is a natural person and a citizen of the State of Alabama.

24. Plaintiff Michael Helsel is a natural person and a citizen of the State of Alabama.

25. Plaintiff Teresa Larsen is a natural person and a citizen of the State of Louisiana.

26. Plaintiff Karen Workman is a natural person and a citizen of the State of Connecticut.

27. Plaintiff Janice Hill is a natural person and a citizen of the State of Connecticut.

28. Plaintiff Vickie Payton is a natural person and a citizen of the State of Georgia.

29. Plaintiff Ernestine Thompson is a natural person and a citizen of the State of Illinois.

30. Plaintiff Rebecca Vincent is a natural person and a citizen of the State of Indiana.

31. Plaintiff Jennifer Andrews is a natural person and a citizen of the State of Minnesota.

32. Plaintiff Amy Hoven is a natural person and a citizen of the State of Minnesota.

33. Plaintiff Lue Stephens is a natural person and a citizen of the State of Mississippi.

34. Plaintiff Frankie Killings-Larkin is a natural person and a citizen of the State of Mississippi.

35. Plaintiff Mary Lancaster is a natural person and a citizen of the State of Missouri.

36. Plaintiff Juliana Wisher is a natural person and a citizen of the State of New Mexico.

37. Plaintiff Jennifer Hoose is a natural person and a citizen of the State of New York.

38. Plaintiff Sean McCloskey is a natural person and a citizen of the State of Ohio.

39. Plaintiff Joshua McDonald is a natural person and a citizen of the State of Oregon.

40. Plaintiff Deborah Steese is a natural person and a citizen of the State of South Carolina.

41. Plaintiff John Viglietti is a natural person and a citizen of the State of Tennessee.

42. Plaintiff Kai Griffin is a natural person and a citizen of the State of Tennessee.

43. Plaintiff Sheri Miller is a natural person and a citizen of the State of Tennessee.

44. Plaintiff Connie Zilbert is a natural person and a citizen of the State of

1    Washington.

2        45.    Plaintiff Ben Kramer is a natural person and a citizen of the State of Washington.

3        46.    Plaintiff Ashley Honeysuckle is a natural person and a citizen of the State of

4    Washington.

5        47.    Plaintiff Frank Custodero is a natural person and a citizen of the State of Florida.

6        48.    Plaintiff Saundra Rogers is a natural person and a citizen of the State of

7    California.

8        49.    Plaintiff Sheera Harris is a natural person and a citizen of the State of Ohio.

9        50.    Defendant Apple Inc. is a corporation existing under the laws of the State of

10   California with its principal place of business located at 1 Infinite Loop, Cupertino, California

11   95014. Apple regularly conducts and transacts business in this District, as well as throughout the

12   United States. Apple manufactures, markets, and sells the iPhone and iPad, among other

13   electronic devices, and owns and operates the Apple App Store, which comes preinstalled on

14   every Apple device.

15               **JURISDICTION AND VENUE**

16        51.    Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because

17   (a) at least one member of the proposed classes is a citizen of a state different from Defendant,

18   (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none

19   of the exceptions under that subsection apply to this action.

20        52.    Federal subject-matter jurisdiction also exists under 28 U.S.C. § 1331 because

21   Plaintiffs allege violations of 18 U.S.C. § 1962(c)-(d).

22        53.    The Court has personal jurisdiction over Defendant because Defendant is

23   headquartered in this District and Defendant's alleged wrongful conduct occurred in and

24   emanated from this District.

25        54.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial

26   part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District.

27               **GENERAL ALLEGATIONS**

28   **I.**     **Apple Promotes, Offers, Supports, and Profits From Illegal Slot Machines**

---

55.     Players can access the Illegal Slots through mobile apps downloaded from the Apple App Store and can play at any time of day or night. The doors to these mobile casinos never close.

56.     The Illegal Slots apps each contain multiple games. For example, the DoubleDown Casino app contains over 200 total titles: 186 slot titles, 21 card game titles, and 1 bingo title.[5] The Illegal Slots derive substantially all of their revenue from their slot titles.

57.     Many of the Illegal Slots feature the same games—sporting the same graphics and music—as can be found on an electronic slot machine in a brick-and-mortar casino. For instance, International Game Technology's well-known slot game "Cleopatra" can be found both in physical casinos and through Apple's DoubleDown Casino app.[6]

58.     The Illegal Slots are designed to mimic the electronic slot machines found in brick-and-mortar casinos, including many of the features designed to maximize time-on-device and money spent. For example, the Illegal Slots offer multiline betting—allowing players to wager and win on multiple pay lines—which tends to keep people playing and spending for longer.[7]

59.     There is no skill involved in the slot machine games offered at the Illegal Slots. Players can only place wagers (using virtual chips), and then press a button to "spin" the slot machine. It is impossible for players to affect the outcome of any spins.

60.     Within the Illegal Slots, players are typically given an initial allotment of virtual chips for free. Players use those chips to play the animated slot machines, choosing the amount they wager on each spin. Virtual chips are won and lost based on the outcome of those spins.

61.     Once a player loses their initial allotment of free chips, the Illegal Slots typically alert the player that he or she has insufficient funds to continue playing that slot game. Many of

---

[5]     Form F-1/A DoubleDown Interactive Co., Ltd. at 82, https://sec.report/Document/0001193125-20-183157/.

[6]     *Id*. at 4 ("We have exclusive access to hundreds of highly recognizable, branded land-based slot titles through our partnership with IGT which enables us to deliver an authentic casino floor experience to our players.").

[7]     *See* Natasha Dow Schüll, *Addiction By Design: Machine Gambling in Las Vegas* (Princeton Univ. Press 2012).

the Illegal Slot games have minimum bet requirements, such that a player cannot continue

playing that game if their chip balance falls too low.

62.     At this point, players have three options: (i) stop playing, (ii) wait for some period

of time before receiving more free chips from the Illegal Slot; or (iii) purchase more chips to

keep playing—often with just a single click. To keep playing the same game immediately,

players navigate to an electronic store and purchase chip packages.

63.     Apple operates as the payment processor for all in-app purchases of virtual chips

in the Illegal Slots. Apple collects the money players spend on virtual chips, takes a cut for itself,

and remits the rest to the Illegal Slots.[8]

64.     Purchased chips extend gameplay in the Illegal Slots because they allow players

to place wagers on more spins of the slot machines.

65.     Virtual chips cannot be used outside of any individual Illegal Slots app. The chips

can only be used to (1) place wagers on slot machine spins, (2) place wagers on the few card

game or bingo titles in the Illegal Slots app, or (3) give a "gift" of virtual chips to another

account in the app. Substantially all virtual chips are used on slot machine spins.

66.     Players typically run out of virtual chips quickly—within a day or two.[9]

67.     Notably, while any legitimately operated slot machine must randomize its results,

social casinos do not fully randomize their results. Instead, social casinos tailor "wins" and

"losses" in such a way as to maximize addiction (and, in turn, revenues). As the CEO of

DoubleDown Casino once explained, "[o]ur games aren't built to be bulletproof like you'd need

to be if you're a real gambling company. We can do things to make our games more [fun] that if

you were an operator in Vegas you'd go to jail for, because *we change the odds just for fun*."[10]

---

[8]     *Apple Developer Program License Agreement*, Schedule 2 § 3.4, *available at* https://developer.apple.com/support/downloads/terms/schedules/Schedule-2-and-3-20211021-English.pdf.

[9]     Form F-1/A DoubleDown Interactive Co., Ltd. at 72, https://sec.report/Document/0001193125-20-183157/ ("Th[e] timing difference [between virtual currency purchase and consumption] is relatively short.").

[10]     *Gambling giant IGT buying Double Down for $500M, moving into Facebook games*, GEEK WIRE (Jan. 12, 2012), https://www.geekwire.com/2012/gambling-giant-igt-buying-doubledown-500m-moving-facebook-games/ [emphasis added].

68.     Developers of social casino games, such as Scientific Games, hold patents for "dynamic paytables" in interactive games. Paytables—coded into the Illegal Slot apps—set the payout for each possible game event. In other words, they determine how many chips players receive for various spin outcomes. Use of a dynamic paytable means that the payout for any given game event can change over the course of a game or over the course of a player's use of the app.

69.     As Scientific Games explained in their patent application, "[t]he slot machine's dynamic paytable is designed to take advantage of the observation that players are more apt to play gaming machines for longer periods of time if the payout is increased as the player continues to play the game. Other slot machines change the paytable based on the amount wagered by the player."[11]

70.     On information and belief, many Illegal Slots utilize dynamic paytables. In these games, players are cheated out of a legitimately randomized slot machine experience.

71.     Rather, the games adjust the potential payouts in order to maximize revenue—changing the gameplay and the odds in order to manipulate players into playing longer and spending more.

## II.     Apple Promotes, Hosts, and Facilitates At Least Fifty Illegal Social Casinos

72.     The Platforms, including Defendant Apple, have directly assisted in creating and operating the unregulated market of virtual casino games from the outset of the industry.

73.     Before gaining access to these social media platforms, the Illegal Slots used methods like loyalty cards to track data on how much gamblers spent, how frequently they played, or how often they bet. The Platform partnerships upgraded their business model to an in-app payment system and provided additional user data which skyrocketed revenue by providing them with access to a whole new market of consumers.

74.     The Illegal Slots rely on Platforms, like Defendant Apple, to make their games

---

[11]     United States Patent, *Dynamic Paytable for Interactive Games*, No. US 7,628,691 B2 (Dec. 8, 2009).

available to players and to collect revenue.[12] The Illegal Slots are *only* available to play via third-party Platforms, including on an app downloaded from the Apple App Store, on an app downloaded from Google Play, or on Facebook (online or mobile app).

75. The core marketing for the Illegal Slots is accomplished in concert with the Platforms, and their systems are inextricably linked. Here, for example, is how one social casino maker described their partnership with the Platforms in a public securities filing:

> Our games are distributed through several main platform providers, including Apple, Facebook, Google, and Amazon, which also provide us valuable information and data, such as the rankings of our games. **Substantially all of our revenue is generated by players using those platforms.** Consequently, our expansion and prospects depend on our continued relationships with these providers[.]
> ....
>
> We focus our marketing efforts on acquiring new players and retaining existing players. We acquire players both organically and through paid channels. Our paid marketing includes performance marketing and dynamic media buying on Facebook, Google, and other channels such as mobile ad networks. Underlying our paid marketing efforts are our data analytics that allow us to estimate the expected value of a player and adjust our user acquisition spend to a targeted payback period. Our broad capabilities in promotions allow us to tailor promotional activity around new releases, execute differentiated multi-channel campaigns, and reach players with preferred creative content.
> ....
>
> Our player retention marketing includes advertising on Facebook as well as outreach through email, push notifications, and social media posts on channels such as Facebook, Instagram, and Pinterest. Our data and analytics also inform our retention marketing efforts. Campaigns are specially designed for each channel based upon player preferences for dimensions such as time of day and creative content. We consistently monitor marketing results and return on investment, replacing ineffective marketing tactics to optimize and improve channel performance.
> ....
>
> We employ a rigorous, data-driven approach to player lifecycle management from user acquisition to ongoing engagement and monetization. We use internally-developed analytic tools to segment and target players and to optimize user acquisition spend across multiple channels.
> ....
>
> We continuously gather and analyze detailed customer play behavior and assess this data in relation to our judgments used for revenue recognition.[13]

---

[12] Form F-1/A DoubleDown Interactive Co., Ltd. at 16, https://sec.report/Document/0001193125-20-183157/.

[13] *Id.* at 16, 72, 85, 91.

76.     By partnering with the Illegal Slots in marketing, distribution, and payment processing, Defendant Apple entered into a mutually beneficial business partnership with the Illegal Slots. In exchange for pushing and distributing the social casino apps and collecting money from consumers, Apple and the other Platforms take a 30 percent commission off of every in-app purchase, earning them billions in revenue.[14]

77.     Apple's profits increasingly rely on revenue from its "Services" business segment, which includes revenue from the App Store.

### A.     The Illegal Slots

78.     Each of the following fifty Illegal Slots allows players to gamble on online slot machines, even in states where such gambling is unlawful.[15]

**Figure 4 – The Illegal Slots**

| # | Game Title | Apple App Store URL |
|---|---|---|
| 1 | Slotomania Vegas Casino Slots | https://apps.apple.com/US/app/id447553564?l=en |
| 2 | Jackpot Party - Casino Slots | https://apps.apple.com/US/app/id575980917?l=en |
| 3 | Cashman Casino Las Vegas Slots | https://apps.apple.com/US/app/id1123582513?l=en |
| 4 | DoubleDown - Casino Slots Game | https://apps.apple.com/US/app/id485126024?l=en |
| 5 | CashFrenzy - Slots Casino | https://apps.apple.com/US/app/id1404165333?l=en |
| 6 | House of Fun: Casino Slots 777 | https://apps.apple.com/US/app/id586634331?l=en |
| 7 | Huuuge Casino Slots Vegas 777 | https://apps.apple.com/US/app/id1028362533?l=en |
| 8 | Heart of Vegas Casino Slots | https://apps.apple.com/US/app/id785537179?l=en |
| 9 | Lightning Link Casino Slots | https://apps.apple.com/US/app/id1243005112?l=en |
| 10 | POP! Slots Live Vegas Casino | https://apps.apple.com/US/app/id1065980436?l=en |
| 11 | DoubleU Casino: Vegas Slots | https://apps.apple.com/US/app/id642727743?l=en |
| 12 | Caesars Casino: Vegas Slots | https://apps.apple.com/US/app/id603097018?l=en |
| 13 | Lotsa Slots - Vegas Casino | https://apps.apple.com/US/app/id1356045010?l=en |
| 14 | myVEGAS Slots - Casino Slots | https://apps.apple.com/US/app/id714508224?l=en |
| 15 | Gold Fish Casino Slots Games | https://apps.apple.com/US/app/id806393795?l=en |
| 16 | Wizard of Oz: Casino Slots | https://apps.apple.com/US/app/id916869395?l=en |
| 17 | Quick Hit Slots - Casino Games | https://apps.apple.com/US/app/id945621521?l=en |

---

[14]     *Apple Developer Program License Agreement*, Schedule 2 § 3.4, *available at* https://developer.apple.com/support/downloads/terms/schedules/Schedule-2-and-3-20211021-English.pdf.

[15]     For the Court's convenience, an iPad containing Apple-based versions of the Illegal Slots will be lodged with the Court as Exhibit 3. Upon request from Apple's appearing counsel, a copy of the iPad will be produced to Apple.

| 18 | Cash Tornado Slots - Casino | https://apps.apple.com/US/app/id1480805172?l=en |
| 19 | Billionaire Casino Slots 777 | https://apps.apple.com/US/app/id1098617974?l=en |
| 20 | Game of Thrones Slots Casino | https://apps.apple.com/US/app/id1369317521?l=en |
| 21 | Hit it Rich! Lucky Vegas Slot | https://apps.apple.com/US/app/id694876905?l=en |
| 22 | my KONAMI - Real Vegas Slots | https://apps.apple.com/US/app/id1040172229?l=en |
| 23 | Jackpot World - Casino Slots | https://apps.apple.com/US/app/id1356980152?l=en |
| 24 | Scatter Slots - Slot Machines | https://apps.apple.com/US/app/id944158857?l=en |
| 25 | Double Win Slots Casino Game | https://apps.apple.com/US/app/id1382108510?l=en |
| 26 | 88 Fortunes Slots Casino Games | https://apps.apple.com/US/app/id1091301948?l=en |
| 27 | Wynn Slots - Las Vegas Casino | https://apps.apple.com/US/app/id1323336775?l=en |
| 28 | Willy Wonka Slots Vegas Casino | https://apps.apple.com/US/app/id1074470421?l=en |
| 29 | Vegas Live Slots Casino | https://apps.apple.com/US/app/id1304885184?l=en |
| 30 | MONOPOLY Slots - Casino Games | https://apps.apple.com/US/app/id1215145992?l=en |
| 31 | Classic Casino Slots Games | https://apps.apple.com/US/app/id1116870834?l=en |
| 32 | GSN Casino: Slot Machine Games | https://apps.apple.com/US/app/id469231420?l=en |
| 33 | Rock N' Cash Casino Slots | https://apps.apple.com/US/app/id1143409775?l=en |
| 34 | Slot Machines 777 - Slots Era | https://apps.apple.com/US/app/id1133138987?l=en |
| 35 | Wild Classic Slots Casino | https://apps.apple.com/US/app/id1135852485?l=en |
| 36 | Club Vegas Slots: Casino Games | https://apps.apple.com/US/app/id1201054588?l=en |
| 37 | Ignite Classic Slots | https://apps.apple.com/US/app/id1256307081?l=en |
| 38 | Slots - Classic Vegas Casino | https://apps.apple.com/US/app/id994102781?l=en |
| 39 | Cash Mania - Casino Slots | https://apps.apple.com/US/app/id1518723506?l=en |
| 40 | Hot Shot Casino - Slots Games | https://apps.apple.com/US/app/id986110430?l=en |
| 41 | Double Hit Casino: Vegas Slots | https://apps.apple.com/US/app/id1016431735?l=en |
| 42 | Huge Win Slots! Casino Games | https://apps.apple.com/US/app/id1247414258?l=en |
| 43 | Winning Slots Las Vegas Casino | https://apps.apple.com/US/app/id1330550298?l=en |
| 44 | High 5 Casino: Home of Slots | https://apps.apple.com/US/app/id673354210?l=en |
| 45 | Tycoon Casino - Vegas Slots | https://apps.apple.com/US/app/id1437618231?l=en |
| 46 | Casino Games - Infinity Slots | https://apps.apple.com/US/app/id950710606?l=en |
| 47 | Slots DoubleDown Fort Knox | https://apps.apple.com/US/app/id1334300759?l=en |
| 48 | Golden Casino – Vegas Slots | https://apps.apple.com/US/app/id1216780424?l=en |
| 49 | Jackpotjoy Slots New 777 Games | https://apps.apple.com/US/app/id1355023074?l=en |
| 50 | Show Me Vegas Slots Casino App | https://apps.apple.com/US/app/id1172073178?l=en |

79.     Most or all of the Illegal Slots are also hosted and promoted by the other Platform members of the Social Casino Enterprise, Google and Facebook.

**B.      Apple's Facilitation, Promotion, and Control Over the Illegal Slots**

80.     Apple, for its part, routinely facilitates the success of social casinos by counseling

the app developers through the app launch process and providing them with resources and business tools necessary to maximize their success on the Apple App Store.

81. Apple's operating system for Mac computers, the iPhone smartphone, and the iPad tablet—known as iOS—is a rigidly controlled closed system.

82. Prior to being published in the Apple App Store, developers must submit their app for review. In this process, Apple examines whether the app violates any company policies and demands that apps comply with all relevant laws within the jurisdiction where the app is available. Apps may be, and often are, removed at Apple's discretion for violating its policies and can be audited at any time.[16]

83. Apple closely monitors its gambling liability by responding to the changing market landscape when it deems necessary. Apple likewise heavily regulates advertising in its system that involves gambling, stating "Gaming, gambling, and lotteries can be tricky to manage and tend to be one of the most regulated offerings on the App Store. Only include this functionality if you've fully vetted your legal obligations everywhere you make your app available and are prepared for extra time during the review process."[17]

84. Apple's App Store categorizes the Illegal Slots as "Casino" games (distinct from "Arcade" games and "Card" games).

85. Apple also rates the Illegal Slots as "17+" indicating that the games are not appropriate for minors. In August 2019, Apple announced that "to help make the App Store safe for kids, apps that feature Frequent/Intense Simulated Gambling will be rated 17+ in all countries and regions."[18]

86. Apple is thus keenly aware of the illegal, unfair, and deceptive nature of the Illegal Slots.

87. Apple also helps the Illegal Slots target consumers and maximize revenue. For

---

[16] *App Review*, Apple Developer, https://developer.apple.com/app-store/review/.

[17] *App Store Review Guidelines*, Apple.com, https://developer.apple.com/app-store/review/guidelines/#other-business-model-issues.

[18] *Upcoming Changes for 17+ Age Ratings and App Availability*, Apple Developer, https://developer.apple.com/news/?id=08192019a.

instance, Apple provides marketing guidance, tools, promotional offers, and more to app developers (like the developers of the Illegal Slots) to help drive users' discovery of apps and in-app purchases.[19]

88.    Apple also selects apps to feature on the App Store.[20] Featured placement increases app installs.

89.    Apple encourages app developers to incorporate Apple's "latest innovative Apple technologies" into their apps "to create useful and engaging experiences." For example, Apple urges developers to "[a]llow your users to . . . quickly purchase items within your app with Apple Pay, sign in to your app and website with their Apple ID, get things done with just their voice using Siri, and much more."[21]

90.    Apple has publicly acknowledged its active participation in the creation of app content, stating that the commissions its charges on all App Store sales reflect the value of the "tools and software for the development, testing and distribution of developers' apps and digital content" that it provides. Defendant Apple Inc.'s Opposition to Epic Games, Inc.'s Motion for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue at 4, *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR (N.D. Cal., filed Aug. 21, 2020) (ECF No. 36). And it admits that it "invests significant resources" to make developers' content meets its standards by engaging in "rigorous, human-assisted review" of "every iOS app." Letter from Douglas G. Vetter, Vice President & Associate General Counsel, Apple Inc., to Canon Pence, General Counsel, Epic Games, Inc., at 4, *Epic Games*, No. 3:20-cv-05640-YGR (ECF No. 37-5).

91.    The Illegal Slot companies and Apple monitor the game activity and use the collected data to increase user spending. This access to data is critical for the developers: Since all payment processing occurs through third-party platforms, the Illegal Slot companies have limited access to personal user data unless players login through Apple or otherwise sign up for

---

[19]    *Promoting your apps*, Apple Developer, https://developer.apple.com/app-store/promote/.

[20]    *Getting Featured on the App Store*, Apple Developer, https://developer.apple.com/app-store/getting-featured/.

[21]    *Apple Developer Program*, Apple Developer, https://developer.apple.com/programs/.

loyalty programs.[22]

92.     Because the Illegal Slots depend on the spending of a small, targeted audience, the Illegal Slot companies and Platforms work together to target and exploit high-spending users, or "whales," as Illegal Slot companies like DoubleDown refer to their top spenders.[23]

93.     The data that the Illegal Slot companies and the Platforms collect on monetization necessarily contributes to the structure and success of the Social Casino Enterprise.

94.     Apple allows Illegal Slot companies to target high spending users and activate non-spending users. Apple aids in the design and direction of targeted advertising, both on and within its App Store and other related Apple platforms, all aimed at driving new customers to the Illegal Slots and retaining current gamblers

95.     Additionally, because the Illegal Slots are required to use Apple's payment system to process all in-game purchases, Apple collects a 30 percent service fee off of every transaction.

96.     Because Apple acts as the "bank" for the Illegal Slots, the Platforms are entirely aware that some consumers spend *hundreds of thousands of dollars* on the Illegal Slots.

97.     At all relevant times, Apple and the Platforms have known of the unlawful nature of the Illegal Slots and nonetheless have subjected the general public to the unlawful, predatory, and addictive games in order to maximize profits at the expense of the public's health and welfare.

98.     Furthermore, on information and belief, in the wake of the *Kater* decision, the Platforms did not remove social casinos from their offerings but instead conferred with each other and decided to each continue to offer illegal social casino games. This decision was consistent with the Platforms' long history of entering into highly illegal agreements with each

---

[22]     Form F-1/A Doubledown Interactive Co., Ltd. at 21, https://sec.report/Document/0001193125-20-183157/.

[23]     *The Journey From a Single-App to a Multi-App Company*, https://youtu.be/PY8gh8M6T20?t=1260 (Joe Sigrist, DoubleDown General Manager: "We track our whales").

1   other as long as it is highly lucrative to do so.[24]

2       99.     Despite having the ability to do so, Apple has not taken steps to limit access to the

3   Illegal Slots, such as by geo-restricting games such that they can only be played in certain states.

4   Apple regularly geo-restricts other gambling games where players can "cash out."

5       100.    If Apple ever discovers an illegal or fraudulent transaction in breach of its

6   Apple's terms or policies, it has the ability to deny developers from redeeming the proceeds in its

7   active balance.

8       101.    Unfortunately, with the Illegal Slots, Apple used their developer tools to take

9   advantage of users with severe gambling problems.

10      102.    As a result, Apple has unlawfully made billions of dollars on the backs of

11  consumers.

12  **III.    Players Are Harmed By the Illegal Slots Hosted by Defendant**

13      103.    Millions of consumers access Illegal Slots through Apple, and at least thousands

14  have paid money to Apple to purchase virtual chips for gambling on the Illegal Slots.

15      104.    These players have been injured by Apple's conduct because they have lost

16  money as a result of Apple's hosting, promoting, and facilitating of illegal gambling and Apple's

17  participation in unfair and unscrupulous business practices.

18      105.    Many players have lost substantial sums of money to Apple and the Social Casino

19  Enterprise. Players have maxed out credit cards, spent money they could not afford, and fallen

20  behind on bills because they cannot stop spending money on Illegal Slots. Some players' injuries

21  amount to tens or even hundreds of thousands of dollars.

22      106.    Many players feel addicted to the Illegal Slots—they try to stop, knowing that

23  they are losing money and that they are playing too much, but they can't. As long as Apple

24  continues to offer and promote Illegal Slots and continues to facilitate the sale of virtual chips,

25  the victimization of these players (and the accompanying harms) will persist.

26  ───────────────

27  [24]     *See, e.g.*, *Exclusive: Apple, Google to pay $324 million to settle conspiracy lawsuit*, available at https://www.reuters.com/article/us-apple-google-lawsuit-exclusive/exclusive-apple-google-to-pay-324-million-to-settle-conspiracy-lawsuit-idUSBREA3N28Z20140425; *Behind a*

28  *Secret Deal Between Google and Faceb*ook, available at https://www.nytimes.com/2021/01/17/technology/google-facebook-ad-deal-antitrust.html.

EXHIBIT B
47

107.     Players addicted to Illegal Slots also suffer serious non-economic damages, ranging from depression to divorce to attempted suicide.

108.     Many of these harms are irreparable. After-the-fact money damages cannot fix injuries like strained marriages, unsought medical treatments, skipped meals, and anxiety and self-loathing caused by Apple's and the Social Casino Enterprise's continued unlawful activity.

### FACTS SPECIFIC TO NAMED PLAINTIFFS

**I.     Ben Kramer**

109.     Plaintiff Ben Kramer, 53, is a resident and citizen of Redmond, Washington. Mr. Kramer started playing DoubleDown Casino in approximately 2013 after discovering the game in the Apple App Store. Since he began playing DoubleDown Casino, he has regularly made purchases in the game through the Apple App Store. Mr. Kramer believes that he has spent approximately $220,000 in DoubleDown Casino, and estimates that he plays the game approximately 48 hours each week. Mr. Kramer's addiction to social casinos has taken a significant toll on his life. He has twice used the equity in his home to pay off massive, high-interest credit card debt amassed from his spending in the games, which increased his mortgage payment and set back his schedule for paying off his house by years. This spending and debt caused enormous strain in his marriage and he believes the financial stresses caused by DoubleDown Casino have likely made his and his husband's plan to retire by age 60 impossible.

**II.     Ashley Honeysuckle**

110.     Plaintiff Ashley Honeysuckle, 36, is a resident and citizen of Gig Harbor, Washington. Ms. Honeysuckle started playing social casinos in approximately 2017 after seeing an ad on Facebook. She regularly plays and makes purchases in Lotsa Slots and Jackpot Party Casino through the Apple App Store. She believes she has made thousands of dollars in purchases as a result of Facebook ads offering promotions on virtual coins.

111.     Social casinos have significantly impacted Ms. Honeysuckle's finances. To date, she estimates that she has spent more than $30,000 on virtual coins. Her addiction to social casinos has caused her to fall behind on rent, car payments, and household bills. Her bank account is frequently overdrawn, which has resulted in overdraft fees. Her credit cards have been

maxed out, and some have been sent to collections, resulting in calls and letters from creditors. Her spending on social casinos has devastated her credit and put a heavy strain on her monthly budget. She has even delayed medical appointments and procedures in order to afford more virtual coins in social casinos and has been forced to borrow money from others to make ends meet. Because of her spending on social casinos, Ms. Honeysuckle and her spouse feel that they are unable to buy a home.

112.    In addition to these financial impacts, social casinos have consumed Ms. Honeysuckle's life. She estimates that she plays social casinos approximately 20 hours each week and has missed out on outings with friends, holidays, family vacations, and special memories with her son because of her addiction. She struggles with severe guilt over her social casino spending, to the point that she can become physically ill when she thinks about the amount of money she has lost playing the games. She suffers from insomnia due to the financial strain from social casinos and experiences frequent anxiety.

**III.    Cheree Bibbs**

113.    Plaintiff Cheree Bibbs, 52, is a resident and citizen of Bessemer, Alabama. Ms. Bibbs plays and has paid money to DoubleDown Casino, Jackpot Party, and Slotomania through the Apple App Store. She began playing social casinos approximately 5 years ago. Ms. Bibbs estimates that she has spent approximately $15,000 in social casinos to date, and estimates that she plays the games as much as 40 hours each week.

**IV.    Robert Alldis**

114.    Plaintiff Robert Alldis, 34, is a resident and citizen of San Diego, California. Mr. Alldis plays and has paid money on Lightning Link Casino through the Apple App Store. He started playing social casinos in approximately 2020 after seeing ads for the games on social media. Mr. Aldiss estimates that he plays social casinos approximately once per week, and estimates that he has spent approximately $1,000 to date playing the games.

**V.    Michael Helsel**

115.    Plaintiff Michael Helsel, 59, is a resident and citizen of Loxley, Alabama. Mr. Helsel currently plays Double U Casino through the Apple App Store and believes he has played

Big Fish Casino, Cashman Casino, DoubleDown Casino, Heart of Vegas, Hit it Rich! Lucky Vegas Casino Slots, and Jackpot Party in the past. Mr. Helsel started playing social casinos in approximately 2016 after seeing advertisements on Facebook. Since then, social casinos have had a significant impact on his life. He estimates that he plays social casinos between 7 to 10 hours per week on average, and estimates that he has lost approximately $1,000 to $1,500 on social casinos to date.

## VI.    Teresa Larsen

116.    Plaintiff Teresa Larsen, 62, is a resident and citizen of Baton Rouge, Louisiana. Ms. Larsen resided in Alabama prior to November 2020, and during her Alabama residency, she played Jackpot Party, DoubleDown Casino, and Goldfish Casino Slots through the Apple App Store. She started playing social casinos in approximately 2017. Ms. Larsen believes she plays social casinos for 15 to 20 hours each week on average, and estimates that she has spent approximately $2,000 in total playing social casinos.

## VII.    Karen Workman

117.    Plaintiff Karen Workman, 57, is a resident and citizen of Norwich, Connecticut. Ms. Workman believes that over time she has played well over a dozen social casino games, including Billionaire Casino Slots 777, Caesars Slots, Cash Frenzy, Double U Casino, DoubleDown Casino, Lightning Link Casino, Zynga Slots, and Slots DoubleDown Fort Knox— all through the Apple App Store. She believes she started playing social casinos in approximately December 2016. Ms. Workman estimates that she plays social casinos for, on average, 40 to 50 hours per week, and estimates that she has spent approximately $25,000 to date playing social casinos.

## VIII.    Janice Hill

118.    Plaintiff Janice Hill, 56, is a resident and citizen of Hartford, Connecticut. Ms. Hill plays Cash Frenzy, Club Vegas 2021, and Jackpot Party through the Apple App Store. She started playing social casinos in approximately 2018 after seeing advertisements while playing other games in the Apple App Store. Ms. Hill estimates that she plays social casinos at least 10 hours each week, and believes she has spent more than $1,000 to date playing social casinos.

## IX. Vickie Payton

119.     Plaintiff Vickie Payton, 56, is a resident and citizen of Union City, Georgia. Ms. Payton played Big Fish Casino, Cashman Casino, and DoubleDown Casino through the Apple App Store until approximately September 2021. She started playing social casinos in approximately 2016 after seeing advertisements on Facebook. Up until the time she was able to stop playing social casinos, Ms. Payton believes she played social casinos approximately 24 hours each week, and estimates that she lost approximately $2,000.

## X. Ernestine Thompson

120.     Plaintiff Ernestine Thompson, 52, is a resident and citizen of Chicago, Illinois. Ms. Thompson plays Cashman Casino, DoubleDown Casino, Jackpot Party, and Slotomania through the Apple App Store. She started playing social casinos in approximately 2015, and she believes she currently plays social casinos approximately 3 to 4 hours each week. Ms. Thompson estimates that she has spent thousands of dollars playing social casinos.

## XI. Rebecca Vincent

121.     Plaintiff Rebecca Vincent, 66, is a resident and citizen of Owensburg, Indiana. Ms. Vincent started playing DoubleDown Casino in approximately 2018. She plays and purchases virtual coins in DoubleDown Casino through the Apple App Store. She estimates that she plays DoubleDown Casino more than 25 hours each week, and estimates she has lost more than $4,000 to date.

## XII. Jennifer Andrews

122.     Plaintiff Jennifer Andrews, 54, is a resident and citizen of Sauk Rapids, Minnesota. Ms. Andrews started playing social casinos in approximately 2011 after seeing an advertisement on Facebook, and believes that over time she has played Caesars Slots, Cash Frenzy, Cashman Casino, Casino Jackpot Slots - Infinity Slots, Double U Casino; Heart of Vegas; Goldfish Casino Slots, Hit it Rich! Lucky Vegas Casino Slots, Jackpot Party, Jackpot Slot Machines - Slots Era Vegas Casino, Lotsa Slots, Monopoly Slots, myVEGAS Slots, Slotomania, Scatter Slots, Willy Wonka Slots, Wizard of Oz Slots, and Quick Hit Casino Games. She currently plays and makes purchases in DoubleDown Casino through the Apple App Store.

Ms. Andrews believes that she plays social casinos for approximately 20 hours per week on average, and estimates she has spent approximately $80,000 playing social casinos.

## XIII.  Amy Hoven

123.    Plaintiff Amy Hoven, 53, is a resident and citizen of Rochester, Minnesota. Ms. Hoven currently plays Game of Thrones Slots and Wizard of Oz Slots through the Apple App Store. She started playing social casinos in approximately October. Ms. Hoven believes that she plays social casinos for approximately 20 to 30 hours per week on average, and estimates that she has spent more than $25,000 to date playing social casinos.

## XIV.  Lue Stephens

124.    Plaintiff Lue Stephens, 62, is a resident and citizen of Aberdeen, Mississippi. Ms. Stephens currently plays Big Fish Casino and myVEGAS Slots through the Apple App Store. She started playing social casinos in approximately 2013. Ms. Stephens believes she plays social casinos approximately 48 hours per week on average, and she estimates that she has spent approximately $22,000 to date playing social casinos.

## XV.  Frankie Killings-Larkin

125.    Plaintiff Frankie Killings-Larkin, 52, is a resident and citizen of Toomsuba, Mississippi. Ms. Killings-Larkin played and made purchases in DoubleDown Casino through the Apple App Store. She started playing social casinos in approximately 2017. Ms. Killings-Larkin believes she used to play social casinos for, on average, 25 hours per week. She estimates that she has spent approximately $30,000 in the games to date.

## XVI.  Mary Lancaster

126.    Plaintiff Mary Lancaster, 73, is a resident and citizen of St. Charles, Missouri. Ms. Lancaster currently plays and spends money on Double U Casino, Pop Slots, Slots ERA, and Vegas Slots through the Apple App Store. She started playing social casinos in approximately 2018. Ms. Lancaster believes she plays social casinos for approximately 30 hours per week on average, and she estimates that she has spent approximately $4,000 playing social casino apps to date.

## XVII. Juliana Wisher

127.    Plaintiff Juliana Wisher, 65, is a resident and citizen of Albuquerque, New Mexico. Ms. Wisher has played and made purchases in DoubleDown Casino, Hit it Rich! Lucky Vegas Casino Slots, Quick Hit Casino Games, Slotomania, and Wizard of Oz Slots through the Apple App Store. She estimates she started playing social casinos more than a decade ago. Ms. Wisher believes that she has played social casinos for approximately 35 hours per week on average, and estimates that she has spent approximately $40,000 to $50,000 playing social casinos to date.

## XVIII. Jennifer Hoose

128.    Plaintiff Jennifer Hoose, 44, is a resident and citizen of Howes Cave, New York. Ms. Hoose believes she has played and spent money on Cash Frenzy, Jackpot Party, Pop Slots, Quick Hit Casino Games, and Slotomania through the Apple App Store in the past, and she currently plays and makes purchases in DoubleDown Casino, Cashman Casino, Show me Vegas, and Lighting Link Casino Slots through the Apple App Store. She started playing social casinos in approximately 2015 after seeing ads in the Apple App Store and on Facebook. She believes she plays social casinos for between 14 and 24 hours per week, and estimates that she has lost approximately $200 to $300 to date.

## XIX.  Sean McCloskey

129.    Plaintiff Sean McCloskey, 44, is a resident and citizen of Huber Heights, Ohio. Mr. McCloskey started playing social casinos in July 2019 after seeing advertisements that appeared in other games he played through the Apple App Store. He has made purchases in Billionaire Casino Slots 777, Cash Frenzy, and Coin Master through the Apple App Store. He estimates that he plays social casinos approximately 20 hours each week, and estimates that he has spent approximately $800 to date in social casinos.

## XX.  Joshua McDonald

130.    Plaintiff Joshua McDonald, 32, is a resident and citizen of Portland, Oregon. Mr. McDonald began playing social casinos in approximately 2018 after seeing an ad on Facebook. He believes he has made purchases in My-KONAMI Real Vegas Slots, Pop Slots, myVEGAS

Slots, Jackpot World, Cash Frenzy, and Double U Casino through the Apple App Store. Mr.

McDonald believes he made a number of these purchases after seeing offers for promotional

bundles of virtual coins at discounted prices outside the game in the Apple App Store. He

estimates that he plays social casinos for approximately 25 hours each week, and estimates that

he has spent approximately $2,000 to $3,000 on social casinos to date.

## XXI.  Deborah Steese

131.    Plaintiff Deborah Steese, 52, is a resident and citizen of Cross, South Carolina.

She started playing social casinos in approximately 2011 after seeing ads for the games while

browsing Facebook. Since believes that, over time, she has played and made purchases in

DoubleDown Casino, Heart of Vegas, Jackpot Party, Lightning Link Casino, My-KONAMI Real

Vegas Slots, and Quick Hit Casino Games through the Apple App Store. She believes she plays

social casinos approximately 3 hours each day and estimates that she has spent more than $1,000

in social casinos to date. Ms. Steese made a number of these purchases after seeing ads outside

the games that appeared in both the Apple App Store and Google Play Store when she logged

into those platforms.

## XXII.  John Viglietti

132.    Plaintiff John Viglietti, 41, is a resident and citizen of Oakland, Tennessee. Mr.

Viglietti started playing social casinos in approximately 2015 after seeing ads in other games he

played through the Apple App Store. He believes that, over time, he has played and made

purchases in Lightning Link Casino, Cashman Casino, Heart of Vegas, and Jackpot Party

through the Apple App Store. Before he stopped playing the games, he believes he spent

approximately 4 hours per day playing social casinos, and estimates that he spent approximately

$500 across the four games he played. He estimates that approximately half of his purchases

were made after he saw promotional offers for virtual coins within the games.

## XXIII. Kai Griffin

133.    Plaintiff Kai Griffin, 51, is a resident and citizen of Thompson's Station,

Tennessee. Mr. Griffin started playing social casinos in approximately 2013 after seeing ads on

Facebook. He believes that he has played and made purchases in 88 Fortunes Casino, Cashman

Casino, DoubleDown Casino, Monopoly Slots, Quick Hit Casino Games, Slotomania, and Heart of Vegas, all through the Apple App Store. To date, he estimates that has spent between approximately $15,000 to $18,000 in social casinos, and estimates that he plays the games approximately 21 hours per week. He believes that a number of his purchases were made as a result of promotional offers for virtual coins he saw within the games and outside the games, while on Facebook.

## XXIV. Sheri Miller

134.     Plaintiff Sheri Miller, 72, is a resident and citizen of Jefferson City, Tennessee. Ms. Miller believes she started playing DoubleDown Casino more than a decade ago after seeing an ad on Facebook. She regularly plays and makes purchases in the game through the Apple App Store. She believes she has spent between approximately $50,000 and $75,000 in the game to date, and she estimates that she plays DoubleDown approximately 25 hours per week.

## XXV.  Connie Zilbert

135.     Plaintiff Connie Zilbert, 67, is a resident and citizen of Deer Park, Washington. She began playing social casinos in approximately 2011 after seeing ads that appeared in her Facebook news feed. She believes that, over time, she has played and made purchases in Casino Slots DoubleDown Fort Knox, DoubleDown Casino, Heart of Vegas, and Slotomania through the Apple App Store. She estimates that she has spent approximately $50,000 across the various games she plays, and estimates that she plays approximately 24 hours per week. She believes a large portion of her purchases were made as a result of constant ads both in the games and outside the games on Facebook.

## XXVI. Frank Custodero

136.     Plaintiff Frank Custodero, 65, is a resident and citizen of Parrish, Florida. Mr. Custodero started playing social casinos in approximately 2018. He has made purchases in Billionaire Casino Slots 777, Classic Casino Slot Games, Jackpot Slot Machines – Slots Era Vegas Casino, Lotsa Slots, and Quick Hit Casino Games through the Apple App Store. He believes he has spent approximately $4,000 in social casinos to date, and estimates that he played the games around 12 hours per week on average.

**XXVII.    Saundra Rogers**

137.    Plaintiff Saundra Rogers, 53, is a resident and citizen of Livermore, California. Ms. Rogers plays and makes purchases in DoubleDown Casino through the Apple App Store. She began playing DoubleDown in 2014. Ms. Rogers estimates that she has spent a total of $6,900 in DoubleDown Casino, and she estimates that she spends 10 hour per week on average playing the game.

**XXVIII.    Sheera Harris**

138.    Plaintiff Sheera Harris, 53, is a resident and citizen of Steubenville, Ohio. Ms. Harris plays and believes she has made purchases in Cashman Casino, Jackpot Mania, Lightning Link Casino, and My-KONAMI Real Vegas Slots through the Apple App Store. She estimates she began playing social casinos in 2020 and estimates that she has spent more than $100 in social casinos to date. She estimates that she plays the games around 1 to 3 hours per day on average.

## <u>CLASS ALLEGATIONS</u>

139.    **Class Definitions**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of themselves and Classes of similarly situated individuals, defined and represented by Class Representatives as follows:

   a.   <u>California Class</u>: All persons in California who have lost money to any Illegal Slots through the Apple platform. The California Class is represented by Class Representatives Robert Alldis and Saundra Rogers.

   b.   <u>Washington Class</u>: All persons in Washington who have lost money to any Illegal Slots through the Apple platform. The Washington Class is represented by Class Representatives Connie Zilbert, Ben Kramer, and Ashley Honeysuckle.

   c.   <u>Alabama Class</u>: All persons in Alabama who have lost money to any Illegal Slots through the Apple platform. The Alabama Class is represented by Class Representatives Cheree Bibbs, Michael Helsel, and Teresa Larsen.

d.  <u>Connecticut Class</u>: All persons in Connecticut who have lost money to any Illegal Slots through the Apple platform. The Connecticut Class is represented by Class Representatives Karen Workman and Janice Hill.

e.  <u>Georgia Class</u>: All persons in Georgia who have lost money to any Illegal Slots through the Apple platform. The Georgia Class is represented by Class Representative Vickie Payton.

f.  <u>Illinois Class</u>: All persons in Illinois who have lost money to any Illegal Slots through the Apple platform. The Illinois Class is represented by Class Representative Ernestine Thompson.

g.  <u>Indiana Class</u>: All persons in Indiana who have lost money to any Illegal Slots through the Apple platform. The Indiana Class is represented by Class Representative Rebecca Vincent.

h.  <u>Minnesota Class</u>: All persons in Minnesota who have lost money to any Illegal Slots through the Apple platform. The Minnesota Class is represented by Class Representatives Jennifer Andrews and Amy Hoven.

i.  <u>Mississippi Class</u>: All persons in Mississippi who have lost money to any Illegal Slots through the Apple platform. The Mississippi Class is represented by Class Representatives Lue Stephens and Frankie Killings-Larkin.

j.  <u>Missouri Class</u>: All persons in Missouri who have lost money to any Illegal Slots through the Apple platform. The Missouri Class is represented by Class Representative Mary Lancaster.

k.  <u>New Mexico Class</u>: All persons in New Mexico who have lost money to any Illegal Slots through the Apple platform. The New Mexico Class is represented by Class Representative Juliana Wisher.

l.  <u>New York Class</u>: All persons in New York who have lost money to any Illegal Slots through the Apple platform. The New York Class is represented by Class Representative Jennifer Hoose.

m.  <u>Ohio Class</u>: All persons in Ohio who have lost money to any Illegal Slots through the Apple platform. The Ohio Class is represented by Class Representatives Sean McCloskey and Sheera Harris.

n.  <u>Oregon Class</u>: All persons in Oregon who have lost money to any Illegal Slots through the Apple platform. The Oregon Class is represented by Class Representative Joshua McDonald.

o.  <u>South Carolina Class</u>: All persons in South Carolina who have lost money to any Illegal Slots through the Apple platform. The South Carolina Class is represented by Class Representative Deborah Steese.

p.  <u>Tennessee Class</u>: All persons in Tennessee who have lost money to any Illegal Slots through the Apple platform. The Tennessee Class is represented by Class Representatives John Viglietti, Kai Griffin, and Sheri Miller.

q.  <u>Nationwide Class</u>: All persons in the United States who have lost money to any Illegal Slots through the Apple platform. The Nationwide Class is represented by Class Representatives Robert Alldis, Cheree Bibbs, Michael Helsel, Teresa Larsen, Karen Workman, Janice Hill, Vickie Payton, Ernestine Thompson, Rebecca Vincent, Jennifer Andrews, Amy Hoven, Lue Stephens, Frankie Killings-Larkin, Mary Lancaster, Juliana Wisher, Jennifer Hoose, Sean McCloskey, Joshua McDonald, Deborah Steese, John Viglietti, Kai Griffin, Sheri Miller, Connie Zilbert, Ben Kramer, Ashley Honeysuckle, Frank Custodero, Saundra Rogers, and Sheera Harris.

140.  The following people are excluded from any of the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise

released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

141. **Numerosity**: On information and belief, tens of thousands of consumers fall into the definition of each Class. Members of the Classes can be identified through Defendant's records, discovery, and other third-party sources.

142. **Commonality and Predominance**: There are many questions of law and fact common to Plaintiffs' and the Classes' claims, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

A. Whether the Illegal Slots are illegal under the relevant state gambling laws;

B. Whether Apple, under relevant state gambling laws, is liable for managing, possessing, controlling, and/or profiting from the Illegal Slots;

C. Whether Apple's participation in operating the Illegal Slots constitutes an unfair and/or unlawful business practice under relevant state consumer protection statutes;

D. Whether Apple should be enjoined from further participation in the Social Casino Enterprise;

E. Whether Apple is a participant in the Social Casino Enterprise; and

F. Whether Apple has committed illegal predicate acts under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

143. **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Classes in that Plaintiffs and the members of the Classes sustained damages arising out of Defendant's wrongful conduct.

144. **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Classes, as Plaintiffs and each member of the Classes lost money playing the Illegal Slots. Plaintiffs also have no interests antagonistic to those of the Classes, and

Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Classes.

145.    **Policies Generally Applicable to the Classes**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies that Plaintiffs challenge apply and affect members of the Classes uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs. The factual and legal bases of Defendant's liability to Plaintiffs and to the other members of the Classes are the same.

146.    **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Classes is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be difficult for the individual members of the Classes to obtain effective relief from Defendant. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

147.    Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

**CAUSES OF ACTION**

<u>**CLAIMS BROUGHT ON BEHALF OF THE STATE CLASSES**</u>

<u>**COUNT I**</u>
**Cal. Bus. and Prof. Code § 17200, *et seq.* ("UCL")**
**Unlawful and Unfair Business Practices**
**(Restitution and Injunctive Relief)**
**(Plaintiffs Robert Alldis and Saundra Rogers, On Behalf of the California Class)**

148.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

149.     Plaintiffs are "person[s]" within the meaning of Cal. Bus. & Prof. Code § 17201 because they are natural persons.

150.     Plaintiffs have standing under the UCL because they suffered injury in fact and have lost money or property as a result of Apple's unlawful and unfair conduct.

151.     By hosting and facilitating the Illegal Slots, Apple engaged in unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200 by committing unlawful, unfair, and fraudulent business acts and practices.

152.     Slot machines have long been outlawed in California.

153.     California law recognizes that a device can be an illegal slot machine without offering users the opportunity to win money.

154.     In fact, if a gaming machine has the look and feel of a slot machine, accepts real money for gameplay, and rewards a winning spin with an "additional chance or right to use the slot machine or device," the device is an illegal slot machine.

155.     Consequently, social casinos, as described herein, are illegal slot machines under California law.

156.     California gambling law is, on this point, consistent with the laws of many other states—including Washington. In *Kater*, for example, the Ninth Circuit held that social casinos are illegal under Washington law because, while users cannot win money, social casino chips are "things of value" because they can be purchased for money, are awarded as prizes in social casino slot machines, and then can be used to allow players to keep spinning social casino slot machines.

157.    California aggressively regulates all forms of gambling. One reason it does so is to prevent consumers from being cheated by professional gambling operations.

158.    Because social casinos have previously operated as if they were not subject to gambling regulations, they do not comply with any of the regulations that govern the operation of slot machines.

159.    Notably, while any legitimately operated slot machine must randomize its results, social casinos do not randomize their results. Instead, social casinos tailor "wins" and "losses" in such a way as to maximize addiction (and, in turn, revenues).

160.    In other words, social casinos cheat players out of a legitimately randomized slot machine experience. Not only can players never actually win money, but their financial losses are maximized by deceptive gameplay tweaks that would never be allowed in a legitimate (*i.e.*, licensed and regulated) slot machine.

161.    The Illegal Slots are illegal slot machines as defined by Cal. Penal Code § 330b(d) because, among other reasons, when a player purchases and wagers virtual casino chips in the Illegal Slots, a winning spin affords the player an "additional chance or right to use" the Illegal Slots. Pursuant to Cal. Penal Code § 330b(a), Defendant Apple, among other violative conduct, manufactures, repairs, owns, stores, possesses, sells, rents, leases, lets on shares, lends and gives away, transports, and exposes for sale or lease, the Illegal Slots. Apple also offers to repair, sells, rents, leases, lets on shares, lends and gives away, permit the operations, placement, maintenance, and keeping of, in places, rooms, spaces, and buildings owned, leased, or occupied, managed, or controlled by Apple, the Illegal Slots.

162.    The Illegal Slots are illegal slot machines as defined by Cal. Penal Code § 330.1 because, among other reasons, when a player purchases and wagers virtual casino chips in the Illegal Slots, a winning spin affords the player an "additional chance or right to use" the Illegal Slots. Pursuant to Cal. Penal Code § 330.1(a), Defendant Apple, among other violative conduct, manufactures, owns, stores, keeps, possesses, sells, rents, leases, lets on shares, lends and gives away, transports, and exposes for sale and lease, the Illegal Slots. Apple also offers to sell, rent, lease, let on shares, lends and gives away and permits the operation of and permits to be placed,

maintained, used, or kept in rooms, spaces, and building owned, leased, or occupied by Apple or under Apple's management and control, the Illegal Slots.

163. The Illegal Slots are also illegal lotteries as defined by Cal. Penal Code § 319. Section 319 defines a lottery as any "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property." Thus, the elements of an illegal lottery under Section 319 are a prize (or "property"), distribution by chance, and consideration.

164. The Illegal Slots satisfy all three elements because players pay valuable consideration in the form of real money to purchase virtual casino chips, use those chips to try to win prizes in the form of additional free plays, and are awarded these prizes based on chance outcomes.

165. California law recognizes that the duty of the operator of a game of chance to permit the winner to play further games for free is an obligation arising from contract, and the right of the winning player to continue to play for free is personal property.

166. Apple's hosting and facilitating of the Illegal Slots constitutes an unfair and unscrupulous business practice because—among other reasons—Apple and the Illegal Slots work together to target and exploit vulnerable and addicted players; to deceptively tweak gameplay in order to maximize time-on-device and revenue; and to operate their online slot machines outside the bounds of licensing, regulation, and tax policy.

167. California's Unfair Competition Law ("UCL"), Bus. and Prof. Code § 17203, specifically authorizes this Court to issue injunctive relief to enjoin ongoing acts of unfair competition and unlawful conduct.

168. Under the UCL, unfair competition encompasses any unlawful act, including acts made unlawful under the penal code and acts made unlawful by federal law.

169. The UCL authorizes this Court to award restitution to the California Class and to enjoin Apple's ongoing violations of Sections 330b and 330.1 of the California Penal Code, as well as violations of the federal RICO law.

170.     No plain, adequate, and complete remedy for Defendant's conduct exists at law. Consequently, the California Class is entitled to an equitable remedy under the UCL.

171.     Plaintiffs Robert Alldis and Saundra Rogers, on behalf of themselves and the California Class, seek an order from the Court awarding restitution to the California Class in an amount to be determined at trial and enjoining Apple from further participation in the Social Casino Enterprise.

## COUNT II
### Unjust Enrichment
**(Plaintiffs Robert Alldis and Saundra Rogers, On Behalf of the California Class)**

172.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

173.     Plaintiffs bring this claim on behalf of themselves and the California Class under the common law of unjust enrichment.

174.     As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiffs and California Class Members by virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

175.     Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

176.      These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

177.     These profits were a benefit conferred upon Apple by California Class Members when purchasing coins to wager in social casinos.

178.     Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each California Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

## COUNT III
### Ala. Code § 8-1-150(a)
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiffs Cheree Bibbs, Michael Helsel, and Teresa Larsen, On Behalf of the Alabama Class)

179.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

180.    Plaintiffs bring this claim on behalf of themselves and an Alabama Class under Alabama's Civil Remedy Statute for Recovery of Gambling Losses, Ala. Code § 8-1-150(a), which was enacted to effectuate the State's public policy against gambling.

181.    Ala. Code § 8-1-150(a) provides: "Any person who has paid any money or delivered any thing of value lost upon any game or wager may recover such money, thing, or its value by an action commenced within six months from the time of such payment or delivery."

182.    Accordingly, Ala. Code § 8-1-150(a) prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

183.    By purchasing coins from Apple to wager on social casinos, Plaintiffs and each member of the Alabama Class paid money or gambled and lost money within the meaning of Ala. Code § 8-1-150(a).

184.    Apple has profited and continues to profit from each payment made by Alabama Class Members to purchase virtual coins, and therefore is in violation of Ala. Code § 8-1-150(a).

185.    Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Alabama Class Members to gamble in social casinos.

EXHIBIT B
65

186.     Plaintiffs and Alabama Class Members are therefore entitled to recover from Apple the amounts they lost when gambling in social casinos through the App Store.

### COUNT IV
### Ala. Code § 8-19-1, *et seq.*
### Alabama Deceptive Trade Practices Act
### (Plaintiffs Cheree Bibbs, Michael Helsel, and Teresa Larsen, On Behalf of the Alabama Class)

187.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

188.     Plaintiffs bring this action on behalf of themselves and the Alabama State Class against Apple.

189.     Apple, Plaintiffs, and Alabama Class members are "persons" within the meaning of Ala. Code § 8-19-3(5).

190.     Plaintiffs and Alabama Class members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

191.     Virtual coins and tokens used to play social casinos are "goods" within the meaning of Ala. Code. § 8-19-3(3).

192.     Apple is and was engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

193.     The Alabama Deceptive Trade Practices Act ("Alabama DTPA") prohibits "deceptive acts or practices in the conduct of any trade or commerce[.]" Ala. Code §  8-19-5.

194.     The Alabama DTPA makes unlawful "engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." *Id*. § 8-19-5(27).

195.     Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Apple profits from illegal gambling in connection with its operation of social casinos,

for which Plaintiffs and Alabama Class members purchased virtual coins and tokens. This constitutes an unconscionable act or practice and thus is in violation of the Alabama DTPA.

196.    Plaintiffs and Alabama Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Apple's unconscionable acts.

197.    Apple's violations present a continuing risk to Plaintiffs and Alabama Class members, as well as to the general public. Apple's unlawful acts and practices complained of herein affect the public interest.

198.    Pursuant to Ala. Code § 8-19-10, Plaintiffs and Alabama Class members seek an order enjoining Apple's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Alabama DTPA.

<u>COUNT V</u>
**Unjust Enrichment**
**(Plaintiffs Cheree Bibbs, Michael Helsel, and Teresa Larsen, On Behalf of the Alabama Class)**

199.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

200.    Plaintiffs bring this claim on behalf of themselves and the Alabama Class under the common law of unjust enrichment.

201.    As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Alabama Class Members by virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

202.    Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

203.    These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

204.   These profits were a benefit conferred upon Apple by Alabama Class Members when purchasing coins to wager in social casinos.

205.   Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Alabama Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

**COUNT VI**
**Conn. Gen. Stat. Ann. § 52-554**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiffs Karen Workman and Janice Hill, On Behalf of the Connecticut Class)**

206.   Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

207.   Plaintiffs bring this claim on behalf of themselves and the Connecticut Class under Connecticut's Civil Remedy Statute for Recovery of Gambling Losses, Conn. Gen. Stat. Ann. § 52-554, which was enacted to effectuate the State's public policy against gambling.

208.    Conn. Gen. Stat. Ann. § 52-554 provides: "Any person who, by playing at any game, or betting on the sides or hands of such as play at any game, excluding any game permitted under chapter 226 or any activity not prohibited under the provisions of sections 53-278a to 53-278g, inclusive, loses the sum or value of one dollar in the whole and pays or delivers the same or any part thereof, may, within three months next following, recover from the winner the money or the value of the goods so lost and paid or delivered, with costs of suit in a civil action, without setting forth the special matter in his complaint."

209.   Accordingly, Conn. Gen. Stat. Ann. § 52-554 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

210.   By purchasing coins from Apple to wager on social casinos, Plaintiffs and each member of the Connecticut Class illegally gambled and lost money within the meaning of Conn. Gen. Stat. Ann. § 52-554.

211.    Apple has profited and continues to profit from each payment made by Connecticut Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Conn. Gen. Stat. Ann. § 52-554.

212.    Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Connecticut Class Members to gamble in social casinos.

213.    Plaintiffs and Connecticut Class Members are therefore entitled to recover from Apple the amounts they lost when gambling in social casinos through the App Store, in addition to costs of suit.

**COUNT VII**
**Conn. Gen. Stat. Ann. § 42-110a, *et seq.***
**Connecticut Unlawful Trade Practices Act**
**(Plaintiffs Karen Workman and Janice Hill, On Behalf of the Connecticut Class)**

214.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

215.    Plaintiffs bring this action on behalf of themselves and the Connecticut Class against Apple.

216.    Apple, Plaintiffs, and Connecticut Class members are "persons" within the meaning of Conn. Gen. Stat. Ann. § 42-110a(3).

217.    Apple is and was engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. Ann. § 42-110a(4).

218.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a).

219.    Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Apple profits from illegal gambling in connection with its operation of social casinos, for which Plaintiffs and Connecticut Class members purchased virtual coins and tokens. This practice offends public policy as it has been established by § Conn. Gen. Stat. 52-554 and common law.

220.    Plaintiffs and Connecticut Class members purchased virtual coins or tokens for personal, family, or household purposes suffered ascertainable loss and actual damages as a direct and proximate result of Apple's unfair and deceptive acts.

221.    Apple's violations present a continuing risk to Plaintiffs and Connecticut Class members, as well as to the general public. Apple's unlawful acts and practices complained of herein affect the public interest.

222.    Pursuant to Conn. Gen. Stat. Ann. § 42-110g, Plaintiffs and Connecticut Class members seek an order enjoining Apple's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Connecticut UTPA.

## COUNT VIII
### Unjust Enrichment
**(Plaintiffs Karen Workman and Janice Hill, On Behalf of the Connecticut Class)**

223.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

224.    Plaintiffs bring this claim on behalf of themselves and the Connecticut Class under the common law of unjust enrichment.

225.    As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Connecticut Class Members by

virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

226. Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

227. These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

228. These profits were a benefit conferred upon Apple by Connecticut Class Members when purchasing coins to wager in social casinos.

229. Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Connecticut Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

## COUNT IX
### Ga. Code Ann. § 13-8-3
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Vickie Payton, On Behalf of the Georgia Class)

230. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

231. Plaintiff brings this claim on behalf of herself and the Georgia Class under Georgia's Civil Remedy Statute for Recovery of Gambling Losses, Ga. Code. Ann. § 13-8-3, which was enacted to effectuate the State's public policy against gambling.

232. Ga. Code. Ann. § 13-8-3 provides: "Money paid or property delivered upon a gambling consideration may be recovered from the winner by the loser by institution of an action for the same within six months after the loss and, after the expiration of that time, by institution of an action by any person, at any time within four years, for the joint use of himself and the educational fund of the county."

233. Accordingly, Ga. Code. Ann. § 13-8-3 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

234.     By purchasing coins from Apple to wager on social casinos, Plaintiff and each member of the Georgia Class gambled and lost money within the meaning of Ga. Code. Ann. § 13-8-3.

235.     Apple has profited and continues to profit from each payment made by Georgia Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Ga. Code. Ann. § 13-8-3.

236.     Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Georgia Class Members to gamble in social casinos.

237.     Plaintiff and Georgia Class Members are therefore entitled to recover from Apple the amounts they lost when gambling in social casinos through the App Store.

## COUNT X
### Ga. Code Ann. § 10-1-390, *et seq.*
### Georgia Fair Business Practices Act
### (Plaintiff Vickie Payton, On Behalf of the Georgia Class)

238.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

239.     Plaintiff brings this action on behalf of herself and the Georgia Class against Apple.

240.     Apple, Plaintiff, and Georgia Class members are "persons" within the meaning of Ga. Code. Ann. § 10-1-392(a)(24).

241.     Plaintiff and Georgia Class members are "consumers" within the meaning of Ga. Code. Ann. § 10-1-392(a)(6).

EXHIBIT B
72

242.     Apple is and was engaged in "trade" and "commerce" within the meaning of Ga. Code. Ann. § 10-1-392(a)(28).

243.     The Georgia Fair Business Practices Act ("Georgia FBPA") prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce[.]" Ga. Code Ann. § 10-1-393(a).

244.     Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Apple profits from illegal gambling in connection with its operation of social casinos, for which Plaintiff and Georgia Class members purchased virtual coins and tokens. This constitutes an unfair act or practice in violation of the Georgia FBPA.

245.     Plaintiff and Georgia Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Apple's conduct.

246.     Apple's violations present a continuing risk to Plaintiff and Georgia Class members, as well as to the general public. Apple's unlawful acts and practices complained of herein affect the public interest.

247.     Pursuant to Ga. Code. Ann. § 10-1-399, Plaintiff and the Georgia Class seek an order enjoining Apple's unfair and/or deceptive acts or practices, and awarding any other just and proper relief available under the Georgia FBPA.

## COUNT XI
### Unjust Enrichment
### (Plaintiff Vickie Payton, On Behalf of the Georgia Class)

248.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

249.     Plaintiff brings this claim on behalf of herself and the Georgia Class under the common law of unjust enrichment.

250.     As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiff and Georgia Class Members by virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

251.     Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

252.     These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

253.     These profits were a benefit conferred upon Apple by Georgia Class Members when purchasing coins to wager in social casinos.

254.     Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Georgia Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

## COUNT XII
### 720 Ill. Comp. Stat. Ann. 5/28-8
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Ernestine Thompson, On Behalf of the Illinois Class)

255.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

256.     Plaintiff brings this claim on behalf of herself and the Illinois Class under Illinois' Civil Remedy Statute for Recovery of Gambling Losses, 720 Ill. Comp. Stat. Ann. 5/28-8, which was enacted to effectuate the State's public policy against gambling.

257.     720 Ill. Comp. Stat. Ann. 5/28-8 provides: "Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof, with costs, in the circuit court. No person who accepts from another person for transmission, and transmits, either in his own name or in the name of such other person, any order for any

transaction to be made upon, or who executes any order given to him by another person, or who executes any transaction for his own account on, any regular board of trade or commercial, commodity or stock exchange, shall, under any circumstances, be deemed a 'winner' of any moneys lost by such other person in or through any such transactions."

258.    Accordingly, 720 Ill. Comp. Stat. Ann. 5/28-8 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

259.    By purchasing coins from Apple to wager on social casinos, Plaintiff and each member of the Illinois Class gambled and lost money within the meaning of 720 Ill. Comp. Stat. Ann. 5/28-8.

260.    Apple has profited and continues to profit from each payment made by Illinois Class Members to purchase virtual coins, and is the "winner" of each transaction, in violation of 720 Ill. Comp. Stat. Ann. 5/28-8.

261.    Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Illinois Class Members to gamble in social casinos.

262.    Plaintiff and Illinois Class Members are therefore entitled to recover from Apple the amounts they lost when gambling in social casinos through the App Store, in addition to costs of suit.

## COUNT XIII
### 815 ILCS 505/1, *et seq.*
### Illinois Consumer Fraud and Deceptive Business Practices Act
### (Plaintiff Ernestine Thompson, On Behalf of the Illinois Class)

263. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

264. Plaintiff brings this action on behalf of herself and the Illinois Class against Apple.

265. Apple, Plaintiff, and Illinois Class members are "persons" within the meaning of 815 ILCS 505/1(c).

266. Plaintiff and Illinois Class members are "consumers" within the meaning of 815 ILCS 505/1(e).

267. Virtual coins and tokens are "merchandise" within the meaning of 815 ILCS 505/1(b).

268. Apple is and was engaged in "trade" and "commerce" within the meaning of 815 ILCS 505/1(f).

269. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFDBPA") prohibits "[U]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" [815 ILCS 510/2], approved August 5, 1965, in the conduct of any trade or commerce[.]" 815 ILCS 505/2.

270. Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Apple profits from illegal gambling in connection with its operation of social casinos, for which Plaintiff and Illinois Class members purchased virtual coins and tokens. This offends public policy because it violates 720 Ill. Comp. Stat. Ann. 5/28-8. Apple intended that Plaintiff rely on its unfair practices with regard to social casinos as outlined above. This constitutes an

unfair or deceptive act or practice, and thus violates the Illinois Consumer Fraud and Deceptive Business Practices Act.

271.   Plaintiff and Illinois Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Apple's conduct.

272.   Apple's violations present a continuing risk to Plaintiff and Illinois Class members, as well as to the general public. Apple's unlawful acts and practices complained of herein affect the public interest.

273.   Pursuant to 815 ILCS 505/10a, Plaintiff and Illinois Class members seek an order enjoining Apple's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Illinois CFDBPA.

## COUNT XIV
### Unjust Enrichment
### (Plaintiff Ernestine Thompson, On Behalf of the Illinois Class)

274.   Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

275.   Plaintiff brings this claim on behalf of herself and the Illinois Class under the common law of unjust enrichment.

276.   As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiff and Illinois Class Members by virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

277.   Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

278.    These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

279.   These profits were a benefit conferred upon Apple by Illinois Class Members when purchasing coins to wager in social casinos.

280. Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Illinois Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

## COUNT XV
### Ind. Code Ann. § 34-16-1-2
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Rebecca Vincent, On Behalf of the Indiana Class)

281. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

282. Plaintiff brings this claim on behalf of herself and the Indiana Class under Indiana's Civil Remedy Statute for Recovery of Gambling Losses, Ind. Code Ann. § 34-16-1-2, which was enacted to effectuate the State's public policy against gambling.

283. Ind. Code Ann. § 34-16-1-2 provides: "If a person, by betting on a game or on the hands or sides of persons playing a game: (1) loses any money or other property; and (2) delivers any part of the money or other property; the person may bring a civil action, within one hundred eighty (180) days, to recover the money or other property so lost and delivered."

284. Accordingly, Ind. Code Ann. § 34-16-1-2 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

285. By purchasing coins from Apple to wager on social casinos, Plaintiff and each member of the Indiana Class gambled and lost money within the meaning of Ind. Code Ann. § 34-16-1-2.

286. Apple has profited and continues to profit from each payment made by Indiana Class Members to purchase virtual coins, and therefore is in violation of Ind. Code Ann. § 34-16-1-2.

287. Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing

technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Indiana Class Members to gamble in social casinos.

288.    Plaintiff and Indiana Class Members are therefore entitled to recover from Apple the amounts they lost when gambling in social casinos through the App Store.

## COUNT XVI
### Unjust Enrichment
### (Plaintiff Rebecca Vincent, On Behalf of the Indiana Class)

289.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

290.    Plaintiff brings this claim on behalf of herself and the Indiana Class under the common law of unjust enrichment.

291.    As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiff and Indiana Class Members by virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

292.    Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

293.    These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

294.    These profits were a benefit conferred upon Apple by Indiana Class Members when purchasing coins to wager in social casinos.

295.    Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Indiana Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

## COUNT XVII
### Minn. Stat. Ann. § 541.20
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiffs Jennifer Andrews and Amy Hoven, On Behalf of the Minnesota Class)

296.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

297.     Plaintiffs bring this claim on behalf of themselves and the Minnesota Class under Minnesota's Civil Remedy Statute for Recovery of Gambling Losses, Minn. Stat. Ann. § 541.20 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

298.     The Statute provides: "Every person who, by playing at cards, dice, or other game, or by betting on the hands or sides of such as are gambling, shall lose to any person so playing or betting any sum of money or any goods, and pays or delivers the same, or any part thereof, to the winner, may sue for and recover such money by a civil action, before any court of competent jurisdiction."

299.     Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

300.     By purchasing coins from Apple to wager on social casinos, Plaintiffs and each member of the Minnesota Class gambled and lost money within the meaning of the Statute.

301.     Apple has profited and continues to profit from each payment made by Minnesota Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of the statute.

302.     Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant

1  percentage of the money paid and lost by Plaintiffs and Minnesota Class Members to gamble in
2  social casinos.

3  303.  Plaintiffs and Minnesota Class Members are therefore entitled to recover from
4  Apple the amounts they lost when gambling in social casinos through the App Store, in addition
5  to costs of suit.

**COUNT XVIII**
**Unjust Enrichment**
**(Plaintiffs Jennifer Andrews and Amy Hoven, On Behalf of the Minnesota Class)**

8  304.  Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth
9  herein.

10  305.  Plaintiffs bring this claim on behalf of themselves and the Minnesota Class under
11  the common law of unjust enrichment.

12  306.  As a result of its unlawful conduct described above, Apple has been and will
13  continue to be unjustly enriched to the detriment of Plaintiffs and Minnesota Class Members by
14  virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple
15  App Store.

16  307.  Apple has profited immensely by providing marketing guidance, tools, and other
17  assistance to the developers of social casinos and retaining a percentage of the money spent by
18  consumers in social casinos.

19  308.  These profits were obtained from illegal gambling in connection with Apple's
20  operation of social casinos.

21  309.  These profits were a benefit conferred upon Apple by Minnesota Class Members
22  when purchasing coins to wager in social casinos.

23  310.  Accordingly, because Apple will be unjustly enriched if it is allowed to retain the
24  illegal profits from social casinos, Plaintiffs and each Minnesota Class Member are entitled to
25  recover the amount by which Apple was unjustly enriched at their expense.

**COUNT XIX**
**Miss. Code Ann. § 87-1-5**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiffs Lue Stephens and Frankie Killings-Larkin, On Behalf of the Mississippi Class)**

311.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

312.     Plaintiffs bring this claim on behalf of themselves and the Mississippi Class under Mississippi's Civil Remedy Statute for Recovery of Gambling Losses, Miss. Code Ann. § 87-1-5 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

313.     The Statute provides: "If any person, by playing at any game whatever, or by betting on the sides or hands of such as do play at any game, or by betting on any horse race or cockfight, or at any other sport or pastime, or by any wager whatever, shall lose any money, property, or other valuable thing, real or personal, and shall pay or deliver the same or any part thereof, the person so losing and paying or delivering the same, or his wife or children, may sue for and recover such money, property, or other valuable thing so lost and paid or delivered, or any part thereof, from the person knowingly receiving the same, with costs."

314.     Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

315.     By purchasing coins from Apple to wager on social casinos, Plaintiffs and each member of the Mississippi Class gambled and lost money within the meaning of the Statute.

316.     Apple has profited and continues to profit from each payment made by Mississippi Class Members to purchase virtual coins, and therefore is the "person knowingly receiving" in each transaction, in violation of the statute.

317.     Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant

percentage of the money paid and lost by Plaintiffs and Mississippi Class Members to gamble in social casinos.

318.    Plaintiffs and Mississippi Class Members are therefore entitled to recover from Apple the amounts they lost when gambling in social casinos through the App Store, in addition to costs of suit.

## COUNT XX
### Unjust Enrichment
**(Plaintiffs Lue Stephens and Frankie Killings-Larkin, On Behalf of the Mississippi Class)**

319.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

320.    Plaintiffs bring this claim on behalf of themselves and the Mississippi Class under the common law of unjust enrichment.

321.    As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Mississippi Class Members by virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

322.    Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

323.     These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

324.    These profits were a benefit conferred upon Apple by Mississippi Class Members when purchasing coins to wager in social casinos.

325.    Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Mississippi Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

## COUNT XXI
### Mo. Ann. Stat. § 434.030
### Civil Remedy Statute for Recovery of Gambling Losses
**(Plaintiff Mary Lancaster, On Behalf of the Missouri Class)**

326.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

327.     Plaintiff brings this claim on behalf of herself and the Missouri Class under Missouri's Civil Remedy Statute for Recovery of Gambling Losses, Mo. Ann. Stat. § 434.030 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

328.     The Statute provides: "Any person who shall lose any money or property at any game, gambling device or by any bet or wager whatever, may recover the same by a civil action."

329.     Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

330.     By purchasing coins from Apple to wager on social casinos, Plaintiff and each member of the Missouri Class gambled and lost money within the meaning of the Statute.

331.     Apple has profited and continues to profit from each payment made by Missouri Class Members to purchase virtual coins, and therefore is subject to "recover[y]" for each transaction, in violation of the Statute.

332.     Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Missouri Class Members to gamble in social casinos.

333.     Plaintiff and Missouri Class Members are therefore entitled to recover from Apple the amounts they lost when gambling in social casinos through the App Store, in addition to costs of suit.

## COUNT XXII
### Mo. Ann. Stat. § 407.020(1)
### Unfair Acts and Practices in the Conduct of Trade or Commerce
### (Plaintiff Mary Lancaster, On Behalf of the Missouri Class)

334. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

335. Plaintiff brings this action on behalf of herself and the Missouri Class against Apple.

336. Missouri's Consumer Protection Act prohibits that "[a]ny deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Ann. Stat. § 407.020(1) (referred to in this count as the "Statute").

337. Under the Statute, an unfair or deceptive practice includes one which is unlawful.

338. Apple, Plaintiff, and Missouri Class members are "persons" within the meaning of Mo. Ann. Stat. §§ 407.020(1) and 407.025.

339. As set forth herein, Apple violated Missouri's Civil Remedy Statute for Recovery of Gambling Losses.

340. Apple's unlawful and otherwise unfair or deceptive acts and practices occurred in the conduct of trade or commerce. Indeed, Apple is responsible for making social casinos available to the public in trade and commerce.

341. Apple's acts and practices were and are injurious to the public interest because Apple continuously advertises, solicits, and enables the general public in Missouri and throughout the United States to play unlawful and otherwise unfair or deceptive social casinos, all while profiting from such conduct.

342. Such acts and practices are part of a pattern or generalized course of conduct on the part of Apple that contradicts the express public policy of Missouri.

343. As a result of Apple's conduct, Plaintiff and Missouri Class Members were injured in their business or property—i.e., economic injury—in that they lost money wagering on unlawful and otherwise unfair or deceptive games of chance.

344.     Apple's unlawful and otherwise unfair or deceptive conduct proximately caused Plaintiff's and Missouri Class Members' injuries because, but for the challenged conduct, Plaintiff and Missouri Class Members would not have lost money wagering on illegal games of chance, which was a direct, foreseeable, and planned consequence of Apple's conduct.

345.     Plaintiff, on her own behalf and on behalf of the Missouri Class, seeks to recover, as permitted by law, actual damages and multiple damages, together with the costs of suit, including reasonable attorneys' fees.

## COUNT XXIII
### Unjust Enrichment
### (Plaintiff Mary Lancaster, On Behalf of the Missouri Class)

346.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

347.     Plaintiff brings this claim on behalf of herself and the Missouri Class under the common law of unjust enrichment.

348.     As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiff and Missouri Class Members by virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

349.     Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

350.      These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

351.     These profits were a benefit conferred upon Apple by Missouri Class Members when purchasing coins to wager in social casinos.

352.     Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Missouri Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

**COUNT XXIV**
**N.M. Stat. Ann. § 44-5-1**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiff Juliana Wisher, On Behalf of the New Mexico Class)**

353.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

354.    Plaintiff brings this claim on behalf of herself and the New Mexico Class under New Mexico's Civil Remedy Statute for Recovery of Gambling Losses, N.M. Stat. Ann. § 44-5-1 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

355.    The Statute provides: "Any person who shall lose any money or property at any game at cards, or at any gambling device, may recover the same by action of debt, if money; if property, by action of trover, replevin or detinue."

356.    Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

357.    By purchasing coins from Apple to wager on social casinos, Plaintiff and each member of the New Mexico Class gambled and lost money within the meaning of the statute.

358.    Apple has profited and continues to profit from each payment made by New Mexico Class Members to purchase virtual coins, and therefore is subject to "recover[y]" for each transaction, in violation of the statute.

359.    Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and New Mexico Class Members to gamble in social casinos.

360.    Plaintiff and New Mexico Class Members are therefore entitled to recover from Apple the amounts they lost when gambling in social casinos through the App Store, in addition to costs of suit.

## COUNT XXV
### N.M. Stat. Ann. § 57-12-3
### Unfair Acts and Practices in the Conduct of Trade or Commerce
### (Plaintiff Juliana Wisher, On Behalf of the New Mexico Class)

361.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

362.    New Mexico's Consumer Protection Act prohibits "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce." N.M. Stat. Ann. § 57-12-3 (referred to in this count as the "Statute").

363.    Under the Statute, an unfair or deceptive act or practice includes one which is unlawful.

364.    Apple, Plaintiff, and New Mexico Class members are "persons" within the meaning of N.M. Stat. Ann. §§ 57-12-3 and 57-12-10.

365.    As set forth herein, Apple violated New Mexico's Civil Remedy Statute for Recovery of Gambling Losses.

366.    Apple's unlawful and otherwise unfair or deceptive acts and practices occurred in the conduct of trade or commerce. Indeed, Apple is responsible for making social casinos available to the public in trade and commerce.

367.    Apple's acts and practices were and are injurious to the public interest because Apple continuously advertises, solicits, and enables the general public in New Mexico and throughout the United States to play unlawful and otherwise unfair or deceptive social casinos, all while profiting from such conduct.

368.    Such acts and practices are part of a pattern or generalized course of conduct on the part of Apple that contradicts the express public policy of New Mexico.

369. As a result of Apple's conduct, Plaintiff and New Mexico Class Members were injured in their business or property—i.e., economic injury—in that they lost money wagering on unlawful and otherwise unfair or deceptive games of chance.

370. Apple's unlawful and otherwise unfair or deceptive conduct proximately caused Plaintiff's and New Mexico Class Members' injuries because, but for the challenged conduct, Plaintiff and New Mexico Class Members would not have lost money wagering on illegal games of chance, which was a direct, foreseeable, and planned consequence of Apple's conduct.

371. Plaintiff, on her own behalf and on behalf of the Class, seeks to recover, as permitted by law, actual damages and multiple damages, together with the costs of suit, including reasonable attorneys' fees.

## COUNT XXVI
### Unjust Enrichment
### (Plaintiff Juliana Wisher, On Behalf of the New Mexico Class)

372. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

373. Plaintiff brings this claim on behalf of herself and the New Mexico Class under the common law of unjust enrichment.

374. As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiff and New Mexico Class Members by virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

375. Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

376. These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

377. These profits were a benefit conferred upon Apple by New Mexico Class Members when purchasing coins to wager in social casinos.

378.    Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each New Mexico Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

**COUNT XXVII**
**N.Y. Gen. Oblig. Law §§ 5-419 & 5-421**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiff Jennifer Hoose, On Behalf of the New York Class)**

379.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

380.    Plaintiff brings this claim on behalf of herself and the New York Class under New York's Civil Remedy Statute for Recovery of Gambling Losses, N.Y. Gen. Oblig. Law §§ 5-419 & 5-421 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

381.    The Statute provides: "Any person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not." The statute further provides: "Every person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

382.    Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

383.    By purchasing coins from Apple to wager on social casinos, Plaintiff and each member of the New York Class gambled and lost money within the meaning of the Statute.

384.    Apple has profited and continues to profit from each payment made by New York Class Members to purchase virtual coins, and therefore is the "winner" (and/or "person to whom the same shall be paid or delivered") of each transaction, in violation of the Statute.

385.    Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and New York Class Members to gamble in social casinos.

386.    Plaintiff and New York Class Members are therefore entitled to recover from Apple the amounts they lost when gambling in social casinos through the App Store, in addition to costs of suit.

## COUNT XXVIII
### Unjust Enrichment
### (Plaintiff Jennifer Hoose, On Behalf of the New York Class)

387.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

388.    Plaintiff brings this claim on behalf of herself and the New York Class under the common law of unjust enrichment.

389.    As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiff and New York Class Members by virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

390.    Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

391.    These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

392.    These profits were a benefit conferred upon Apple by New York Class Members when purchasing coins to wager in social casinos.

393.    Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each New York Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

**COUNT XXIX**
**Ohio Rev. Code § 3763.02**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiffs Sean McCloskey and Sheera Harris, On Behalf of the Ohio Class)**

394.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

395.    Plaintiffs bring this claim on behalf of themselves and the Ohio Class under Ohio's Civil Remedy Statute for Recovery of Gambling Losses, Ohio Rev. Code § 3763.02, which was enacted to effectuate the State's public policy against gambling.

396.    Section 3763.02 provides: "If a person, by playing a game, or by a wager, loses to another, money or other thing of value, and pays or delivers it or a part thereof, to the winner thereof, such person losing and paying or delivering, within six months after such loss and payment or delivery, may sue for and recover such money or thing of value or part thereof, from the winner thereof, with costs of suit."

397.    Accordingly, Section 3763.02 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

398.    By purchasing coins from Apple to wager on social casinos, Plaintiffs and each member of the Ohio Class gambled and lost money within the meaning of Section 3763.02.

399.    Apple has profited and continues to profit from each payment made by Ohio Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Section 3763.02.

400.     Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Ohio Class Members to gamble in social casinos.

401.     Plaintiffs and Ohio Class Members are therefore entitled to recover from Apple the amounts they lost when gambling in social casinos through the App Store, in addition to costs of suit.

### COUNT XXX
### Unjust Enrichment
### (Plaintiffs Sean McCloskey and Sheera Harris, On Behalf of the Ohio Class)

402.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

403.     Plaintiffs bring this claim on behalf of themselves and the Ohio Class under the common law of unjust enrichment.

404.     As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Ohio Class Members by virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

405.     Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

406.     These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

EXHIBIT B
93

407. These profits were a benefit conferred upon Apple by Ohio Class Members when purchasing coins to wager in social casinos.

408. Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Ohio Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

## COUNT XXXI
### Or. Rev. Stat. § 30.740
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Joshua McDonald, On Behalf of the Oregon Class)

409. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

410. Plaintiff brings this claim on behalf of himself and the Oregon Class under Oregon's Civil Remedy Statute for Recovery of Gambling Losses, Or. Rev. Stat. § 30.740, which was enacted to effectuate the State's public policy against gambling.

411. Section 30.740 provides: "All persons losing money or anything of value at or on any unlawful game described in ORS 167.117[,] … 167.122[,] … and 167.127 … shall have a cause of action to recover from the dealer winning the same, or proprietor for whose benefit such game was played or dealt, or such money or thing of value won, twice the amount of the money or double the value of the thing so lost."

412. Accordingly, Section 30.740 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

413. ORS 167.117(7) defines "gambling" as any time a person "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under the control or influence of the person, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome."

414. Players of social casinos risk something of value (virtual coins purchased with real money) upon the outcome of a future contingent event (the results of the social casinos) not under the players' control or influence, upon the understanding that players will receive

something of value (additional coins allowing them to continue playing the game for free) in the event of a certain outcome.

415.    Thus, by purchasing coins from Apple to wager on social casinos, Plaintiff and each member of the Oregon Class gambled and lost money in illegal gambling transactions within the meaning of Section 30.740.

416.    Apple has profited and continues to profit from each payment made by Oregon Class Members to purchase virtual coins, and therefore is both the "dealer winning" the same and a proprietor for whose benefit social casinos were played, in violation of Section 30.740.

417.    Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Oregon Class Members to gamble in social casinos.

418.    Plaintiff and Oregon Class Members are therefore entitled to recover from Apple double the amounts they lost when gambling in social casinos through the App Store.

## COUNT XXXII
### Unjust Enrichment
### (Plaintiff Joshua McDonald, On Behalf of the Oregon Class)

419.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

420.    Plaintiff brings this claim on behalf of himself and the Oregon Class under the common law of unjust enrichment.

421.    As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiff and Oregon Class Members by

virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

422.    Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

423.    These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

424.    These profits were a benefit conferred upon Apple by Oregon Class Members when purchasing coins to wager in social casinos.

425.    Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Oregon Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

## COUNT XXXIII
### S.C. Code § 32-1-10
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Deborah Steese, On Behalf of the South Carolina Class)

426.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

427.    Plaintiff brings this claim on behalf of herself and the South Carolina Class under South Carolina's Civil Remedy Statute for Recovery of Gambling Losses, S.C. Code § 32-1-10, which was enacted to effectuate the State's public policy against gambling.

428.    Section 32-1-10 provides: "Any person who shall at any time or sitting, by playing at cards, dice table or any other game whatsoever or by betting on the sides or hands of such as do play at any of the games aforesaid, lose to any person or persons so playing or betting, in the whole, the sum or value of fifty dollars and shall pay or deliver such sum or value or any part thereof shall be at liberty, within three months then next ensuing, to sue for and recover the money or goods so lost and paid or delivered or any part thereof from the respective winner or winners thereof, with costs of suit …."

429. Accordingly, Section 32-1-10 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

430. By purchasing coins from Apple to wager on social casinos, Plaintiff and each member of the South Carolina Class gambled and lost money within the meaning of Section 32-1-10.

431. Apple has profited and continues to profit from each payment made by South Carolina Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Section 32-1-10.

432. Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and South Carolina Class Members to gamble in social casinos.

433. Plaintiff and South Carolina Class Members are therefore entitled to recover from Apple the amounts they lost when gambling in social casinos through the App Store, in addition to costs of suit.

## COUNT XXXIV
### Unjust Enrichment
### (Plaintiff Deborah Steese, On Behalf of the South Carolina Class)

434. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

435. Plaintiff brings this claim on behalf of herself and the South Carolina Class under the common law of unjust enrichment.

436.     As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiff and South Carolina Class Members by virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

437.     Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

438.      These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

439.     These profits were a benefit conferred upon Apple by South Carolina Class Members when purchasing coins to wager in social casinos.

440.     Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each South Carolina Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

<u>**COUNT XXXV**</u>
**Tenn. Code § 28-3-106**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiffs John Viglietti, Kai Griffin, and Sheri Miller, On Behalf of the Tennessee Class)**

441.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

442.     Plaintiffs bring this claim on behalf of themselves and the Tennessee Class under Tennessee's Civil Remedy Statute for Recovery of Gambling Losses, Tenn. Code § 28-3-106, which was enacted to effectuate the State's public policy against gambling.

443.      Section 28-3-106 provides that "the loser" of "any kind of gambling or betting" may bring an action "to recover money or goods lost" within 90 days after paying or delivering the lost money or goods.

444.     Accordingly, Section 28-3-106 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

445.    By purchasing coins from Apple to wager on social casinos, Plaintiffs and each member of the Tennessee Class gambled and lost money within the meaning of Section 28-3-106.

446.    Apple has profited and continues to profit from each payment made by Class Members to purchase virtual coins, and therefore is in violation of Section 28-3-106.

447.    Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Tennessee Class Members to gamble in social casinos.

448.    Plaintiffs and Tennessee Class Members are therefore entitled to recover from Apple the amounts they lost when gambling in social casinos through the App Store.

### COUNT XXXVI
### Unjust Enrichment
**(Plaintiffs John Viglietti, Kai Griffin, and Sheri Miller, On Behalf of the Tennessee Class)**

449.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

450.    Plaintiffs bring this claim on behalf of themselves and the Tennessee Class under the common law of unjust enrichment.

451.    As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Tennessee Class Members by virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

452.     Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

453.      These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

454.     These profits were a benefit conferred upon Apple by Tennessee Class Members when purchasing coins to wager in social casinos.

455.     Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Tennessee Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

## COUNT XXXVII
### Wash. Rev. Code § 4.24.070
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiffs Connie Zilbert, Ben Kramer, and Ashley Honeysuckle, On Behalf of the Washington Class)

456.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

457.     Plaintiffs bring this claim on behalf of themselves and the Washington Class under Washington's Civil Remedy Statute for Recovery of Gambling Losses, Wash. Rev. Code § 4.24.070, which was enacted to effectuate the State's public policy against gambling.

458.     Section 4.24.070 provides: "All persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

459.     Accordingly, Section 4.24.070 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

460.    By purchasing coins from Apple to wager on social casinos, Plaintiffs and each member of the Washington Class gambled and lost money within the meaning of Section 4.24.070.

461.    "Gambling," defined by RCW § 9.46.0237, "means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence."

462.    Virtual coins and tokens used to play social casinos are "thing[s] of value" under RCW § 9.46.0285.

463.    Social casinos are illegal gambling games because they are online games at which players wager things of value (the chips) and by an element of chance (e.g., by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional chips).

464.    Apple has profited and continues to profit from each payment made by Washington Class Members to purchase virtual coins, and therefore is both the "dealer winning" the same and a proprietor for whose benefit social casinos were played, in violation of Section 4.24.070.

465.    Apple's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Apple's gaming platform; and (3) offers and distributes social casinos through the App Store and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Washington Class Members to gamble in social casinos.

466.    Plaintiffs and Washington Class Members are therefore entitled to recover from Apple the amounts they lost when gambling in social casinos through the App Store.

**COUNT XXXVIII**
**Wash. Rev. Code § 19.86.020**
**Unfair Acts and Practices in the Conduct of Trade or Commerce**
**(Plaintiffs Connie Zilbert, Ben Kramer, and Ashley Honeysuckle, On Behalf of the Washington Class)**

467. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

468. Washington's Consumer Protection Act ("CPA") prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW § 19.86.020.

469. Under the CPA, an unfair or deceptive act is one which is unlawful and against public policy as declared by the legislature or judiciary.

470. Plaintiffs and Washington Class Members are "persons" within the meaning of RCW §§ 19.86.020 and 19.86.090.

471. Apple violated RCW § 9.46.010, *et seq.*, which declares that it is the policy of the State of Washington to, *inter alia*, "restrain all persons from seeking profit from professional gambling activities in this state," to "restrain all persons from patronizing such professional gambling activities," and to "safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling." RCW § 9.46.010.

472. Under RCW § 9.46.010, *et seq.*, unlawful "gambling" is defined as "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence." RCW § 9.46.0237.

473. Virtual coins and tokens used to play social casinos are "thing[s] of value" under RCW § 9.46.0285.

474. Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (e.g., by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning virtual coins or tokens).

475.     Apple operates social casinos in conjunction with the developers of those casinos and has profited immensely from its operation of unlawful games of chance, amassing hundreds of millions of dollars from illegal gambling transactions.

476.     Apple's unlawful acts and practices occurred in the conduct of trade or commerce. Indeed, Apple is responsible for making social casinos available to the public in trade and commerce.

477.     Apple's acts and practices were and are injurious to the public interest because Apple continuously advertises, solicits, and enables the general public in Washington State and throughout the United States to play unlawful social casinos, all while profiting from such conduct.

478.     This is part of a pattern or generalized course of conduct on the part of Apple that contradicts the express public policy of the State of Washington.

479.     As a result of Apple's conduct, Plaintiffs and Washington Class Members were injured in their business or property—i.e., economic injury—in that they lost money wagering on unlawful games of chance.

480.     Apple's unlawful conduct proximately caused Plaintiffs' and Washington Class Members' injuries because, but for the challenged conduct, Plaintiffs and Washington Class Members would not have lost money wagering on illegal games of chance, which was a direct, foreseeable, and planned consequence of Apple's conduct.

481.     Plaintiffs, on their own behalf and on behalf of the Washington Class, seek to recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

### COUNT XXXIX
### Unjust Enrichment
**(Plaintiffs Connie Zilbert, Ben Kramer, and Ashley Honeysuckle, On Behalf of the Washington Class)**

482.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

483.    Plaintiffs bring this claim on behalf of themselves and the Washington Class under the common law of unjust enrichment.

484.    As a result of its unlawful conduct described above, Apple has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Washington Class Members by virtue of their purchase of virtual coins from Apple to wager in social casinos through the Apple App Store.

485.    Apple has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

486.    These profits were obtained from illegal gambling in connection with Apple's operation of social casinos.

487.    These profits were a benefit conferred upon Apple by Washington Class Members when purchasing coins to wager in social casinos.

488.    Accordingly, because Apple will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Washington Class Member are entitled to recover the amount by which Apple was unjustly enriched at their expense.

## CLAIMS BROUGHT ON BEHALF OF THE NATIONWIDE CLASS

### COUNT XL
### 18 U.S.C. § 1962(c) (RICO)
### Racketeering Activities and Collection of Unlawful Debts
### (Damages and Injunctive Relief)
### (All Plaintiffs, On Behalf of the Nationwide Class)

489.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

490.    At all relevant times, Apple is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because it is capable of holding, and does hold, "a legal or beneficial interest in property."

491.    Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue as they were injured in their business and/or property as a result of the

Social Casino Enterprise's wrongful conduct described herein, including but not limited to the Enterprise's (1) unlawfully taking and receiving money from Plaintiffs and the Nationwide Class; (2) never providing Plaintiffs and members of the Nationwide Class a fair and objective chance to win—they could only lose; and (3) directly and knowingly profiting from, on information and belief, rigged and manipulated slot machines.

492. Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

493. 18 U.S.C. § 1961(1) defines "racketeering activity" to include, among other things, (i) any act which is indictable under Title 18, Section 1084 of the United States Code (relating to the transmission of gambling information); and (ii) any act which is indictable under Title 18, Section 1955 of the United States Code (relating to the prohibition of illegal gambling businesses).

494. Interstate gambling, including interstate internet gambling, is illegal under federal law if the gambling transaction is illegal in any states in which the transaction occurs. As relevant here, at least some portion of all alleged gambling transactions occur within California, where the alleged gambling transactions are illegal. Consequently, all alleged gambling transactions are illegal under federal law.

495. Specifically, illegal gambling is indictable under both Section 1084 and Section 1955 of Title 18 of the United States Code, as well as under California law, and is punishable by imprisonment for more than one year.

496. Therefore, the Social Enterprise is engaged in "racketeering activity."

497. 18 U.S.C. § 1961(6) defines "unlawful debt" as a debt "(A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof," and "(B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof."

498.     Because the Social Casino Enterprise collects debts incurred from a gambling activity in violation of California and other state law, described herein, its profits derived from its ownership and maintenance constitute "unlawful debt" as defined in Section 1961(6).

499.     Apple violated 18 U.S.C. § 1962(c) and § 1962(d) by participating in, facilitating, or conducting the affairs of the Social Casino Enterprise through a pattern of racketeering activity composed of indictable offenses under 18 U.S.C. § 1084, 18 U.S.C. § 1955, and California Penal Code § 319, § 330b, and § 330.1.

500.     The affiliation between the Defendant Apple, the other Platforms, and the Illegal Slot companies constitutes a conspiracy to use an enterprise for the collection of unlawful debt in violation of 18 U.S.C. § 1962(d).

### Social Casino Enterprise

501.     RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

502.     Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

503.     The Social Casino Enterprise is an association-in-fact composed of Apple, Google, Facebook, and the Illegal Slot companies who are engaged in and whose activities affect interstate commerce, and which have affected and damaged interstate commercial activity. This Enterprise exists separately from the otherwise legitimate businesses operations of each individual participant.

504.     The pattern of racketeering activity conducted by the members of the Social Casino Enterprise is distinct from the Social Casino Enterprise itself, as each act of racketeering is a separate offense committed by an entity while the Social Casino Enterprise itself is an association-in-fact of legal entities. The Social Casino Enterprise has an informal structure of app developers and platforms with continuing functions or responsibilities.

505.    For approximately a decade, the Social Casino Enterprise has collaborated together to target and retain high-spending users in their online gambling scheme throughout the country. At the very least, following the Ninth Circuit's March 18, 2018 holding in *Kater*, Defendant Apple and the other Platforms, on information and belief, mutually agreed to continue their Enterprise through their ongoing collection of unlawful debts, functioning as a cohesive unit with the purpose of gaining illicit gambling profits.

Structure of the Social Casino Enterprise

506.    The Social Casino Enterprise consists of dozens of Illegal Slot companies and the Platforms (Apple, Google, and Facebook). Each participant agreed to conduct and carry out the affairs and goals of the Social Casino Enterprise:

A.    The Illegal Slot companies agreed to conduct the affairs of the Social Casino Enterprise by developing, updating and operating the illegal slot machines: the "gambling devices." The Illegal Slot companies operate as the principals, forming the necessary business partnerships with Apple, Google and Facebook for the successful execution of their unlawful gambling scheme. The Illegal Slot companies fundamentally rely on the Platforms to host their games, access consumers, and collect revenue. Upon constructive notice of the unlawful nature of the virtual social gambling applications, the Illegal Slot companies agreed with all Enterprise participants to uphold their roles in the Social Casino Enterprise and to continue functioning as a single unit with the common purpose of collecting unlawful debts from online gambling activity.

B.    Apple, Google and Facebook agreed to conduct the affairs of the Social Casino Enterprise by serving as the gambling premises, hosting the virtual social gambling applications and processing all in-app transactions in exchange for a share in the gamblers' losses. Additionally, upon notice of the unlawful nature of the virtual social gambling applications, Apple, Google, and Facebook agreed with all participants to uphold their roles in the Social Casino Enterprise and to continue functioning as a single unit with the common purpose of collecting unlawful debts from online gambling activity.

507.     At all relevant times, each Social Casino Enterprise participant was aware of the conduct of the Social Casino Enterprise, was a knowing and willing participant in that conduct, and reaped profits from that conduct through in-app sales.

508.     The persons engaged in the Social Casino Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities.

509.     All members of the Social Casino Enterprise coordinate and maintain their respective roles in order to enrich themselves and to further the common interests of the whole.

510.     Each Social Casino Enterprise participant participated in the operation and management of the Social Casino Enterprise by directing its affairs as described herein.

511.     The wrongful conduct of the Social Casino Enterprise has been and remains part of the Social Casino Enterprise's ongoing way of doing business and constitutes a continuing threat to the Plaintiffs' and the Nationwide Class's property. Without the repeated illegal acts and intentional coordination between all participants, the Social Casino Enterprise's scheme would not have succeeded and would not pose a threat to Plaintiffs the Class into the future.

<u>Pattern of Racketeering Activity</u>

512.     The affairs of the Social Casino Enterprise were conducted in such a way to form a pattern of racketeering activity. The Social Casino Enterprise's general pattern of activity consists of designing and operating illegal internet-based slot machines and repeatedly violating public policy against gambling by:

    A. Developing illegal slot machine games and disguising them as innocuous video game entertainment;

    B. Distributing and operating illegal slot machine games that are, on information and belief, rigged and manipulated;

    C. Concealing the scope and deceptive nature of their gambling applications despite knowledge of their predatory design and business model;

    D. Providing a host platform to house unlicensed gambling activity;

    E. Injuring the public interest by continuously advertising to and soliciting the general public to play illegal slot machines;

1    F.   Conspiring to uphold the Social Casino Enterprise; and

2    G.   Unjustly collecting unlawful debts and retaining the profits from their illegal social

3          gambling applications.

4    513.    The Social Casino Enterprise has operated as a continuous unit since at least

5  2010.

6    514.    Pursuant to and in furtherance of their fraudulent scheme, Apple committed

7  multiple predicate act violations of federal and state law as previously alleged herein.

**COUNT XLI**
**RICO § 1962(d)**
**Conspiracy to Engage in Racketeering Activities and Collection of Unlawful Debts**
**(Damages and Injunctive Relief)**
**(All Plaintiffs, On Behalf of the Nationwide Class)**

515.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth

herein.

516.    18 U.S.C. § 1962(d) states that "[i]t shall be unlawful for any person to conspire

to violate any of the provisions of subsection (a), (b), or (c) of this section."

517.    As described throughout, and in detail in Count II, even if it did not direct or

manage the affairs of the Social Casino Enterprise, Apple conspired to commit predicate acts in

violation of § 1962(c), including violations of California Penal Code §§ 330b and 330.1.

518.    Defendant Apple acted knowingly at all times when agreeing to conduct the

activities of the Social Casino Enterprise. Apple agreed to and indeed did participate in the

requisite pattern of racketeering activity which constitutes this RICO claim, collected unlawful

debts, engaged in racketeering activities, and intentionally acted in furtherance of the conspiracy

by conducting the pattern of racketeering and unlawful debt collection as described above.

519.    At the very least, Apple had notice of the illegality of the Social Casino Enterprise

as of the Ninth Circuit's 2018 holding in *Kater*. Apple's post-*Kater* participation in the Social

Casino Enterprise demonstrates its commitment to upholding and operating the structure of the

Social Casino Enterprise.

520.    As a result of Apple's conduct, Plaintiffs and Members of the Nationwide Class were deprived of money and property that they would not otherwise have lost.

521.    Under 18 U.S.C. § 1964(c), the Nationwide Class is entitled to treble their damages, plus interest, costs, and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter an Order:

a)    Certifying this case as a class action on behalf of the Classes defined above, appointing Robert Alldis, Cheree Bibbs, Michael Helsel, Teresa Larsen, Karen Workman, Janice Hill, Vickie Payton, Ernestine Thompson, Rebecca Vincent, Jennifer Andrews, Amy Hoven, Lue Stephens, Frankie Killings-Larkin, Mary Lancaster, Juliana Wisher, Jennifer Hoose, Sean McCloskey, Joshua McDonald, Deborah Steese, John Viglietti, Kai Griffin, Sheri Miller, Connie Zilbert, Ben Kramer, Ashley Honeysuckle, Frank Custodero, Saundra Rogers, and Sheera Harris as representatives of the Classes, and appointing their counsel as Class Counsel;

b)    Declaring that Defendant's conduct, as set out above, is unlawful under California's UCL, Ala. Code § 8-1-150(a), Ala. Code § 8-19-1, *et seq.*, Conn. Gen. Stat. Ann. § 52-554, Conn. Gen. Stat. Ann. § 42-110a, *et seq.*, Ga. Code Ann. § 13-8-3, Ga. Code Ann. § 10-1-390, *et seq.*, 720 Ill. Comp. Stat. Ann. 5/28-8, 815 ILCS 505/1, *et seq.*, Ind. Code Ann. § 34-16-1-2, Minn. Stat. Ann. § 541.20, Miss. Code Ann. § 87-1-5, Mo. Ann. Stat. § 434.030, Mo. Ann. Stat. § 407.020(1), Mont. Code Ann. § 23-5-131, N.M. Stat. Ann. § 44-5-1, N.M. Stat. Ann. § 57-12-3, N.Y. Gen. Oblig. Law §§ 5-419 & 5-421, Ohio Rev. Code § 3763.02, Or. Rev. Stat. § 30.740, S.C. Code § 32-1-10, Tenn. Code § 28-3-106, Wash. Rev. Code § 4.24.070, and Wash. Rev. Code § 19.86.020;

c)    Declaring that Defendant's conduct, as set out above, constitutes racketeering activities, collection of unlawful debts, and conspiracy to engage in the same;

d)    Entering judgment against Defendant Apple, in the amount of the losses suffered by Plaintiffs and each member of the Classes;

e)    Enjoining Defendant from continuing the challenged conduct;

f)      Awarding damages to Plaintiffs and the Class members in an amount to be determined at trial, including trebling as appropriate;

g)      Awarding restitution to Plaintiffs and Class members in an amount to be determined at trial,

h)      Requiring disgorgement of all of Apple's ill-gotten gains;

i)      Awarding reasonable attorneys' fees and expenses;

j)      Awarding pre- and post-judgment interest, to the extent allowable;

k)      Requiring injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Classes; and

l)      Awarding such other and further relief as equity and justice require, including all forms of relief provided for under Plaintiffs' claims.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**ROBERT ALLDIS, CHEREE BIBBS, MICHAEL HELSEL, TERESA LARSEN, KAREN WORKMAN, JANICE HILL, VICKIE PAYTON, ERNESTINE THOMPSON, REBECCA VINCENT, JENNIFER ANDREWS, AMY HOVEN, LUE STEPHENS, FRANKIE KILLINGS-LARKIN, MARY LANCASTER, JULIANA WISHER, JENNIFER HOOSE, SEAN MCCLOSKEY, JOSHUA MCDONALD, DEBORAH STEESE, JOHN VIGLIETTI, KAI GRIFFIN, SHERI MILLER, CONNIE ZILBERT, BEN KRAMER, ASHLEY HONEYSUCKLE, FRANK CUSTODERO, SAUNDRA ROGERS, AND SHEERA HARRIS,** individually and on behalf of all others similarly situated,

Dated: November 22, 2021

**EDELSON PC**

By: /s/ Rafey S. Balabanian
RAFEY S. BALABANIAN (Bar No. 315962)
rbalabanian@edelson.com
TODD LOGAN (Bar No. 305912)
tlogan@edelson.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300
Fax: 415.373.9435

JAY EDELSON*
jedelson@edelson.com
THEO BENJAMIN*
tbenjamin@edelson.com
350 North LaSalle St., 14th Floor
Chicago, IL 60654
Tel: 312.589.6370
Fax: 312.589.6378

**TYCKO & ZAVAREEI LLP**

ANDREA R. GOLD*
agold@tzlegal.com
GLENN CHAPPELL*
gchappell@tzlegal.com
1828 L Street NW Suite 1000
Washington, DC 20036
Tel:     202.973.0900
Fax:    202.973.0950

HASSAN A. ZAVAREEI (Bar No. 181547)
hzavareei@tzlegal.com
1828 L Street NW Suite 1000
Washington, DC 20036
Tel:     202.973.0900
Fax:    202.973.0950

**KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT**

KRISTEN LAKE CARDOSO*
cardoso@kolawyers.com
1 West Las Olas Boulevard, Suite 500
Fort Lauderdale, Florida 33301
Tel: 954.525.4100
Fax: 954.525.4300

**BURSOR & FISHER. P.A.**

SARAH N. WESTCOT (Bar No. 264916)
swestcot@bursor.com
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: 305.330.5512

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TOUSLEY BRAIN STEPHENS, PLLC**

CECILY C. SHIEL*
cshiel@tousley.com
1700 Seventh Avenue, Suite 2200
Seattle, WA 98101
Tel:    206.682.8600
Fax:    206.682.2992

**DOVEL & LUNER, LLP**

CHRISTIN CHO (Bar No. 238173)
christin@dovel.com
201 Santa Monica Blvd, Suite 600
Santa Monica, CA 90401
Tel:    310.656.7077
Fax:    310.656.7069

**DAVIS & NORRIS, LLP**

JOHN E. NORRIS*
jnorris@davisnorris.com
2154 Highland Avenue South
Birmingham, AL 35205
Tel:    205.930.9900
Fax:    205.930.9989

**STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP**

JILL M. MANNING (State Bar No. 178849)
235 Pine Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 421-3400
Fax: (415) 421-2234

**PEARSON, SIMON & WARSHAW, LLP**

MELISSA S. WEINER*
mweiner@pswlaw.com
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610

*pro hac vice admitted and/or forthcoming

EXHIBIT B
113

Rafey S. Balabanian (SBN 315962)
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300 / Fax: 415.373.9435

*Interim Lead Counsel*

**[Additional Counsel Listed on Signature Page]**

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| KATHLEEN WILKINSON, NANCY URBANCZYK, LAURA PERKINSON, MARIA VALENCIA-TORRES, MARY AUSTIN, PATRICIA MCCULLOUGH, ALISON KODA, GLENNA WIEGARD, CLOTERA ROGERS, CAROL SMITH, JANICE WILLIAMS, JENNIFER ANDREWS, DAWN MEHSIKOMER, DENICE WAX, FRANCES LONG, SANDRA MEYERS, STEVE SIMONS, VANESSA SOWELL SKEETER, DONNA WHITING, SHERI MILLER, PAUL LOMBARD, BEN KRAMER, ELEANOR MIZRAHI, and JANICE WILSON, individually, and on behalf of the proposed classes, <br><br> *Plaintiffs*, <br><br> v. <br><br> FACEBOOK, INC., <br><br> *Defendant*. | Case No. 5:21-cv-02777-EJD <br><br> **PLAINTIFFS' MASTER COMPLAINT** <br><br> **CLASS ACTION** <br><br> **JURY DEMAND** |
| HANNELORE BOORN, individually and on behalf of all others similarly situated, <br><br> *Plaintiff*, <br><br> v. <br><br> FACEBOOK, INC., <br><br> *Defendant*. | Case No. 5:21-cv-02818-EJD <br><br> **PLAINTIFF'S MASTER COMPLAINT** <br><br> **CLASS ACTION** <br><br> **JURY DEMANDED** |

Plaintiffs Kathleen Wilkinson, Nancy Urbanczyk, Laura Perkinson, Maria Valencia-Torres, Mary Austin, Patricia McCullough, Alison Koda, Glenna Wiegard, Clotera Rogers, Carol Smith, Hannelore Boorn, Janice Williams, Jennifer Andrews, Dawn Mehsikomer, Denice Wax, Frances Long, Sandra Meyers, Steve Simons, Vanessa Sowell Skeeter, Donna Whiting, Sheri Miller, Paul Lombard, Ben Kramer, Eleanor Mizrahi, and Janice Wilson, individually and on behalf of the proposed classes, bring this Class Action Complaint against Defendant Facebook, Inc. ("Defendant" or "Facebook"), seeking restitution, damages, injunctive relief, and other appropriate relief from Facebook's ongoing participation in an illegal internet gambling enterprise. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and on information and belief derived from investigation of counsel, and review of public documents as to all other matters.

## **INTRODUCTION**

1. Over the last decade, the world's leading slot machine makers—companies like International Game Technology, Scientific Games Corporation, and Aristocrat Leisure—have teamed up with American technology companies to develop a new product line: social casinos.

2. Social casinos are apps—playable from smartphones, tablets, and internet browsers—that make the "authentic Vegas-style[1]" experience of slot machine gambling available to consumers anywhere and anytime. *See* Figure 1 (Screenshot of DoubleDown Casino Gameplay). By moving their casino games directly onto the phones, tablets, and computers of players, and by leveraging an innocuous-sounding "free-to-play" model,[2] social casino companies, along with Facebook, Google, and Apple (the "Platforms"), have found a way to smuggle slot machines into the homes of consumers nationwide, twenty-four hours a day and three-hundred-sixty-five days a year.

3. Just like Las Vegas slot machines, social casinos allow users to purchase virtual

---

[1]    Form F-1/A DoubleDown Interactive Co., Ltd. at 87, https://sec.report/Document/0001193125-20-183157/.

[2]    This term is a misnomer. It refers to a business model by which the initial download of the game is free, but companies reap huge profits by selling "in-game" items (known generally as "in-app purchases").

---

2
**EXHIBIT B**
115

1     "chips" in exchange for real money and then gamble those chips at slot machine games in hopes

2     of winning still more chips to keep gambling. In DoubleDown Casino, for example, players

3     purchase "chip packages" costing up to $499.99. *See* Figure 2 (Screenshot of "Popular" Chip

4     Packages in DoubleDown Casino). But unlike Las Vegas slots, social casinos do not allow

5     players to cash out their chips. Instead, purchased chips and won chips alike can be used only for

6     more slot machine "spinning."

**Figure 1**            **Figure 2**

18         4.     Like Las Vegas slots, social casinos are extraordinarily profitable and highly

19     addictive. Social casinos are so lucrative because they mix the addictive aspects of traditional

20     slot machines with the power of the Platforms, including Defendant Facebook, to leverage big

21     data and social network pressures to identify, target, and exploit consumers prone to addictive

22     behaviors.[3]

23         5.     Simply put, the social casino apps do not, and cannot, operate and profit at such a

24     high level from these illegal games on their own. Their business of targeting, retaining, and

25     collecting losses from addicted gamblers is inextricably entwined with the Platforms. Not only

26     do the Platforms retain full control over allowing social casinos into their stores, and their

---

[3]     *See, e.g., How social casinos leverage Facebook user data to target vulnerable gamblers*,
PBS NEWS HOUR, youtube.com/watch?v=FFtkFLNJZfM.

PLAINTIFFS' MASTER COMPLAINT     3     Case Nos. 5:21-cv-02777-EJD
**EXHIBIT B**     5:21-cv-02818-EJD
116

distribution and promotion therein, but they also share directly in a substantial portion of the

gamblers' losses, which are collected and controlled by the Platforms themselves.

6.      Because the Platforms are the centers for distribution and payment, social casinos

gain a critical partner to retain high-spending users and collect player data, a trustworthy

marketplace to conduct payment transactions, and the technological means to update their apps

with targeted new content designed to keep addicted players spending money.

7.      For example, in 2019, PBS NewsHour reported:

> [w]e obtained leaked company documents that show how [a social casino's] VIP system
> tracks players by their Facebook IDs, closely monitors their game play, and then prods
> people to keep them spending. They refer to their VIPs as whales, a term taken from the
> casino industry to describe big spenders.
>
> Social casinos now use behavioral analysis software to quickly identify people who are
> likely to become big spenders. Behaviors like increasing your bet, or playing frequently,
> are signals to the companies, and they target these players with heavy marketing, and
> label them, proto-whales . . .
>
> Facebook's website shows how it tracks people online, and can predict who is likely to
> spend big by analyzing user data. **Facebook helps social casinos find those potential
> whales. It charges a premium to nudge players to spend more, to target people
> whose online behavior might be a sign of addiction**.[4]

8.      Last year alone, consumers purchased and gambled away an estimated *$6 billion*

in social casino virtual chips.[5] Indeed, of the top twelve grossing apps available on Defendant

Facebook, *nine* are social casinos. *See* Figure 3 (Screenshot of "Top Grossing" Facebook Apps).

---

[4]      *Id.*

[5]      *SciPlay Net Income Skyrockets 127 Percent, as Social Gaming Embraced by Americans
Sheltered at Home*, CASINO.ORG (May 13, 2020), https://www.casino.org/news/sciplay-net-
income-skyrockets-127-percent-as-social-gaming-embraced/.

**Figure 3**



9.     By utilizing Facebook for promotion, distribution and payment processing, the social casinos entered into a mutually beneficial business partnership. In exchange for promoting and distributing the casino games, providing them valuable data and insight about their players, and collecting money from consumers, Facebook (and the other Platforms) take a *30 percent* commission off of every wager, earning them billions in revenue. By comparison, the "house" at a traditional casino only takes 1 to 15 percent, while also taking on significant risk of loss in its operation. Facebook's 30 percent commission, on the other hand, is guaranteed for its ability to act as a casino "host" and bankroll.

10.     The result (and intent) of this dangerous partnership is that consumers become addicted to social casino apps, maxing out their credit cards with purchases amounting to tens or even hundreds of thousands of dollars. Consumers addicted to social casinos suffer a variety of non-financial damages ranging from depression to divorce to attempted suicide.

11.     These devastating consequences are not hypothetical or hyperbole: below are excerpts of sworn testimony from individuals describing their experiences with social casinos:

- "There is no way to escape. . . . I actually was able to stop playing DoubleDown once, but I relapsed. DoubleDown has affected my life in so many ways. . . . Overall, I believe that I have spent well over $220,000

Case 2:23-cv-04324-GW-AGR Document 185-3 Filed 01/28/25 Page 6 of 31
Case 5:21-cv-02777-EJD Document 1-5 Filed 11/08/25 Page 8 of 31
Page ID #:1332

playing DoubleDown. . . . My husband and I dreamed of paying off our house and retiring at age 60. My addiction to DoubleDown likely ruined that plan. *The financial consequences have caused a lot of strain in our relationship. When I got hooked on DoubleDown again, I lied to my husband about the total amount I had spent because I was afraid he would divorce me if he were to find out the real amount.* He found out anyway, and when he did, he contacted a divorce attorney to start the process of separation. Luckily for me, he decided to give me another chance. I am so thankful for his patience with me, but I feel terrible that I have put him through all this." Exhibit 1, Declaration of Ben Kramer ¶¶ 3-4, 7 (emphasis added).

- "Overall, I believe that I have spent between $10,000-$20,000 playing social casinos. . . . This kind of loss *put a huge strain on my ability to even buy food* since I had spent money on a stupid game. I believe social casinos were taking advantage of my addiction. … This game hurt me and the worst part was that when my husband was alive, he would say, 'You're not spending money on there are you?' and *I lied. I hate that I have to live with that now.*" Exhibit 2, Declaration of Laura Perkinson ¶¶ 3-6 (emphasis added).

12.     Unsurprisingly, social casinos are illegal under many states' gambling laws.

13.     As the Ninth Circuit held in *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785 (9th Cir. 2018):

> In this appeal, we consider whether the virtual game platform "Big Fish Casino" constitutes illegal gambling under Washington law. Defendant–Appellee Churchill Downs, the game's owner and operator, has made millions of dollars off of Big Fish Casino. However, despite collecting millions in revenue, Churchill Downs, like Captain Renault in *Casablanca*, purports to be shocked—shocked!—to find that Big Fish Casino could constitute illegal gambling. We are not. We therefore reverse the district court and hold that because Big Fish Casino's virtual chips are a "thing of value," Big Fish Casino constitutes illegal gambling under Washington law.

14.     As an instructive example, DoubleDown Casino is illegal both in Washington and here in California (where the Platforms, including Defendant Facebook, host it and collect their 30% commission). This year, consumers will purchase approximately $400 million worth of virtual casino chips in DoubleDown Casino. That $400 million will be divided up approximately as follows: $240 million to DoubleDown; $40 million to International Game Technology ("IGT") (a multinational slot machine manufacturer that licenses slot machine game intellectual property to DoubleDown); and—as particularly relevant here—the remaining $120 million to Facebook and the other Platforms (for hosting the app, driving vulnerable consumers to it, and processing the payments for those consumers' virtual chip purchases).

15.     In other words, despite knowing that DoubleDown Casino is illegal, Facebook and the other Platforms continue to maintain a major (30%) financial interest by hosting the game, driving customers to it, and acting as the bank.

16.     As such, DoubleDown, Facebook, and the other Platforms are all liable as co-conspirators to an illegal gambling enterprise. Moreover, DoubleDown Casino is just one of more than fifty social casino apps (the "Illegal Slots") that the Platforms illegally host, promote, and profit from.

17.     Consequently, Facebook and the other Platforms—alongside the Illegal Slot companies—are liable as co-conspirators to an illegal gambling conspiracy.

18.     Defendant Facebook, for its part, is a direct participant in an informal association and enterprise of individuals and entities with the explicit purpose of knowingly devising and operating an online gambling scheme to exploit consumers and reap billions in profits (the "Social Casino Enterprise").

19.     This ongoing Enterprise necessarily promotes the success of each of its members: Social casino operators need Platforms like Facebook, Apple, and Google, to access consumers, host their games, and process payments. The Platforms, for their part, need developers like DoubleDown to publish profit-driven and addictive applications on their platforms to generate massive revenue streams.

20.     Through this case, Plaintiffs seek to force Facebook to stop participating in, and to return to consumers the money it has illegally profited from, the Social Casino Enterprise.

21.     Plaintiffs, on behalf of the putative Classes, bring claims for damages and for injunctive relief under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"); California's Unfair Competition Law, Business and Professions Code § 17200, *et seq.* ("UCL"); state gambling laws; state consumer protection statutes; and unjust enrichment.

## **PARTIES**

22.     Plaintiff Kathleen Wilkinson is a natural person and a citizen of the State of Montana.

23.     Plaintiff Nancy Urbanczyk is a natural person and a citizen of the State of Illinois.

24.     Plaintiff Laura Perkinson is a natural person and a citizen of the State of Washington.

25.     Plaintiff Maria Valencia-Torres is a natural person and a citizen of the State of Alabama.

26.     Plaintiff Mary Austin is a natural person and a citizen of the State of Arkansas.

27.     Plaintiff Patricia McCullough is a natural person and a citizen of the State of Georgia.

28.     Plaintiff Alison Koda is a natural person and a citizen of the State of Illinois.

29.     Plaintiff Glenna Wiegard is a natural person and a citizen of the State of Illinois.

30.     Plaintiff Clotera Rogers is a natural person and a citizen of the State of Illinois.

31.     Plaintiff Carol Smith is a natural person and a citizen of the State of Illinois.

32.     Plaintiff Hannelore Boorn is a natural person and a citizen of the State of Kentucky.

33.     Plaintiff Janice Williams is a natural person and a citizen of the State of Kentucky.

34.     Plaintiff Jennifer Andrews is a natural person and a citizen of the State of Minnesota.

35.     Plaintiff Dawn Mehsikomer is a natural person and a citizen of the State of Minnesota.

36.     Plaintiff Denice Wax is a natural person and a citizen of the State of Minnesota.

37.     Plaintiff Frances Long is a natural person and a citizen of the State of Missouri.

38.     Plaintiff Sandra Meyers is a natural person and a citizen of the State of Montana.

39.     Plaintiff Steve Simons is a natural person and a citizen of the State of New Jersey.

40.     Plaintiff Vanessa Sowell Skeeter is a natural person and a citizen of the State of New York.

41.     Plaintiff Donna Whiting is a natural person and a citizen of the State of South Carolina.

42.     Plaintiff Sheri Miller is a natural person and a citizen of the State of Tennessee.

43.      Plaintiff Paul Lombard is a natural person and a citizen of the Commonwealth of Virginia.

44.     Plaintiff Ben Kramer is a natural person and a citizen of the State of Washington.

45.     Plaintiff Eleanor Mizrahi is a natural person and a citizen of the State of California.

46.     Plaintiff Janice Wilson is a natural person and a citizen of the State of California.

47.     Defendant Facebook, Inc. is a corporation existing under the laws of the State of Delaware with its principal place of business located at 1 Hacker Way, Menlo Park, California 94025. Facebook regularly conducts and transacts business in this District and throughout the United States. Facebook owns and operates the Facebook App Center.

## JURISDICTION AND VENUE

48.     Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the proposed classes is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

49.     Federal subject-matter jurisdiction also exists under 28 U.S.C. § 1331 because Plaintiffs allege violations of 18 U.S.C. § 1962(c)-(d).

50.     The Court has personal jurisdiction over Defendant because Defendant is headquartered in this District and Defendant's alleged wrongful conduct occurred in and emanated from this District.

51.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District.

## GENERAL ALLEGATIONS

**I.      Facebook Promotes, Offers, Supports, and Profits From Illegal Slot Machines**

52.     Players can access Illegal Slots through Facebook—either on a computer or a mobile device—and play at any time of day or night. The doors to these mobile casinos never close.

53.     The Illegal Slot apps each contain multiple games. For example, the DoubleDown Casino app contains over 200 total titles: 186 slot titles, 21 card game titles, and 1 bingo title.[6] The Illegal Slots derive substantially all of their revenue from their slot titles.

54.     Many of the Illegal Slots feature the same games—sporting the same graphics and music—as can be found on a slot machine in a brick-and-mortar casino. For instance, International Game Technology's well-known slot game "Cleopatra" can be found both in physical casinos and through Facebook's DoubleDown Casino app.[7]

55.     The Illegal Slots are designed to mimic the electronic slot machines found in brick-and-mortar casinos, including many of the features designed to maximize time-on-device and money spent. For example, the Illegal Slots offer multiline betting—allowing players to wager and win on multiple pay lines—which tends to keep people playing and spending for longer.[8]

56.     There is no skill involved in the slot machine games offered at the Illegal Slots. Players can only place wagers (using virtual chips), and then press a button to "spin" the slot machine. It is impossible for players to affect the outcome of any spins.

57.     Within the Illegal Slots, players are typically given an initial allotment of virtual chips for free. Players use those chips to play the animated slot machines, choosing the amount they wager on each spin. Virtual chips are won and lost based on the outcome of those spins.

58.     Once a player loses their initial allotment of free chips, the Illegal Slots typically alert the player that he or she has insufficient funds to continue playing that slot game. Many of the Illegal Slot games have minimum bet requirements, such that a player cannot continue playing that game if their chip balance falls too low.

59.     At this point, players have three options: (i) stop playing, (ii) wait for some period

---

[6]     Form F-1/A DoubleDown Interactive Co., Ltd. at 82, https://sec.report/Document/0001193125-20-183157/.

[7]     *Id.* at 4 ("We have exclusive access to hundreds of highly recognizable, branded land-based slot titles through our partnership with IGT which enables us to deliver an authentic casino floor experience to our players.").

[8]     *See* Natasha Dow Schüll, *Addiction By Design: Machine Gambling in Las Vegas* (Princeton Univ. Press 2012).

of time before receiving more free chips from the Illegal Slot; or (iii) purchase more chips to keep playing—often with just a single click. To keep playing the same game immediately, players navigate to an electronic store and purchase chip packages.

60. Facebook operates as the payment processor for all in-app purchases of virtual chips in the Illegal Slots. Facebook collects the money players spend on virtual chips, takes a cut for itself, and remits the rest to the Illegal Slots.[9]

61. Purchased chips extend gameplay in the Illegal Slots because they allow players to place wagers on more spins of the slot machines.

62. Virtual chips cannot be used outside of any individual Illegal Slots app. The chips can only be used to (1) place wagers on slot machine spins, (2) place wagers on the few card game or bingo titles in the Illegal Slots app, or (3) give a "gift" of virtual chips to another account in the app. Substantially all virtual chips are used on slot machine spins.

63. Players typically run out of virtual chips quickly—within a day or two.[10]

64. Notably, while any legitimately operated slot machine must randomize its results, social casinos do not fully randomize their results. Instead, social casinos tailor "wins" and "losses" in such a way as to maximize addiction (and, in turn, revenues). As the CEO of DoubleDown Casino once explained, "[o]ur games aren't built to be bulletproof like you'd need to be if you're a real gambling company. We can do things to make our games more [fun] that if you were an operator in Vegas you'd go to jail for, because *we change the odds just for fun*."[11]

65. Developers of social casino games, such as Scientific Games, hold patents for "dynamic paytables" in interactive games. Paytables—coded into the Illegal Slot apps—set the payout for each possible game event. In other words, they determine how many chips players

---

[9] *Payments Terms*, Facebook for Developers, https://developers.facebook.com/policy/payments_terms.

[10] Form F-1/A DoubleDown Interactive Co., Ltd. at 72, https://sec.report/Document/0001193125-20-183157/ ("Th[e] timing difference [between virtual currency purchase and consumption] is relatively short.").

[11] *Gambling giant IGT buying Double Down for $500M, moving into Facebook games*, GEEK WIRE (Jan. 12, 2012), https://www.geekwire.com/2012/gambling-giant-igt-buying-doubledown-500m-moving-facebook-games/ [emphasis added].

---

PLAINTIFFS' MASTER COMPLAINT     11     Case Nos. 5:21-cv-02777-EJD
EXHIBIT B
124
    5:21-cv-02818-EJD

receive for various spin outcomes. Use of a dynamic paytable means that the payout for any given game event can change over the course of a game or over the course of a player's use of the app.

66.     As Scientific Games explained in their patent application, "[t]he slot machine's dynamic paytable is designed to take advantage of the observation that players are more apt to play gaming machines for longer periods of time if the payout is increased as the player continues to play the game. Other slot machines change the paytable based on the amount wagered by the player."[12]

67.     On information and belief, many Illegal Slots utilize dynamic paytables. In these games, players are cheated out of a legitimately randomized slot machine experience. Rather, the games adjust the potential payouts in order to maximize revenue—changing the gameplay and the odds in order to manipulate players into playing longer and spending more.

## II.     Facebook Promotes, Hosts and Facilitates At Least Fifty Illegal Social Casinos

68.     The Platforms, including Defendant Facebook, have directly assisted in creating and operating the unregulated market of virtual casino games from the outset of the industry.

69.     Before gaining access to these social media platforms, the Illegal Slots used methods like loyalty cards to track data on how much gamblers spent, how frequently they played, or how often they bet. The Platform partnerships upgraded their business model to an in-app payment system and provided additional user data which skyrocketed revenue by providing them with access to a whole new market of consumers.

70.     The Illegal Slots rely on Platforms, like Defendant Facebook, to make their games available to players and to collect revenue.[13] The Illegal Slots are *only* available to play via third-party Platforms, including on Facebook (online or mobile app), on an app downloaded from the Apple App Store, or on an app downloaded from Google Play.

---

[12]     United States Patent, *Dynamic Paytable for Interactive Games*, No. US 7,628,691 B2 (Dec. 8, 2009).

[13]     Form F-1/A DoubleDown Interactive Co., Ltd. at 16, https://sec.report/Document/0001193125-20-183157/.

71.     The core marketing for the Illegal Slots is accomplished in concert with the Platforms, and their systems are inextricably linked. Here, for example, is how one social casino maker described their partnership with the Platforms in a public securities filing:

> Our games are distributed through several main platform providers, including Apple, Facebook, Google, and Amazon, which also provide us valuable information and data, such as the rankings of our games. **Substantially all of our revenue is generated by players using those platforms.** Consequently, our expansion and prospects depend on our continued relationships with these providers[.]
> ….
>
> We focus our marketing efforts on acquiring new players and retaining existing players. We acquire players both organically and through paid channels. Our paid marketing includes performance marketing and dynamic media buying on Facebook, Google, and other channels such as mobile ad networks. Underlying our paid marketing efforts are our data analytics that allow us to estimate the expected value of a player and adjust our user acquisition spend to a targeted payback period. Our broad capabilities in promotions allow us to tailor promotional activity around new releases, execute differentiated multi-channel campaigns, and reach players with preferred creative content.
> ….
>
> Our player retention marketing includes advertising on Facebook as well as outreach through email, push notifications, and social media posts on channels such as Facebook, Instagram, and Pinterest. Our data and analytics also inform our retention marketing efforts. Campaigns are specially designed for each channel based upon player preferences for dimensions such as time of day and creative content. We consistently monitor marketing results and return on investment, replacing ineffective marketing tactics to optimize and improve channel performance.
> ….
>
> We employ a rigorous, data-driven approach to player lifecycle management from user acquisition to ongoing engagement and monetization. We use internally-developed analytic tools to segment and target players and to optimize user acquisition spend across multiple channels.
> ….
>
> We continuously gather and analyze detailed customer play behavior and assess this data in relation to our judgments used for revenue recognition.[14]

72.     By partnering with the Illegal Slots in marketing, distribution, and payment processing, Defendant Facebook entered into a mutually beneficial business partnership with the Illegal Slots. In exchange for pushing and distributing the social casino apps and collecting

---

[14]     *Id.* at 16, 72, 85, 91.

money from consumers, Facebook and the other Platforms take a 30 percent commission off of every in-app purchase, earning them billions in revenue.[15]

### A. The Illegal Slots

73. Each of the following fifty Illegal Slots offered by Facebook allows players to gamble on online slot machines, even in states where such gambling is unlawful.[16]

**Figure 4 – The Illegal Slots**

| # | Game Title | Facebook URL |
|---|---|---|
| 1 | DoubleDown Casino | https://apps.facebook.com/doubledowncasino/ |
| 2 | Slotomania Slot Machines | https://apps.facebook.com/slotomania/ |
| 3 | Jackpot Party Casino Slots | https://apps.facebook.com/jackpotpartycasino/ |
| 4 | House of Fun – Slots | https://apps.facebook.com/houseoffun/ |
| 5 | DoubleU Casino | https://apps.facebook.com/doubleucasino/ |
| 6 | High 5 Casino Real Slots | https://apps.facebook.com/highfivecasino |
| 7 | Heart of Vegas | https://apps.facebook.com/heart_of_vegas |
| 8 | Caesars Slots | https://apps.facebook.com/caesars/ |
| 9 | Hit It Rich! Casino Slots | https://apps.facebook.com/hititrich/ |
| 10 | myVEGAS Slots | https://apps.facebook.com/playmyvegas |
| 11 | GSN Casino | https://apps.facebook.com/mesmogames/ |
| 12 | Rock N' Cash Casino Slots | https://apps.facebook.com/rockncash/ |
| 13 | Huuuge Casino | https://apps.facebook.com/1672695549623058/ |
| 14 | Old Vegas Slots | https://apps.facebook.com/oldvegasslots/ |
| 15 | Take5 Free Slots | https://apps.facebook.com/takefiveslots/ |
| 16 | Quick Hit Slots | https://apps.facebook.com/quickhitslots/ |
| 17 | Vegas Downtown Slots & Words | https://apps.facebook.com/vegas_downtown_slots |
| 18 | Diamond Sky Casino | https://apps.facebook.com/diamondskycasino |
| 19 | Gold Fish Casino Slots | https://apps.facebook.com/goldfishcasinoslots/ |
| 20 | Billionaire Casino | https://apps.facebook.com/657457464407450/ |
| 21 | Slots - Wizard of Oz | https://apps.facebook.com/wizardofozslots/ |

---

[15] *Payments Terms*, Facebook for Developers, https://developers.facebook.com/policy/payments_terms.

[16] For the Court's convenience, an iPad containing Apple-based versions of the Illegal Slots will be lodged with the Court as Exhibit 3. Upon request from Facebook's appearing counsel, a copy of the iPad will be produced to Facebook. For the purposes of the claims alleged here, the Apple-based versions of the Illegal Slot games are materially indistinguishable from the Facebook-based versions.

| 22 | Hot Shot Casino Slots | https://apps.facebook.com/hotshotcasino/ |
| 23 | Scatter Slots | https://apps.facebook.com/scatterslots/ |
| 24 | Jackpotjoy Slots | https://apps.facebook.com/jackpotjoyslots/ |
| 25 | Real Casino - Free Slots | https://apps.facebook.com/realtexasholdem/ |
| 26 | Infinity Slots | https://apps.facebook.com/infinityslots/ |
| 27 | Let's Vegas Casino-Slot Roulette | https://apps.facebook.com/letsvegas/ |
| 28 | OMG! Fortune FREE Slots | https://apps.facebook.com/omgfortune/ |
| 29 | Gold Party Casino - Free Slots | https://apps.facebook.com/goldpartycasino/ |
| 30 | Vegas Live Slots | https://apps.facebook.com/vegasliveslots/ |
| 31 | my KONAMI Slots | https://apps.facebook.com/mykonamislots/ |
| 32 | Spin Vegas Slots | https://apps.facebook.com/spinvegasslots |
| 33 | Cashman Casino | https://apps.facebook.com/cashman_casino |
| 34 | Baba WILD Slots & Casino | https://apps.facebook.com/babacasino/ |
| 35 | MONOPOLY Slots! | https://apps.facebook.com/monopoly-slots/ |
| 36 | Slotica Casino - Free Slots | https://apps.facebook.com/slotica_slots/ |
| 37 | Mirrorball Slots | https://apps.facebook.com/mirrorballslots/ |
| 38 | Slots Era | https://apps.facebook.com/slotsera/ |
| 39 | CasinoStar - Free Slots | https://apps.facebook.com/casinostar |
| 40 | Slots - Classic Vegas Casino | https://apps.facebook.com/classic-vegas/ |
| 41 | Lucky Time Slots | https://apps.facebook.com/luckytimeslots/ |
| 42 | Vegas Star Casino - Free Slots | https://apps.facebook.com/vegasstarcasino |
| 43 | Willy Wonka Slots Free Casino | https://apps.facebook.com/wonkaslots/ |
| 44 | DoubleHit Casino - Free Slots | https://apps.facebook.com/doublehitcasino/ |
| 45 | Winning Slots | https://apps.facebook.com/winningslots/ |
| 46 | Our Slots | https://apps.facebook.com/our-slots/ |
| 47 | Gambino Slots | https://apps.facebook.com/gambino-slots/ |
| 48 | Slots Farm | https://apps.facebook.com/slots_farm/ |
| 49 | Blazing 7s Slots | https://apps.facebook.com/blazingsevensslots/ |
| 50 | VegasTower Casino - Free Slots | https://apps.facebook.com/vegastowercasino/ |

74.    Most or all of the Illegal Slots are also hosted and promoted by the other Platform members of the Social Casino Enterprise: Apple and Google.

**B.    Facebook's Facilitation, Promotion, and Control Over the Illegal Slots**

75.    Facebook, for its part, routinely facilitates the success of social casinos by counseling the app developers through the app launch process and providing them with resources and business tools necessary to maximize the platform's powerful social features.[17]

76.    Prior to being published in the Facebook App Center, developers must submit their app for review. In this process, Facebook examines whether the app violates any company policies and demands that apps comply with all relevant laws within the jurisdiction where the app is available.[18] Apps may be, and often are, removed at Facebook's discretion for violating its policies and can be audited at any time.

77.    The Platforms, through their app review process, are keenly aware of the illegal and deceptive nature of the Illegal Slots. Facebook categorizes the Illegal Slots as "Casino" games (distinct from "Arcade" games and "Card" games).

78.    Facebook also helps the Illegal Slots with marketing and analytics. Facebook Products, such as App Ads (targets lookalike audiences to increase engagement), App Invite (solicits new players via Game Requests), Facebook Analytics for Apps (tracks the time spent between installation and purchase and devises strategies to turn out higher profits), Facebook login (facilitates easy, familiar sign-up), and Sharing (creates viral social distribution), all enable the Illegal Slots to acquire new users and retain high-spenders. Social features keep players engaged longer, which in turn drives higher and more stable monetization.[19]

79.    By way of example, International Game Technology cited the success of Facebook's distribution channel as one of its main reasons for acquiring DoubleDown Interactive, of "DoubleDown Casino" fame, for $500 million in 2012.[20]

---

[17]    *Developer Products*, Facebook for Developers, https://developers.facebook.com/products.

[18]    *Facebook Platform Terms*, Facebook for Developers, https://developers.facebook.com/policy.

[19]    Form F-1/A DoubleDown Interactive Co., Ltd. at 80, https://sec.report/Document/0001193125-20-183157/.

[20]    *International Game Technology to Acquire Social Gaming Company Double Down Interactive*, PRNEWSWIRE (Jan 12, 2012), https://www.prnewswire.com/news-

---

80.     Millions of social casino players access their preferred Illegal Slot through their Facebook login.[21] Upon login, Facebook sends targeted ads offering in-game rewards to users who invite their Facebook friends to also play the Illegal Slots. In many Illegal Slots, the more players a user brings to the game, the more virtual chips they can earn. Users can then compete in "tournaments" online with friends, driving increased chip sales.

81.     Meanwhile, the Illegal Slot companies and Facebook monitor the game activity and use the collected data to increase user spending.[22] This access to data is critical for the developers: Since all payment processing occurs through third-party platforms, the Illegal Slot companies have limited access to personal user data unless players login through Facebook or otherwise sign up for loyalty programs.[23]

82.     Because the Illegal Slots depend on the spending of a small, targeted audience, the Illegal Slot companies and Platforms work together to target and exploit high-spending users, or "whales," as Illegal Slot companies like DoubleDown refer to their top-spenders.[24]

83.     The data that the Illegal Slot companies and the Platforms collect on monetization necessarily contributes to the structure and success of the Social Casino Enterprise.[25]

84.     Facebook App Ads allow Illegal Slot companies to target high spending users and activate non-spending users.[26]

---

releases/international-game-technology-to-acquire-social-gaming-company-double-down-interactive-137209833.html.

[21]     *See, e.g.*, *Success Stories: DoubleU Games*, Facebook for Developers, https://developers.facebook.com/success-stories/doubleu-games/.

[22]     *DoubleDown Casino Launches the World's First Social Slot Tournaments on Facebook*, PRNewswire (July 19, 2011), https://www.prnewswire.com/news-releases/doubledown-casino-launches-the-worlds-first-social-slot-tournaments-on-facebook-125830673.html (last visited Nov. 22, 2021).

[23]     Form F-1/A Doubledown Interactive Co., Ltd. at 21, https://sec.report/Document/0001193125-20-183157/.

[24]     *The Journey From a Single-App to a Multi-App Company*, https://youtu.be/PY8gh8M6T20?t=1260 (Joe Sigrist, DoubleDown General Manager: "We track our whales").

[25]     *Success Stories: DoubleU Games*, Facebook for Developers, https://developers.facebook.com/success-stories/doubleu-games/.

[26]     *Id.*

---

85.    A 2019 *PBS NewsHour* report quotes Facebook executive Julien Codorniou (in 2014) regarding social casinos' financial potential and acknowledging Facebook's intentional role in sharing in the gambling profits:[27]

> It's the number one category on Facebook. It's a category that, you know, never stops growing. Every year, we see new companies out of nowhere coming up with amazing games, amazing IP, launching on Facebook, launching on mobile, making significant money.
>
> It's very good for gaming companies because they can decide to target on Facebook, or on mobile, you know, specific users, or just the whales.

86.    That same article also features former top Facebook executive Sam Lessin admitting to Facebook's knowledge of social casinos' exploitation of vulnerable consumers. In 2012, Lessin emailed Facebook CEO Mark Zuckerberg with his concerns about the predatory and unethical nature of the in-app purchase business model for casino gaming apps.[28] The warning fell on deaf ears:

> I mean, it sounds disgusting, right? You know, we're going to have to live in a world where both very, very good people, and very, very bad people have better tools.[29]

87.    At all relevant times, Facebook and the Platforms have known of the unlawful nature of the Illegal Slots and nonetheless have subjected the general public to the unlawful, predatory, and addictive games in order to maximize profits at the expense of the public's health and welfare.

88.    Apps, including the Illegal Slots, are required to use Facebook Payments to process all in-game purchases, and Facebook collects a 30 percent service fee off of every transaction.[30]

---

[27]    Nate Halverson, *How social casinos leverage Facebook user data to target vulnerable gamblers*, PBS NewsHour (Aug. 13, 2019), https://www.pbs.org/newshour/show/how-social-casinos-leverage-facebook-user-data-to-target-vulnerable-gamblers.

[28]    *Id.*

[29]    *Id.*

[30]    *Payment Terms*, Facebook for Developers, https://developers.facebook.com/policy/payments_terms.

89. Because they act as the "bank" for the Illegal Slots, the Platforms are entirely aware that some consumers spend *hundreds of thousands of dollars* on the Illegal Slots.

90. Furthermore, on information and belief, in the wake of the *Kater* decision, the Platforms did not remove social casinos from their offerings but instead conferred with each other and decided to each continue to offer illegal social casino games. This decision was consistent with the Platforms' long history of entering into highly illegal agreements with each other as long as it is highly lucrative to do so.[31]

91. Despite having the ability to do so, Facebook has not taken any steps to limit access to the Illegal Slots, such as by excluding minors or excluding players from states where the Illegal Slots violate state gambling laws.

92. If Facebook ever discovers an illegal or fraudulent transaction in breach of its Facebook terms or policies, it can deny developers from redeeming the proceeds in its Developer Balance.[32]

93. Unfortunately, Facebook used its developer tools to take advantage of users with severe gambling problems.

94. As a result, Facebook has unlawfully made billions of dollars on the backs of consumers.

**III.    Players Are Harmed By the Illegal Slots Hosted by Defendant**

95. Millions of consumers access Illegal Slots through Facebook, and at least thousands have paid money to Facebook to purchase virtual chips for gambling on the Illegal Slots.

96. These players have been injured by Facebook's conduct because they have lost money as a result of Facebook's hosting, promoting, and facilitating of illegal gambling and

---

[31]    S*ee, e.g.*, *Exclusive: Apple, Google to pay $324 million to settle conspiracy lawsuit*, available at https://www.reuters.com/article/us-apple-google-lawsuit-exclusive/exclusive-apple-google-to-pay-324-million-to-settle-conspiracy-lawsuit-idUSBREA3N28Z20140425; *Behind a Secret Deal Between Google and Faceb*ook, available at https://www.nytimes.com/2021/01/17/technology/google-facebook-ad-deal-antitrust.html.

[32]    *Id.*

Facebook's participation in unfair and unscrupulous business practices.

97. Many players have lost substantial sums of money to Facebook and the Social Casino Enterprise. Players have maxed out credit cards, spent money they could not afford, and fallen behind on bills because they cannot stop spending money on Illegal Slots. Some players' injuries amount to tens or even hundreds of thousands of dollars.

98. Many players feel addicted to the Illegal Slots—they try to stop, knowing that they are losing money and that they are playing too much, but they can't. As long as Facebook continues to offer and promote Illegal Slots and continues to facilitate the sale of virtual chips, the victimization of these players (and the accompanying harms) will persist.

99. Players addicted to Illegal Slots also suffer serious non-economic damages, ranging from depression to divorce to attempted suicide.

100. Many of these harms are irreparable. After-the-fact money damages cannot fix injuries like strained marriages, unsought medical treatments, skipped meals, and anxiety and self-loathing caused by Facebook's and the Social Casino Enterprise's continued unlawful activity.

## FACTS SPECIFIC TO NAMED PLAINTIFFS

### I. Nancy Urbanczyk

101. Plaintiff Nancy Urbanczyk, 71, is a resident and citizen of Shorewood, Illinois. Ms. Urbanczyk plays and makes purchases in DoubleDown Casino through Facebook. She started playing DoubleDown Casino in approximately 2013. Ms. Urbanczyk is addicted to DoubleDown. She estimates that she plays the game 2 to 3 hours per day, and believes she has spent approximately $240,000 in the game to date, sometimes spending as much as $1,000 on chips in a single evening. As a result of her addiction, Ms. Urbanczyk lost her retirement savings, had to take out a mortgage on her home, and had to find a job at the age of 70. Her addiction has put significant strain on her personal relationships and her mental well-being.

### II. Laura Perkinson

102. Plaintiff Laura Perkinson, 78, is a resident and citizen of Centralia, Washington. Ms. Perkinson was disabled in an accident several decades ago and has often turned to the

Internet for social interaction. This eventually led her to social casinos, which she began playing more than a decade ago. She believes that, over time, she has played and made purchases in more than a dozen social casino games, including 88 Fortunes Casino, Big Fish Casino, Caesars Slots, Casino Jackpot Slots - Infinity Slots, DoubleDown Casino, House of Fun, Jackpot Mania, Jackpot Party, Willy Wonka Slots, and Wizard of Oz Slots through Facebook. Eventually, and especially after she lost her husband, Ms. Perkinson estimates that she began to play social casinos for approximately four to five hours a day. Playing social casinos through Facebook has had a devastating impact on Ms. Perkinson's life. In total, she estimates that she has lost between $10,000 and $20,000 in social casinos. Ms. Perkinson's addiction has also put significant strain on her personal relationships and her mental well-being and has even impacted her ability to buy food.

### III.  Ben Kramer

103.    Plaintiff Ben Kramer, 53, is a resident and citizen of Redmond, Washington. Mr. Kramer started playing DoubleDown Casino in approximately 2013 after discovering the game in the Apple App Store. He plays and makes purchases in DoubleDown Casino through Facebook. Mr. Kramer believes that he has spent approximately $220,000 in DoubleDown Casino, and estimates that he plays the game approximately 48 hours each week. Mr. Kramer's addiction to social casinos has taken a significant toll on his life. He has twice used the equity in his home to pay off massive, high-interest credit card debt amassed from his spending in the games, which increased his mortgage payment and set back his schedule for paying off his house by years. This spending and debt caused enormous strain in his marriage and he believes the financial stresses caused by DoubleDown Casino have likely made his and his husband's plan to retire by age 60 impossible.

### IV.  Maria Valencia-Torres

104.    Plaintiff Maria Valencia-Torres, 51, is a resident and citizen of Pelham, Alabama. Ms. Valencia-Torres plays and has made purchases in MyVegas Slots and Slotomania through Facebook. She started playing social casinos in approximately 2014. Ms. Valencia-Torres believes she plays social casinos for approximately 15 to 20 hours per week on average, and she

Case 2:23-cv-05243-GW-AGR  Document 115-3  Filed 08/19/25  Page 29 of 147
Case 2:21-cv-02777-EJD  Document 185  Filed 12/03/21  Page 147 of 296
Page ID #:1348

estimates that she has spent approximately $1,500 to date playing social casinos.

## V.  Mary Austin

105.  Plaintiff Mary Austin, 62, is a resident and citizen of Springdale, Arkansas. Ms. Austin currently plays and has made purchases in Slotomania through Facebook. She started playing Slotomania in approximately 2015 after seeing advertisements on Facebook. Ms. Austin plays Slotomania every day and believes her playing time adds up to many hours each week, and she estimates that she has lost more than $60,000 playing social casinos to date.

## VI.  Patricia McCullough

106.  Plaintiff Patricia McCullough, 73, is a resident and citizen of Harlem, Georgia. Ms. McCullough plays and makes purchases in DoubleDown Casino through Facebook. She started playing DoubleDown Casino in approximately 2016 after seeing advertisements on Facebook. Ms. McCullough believes she plays social casinos approximately 15 hours per week, and estimates that she has spent more than $4,000 to date playing social casinos.

## VII.  Alison Koda

107.  Plaintiff Alison Koda, 57, is a resident and citizen of Winthrop Harbor, Illinois. Ms. Koda believes that, over time, she has played and made purchases in DoubleDown Casino, Goldfish Casino Slots, Jackpot Party, Baba Wild Slots, and High Five Casino through Facebook. She started playing social casinos in approximately 2011 after seeing advertisements on Facebook. Ms. Koda believes she plays social casinos approximately 4 hours per week, and estimates that she has spent approximately $1,000 playing social casinos to date.

## VIII.  Glenna Wiegard

108.  Plaintiff Glenna Wiegard, 58, is a resident and citizen of Ellis Grove, Illinois. Ms. Wiegard plays and has made purchases in Goldfish Casino Slots and Jackpot Party through Facebook. She started playing social casinos in approximately 2017. Ms. Wiegard believes she plays social casinos many hours each week, and estimates that she has spent approximately $400 playing social casinos to date.

## IX.  Clotera Rogers

109.  Plaintiff Clotera Rogers, 82, is a resident and citizen of Homewood, Illinois. Ms.

Rogers has played and made purchases in Hit it Rich! Lucky Vegas Casino Slots, and she currently plays and makes purchases in Jackpot Party through Facebook. She started playing social casinos in approximately 2014. Ms. Rogers plays social casinos many hours each week, and estimates she has spent approximately $1,000 to $2,000 to date playing social casinos.

**X.    Carol Smith**

110.    Plaintiff Carol Smith, 71, is a resident and citizen of Chicago, Illinois. Ms. Smith believes that, over time, she has played and made purchases in Monopoly Slots, Quick Hit Casino Games, DoubleDown Casino, Hit it Rich! Lucky Vegas Casino Slots, Jackpot Slot Machines – Slots Era Vegas Casino, Rock and Cash Slots, Diamond Sky Casino, Best Casino Slots, and Spin Vegas through Facebook. She started playing social casinos in approximately 2014. Ms. Smith believes she plays social casinos more than 35 hours per week, and estimates that she has spent more than $4,000 to date in social casinos.

**XI.    Hannelore Boorn**

111.    Plaintiff Hannelore Boorn, 71, is a resident and citizen of Lexington, Kentucky. Ms. Boorn has played and made purchases in Quick Hit Casino Games and currently plays and makes purchases in DoubleDown Casino through Facebook. She started playing social casinos more than a decade ago. Ms. Boorn estimates that she plays social casinos more than 35 hours each week, and estimates she has lost more than $90,000 in social casinos to date.

**XII.    Janice Williams**

112.    Plaintiff Janice Williams, 63, is a resident and citizen of Lexington, Kentucky. Ms. Williams has played Slotomania and currently plays DoubleDown Casino, and has made purchases in both games through Facebook. She started playing social casinos more than a decade ago. Ms. Williams believes she plays social casinos approximately 20 hours per week, and estimates that she has spent approximately $10,000 playing social casinos to date.

**XIII.    Jennifer Andrews**

113.    Plaintiff Jennifer Andrews, 54, is a resident and citizen of Sauk Rapids, Minnesota. Ms. Andrews started playing social casinos around 2011 after seeing an advertisement on Facebook. She believes that, over time, she has played more than a dozen

social casino games, including Caesars Slots, Cash Frenzy, Cashman Casino, Casino Jackpot Slots - Infinity Slots, Double U Casino, Willy Wonka Slots, Wizard of Oz Slots, and Quick Hit Casino Games. She currently plays and makes purchases in DoubleDown Casino through Facebook. Ms. Andrews estimates that she plays social casinos approximately 20 hours per week on average, and estimates that she has spent approximately $80,000 playing social casinos.

## XIV. Dawn Mehsikomer

114. Plaintiff Dawn Mehsikomer, 64, is a resident and citizen of New Brighton, Minnesota. Ms. Mehsikomer has played and made purchases in Double U Casino, Heart of Vegas, DoubleDown Casino, and Jackpot Party through Facebook. She started playing social casinos in approximately 2011. Ms. Mehsikomer estimates that she plays social casinos for approximately 20 to 25 hours per week on average, and estimates that she has lost approximately $100,000 playing social casinos.

## XV. Denice Wax

115. Plaintiff Denice Wax, 60, is a resident and citizen of Fridley, Minnesota. Ms. Wax has played and made purchases in Double U Casino, and she currently plays and makes purchases in DoubleDown Casino through Facebook. She believes she started playing social casinos around 2010. Ms. Wax has spent many hours playing social casinos, and estimates that she has spent more than $19,000 in social casinos to date.

## XVI. Frances Long

116. Plaintiff Frances Long, 70, is a resident and citizen of Ferguson, Missouri. Ms. Long believes she has, over time, played more than a dozen social casino games, including Double U Casino, House of Fun, Caesars Slots, Slotomania, Real Casino, Real Vegas Casino, and Old Vegas through Facebook. Ms. Long believes she plays social casinos between approximately 35 and 70 hours each week, and estimates that she has spent more than $15,000 on the games to date.

## XVII. Sandra Meyers

117. Plaintiff Sandra Meyers, 71, is a resident and citizen of Helena, Montana. Ms. Meyers currently plays and has made purchases in DoubleDown Casino and My-KONAMI Real

Vegas Slots through Facebook. She started playing social casinos in approximately 2017 after seeing an advertisement on Facebook. Ms. Meyers believes she plays social casinos dozens of hours per week, and estimates that she has spent approximately $9,000 playing social casinos to date.

**XVIII. Kathleen Wilkinson**

118.     Plaintiff Kathleen Wilkinson, 52, is a resident and citizen of Kalispell, Montana. Ms. Wilkinson believes she has played and made purchases in more than a dozen social casinos, including DoubleDown Casino, Jackpot Party, Scatter Slots, Heart of Vegas, House of Fun, Willy Wonka Slots, Wizard of Oz Slots, and Cashman Casino. She started playing social casinos in approximately July 2016. Ms. Wilkinson believes she plays social casinos for approximately 40 to 50 hours per week on average, and estimates that she has spent approximately $50,000 to date playing social casinos.

**XIX.  Steven Simons**

119.     Plaintiff Steven Simons, 55, is a resident and citizen of Westwood, New Jersey. Mr. Simons has played and made purchases in Jackpot Party and GSN Casino and currently plays and makes purchases in DoubleDown Casino through Facebook. He started playing social casinos in approximately 2014 after seeing an ad on Facebook. Mr. Simons estimates that he plays social casinos for approximately 20 hours per week on average, and estimates that he has spent approximately $15,000 playing social casinos.

**XX.   Vanessa Sowell Skeeter**

120.     Plaintiff Vanessa Sowell Skeeter, 65, is a resident and citizen of Bronx, New York. Ms. Skeeter has played and made purchases in Quick Hit Casino Games, and DoubleDown Casino through Facebook. She started playing social casinos in approximately 2016 after seeing an ad on Facebook. Ms. Skeeter believes she plays social casinos 6 to 10 hours each week, and estimates that she has spent approximately $5,000 to date in social casinos.

**XXI.  Donna Whiting**

121.     Plaintiff Donna Whiting, 68, is a resident and citizen of Little River, South Carolina. Ms. Whiting started playing social casinos in approximately 2010 after seeing ads on

Facebook. She plays and has made purchases in DoubleDown Casino and Jackpot Party through Facebook. To date, she estimates she has spent between approximately $30,000 to $60,000 in social casinos, and she estimates that she plays approximately 28 hours per week.

## XXII. Sheri Miller

122.    Plaintiff Sheri Miller, 72, is a resident and citizen of Jefferson City, Tennessee. Ms. Miller started playing DoubleDown Casino more than a decade ago after seeing an ad while browsing Facebook. She plays and makes purchases in DoubleDown Casino through Facebook. She estimates that she has spent between approximately $50,000 and $75,000 to date, and estimates that she plays DoubleDown Casino approximately 25 hours per week.

## XXIII. Paul Lombard

123.    Plaintiff Paul Lombard, 71, is a resident and citizen of Virginia Beach, Virginia. Mr. Lombard began playing social casinos in approximately 2013 after seeing ads on Facebook. He plays and makes purchases in DoubleDown Casino, Double U Casino, and Slotomania through Facebook. He estimates that has spent more than $10,000. He believes that many of his purchases were made after he saw ads outside the social casinos when he logged into the "Games" section of Facebook or received email ads with special offers for virtual coins. Social casinos have substantially impacted Mr. Lombard's life. In addition to the financial impact, he believes he plays social casinos at least 15 hours each week, and has not made upgrades to his home, put money into his grandson's savings fund, or made planned contributions to his retirement funds so that he can spend more money on the social casinos.

## XXIV. Eleanor Mizrahi

124.    Plaintiff Eleanor Mizrahi, 76, is a resident and citizen of Sherwood Forest, California. Ms. Mizrahi started playing DoubleDown Casino in approximately 2013 after discovering it on Facebook. She plays and makes purchases in DoubleDown Casino through Facebook. Ms. Mizrahi estimates she has spent approximately $108,000 to date in DoubleDown and believes that she plays DoubleDown Casino approximately 20 hours each week.

## XXV. Janice Wilson

125.    Plaintiff Janice Wilson, 63, is a resident and citizen of Modesto, California. Ms.

Wilson plays Game of Thrones Slots, Hit it Rich! Lucky Vegas Casino Slots, myVEGAS Slots, Willy Wonka Slots, and Wizard of Oz Slots through Facebook. Ms. Wilson estimates that she plays social casinos approximately 40 hours per week, and she estimates that she has spent more than $25,000 to date playing the social casinos. She regularly makes purchases in the social casinos after seeing promotional ads on Facebook offering discounted coins.

## **CLASS ALLEGATIONS**

126. **Class Definitions**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of themselves and Classes of similarly situated individuals, defined and represented by Class Representatives as follows:

   a. <u>California Class</u>: All persons in California who have lost money to any Illegal Slots through the Facebook platform. The California Class is represented by Class Representatives Eleanor Mizrahi and Janice Wilson.

   b. <u>Washington Class</u>: All persons in Washington who have lost money to any Illegal Slots through the Facebook platform. The Washington Class is represented by Class Representative Ben Kramer.

   c. <u>Alabama Class</u>: All persons in Alabama who have lost money to any Illegal Slots through the Facebook platform. The Alabama Class is represented by Class Representative Maria Valencia-Torres.

   d. <u>Arkansas Class</u>: All persons in Arkansas who have lost money to any Illegal Slots through the Facebook platform. The Arkansas Class is represented by Class Representative Mary Austin.

   e. <u>Georgia Class</u>: All persons in Georgia who have lost money to any Illegal Slots through the Facebook platform. The Georgia Class is represented by Class Representative Patricia McCullough.

   f. <u>Illinois Class</u>: All persons in Illinois who have lost money to any Illegal Slots through the Facebook platform. The Illinois Class is represented by Class Representatives Alison Koda, Glenna Wiegard, Clotera Rogers, and Carol Smith.

PLAINTIFFS' MASTER COMPLAINT     27     Case Nos. 5:21-cv-02777-EJD
**EXHIBIT B**
140     5:21-cv-02818-EJD

g. <u>Kentucky Class</u>: All persons in Kentucky who have lost money to any Illegal Slots through the Facebook platform. The Kentucky Class is represented by Class Representatives Hannelore Boorn and Janice Williams.

h. <u>Minnesota Class</u>: All persons in Minnesota who have lost money to any Illegal Slots through the Facebook platform. The Minnesota Class is represented by Class Representatives Jennifer Andrews, Dawn Mehsikomer, and Denice Wax.

i. <u>Missouri Class</u>: All persons in Missouri who have lost money to any Illegal Slots through the Facebook platform. The Missouri Class is represented by Class Representative Frances Long.

j. <u>Montana Class</u>: All persons in Montana who have lost money to any Illegal Slots through the Facebook platform. The Montana Class is represented by Class Representatives Sandra Meyers and Kathleen Wilkinson.

k. <u>New Jersey Class</u>: All persons in New Jersey who have lost money to any Illegal Slots through the Facebook platform. The New Jersey Class is represented by Class Representative Steven Simons.

l. <u>New York Class</u>: All persons in New York who have lost money to any Illegal Slots through the Facebook platform. The New York Class is represented by Class Representative Vanessa Sowell Skeeter.

m. <u>South Carolina Class</u>: All persons in South Carolina who have lost money to any Illegal Slots through the Facebook platform. The South Carolina Class is represented by Class Representative Donna Whiting.

n. <u>Tennessee Class</u>: All persons in Tennessee who have lost money to any Illegal Slots through the Facebook platform. The Tennessee Class is represented by Class Representative Sheri Miller.

o. <u>Virginia Class</u>: All persons in Virginia who have lost money to any Illegal Slots through the Facebook platform. The Virginia Class is represented by Class Representative Paul Lombard.

p. <u>Nationwide Class</u>: All persons in the United States who have lost money to any Illegal Slots through the Facebook platform. The Nationwide Class is represented by Class Representatives Kathleen Wilkinson, Nancy Urbanczyk, Laura Perkinson, Maria Valencia-Torres, Mary Austin, Patricia McCullough, Alison Koda, Glenna Wiegard, Clotera Rogers, Carol Smith, Hannelore Boorn, Janice Williams, Jennifer Andrews, Dawn Mehsikomer, Denice Wax, Frances Long, Sandra Meyers, Steve Simons, Vanessa Sowell Skeeter, Donna Whiting, Sheri Miller, Paul Lombard, Ben Kramer, Eleanor Mizrahi, and Janice Wilson.

127. The following people are excluded from any of the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

128. **Numerosity**: On information and belief, thousands of consumers fall into the definition of each Class. Members of the Classes can be identified through Defendant's records, discovery, and other third-party sources.

129. **Commonality and Predominance**: There are many questions of law and fact common to Plaintiffs' and the Classes' claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Classes include, but are not necessarily limited to the following:

A. Whether the Illegal Slots are illegal under the relevant state gambling laws;

B. Whether Facebook, under relevant state gambling laws, is liable for managing, possessing, controlling, and/or profiting from the Illegal Slots;

C.      Whether Facebook's participation in operating the Illegal Slots constitutes an unfair and/or unlawful business practice under relevant state consumer protection statutes;

D.      Whether Facebook should be enjoined from further participation in the Social Casino Enterprise;

E.      Whether Facebook is a participant in the Social Casino Enterprise; and

F.      Whether Facebook has committed illegal predicate acts under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

130.    **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Classes in that Plaintiffs and the members of the Classes sustained damages arising out of Defendant's wrongful conduct.

131.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Classes, as Plaintiffs and each member of the Classes lost money playing the Illegal Slots. Plaintiffs also have no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Classes.

132.    **Policies Generally Applicable to the Classes**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies that Plaintiffs challenge apply and affect members of the Classes uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs. The factual and legal bases of Defendant's liability to Plaintiffs and to the other members of the Classes are the same.

PLAINTIFFS' MASTER COMPLAINT        30        Case Nos. 5:21-cv-02777-EJD
**EXHIBIT B**
**143**        5:21-cv-02818-EJD

133. **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Classes is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be difficult for the individual members of the Classes to obtain effective relief from Defendant. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

134. Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## CAUSES OF ACTION

## <u>CLAIMS BROUGHT ON BEHALF OF THE STATE CLASSES</u>

### <u>COUNT I</u>
**Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL")**
**Unlawful and Unfair Business Practices**
**(Restitution and Injunctive Relief)**
**(Plaintiffs Eleanor Mizrahi and Janice Wilson, On Behalf of the California Class)**

135. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

136. Plaintiffs are "person[s]" within the meaning of Cal. Bus. & Prof. Code § 17201 because they are natural persons.

137. Plaintiffs have standing under the UCL because they suffered injury in fact and have lost money or property as a result of Facebook's unlawful and unfair conduct.

138. By hosting and facilitating the Illegal Slots, Facebook engaged in unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200 by committing unlawful, unfair, and fraudulent business acts and practices.

139. Slot machines have long been outlawed in California.

140. California law recognizes that a device can be an illegal slot machine without offering users the opportunity to win money.

141. In fact, if a gaming machine has the look and feel of a slot machine, accepts real money for gameplay, and rewards a winning spin with an "additional chance or right to use the slot machine or device," the device is an illegal slot machine.

142. Consequently, social casinos, as described herein, are illegal slot machines under California law.

143. California gambling law is, on this point, consistent with the laws of many other states—including Washington. In *Kater*, for example, the Ninth Circuit held that social casinos are illegal under Washington law because, while users cannot win money, social casino chips are "things of value" because they can be purchased for money, are awarded as prizes in social casino slot machines, and then can be used to allow players to keep spinning social casino slot machines.

144. California aggressively regulates all forms of gambling. One reason it does so is to prevent consumers from being cheated by professional gambling operations.

145. Because social casinos have previously operated as if they were not subject to gambling regulations, they do not comply with any of the regulations that govern the operation of slot machines.

146. Notably, while any legitimately operated slot machine must randomize its results, social casinos do not randomize their results. Instead, social casinos tailor "wins" and "losses" in such a way as to maximize addiction (and, in turn, revenues).

147. In other words, social casinos cheat players out of a legitimately randomized slot machine experience. Not only can players never actually win money, but their financial losses are maximized by deceptive gameplay tweaks that would never be allowed in a legitimate slot machine.

148. The Illegal Slots are illegal slot machines as defined by Cal. Penal Code § 330b(d) because, among other reasons, when a player purchases and wagers virtual casino

Case 2:23-cv-04324-GW-AGR Document 185-3 Filed 03/28/25 Page 150 of 158
Case 2:23-cv-02777-EJD Document 185-3 Filed 03/28/25 Page 150 of 296
Page ID #:1359

chips in the Illegal Slots, a winning spin affords the player an "additional chance or right to use" the Illegal Slots. Pursuant to Cal. Penal Code § 330b(a), Defendant Facebook, among other violative conduct, manufactures, repairs, owns, stores, possesses, sells, rents, leases, lets on shares, lends and gives away, transports, and exposes for sale or lease, the Illegal Slots. Facebook also offers to repair, sells, rents, leases, lets on shares, lends and gives away, permit the operations, placement, maintenance, and keeping of, in places, rooms, spaces, and buildings owned, leased, or occupied, managed, or controlled by Facebook, the Illegal Slots.

149. The Illegal Slots are illegal slot machines as defined by Cal. Penal Code § 330.1 because, among other reasons, when a player purchases and wagers virtual casino chips in the Illegal Slots, a winning spin affords the player an "additional chance or right to use" the Illegal Slots. Pursuant to Cal. Penal Code § 330.1(a), Defendant Facebook, among other violative conduct, manufactures, owns, stores, keeps, possesses, sells, rents, leases, lets on shares, lends and gives away, transports, and exposes for sale and lease, the Illegal Slots. Facebook also offers to sell, rent, lease, let on shares, lends and gives away and permits the operation of and permits to be placed, maintained, used, or kept in rooms, spaces, and building owned, leased, or occupied by Facebook or under Facebook's management and control, the Illegal Slots.

150. The Illegal Slots are also illegal lotteries as defined by Cal. Penal Code § 319. Section 319 defines a lottery as any "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property." Thus, the elements of an illegal lottery under Section 319 are a prize (or "property"), distribution by chance, and consideration.

151. The Illegal Slots satisfy all three elements because players pay valuable consideration in the form of real money to purchase virtual casino chips, use those chips to try to win prizes in the form of additional free plays, and are awarded these prizes based on chance outcomes.

152. California law recognizes that the duty of the operator of a game of chance to permit the winner to play further games for free is an obligation arising from contract, and the right of the winning player to continue to play for free is personal property.

153.     Facebook's hosting and facilitating of the Illegal Slots constitutes an unfair and unscrupulous business practice because—among other reasons—Facebook and the Illegal Slots work together to target and exploit vulnerable and addicted players; to deceptively tweak gameplay in order to maximize time-on-device and revenue; and to operate their online slot machines outside the bounds of licensing, regulation, and tax policy. California's Unfair Competition Law ("UCL"), Cal. Bus. and Prof. Code § 17203, specifically authorizes this Court to issue injunctive relief to enjoin ongoing acts of unfair competition and unlawful conduct.

154.     Under the UCL, unfair competition encompasses any unlawful act, including acts made unlawful under the penal code and acts made unlawful by federal law.

155.     The UCL authorizes this Court to award restitution to the California Class and to enjoin Facebook's ongoing violations of Sections 330b and 330.1 of the California Penal Code, as well as violations of the federal RICO law.

156.      No plain, adequate, and complete remedy for Defendant's conduct exists at law. Consequently, the California Class is entitled to an equitable remedy under the UCL.

157.     Plaintiffs Eleanor Mizrahi and Janice Wilson, on behalf of themselves and the California Class, seek an order from the Court awarding restitution to the California Class in an amount to be determined at trial and enjoining Facebook from further participation in the Social Casino Enterprise.

## COUNT II
### Unjust Enrichment
**(Plaintiffs Eleanor Mizrahi and Janice Wilson, On Behalf of the California Class)**

158.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

159.     Plaintiffs bring this claim on behalf of themselves and the California Class under the common law of unjust enrichment.

160.     As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiffs and California Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

161.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

162.     These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

163.    These profits were a benefit conferred upon Facebook by California Class Members when purchasing coins to wager in social casinos.

164.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each California Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT III
### Ala. Code § 8-1-150(a)
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Maria Valencia-Torres, On Behalf of the Alabama Class)

165.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

166.    Plaintiff brings this claim on behalf of herself and the Alabama Class under Alabama's Civil Remedy Statute for Recovery of Gambling Losses, Ala. Code § 8-1-150(a), which was enacted to effectuate the State's public policy against gambling.

167.     Ala. Code § 8-1-150(a) provides: "Any person who has paid any money or delivered any thing of value lost upon any game or wager may recover such money, thing, or its value by an action commenced within six months from the time of such payment or delivery."

168.    Accordingly, Ala. Code § 8-1-150(a) prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

169.    By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the Alabama Class paid money or gambled and lost money within the meaning of Ala. Code § 8-1-150(a).

170.     Facebook has profited and continues to profit from each payment made by Alabama Class Members to purchase virtual coins, and therefore is in violation of Ala. Code § 8-1-150(a).

171.     Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Alabama Class Members to gamble in social casinos.

172.     Plaintiff and Alabama Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook.

**COUNT IV**
**Ala. Code § 8-19-1, *et seq.***
**Alabama Deceptive Trade Practices Act**
**(Plaintiff Maria Valencia-Torres, On Behalf of the Alabama Class)**

173.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

174.     Plaintiff brings this action on behalf of herself and the Alabama Class against Facebook.

175.     Facebook, Plaintiff, and Alabama Class members are "persons" within the meaning of Ala. Code § 8-19-3(5).

176.     Plaintiff and Alabama Class members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

177.     Virtual coins and tokens used to play social casinos are "goods" within the meaning of Ala. Code. § 8-19-3(3).

178.     Facebook is and was engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

179.     The Alabama Deceptive Trade Practices Act ("Alabama DTPA") prohibits "deceptive acts or practices in the conduct of any trade or commerce[.]" Ala. Code §  8-19-5.

180.     The Alabama DTPA makes unlawful "engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." *Id.* § 8-19-5(27).

181.     Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Facebook profits from illegal gambling in connection with its operation of social casinos, for which Plaintiff and Alabama Class members purchased virtual coins and tokens. This constitutes an unconscionable act or practice and thus is in violation of the Alabama DTPA.

182.     Plaintiff and Alabama Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Facebook's unconscionable acts.

183.      Facebook's violations present a continuing risk to Plaintiff and Alabama Class members, as well as to the general public. Facebook's unlawful acts and practices complained of herein affect the public interest.

184.     Pursuant to Ala. Code § 8-19-10, Plaintiff and Alabama Class members seek an order enjoining Facebook's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Alabama DTPA.

### COUNT V
**Unjust Enrichment**
**(Plaintiff Maria Valencia-Torres, On Behalf of the Alabama Class)**

185.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

186.    Plaintiff brings this claim on behalf of herself and the Alabama Class under the common law of unjust enrichment.

187.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and Alabama Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

188.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

189.    These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

190.    These profits were a benefit conferred upon Facebook by Alabama Class Members when purchasing coins to wager in social casinos.

191.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Alabama Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT VI
### Ark. Code. Ann. § 16-118-103
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Mary Austin, On Behalf of the Arkansas Class)

192.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

193.    Plaintiff brings this claim on behalf of herself and the Arkansas Class under Arkansas's Civil Remedy Statute for Recovery of Gambling Losses, Ark. Code. Ann. § 16-118-103, which was enacted to effectuate the State's public policy against gambling.

194.    Ark. Code. Ann. § 16-118-103 provides: "Any person who loses any money or property at any game or gambling device, or any bet or wager whatever, may recover the money or property by obtaining a judgment ordering the return of the money or property following an action against the person winning the money or property."

195.     Accordingly, Ark. Code. Ann. § 16-118-103 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

196.     By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the Arkansas Class paid money or gambled and lost money within the meaning of Ark. Code. Ann. § 16-118-103.

197.     Facebook has profited and continues to profit from each payment made by Arkansas Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Ark. Code. Ann. § 16-118-103.

198.     Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Arkansas Class Members to gamble in social casinos.

199.     Plaintiff and Arkansas Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook.

## COUNT VII
### Ark. Code Ann. § 4-88-101, *et seq.*
### Arkansas Deceptive Trade Practice Act
### (Plaintiff Mary Austin, On Behalf of the Arkansas Class)

200.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

201.     Plaintiff brings this action on behalf of herself and the Arkansas Class against Facebook.

202.     Facebook, Plaintiff, and Arkansas Class members are "persons" within the meaning of Ark. Code Ann. § 4-88-102(5).

203.     Virtual coins and tokens used to play social casinos are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

204.     The Arkansas Deceptive Trade Practice Act ("Arkansas DTPA") prohibits "[d]eceptive and unconscionable trade practices[.]" Ark. Code Ann. § 4-88-107(a).

205.     The Arkansas DTPA makes unlawful "engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark. Code Ann. § 4-88-107(a)(10).

206.     Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Facebook profits from illegal gambling in connection with its operation of social casinos, for which Plaintiff and Arkansas Class members purchased virtual coins and tokens. Facebook's conduct is thus unconscionable and in violation of the Arkansas DTPA.

207.     Plaintiff and Arkansas Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable financial loss and actual damages as a direct and proximate result of their reliance on Facebook's unconscionable conduct.

208.     Facebook's violations present a continuing risk to Plaintiff and Arkansas Class members, as well as to the general public. Facebook's unlawful acts and practices complained of herein affect the public interest.

209.     Plaintiff and Arkansas Class members seek an order enjoining Facebook's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Arkansas DTPA.

**COUNT VIII**
**Unjust Enrichment**
**(Plaintiff Mary Austin, On Behalf of the Arkansas Class)**

210. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

211. Plaintiff brings this claim on behalf of herself and the Arkansas Class under the common law of unjust enrichment.

212. As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and Arkansas Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

213. Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

214. These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

215. These profits were a benefit conferred upon Facebook by Arkansas Class Members when purchasing coins to wager in social casinos.

216. Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Arkansas Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

**COUNT IX**
**Ga. Code Ann. § 13-8-3**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiff Patricia McCullough, On Behalf of the Georgia Class)**

217. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

218. Plaintiff brings this claim on behalf of herself and the Georgia Class under Georgia's Civil Remedy Statute for Recovery of Gambling Losses, Ga. Code. Ann. § 13-8-3, which was enacted to effectuate the State's public policy against gambling.

219.     Ga. Code. Ann. § 13-8-3 provides: "Money paid or property delivered upon a gambling consideration may be recovered from the winner by the loser by institution of an action for the same within six months after the loss and, after the expiration of that time, by institution of an action by any person, at any time within four years, for the joint use of himself and the educational fund of the county."

220.     Accordingly, Ga. Code. Ann. § 13-8-3 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

221.     By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the Georgia Class gambled and lost money within the meaning of Ga. Code. Ann. § 13-8-3.

222.     Facebook has profited and continues to profit from each payment made by Georgia Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Ga. Code. Ann. § 13-8-3.

223.     Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Class Members to gamble in social casinos.

224.     Plaintiff and Georgia Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook.

## COUNT X
### Ga. Code Ann. § 10-1-390, *et seq.*
### Georgia Fair Business Practices Act
### (Plaintiff Patricia McCullough, On Behalf of the Georgia Class)

225. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

226. Plaintiff brings this action on behalf of herself and the Georgia Class against Facebook.

227. Facebook, Plaintiff, and Georgia Class members are "persons" within the meaning of Ga. Code. Ann. § 10-1-392(a)(24).

228. Plaintiff and Georgia Class members are "consumers" within the meaning of Ga. Code. Ann. § 10-1-392(a)(6).

229. Facebook is and was engaged in "trade" and "commerce" within the meaning of Ga. Code. Ann. § 10-1-392(a)(28).

230. The Georgia Fair Business Practices Act ("Georgia FBPA") prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce[.]" Ga. Code Ann. § 10-1-393(a).

231. Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Facebook profits from illegal gambling in connection with its operation of social casinos, for which Plaintiff and Georgia Class members purchased virtual coins and tokens. This constitutes an unfair act or practice in violation of the Georgia FBPA.

232. Plaintiff and Georgia Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Facebook's conduct.

233.     Facebook's violations present a continuing risk to Plaintiff and Georgia Class members, as well as to the general public. Facebook's unlawful acts and practices complained of herein affect the public interest.

234.     Pursuant to Ga. Code. Ann. § 10-1-399, Plaintiff and the Georgia Class seek an order enjoining Facebook's unfair and/or deceptive acts or practices, and awarding any other just and proper relief available under the Georgia FBPA.

## COUNT XI
### Unjust Enrichment
### (Plaintiff Patricia McCullough, On Behalf of the Georgia Class)

235.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

236.     Plaintiff brings this claim on behalf of herself and the Georgia Class under the common law of unjust enrichment.

237.     As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and Georgia Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

238.     Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

239.      These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

240.     These profits were a benefit conferred upon Facebook by Georgia Class Members when purchasing coins to wager in social casinos.

241.     Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Georgia Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

<u>**COUNT XII**</u>
**720 Ill. Comp. Stat. Ann. 5/28-8**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiffs Alison Koda, Glenna Wiegard, Clotera Rogers, and Carol Smith, On Behalf of the Illinois Class)**

242.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

243.    Plaintiffs bring this claim on behalf of themselves and the Illinois Class under Illinois' Civil Remedy Statute for Recovery of Gambling Losses, 720 Ill. Comp. Stat. Ann. 5/28-8, which was enacted to effectuate the State's public policy against gambling.

244.    720 Ill. Comp. Stat. Ann. 5/28-8 provides: "Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof, with costs, in the circuit court. No person who accepts from another person for transmission, and transmits, either in his own name or in the name of such other person, any order for any transaction to be made upon, or who executes any order given to him by another person, or who executes any transaction for his own account on, any regular board of trade or commercial, commodity or stock exchange, shall, under any circumstances, be deemed a 'winner' of any moneys lost by such other person in or through any such transactions."

245.    Accordingly, 720 Ill. Comp. Stat. Ann. 5/28-8 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

246.    By purchasing coins from Facebook to wager on social casinos, Plaintiffs and each member of the Illinois Class gambled and lost money within the meaning of 720 Ill. Comp. Stat. Ann. 5/28-8.

247.    Facebook has profited and continues to profit from each payment made by Illinois Class Members to purchase virtual coins, and is the "winner" of each transaction, in violation of 720 Ill. Comp. Stat. Ann. 5/28-8.

248.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Illinois Class Members to gamble in social casinos.

249.    Plaintiffs and Illinois Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

## COUNT XIII
### 815 ILCS 505/1, *et seq.*
### Illinois Consumer Fraud and Deceptive Business Practices Act
### (Plaintiffs Alison Koda, Glenna Wiegard, Clotera Rogers, and Carol Smith, On Behalf of the Illinois Class)

250.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

251.    Plaintiffs bring this action on behalf of themselves and the Illinois Class against Facebook.

252.    Facebook, Plaintiffs, and Illinois Class members are "persons" within the meaning of 815 ILCS 505/1(c).

253.    Plaintiffs and Illinois Class members are "consumers" within the meaning of 815 ILCS 505/1(e).

254.    Virtual coins and tokens are "merchandise" within the meaning of 815 ILCS 505/1(b).

255.    Facebook is and was engaged in "trade" and "commerce" within the meaning of 815 ILCS 505/1(f).

256.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFDBPA") prohibits "[U]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" [815 ILCS 510/2], approved August 5, 1965, in the conduct of any trade or commerce[.]" 815 ILCS 505/2.

257.     Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Facebook profits from illegal gambling in connection with its operation of social casinos, for which Plaintiffs and Illinois State Class members purchased virtual coins and tokens. This offends public policy because it violates 720 Ill. Comp. Stat. Ann. 5/28-8.  Facebook intended that Plaintiffs rely on its unfair practices with regard to social casinos as outlined above. This constitutes an unfair or deceptive act or practice, and thus violates the Illinois Consumer Fraud and Deceptive Business Practices Act.

258.     Plaintiffs and Illinois Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Facebook's conduct.

259.     Facebook's violations present a continuing risk to Plaintiffs and Illinois Class members, as well as to the general public. Facebook's unlawful acts and practices complained of herein affect the public interest.

260.     Pursuant to  815 ILCS 505/10a, Plaintiffs and Illinois Class members seek an order enjoining Facebook's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Illinois CFDBPA.

## COUNT XIV
### Unjust Enrichment
**(Plaintiffs Alison Koda, Glenna Wiegard, Clotera Rogers, and Carol Smith, On Behalf of the Illinois Class)**

261.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

262.    Plaintiffs bring this claim on behalf of themselves and the Illinois Class under the common law of unjust enrichment.

263.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Illinois Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

264.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

265.     These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

266.    These profits were a benefit conferred upon Facebook by Illinois Class Members when purchasing coins to wager in social casinos.

267.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Illinois Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT XV
### Ky. Rev. Stat. Ann. § 372.020
### Civil Remedy Statute for Recovery of Gambling Losses
**(Plaintiffs Hannelore Boorn and Janice Williams, On Behalf of the Kentucky Class)**

268.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

269.    Plaintiffs bring this claim on behalf of themselves and the Kentucky Class under Kentucky's Civil Remedy Statute for Recovery of Gambling Losses, Ky. Rev. Stat. Ann. § 372.020, which was enacted to effectuate the State's public policy against gambling.

270.     Ky. Rev. Stat. Ann. § 372.020 provides: "If any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more, or anything of that value, and pays, transfers or delivers it, the loser or any of his creditors may recover it, or its value, from the winner, or any transferee of the winner, having notice of the consideration, by action brought within five (5) years after the payment, transfer or delivery. Recovery may be had against the winner, although the payment, transfer or delivery was made to the endorsee, assignee, or transferee of the winner."

271.     Accordingly, Ky. Rev. Stat. Ann. § 372.020 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

272.     By purchasing coins from Facebook to wager on social casinos, Plaintiffs and each member of the Kentucky Class gambled and lost money within the meaning of Ky. Rev. Stat. Ann. § 372.020.

273.     Facebook has profited and continues to profit from each payment made by Kentucky Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Ky. Rev. Stat. Ann. § 372.020.

274.     Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Kentucky Class Members to gamble in social casinos.

275.     Plaintiffs and Kentucky Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook.

**COUNT XVI**
**Ky. Rev. Stat. § 367.110, *et seq.***
**Kentucky Consumer Protection Act**
**(Plaintiffs Hannelore Boorn and Janice Williams, On Behalf of the Kentucky Class)**

276. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

277. Plaintiffs bring this action on behalf of themselves and the Kentucky State Class against Facebook.

278. Facebook, Plaintiffs, and Kentucky Class members are "persons" within the meaning of Ky. Rev. Stat. § 367.110(1).

279. Facebook is and was engaged in "trade" or "commerce"" within the meaning of Ky. Rev. Stat. § 367.110(2).

280. The Kentucky Consumer Protection Act ("Kentucky CPA") prohibits unfair, unconscionable, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce. Ky. Rev. Stat. §§ 367.170(1) and (2).

281. Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Facebook profits from illegal gambling in connection with its operation of social casinos, for which Plaintiffs and Kentucky Class members purchased virtual coins and tokens. This constitutes an unconscionable act or practice and thus is in violation of the Kentucky CPA.

282. Plaintiffs and Kentucky Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Facebook's unconscionable acts.

283. Facebook's violations present a continuing risk to Plaintiffs and Kentucky Class members, as well as to the general public. Facebook's unlawful acts and practices complained of herein affect the public interest.

284.    Plaintiffs and Kentucky Class members seek an order enjoining Facebook's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Kentucky CPA.

## COUNT XVII
### Unjust Enrichment
### (Plaintiffs Hannelore Boorn and Janice Williams, On Behalf of the Kentucky Class)

285.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

286.    Plaintiffs bring this claim on behalf of themselves and the Kentucky Class under the common law of unjust enrichment.

287.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Kentucky Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

288.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

289.     These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

290.    These profits were a benefit conferred upon Facebook by Kentucky Class Members when purchasing coins to wager in social casinos.

291.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Kentucky Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT XVIII
### Minn. Stat. Ann. § 541.20
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiffs Jennifer Andrews, Dawn Mehsikomer and Denice Wax, On Behalf of the Minnesota Class)

292.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

293.     Plaintiffs bring this claim on behalf of themselves and the Minnesota Class under Minnesota's Civil Remedy Statute for Recovery of Gambling Losses, Minn. Stat. Ann. § 541.20 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

294.     The Statute provides: "Every person who, by playing at cards, dice, or other game, or by betting on the hands or sides of such as are gambling, shall lose to any person so playing or betting any sum of money or any goods, and pays or delivers the same, or any part thereof, to the winner, may sue for and recover such money by a civil action, before any court of competent jurisdiction."

295.     Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

296.     By purchasing coins from Facebook to wager on social casinos, Plaintiffs and each member of the Minnesota Class gambled and lost money within the meaning of the Statute.

297.     Facebook has profited and continues to profit from each payment made by Minnesota Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of the statute.

298.     Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Minnesota Class Members to gamble in social casinos.

299.     Plaintiffs and Minnesota Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

## COUNT XIX
### Unjust Enrichment
### (Plaintiffs Jennifer Andrews, Dawn Mehsikomer and Denice Wax, On Behalf of the Minnesota Class)

300.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

301.     Plaintiffs bring this claim on behalf of themselves and the Minnesota Class under the common law of unjust enrichment.

302.     As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Minnesota Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

303.     Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

304.      These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

305.     These profits were a benefit conferred upon Facebook by Minnesota Class Members when purchasing coins to wager in social casinos.

306.     Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Minnesota Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT XX
### Mo. Ann. Stat. § 434.030
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Frances Long, On Behalf of the Missouri Class)

307.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

308.     Plaintiff brings this claim on behalf of herself and the Missouri Class under Missouri's Civil Remedy Statute for Recovery of Gambling Losses, Mo. Ann. Stat. § 434.030 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

309.     The Statute provides: "Any person who shall lose any money or property at any game, gambling device or by any bet or wager whatever, may recover the same by a civil action."

310.     Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

311.     By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the Missouri Class gambled and lost money within the meaning of the Statute.

312.     Facebook has profited and continues to profit from each payment made by Missouri Class Members to purchase virtual coins, and therefore is subject to "recover[y]" for each transaction, in violation of the Statute.

313.     Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Missouri Class Members to gamble in social casinos.

314.     Plaintiff and Missouri Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

**COUNT XXI**
**Mo. Ann. Stat. § 407.020(1)**
**Unfair Acts and Practices in the Conduct of Trade or Commerce**
**(Plaintiff Frances Long, On Behalf of the Missouri Class)**

315.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

316.    Missouri's Consumer Protection Act prohibits that "[a]ny deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Ann. Stat. § 407.020(1) (referred to in this count as the "Statute").

317.    Under the Statute, an unfair or deceptive practice includes one which is unlawful.

318.    Facebook, Plaintiff, and Missouri Class members are "persons" within the meaning of Mo. Ann. Stat. §§ 407.020(1) and 407.025.

319.    As set forth herein, Facebook violated Missouri's Civil Remedy Statute for Recovery of Gambling Losses.

320.    Facebook's unlawful and otherwise unfair or deceptive acts and practices occurred in the conduct of trade or commerce. Indeed, Facebook is responsible for making social casinos available to the public in trade and commerce.

321.    Facebook's acts and practices were and are injurious to the public interest because Facebook continuously advertises, solicits, and enables the general public in Missouri and throughout the United States to play unlawful and otherwise unfair or deceptive social casinos, all while profiting from such conduct.

322.    Such acts and practices are part of a pattern or generalized course of conduct on the part of Facebook that contradicts the express public policy of Missouri.

323.    As a result of Facebook's conduct, Plaintiff and Missouri Class Members were injured in their business or property—i.e., economic injury—in that they lost money wagering on unlawful and otherwise unfair or deceptive games of chance.

324.    Facebook's unlawful and otherwise unfair or deceptive conduct proximately caused Plaintiff's and Missouri Class Members' injuries because, but for the challenged conduct,

Plaintiff and Missouri Class Members would not have lost money wagering on illegal games of chance, which was a direct, foreseeable, and planned consequence of Facebook's conduct.

325.    Plaintiff, on her own behalf and on behalf of the Missouri Class, seeks to recover, as permitted by law, actual damages and multiple damages, together with the costs of suit, including reasonable attorneys' fees.

## COUNT XXII
### Unjust Enrichment
### (Plaintiff Frances Long, On Behalf of the Missouri Class)

326.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

327.    Plaintiff brings this claim on behalf of herself and the Missouri Class under the common law of unjust enrichment.

328.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and Missouri Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

329.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

330.    These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

331.    These profits were a benefit conferred upon Facebook by Missouri Class Members when purchasing coins to wager in social casinos.

332.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Missouri Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT XXIII
### Mont. Code Ann. § 23-5-131
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiffs Sandra Meyers and Kathleen Wilkinson, On Behalf of the Montana Class)

333.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

334.    Plaintiffs bring this claim on behalf of themselves and the Montana Class under Montana's Civil Remedy Statute for Recovery of Gambling Losses, Mont. Code Ann. § 23-5-131 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

335.    The Statute provides: "A person, or the person's dependent or guardian, who, by playing or betting at an illegal gambling device or illegal gambling enterprise, loses money, property, or any other thing of value and pays and delivers it to another person connected with the operation or conduct of the illegal gambling device or illegal gambling enterprise, within 1 year following the person's loss, may: (1) bring a civil action in a court of competent jurisdiction to recover the loss; (2) recover the costs of the civil action and exemplary damages of no less than $500 and no more than $5,000; and (3) join as a Facebook any person having an interest in the illegal gambling device or illegal gambling enterprise."

336.    Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

337.    By purchasing coins from Facebook to wager on social casinos, Plaintiffs and each member of the Montana Class gambled and lost money within the meaning of the Statute.

338.    Facebook has profited and continues to profit from each payment made by Class Members to purchase virtual coins, and therefore is "another person" for each transaction, in violation of the Statute.

339.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant

percentage of the money paid and lost by Plaintiffs and Montana Class Members to gamble in social casinos.

340. Plaintiffs and Montana Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

**COUNT XXIV**
**Unjust Enrichment**
**(Plaintiffs Sandra Meyers and Kathleen Wilkinson, On Behalf of the Montana Class)**

341. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

342. Plaintiffs bring this claim on behalf of themselves and the Montana Class under the common law of unjust enrichment.

343. As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Montana Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

344. Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

345. These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

346. These profits were a benefit conferred upon Facebook by Montana Class Members when purchasing coins to wager in social casinos.

347. Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Montana Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

**COUNT XXV**
**N.J. Stat. Ann. § 2A:40-5**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiff Steven Simons, On Behalf of the New Jersey Class)**

348.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

349.    Plaintiff brings this claim on behalf of himself and the New Jersey Class under New Jersey's Civil Remedy Statute for Recovery of Gambling Losses, N.J. Stat. Ann. § 2A:40-5 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

350.    The Statute provides: "If any person shall lose any money, goods, chattels or other valuable thing, in violation of section 2A:40-1 of this title, and shall pay or deliver the same or any part thereof to the winner, or to any person to his use, or to a stakeholder, such person may sue for and recover such money, or the value of such goods, chattels, or other valuable thing, from such winner, or from such depositary, or from such stakeholder, whether the same has been delivered or paid over by such stakeholder or not, in a civil action provided such action is brought within 6 calendar months after payment or delivery."

351.    Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

352.    By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the New Jersey Class gambled and lost money within the meaning of the statute.

353.    Facebook has profited and continues to profit from each payment made by New Jersey Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of the Statute.

354.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant

percentage of the money paid and lost by Plaintiff and New Jersey Class Members to gamble in social casinos.

355.    Plaintiff and New Jersey Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

### COUNT XXVI
### N.J. Stat. Ann. § 56:8-2
### Unfair Acts and Practices in the Conduct of Trade or Commerce
### (Plaintiff Steven Simons, On Behalf of the New Jersey Class)

356.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

357.    New Jersey's Consumer Protection Act prohibits "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." N.J. Stat. Ann. § 56:8-2 (referred to in this count as the "Statute").

358.    Under the Statute, an unconscionable practice includes one which is unlawful.

359.    Facebook, Plaintiff, and New Jersey Class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-2.

360.    As set forth herein, Facebook violated New Jersey's Civil Remedy Statute for Recovery of Gambling Losses.

361.    Facebook's unlawful and otherwise unconscionable practices occurred in the conduct of trade or commerce. Indeed, Facebook is responsible for making social casinos available to the public in trade and commerce.

362.    Facebook's practices were and are injurious to the public interest because Facebook continuously advertises, solicits, and enables the general public in New Jersey and throughout the United States to play unlawful and otherwise unconscionable social casinos, all while profiting from such conduct.

363.    Such practices are part of a pattern or generalized course of conduct on the part of Facebook that contradicts the express public policy of New Jersey.

364.    As a result of Facebook's conduct, Plaintiff and New Jersey Class Members were injured in their business or property—i.e., economic injury—in that they lost money wagering on unlawful and otherwise unconscionable games of chance.

365.    Facebook's unlawful and otherwise unconscionable conduct proximately caused Plaintiff's and Class Members' injuries because, but for the challenged conduct, Plaintiff and New Jersey Class Members would not have lost money wagering on illegal games of chance, which was a direct, foreseeable, and planned consequence of Facebook's conduct.

366.    Plaintiff, on his own behalf and on behalf of the New Jersey Class, seeks to recover, as permitted by law, actual damages and multiple damages, together with the costs of suit, including reasonable attorneys' fees.

### COUNT XXVII
**Unjust Enrichment**
**(Plaintiff Steven Simons, On Behalf of the New Jersey Class)**

367.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

368.    Plaintiff brings this claim on behalf of himself and the New Jersey Class under the common law of unjust enrichment.

369.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and New Jersey Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

370.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

371.     These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

61

372. These profits were a benefit conferred upon Facebook by New Jersey Class Members when purchasing coins to wager in social casinos.

373. Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each New Jersey Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT XXVIII
### N.Y. Gen. Oblig. Law §§ 5-419 & 5-421
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Vanessa Sowell Skeeter, On Behalf of the New York Class)

374. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

375. Plaintiff brings this claim on behalf of herself and the New York Class under New York's Civil Remedy Statute for Recovery of Gambling Losses, N.Y. Gen. Oblig. Law §§ 5-419 & 5-421 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

376. The Statute provides: "Any person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not." The statute further provides: "Every person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

377. Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

378. By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the New York Class gambled and lost money within the meaning of the Statute.

379.    Facebook has profited and continues to profit from each payment made by New York Class Members to purchase virtual coins, and therefore is the "winner" (and/or "person to whom the same shall be paid or delivered") of each transaction, in violation of the Statute.

380.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and New York Class Members to gamble in social casinos.

381.    Plaintiff and New York Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

## COUNT XXIX
### Unjust Enrichment
**(Plaintiff Vanessa Sowell Skeeter, On Behalf of the New York Class)**

382.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

383.    Plaintiff brings this claim on behalf of herself and the New York Class under the common law of unjust enrichment.

384.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and New York Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

385.     Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

386.      These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

387.     These profits were a benefit conferred upon Facebook by New York Class Members when purchasing coins to wager in social casinos.

388.     Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each New York Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT XXX
### S.C. Code § 32-1-10
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Donna Whiting, On Behalf of the South Carolina Class)

389.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

390.     Plaintiff brings this claim on behalf of herself and the South Carolina Class under South Carolina's Civil Remedy Statute for Recovery of Gambling Losses, S.C. Code § 32-1-10, which was enacted to effectuate the State's public policy against gambling.

391.     Section 32-1-10 provides: "Any person who shall at any time or sitting, by playing at cards, dice table or any other game whatsoever or by betting on the sides or hands of such as do play at any of the games aforesaid, lose to any person or persons so playing or betting, in the whole, the sum or value of fifty dollars and shall pay or deliver such sum or value or any part thereof shall be at liberty, within three months then next ensuing, to sue for and recover the money or goods so lost and paid or delivered or any part thereof from the respective winner or winners thereof, with costs of suit …."

392.     Accordingly, Section 32-1-10 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

393.     By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the South Carolina Class gambled and lost money within the meaning of Section 32-1-10.

394.     Facebook has profited and continues to profit from each payment made by Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Section 32-1-10.

395.     Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Class Members to gamble in social casinos.

396.     Plaintiff and South Carolina Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

## COUNT XXXI
### Unjust Enrichment
### (Plaintiff Donna Whiting, On Behalf of the South Carolina Class)

397.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

398.     Plaintiff brings this claim on behalf of herself and the South Carolina Class under the common law of unjust enrichment.

399.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and South Carolina Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

400.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

401.    These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

402.    These profits were a benefit conferred upon Facebook by South Carolina Class Members when purchasing coins to wager in social casinos.

403.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each South Carolina Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT XXXII
### Tenn. Code § 28-3-106
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Sheri Miller, On Behalf of the Tennessee Class)

404.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

405.    Plaintiff brings this claim on behalf of herself and the Tennessee Class under Tennessee's Civil Remedy Statute for Recovery of Gambling Losses, Tenn. Code § 28-3-106, which was enacted to effectuate the State's public policy against gambling.

406.    Section 28-3-106 provides that "the loser" of "any kind of gambling or betting" may bring an action "to recover money or goods lost" within 90 days after paying or delivering the lost money or goods.

407.    Accordingly, Section 28-3-106 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

408.     By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the Tennessee Class gambled and lost money within the meaning of Section 28-3-106.

409.     Facebook has profited and continues to profit from each payment made by Class Members to purchase virtual coins, and therefore is in violation of Section 28-3-106.

410.     Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Tennessee Class Members to gamble in social casinos.

411.     Plaintiff and Tennessee Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook.

## COUNT XXXIII
### Unjust Enrichment
### (Plaintiff Sheri Miller, On Behalf of the Tennessee Class)

412.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

413.     Plaintiff brings this claim on behalf of herself and the Tennessee Class under the common law of unjust enrichment.

414.     As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and Tennessee Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

415.     Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

416.      These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

417.     These profits were a benefit conferred upon Facebook by Tennessee Class Members when purchasing coins to wager in social casinos.

418.     Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Tennessee Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT XXXIV
### Va. Code § 11-15
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Paul Lombard, On Behalf of the Virginia Class)

419.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

420.     Plaintiff brings this claim on behalf of himself and the Virginia Class under Virginia's Civil Remedy Statute for Recovery of Gambling Losses, Va. Code § 11-15, which was enacted to effectuate the State's public policy against gambling.

421.     Section 11-15 provides: "Any person who shall, by playing at any game or betting on the sides or hands of such as play at any game, lose within twenty-four hours, the sum or value of five dollars, or more, and pay or deliver the same, or any part thereof, may, within three months next following, recover from the winner, the money or the value of the goods so lost and paid or delivered, with costs of suit in civil action, either by suit or warrant, according to the amount or value thereof."

422.     Accordingly, Section 11-15 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

423.    By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the Virginia Class gambled and lost money within the meaning of Section 11-15.

424.    Facebook has profited and continues to profit from each payment made by Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Section 11-15.

425.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Virginia Class Members to gamble in social casinos.

426.    Plaintiff and Virginia Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

### COUNT XXXV
**Unjust Enrichment**
**(Plaintiff Paul Lombard, On Behalf of the Virginia Class)**

427.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

428.    Plaintiff brings this claim on behalf of himself and the Virginia Class under the common law of unjust enrichment.

429.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and Virginia Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

430.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

431.    These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

432.    These profits were a benefit conferred upon Facebook by Virginia Class Members when purchasing coins to wager in social casinos.

433.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Virginia Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

### COUNT XXXVI
**Wash. Rev. Code § 4.24.070**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiff Ben Kramer, On Behalf of the Washington Class)**

434.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

435.    Plaintiff brings this claim on behalf of himself and the Washington Class under Washington's Civil Remedy Statute for Recovery of Gambling Losses, Wash. Rev. Code § 4.24.070, which was enacted to effectuate the State's public policy against gambling.

436.    Section 4.24.070 provides: "All persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

437.    Accordingly, Section 4.24.070 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

438.    By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the Washington Class gambled and lost money within the meaning of Section 4.24.070.

---

PLAINTIFFS' MASTER COMPLAINT

70

**EXHIBIT B**
**183**

Case Nos. 5:21-cv-02777-EJD
5:21-cv-02818-EJD

439. "Gambling," defined by RCW § 9.46.0237, "means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence.",

440. Virtual coins and tokens used to play social casinos are "thing[s] of value" under RCW § 9.46.0285.

441. Social casinos are illegal gambling games because they are online games at which players wager things of value (the chips) and by an element of chance (e.g., by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional chips).

442. Facebook has profited and continues to profit from each payment made by Washington Class Members to purchase virtual coins, and therefore is both the "dealer winning" the same and a proprietor for whose benefit social casinos were played, in violation of Section 4.24.070.

443. Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Washington Class Members to gamble in social casinos.

444. Plaintiff and Washington Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook.

## COUNT XXXVII
### Wash. Rev. Code § 19.86.020
### Unfair Acts and Practices in the Conduct of Trade or Commerce
### (Plaintiff Ben Kramer, On Behalf of the Washington Class)

445. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

446. Washington's Consumer Protection Act ("CPA") prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW § 19.86.020.

447. Under the CPA, an unfair or deceptive act is one which is unlawful and against public policy as declared by the legislature or judiciary.

448. Plaintiff and Washington Class Members are "persons" within the meaning of RCW §§ 19.86.020 and 19.86.090.

449. Facebook violated RCW § 9.46.010, *et seq.*, which declares that it is the policy of the State of Washington to, *inter alia*, "restrain all persons from seeking profit from professional gambling activities in this state," to "restrain all persons from patronizing such professional gambling activities," and to "safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling." RCW § 9.46.010.

450. Under RCW § 9.46.010, *et seq.*, unlawful "gambling" is defined as "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence." RCW § 9.46.0237.

451. Virtual coins and tokens used to play social casinos are "thing[s] of value" under RCW § 9.46.0285.

452. Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (e.g., by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning virtual coins or tokens).

453. Facebook operates social casinos in conjunction with the developers of those casinos and has profited immensely from its operation of unlawful games of chance, amassing hundreds of millions of dollars from illegal gambling transactions.

454.     Facebook's unlawful acts and practices occurred in the conduct of trade or commerce. Indeed, Facebook is responsible for making social casinos available to the public in trade and commerce.

455.     Facebook's acts and practices were and are injurious to the public interest because Facebook continuously advertises, solicits, and enables the general public in Washington State and throughout the United States to play unlawful social casinos, all while profiting from such conduct.

456.     This is part of a pattern or generalized course of conduct on the part of Facebook that contradicts the express public policy of the State of Washington.

457.     As a result of Facebook's conduct, Plaintiff and Washington Class Members were injured in their business or property—i.e., economic injury—in that they lost money wagering on unlawful games of chance.

458.     Facebook's unlawful conduct proximately caused Plaintiff's and Washington Class Members' injuries because, but for the challenged conduct, Plaintiff and Washington Class Members would not have lost money wagering on illegal games of chance, which was a direct, foreseeable, and planned consequence of Facebook's conduct.

459.     Plaintiff, on his own behalf and on behalf of the Washington Class, seeks to recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

## COUNT XXXVIII
### Unjust Enrichment
### (Plaintiff Ben Kramer, On Behalf of the Washington Class)

460.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

461.     Plaintiff brings this claim on behalf of himself and the Washington Class under the common law of unjust enrichment.

462.     As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and Washington Class Members by

virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

463.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

464.    These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

465.    These profits were a benefit conferred upon Facebook by Washington Class Members when purchasing coins to wager in social casinos.

466.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Washington Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## CLAIMS BROUGHT ON BEHALF OF THE NATIONWIDE CLASS

### COUNT XXXIX
**18 U.S.C. § 1962(c) (RICO)**
**Racketeering Activities and Collection of Unlawful Debts**
**(Damages and Injunctive Relief)**
**(All Plaintiffs, On Behalf of the Nationwide Class)**

467.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

468.    At all relevant times, Facebook is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because it is capable of holding, and does hold, "a legal or beneficial interest in property."

469.    Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue as they were injured in their business and/or property as a result of the Social Casino Enterprise's wrongful conduct described herein, including but not limited to the Enterprise's (1) taking and receiving money from Plaintiffs and the Nationwide Class; (2) never providing Plaintiffs and members of the Nationwide Class a fair and objective chance to win—

they could only lose; and (3) having directly and knowingly profited from, on information and belief, rigged and manipulated slot machines.

470.    Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

471.    18 U.S.C. § 1961(1) defines "racketeering activity" to include (i) " any act … involving … gambling … which is chargeable under State law and punishable by imprisonment for more than one year;" (ii) any act which is indictable under Title 18, Section 1084 of the United States Code (relating to the transmission of gambling information); and (iii) any act which is indictable under Title 18, Section 1955 of the United States Code (relating to the prohibition of illegal gambling businesses).

472.    Interstate gambling, including interstate internet gambling, is illegal under federal law if the gambling transaction is illegal in any states in which the transaction occurs. As relevant here, at least some portion of all alleged gambling transactions occur within California, where the alleged gambling transactions are illegal. Consequently, all alleged gambling transactions are illegal under federal law.

473.    Specifically, illegal gambling is indictable under both Section 1084 and Section 1955 of Title 18 of the United States Code as well as under California law, and is punishable by imprisonment for more than one year.

474.    Therefore, the Social Enterprise is engaged in "racketeering activity."

475.    18 U.S.C. § 1961(6) defines "unlawful debt" as a debt "(A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof," and "(B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof."

476.    Because the Social Casino Enterprise collects debts incurred from a gambling activity in violation of California and other state law, described herein, its profits derived from its ownership and maintenance constitute "unlawful debt" as defined in Section 1961(6).

477.     Facebook violated 18 U.S.C. § 1962(c) and § 1962(d) by participating in, facilitating, or conducting the affairs of the Social Casino Enterprise through a pattern of racketeering activity composed of indictable offenses under 18 U.S.C. § 1084, 18 U.S.C. § 1955, California Penal Code §§ 319, 330b, and 330.1.

478.     The affiliation between Defendant Facebook, the other Platforms, and the Illegal Slots constitutes a conspiracy to use an enterprise for the collection of unlawful debt in violation of 18 U.S.C. § 1962(d).

### Social Casino Enterprise

479.      RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

480.     Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

481.     The Social Casino Enterprise is an association-in-fact composed of Facebook, Apple, Google, and the Illegal Slot companies who are engaged in and whose activities affect interstate commerce, and which have affected and damaged interstate commercial activity. This Enterprise exists separately from the otherwise legitimate businesses operations of each individual participant.

482.     The pattern of racketeering activity conducted by the members of the Social Casino Enterprise is distinct from the Social Casino Enterprise itself, as each act of racketeering is a separate offense committed by an entity while the Social Casino Enterprise itself is an association-in-fact of legal entities. The Social Casino Enterprise has an informal structure of app developers and platforms with continuing functions or responsibilities.

483.     For approximately a decade, the Social Casino Enterprise has collaborated together to target and retain high-spending users in their online gambling scheme throughout the country. At the very latest, following the Ninth Circuit's March 28, 2018, holding in *Kater*,

Defendant Facebook and the other Platforms, on information and belief, mutually agreed to continue their Enterprise through their ongoing collection of unlawful debts, functioning as a cohesive unit with the purpose of gaining illicit gambling profits.

Structure of the Social Casino Enterprise

484. The Social Casino Enterprise consists of dozens of Illegal Slot companies and the Platforms (Facebook, Apple and Google). Each participant agreed to conduct and carry out the affairs and goals of the Social Casino Enterprise:

A. The Illegal Slot companies agreed to conduct the affairs of the Social Casino Enterprise by developing, updating and operating the illegal slot machines: the "gambling devices." The Illegal Slot companies operate as the principals, forming the necessary business partnerships with Facebook, Apple and Google for the successful execution of their unlawful gambling scheme. The Illegal Slot companies fundamentally rely on the Platforms to host their games, access consumers, and collect revenue. Upon constructive notice of the unlawful nature of the virtual social gambling applications, the Illegal Slot companies agreed with all Enterprise participants to uphold their roles in the Social Casino Enterprise and to continue functioning as a single unit with the common purpose of collecting unlawful debts from online gambling activity.

B. Facebook, Apple and Google agreed to conduct the affairs of the Social Casino Enterprise by serving as the gambling premises, hosting the virtual social gambling applications, and processing all in-app transactions in exchange for a share in the gamblers' losses. Additionally, upon notice of the unlawful nature of the virtual social gambling applications, Facebook, Apple, and Google agreed with all participants to uphold their roles in the Social Casino Enterprise and to continue functioning as a single unit with the common purpose of collecting unlawful debts from online gambling activity.

485. At all relevant times, each Social Casino Enterprise participant was aware of the conduct of the Social Casino Enterprise, was a knowing and willing participant in that conduct, and reaped profits from that conduct through in-app sales.

486. The persons engaged in the Social Casino Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities.

487.     All members of the Social Casino Enterprise coordinate and maintain their respective roles in order to enrich themselves and to further the common interests of the whole.

488.     Each Social Casino Enterprise participant participated in the operation and management of the Social Casino Enterprise by directing its affairs as described herein.

489.     The wrongful conduct of the Social Casino Enterprise has been and remains part of the Social Casino Enterprise's ongoing way of doing business and constitutes a continuing threat to the Plaintiffs' and the Class's property. Without the repeated illegal acts and intentional coordination between all participants, the Social Casino Enterprise's scheme would not have succeeded and would not pose a threat to Plaintiffs and the Class into the future.

<u>Pattern of Racketeering Activity</u>

490.     The affairs of the Social Casino Enterprise were conducted in such a way to form a pattern of racketeering activity. The Social Casino Enterprise's general pattern of activity consists of designing and operating illegal internet-based slot machines and repeatedly violating public policy against gambling by:

A.  Developing illegal slot machine games and disguising them as innocuous video game entertainment;

B.  Distributing and operating illegal slot machine games that are, on information and belief, rigged and manipulated;

C.  Concealing the scope and deceptive nature of their gambling applications despite knowledge of their predatory design and business model;

D.  Providing a host platform to house unlicensed gambling activity;

E.  Injuring the public interest by continuously advertising to and soliciting the general public to play illegal slot machines;

F.  Conspiring to uphold the Social Casino Enterprise; and

G.  Unjustly collecting unlawful debts and retaining the profits from their illegal social gambling applications.

491.     The Social Casino Enterprise has operated as a continuous unit since at least 2010.

492.     Pursuant to and in furtherance of their fraudulent scheme, Facebook committed multiple predicate act violations of federal and state law as previously alleged herein.

## COUNT XL

### RICO § 1962(d)
### Conspiracy to Engage in Racketeering Activities and Collection of Unlawful Debts
### (Damages and Injunctive Relief)
### (All Plaintiffs, On Behalf of the Nationwide Class)

493.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

494.     18 U.S.C. § 1962(d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

495.     As described throughout, and in detail in Count II, even if it did not direct or manage the affairs of the Social Casino Enterprise, Facebook conspired to commit predicate acts in violation of § 1962(c), including violations of California Penal Code §§ 330b and 330.1.

496.     Defendant Facebook acted knowingly at all times when agreeing to conduct the activities of the Social Casino Enterprise. Facebook agreed to and indeed did participate in the requisite pattern of racketeering activity which constitutes this RICO claim, collected unlawful debts, engaged in racketeering activities, and intentionally acted in furtherance of the conspiracy by conducting the pattern of racketeering and unlawful debt collection as described above.

497.     At the very latest, Facebook had notice of the illegality of the Social Casino Enterprise as of the Ninth Circuit's 2018 holding in *Kater*. Facebook's post-*Kater* participation in the Social Casino Enterprise demonstrates its commitment to upholding and operating the structure of the Social Casino Enterprise.

498.     As a result of Facebook's conduct, Plaintiffs and Members of the Nationwide Class were deprived of money and property that they would not otherwise have lost.

499.     Under 18 U.S.C. § 1964(c), the Nationwide Class is entitled to treble their damages, plus interest, costs, and reasonable attorneys' fees.

1

## **PRAYER FOR RELIEF**

2     Plaintiffs, individually and on behalf of all others similarly situated, respectfully request

3    that this Court enter an Order:

4         a)     Certifying this case as a class action on behalf of the Classes defined above,

5    appointing Kathleen Wilkinson, Nancy Urbanczyk, Laura Perkinson, Maria Valencia-Torres,

6    Mary Austin, Patricia McCullough, Alison Koda, Glenna Wiegard, Clotera Rogers, Carol Smith,

7    Hannelore Boorn, Janice Williams, Jennifer Andrews, Dawn Mehsikomer, Denice Wax, Frances

8    Long, Sandra Meyers, Steve Simons, Vanessa Sowell Skeeter, Donna Whiting, Sheri Miller,

9    Paul Lombard, Ben Kramer, Eleanor Mizrahi, and Janice Wilson as representatives of the

10    Classes, and appointing their counsel as Class Counsel;

11        b)     Declaring that Defendant's conduct, as set out above, is unlawful under

12    California's UCL, Ala. Code § 8-1-150(a), Ala. Code § 8-19-1, *et seq.*, Ark. Code. Ann. § 16-

13    118-103, Ark. Code Ann. § 4-88-101, *et seq.*, Ga. Code Ann. § 13-8-3, Ga. Code Ann. § 10-1-

14    390, *et seq.*, 720 Ill. Comp. Stat. Ann. 5/28-8, 815 ILCS 505/1, *et seq.*, Ky. Rev. Stat. Ann. §

15    372.020, Ky. Rev. Stat. § 367.110, *et seq.*, Minn. Stat. Ann. § 541.20, Mo. Ann. Stat. § 434.030,

16    Mo. Ann. Stat. § 407.020(1), Mont. Code Ann. § 23-5-131, N.J. Stat. Ann. § 2A:40-5, N.J. Stat.

17    Ann. § 56:8-2, N.Y. Gen. Oblig. Law §§ 5-419 & 5-421, S.C. Code § 32-1-10, Tenn. Code § 28-

18    3-106, Va. Code § 11-15, Wash. Rev. Code § 4.24.070, and Wash. Rev. Code § 19.86.020;

19        c)     Declaring that Defendant's conduct, as set out above, constitutes racketeering

20    activities, collection of unlawful debts, and conspiracy to engage in the same;

21        d)     Entering judgment against Defendant Facebook, in the amount of the losses

22    suffered by Plaintiffs and each member of the Classes;

23        e)     Enjoining Defendant from continuing the challenged conduct;

24        f)     Awarding damages to Plaintiffs and the Class members in an amount to be

25    determined at trial, including trebling as appropriate;

26        g)     Awarding restitution to Plaintiffs and Class members in an amount to be

27    determined at trial;

28        h)     Requiring disgorgement of all of Defendant Facebook's ill-gotten gains;

PLAINTIFFS' MASTER COMPLAINT       80       Case Nos. 5:21-cv-02777-EJD
**EXHIBIT B**       5:21-cv-02818-EJD
**193**

1       i)      Awarding reasonable attorneys' fees and expenses;

2       j)      Awarding pre- and post-judgment interest, to the extent allowable;

3       k)      Requiring injunctive and/or declaratory relief as necessary to protect the interests

4  of Plaintiffs and the Classes; and

5       l)      Awarding such other and further relief as equity and justice require, including all

6  forms of relief provided for under the Plaintiffs' claims.

7  **JURY DEMAND**

8      Plaintiffs request a trial by jury of all claims that can be so tried.

9

10                                  Respectfully Submitted,

11                                  **KATHLEEN WILKINSON, NANCY**

12     **URBANCZYK, LAURA PERKINSON, MARIA**

    **VALENCIA-TORRES, MARY AUSTIN,**

13     **PATRICIA MCCULLOUGH, ALISON KODA,**

    **GLENNA WIEGARD, CLOTERA ROGERS,**

14     **CAROL SMITH, HANNELORE BOORN,**

    **JANICE WILLIAMS, JENNIFER ANDREWS,**

15     **DAWN MEHSIKOMER, DENICE WAX,**

    **FRANCES LONG, SANDRA MEYERS, STEVE**

16     **SIMONS, VANESSA SOWELL SKEETER,**

17     **DONNA WHITING, SHERI MILLER, PAUL**

    **LOMBARD, BEN KRAMER, ELEANOR**

18     **MIZRAHI, AND JANICE WILSON**, individually

    and on behalf of all others similarly situated,

19

20 Dated: November 22, 2021      **EDELSON PC**

21                                    By: /s/ Rafey S. Balabanian

22                                  RAFEY S. BALABANIAN (Bar No. 315962)

    rbalabanian@edelson.com

23     TODD LOGAN (Bar No. 305912)

    tlogan@edelson.com

24     150 California Street, 18th Floor

    San Francisco, CA 94111

25     Tel: 415.212.9300

    Fax: 415.373.9435

26

27     JAY EDELSON*

    jedelson@edelson.com

28     THEO BENJAMIN*

---

tbenjamin@edelson.com
350 North LaSalle St., 14th Floor
Chicago, IL 60654
Tel: 312.589.6370
Fax: 312.589.6378

**TYCKO & ZAVAREEI LLP**

ANDREA R. GOLD*
agold@tzlegal.com
GLENN CHAPPELL*
gchappell@tzlegal.com
1828 L Street NW Suite 1000
Washington, DC 20036
Tel:     202.973.0900
Fax:     202.973.0950

HASSAN A. ZAVAREEI (Bar No. 181547)
hzavareei@tzlegal.com
1828 L Street NW Suite 1000
Washington, DC 20036
Tel:     202.973.0900
Fax:     202.973.0950

**KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT**

KRISTEN LAKE CARDOSO*
cardoso@kolawyers.com
1 West Las Olas Boulevard, Suite 500
Fort Lauderdale, Florida 33301
Tel: 954.525.4100
Fax: 954.525.4300

**BURSOR & FISHER. P.A.**

SARAH N. WESTCOT (Bar No. 264916)
swestcot@bursor.com
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: 305.330.5512

**TOUSLEY BRAIN STEPHENS, PLLC**

CECILY C. SHIEL*
cshiel@tousley.com
1700 Seventh Avenue, Suite 2200
Seattle, WA 98101

Tel:    206.682.8600
Fax:    206.682.2992

**DOVEL & LUNER, LLP**

CHRISTIN CHO (Bar No. 238173)
christin@dovel.com
201 Santa Monica Blvd, Suite 600
Santa Monica, CA 90401
Tel:    310.656.7077
Fax:    310.656.7069

**DAVIS & NORRIS, LLP**

JOHN E. NORRIS*
jnorris@davisnorris.com
2154 Highland Avenue South
Birmingham, AL 35205
Tel:    205.930.9900
Fax:    205.930.9989

**STEYER LOWENTHAL BOODROOKAS ALVAREZ & SMITH LLP**

JILL M. MANNING (State Bar No. 178849)
235 Pine Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 421-3400
Fax: (415) 421-2234

**PEARSON, SIMON & WARSHAW, LLP**

MELISSA S. WEINER*
mweiner@pswlaw.com
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610

*pro hac vice admitted and/or forthcoming

1   Rafey S. Balabanian (SBN 315962)
    EDELSON PC
2   150 California Street, 18th Floor
    San Francisco, California 94111
3   Tel: 415.212.9300 / Fax: 415.373.9435

4   *Interim Lead Counsel*

5   **[Additional Counsel Listed on Signature Page]**

6           **UNITED STATES DISTRICT COURT**
           **NORTHERN DISTRICT OF CALIFORNIA**
7                  **SAN JOSE DIVISION**

8   **IN RE: GOOGLE PLAY STORE**          Case No. 5:21-md-03001-EJD
    **SIMULATED CASINO-STYLE GAMES**
9   **LITIGATION**                         **PLAINTIFFS' MASTER COMPLAINT**

10                                          **CLASS ACTION**

11                                          **JURY DEMAND**

12

13

14

15

16          Plaintiffs John Sarley, Renee Christian, Maria Valencia-Torres, Patricia McCullough,

17  Rozette Jones, Glenna Wiegard, Ernestine Thompson, Janice Williams, Jennifer Andrews, Edgar

18  Smith, Frankie Killings-Larkin, Frances Long, Barbara McFarland, Sandra Meyers, Heather

19  Yesuvida, Vanessa Sowell Skeeter, Mindy Duplain, Crystal Van Fleet, Saundra Hegler, Deborah

20  Steese, Terri Bruschi, John Dickey, Shawna Konchesky-Bair, Crystal Russell, and Judy

21  Solomon, individually and on behalf of the proposed classes, bring this Class Action Complaint

22  against Defendant Google LLC ("Google") seeking restitution, damages, injunctive relief, and

23  other appropriate relief from Google's ongoing participation in an illegal internet gambling

24  enterprise. Plaintiffs allege as follows upon personal knowledge as to themselves and their own

25  acts and experiences, and on information and belief derived from investigation of counsel, and

26  review of public documents as to all other matters.

27

28

1

## **INTRODUCTION**

2      1.      Over the last decade, the world's leading slot machine makers—companies like

3  International Game Technology, Scientific Games Corporation, and Aristocrat Leisure—have

4  teamed up with American technology companies to develop a new product line: social casinos.

5      2.      Social casinos are apps—playable from smartphones, tablets, and internet

6  browsers—that make the "authentic Vegas-style"[1] experience of slot machine gambling available

7  to consumers anywhere and anytime. *See* Figure 1 (Screenshot of DoubleDown Casino

8  Gameplay). By moving their casino games directly onto the phones, tablets, and computers of

9  players, and by leveraging an innocuous-sounding "free-to-play" model,[2] social casino

10  companies, along with Google, Facebook, and Apple (the "Platforms"), have found a way to

11  smuggle slot machines into the homes of consumers nationwide, twenty-four hours a day and

12  three-hundred-sixty-five days a year.

13      3.      Just like Las Vegas slot machines, social casinos allow users to purchase virtual

14  "chips" in exchange for real money and then gamble those chips at slot machine games in hopes

15  of winning still more chips to keep gambling. In DoubleDown Casino, for example, players

16  purchase "chip packages" costing up to $499.99. *See* Figure 2 (Screenshot of "Popular" Chip

17  Packages in DoubleDown Casino). But unlike Las Vegas slots, social casinos do not allow

18  players to cash out their chips. Instead, purchased chips and won chips alike can be used only for

19  more slot machine "spinning."

20

21

22

23

24

25

---

26  [1]      Form F-1/A DoubleDown Interactive Co., Ltd. at 87,
https://sec.report/Document/0001193125-20-183157/.

27  [2]      This term is a misnomer. It refers to a business model by which the initial download of
28  the game is free, but companies reap huge profits by selling "in-game" items (known generally
as "in-app purchases").

---

**Figure 1**                    **Figure 2**

 

4.    Like Las Vegas slots, social casinos are extraordinarily profitable and highly addictive. Social casinos are so lucrative because they mix the addictive aspects of traditional slot machines with the power of the Platforms, including Defendant Google, to leverage big data and social network pressures to identify, target, and exploit consumers prone to addictive behaviors.[3]

5.    Simply put, the social casino apps do not, and cannot, operate and profit at such a high level from these illegal games on their own. Their business of targeting, retaining, and collecting losses from addicted gamblers is inextricably entwined with the Platforms. Not only do the Platforms retain full control over allowing social casinos into their stores, and their distribution and promotion therein, but they also share directly in a substantial portion of the gamblers' losses, which are collected and controlled by the Platforms themselves.

6.    Because the Platforms are the centers for promotion, distribution, and payment, social casinos gain a critical partner to retain high-spending users and collect player data, a trustworthy marketplace to conduct payment transactions, and the technological means to update their apps with targeted new content designed to keep addicted players spending money.

---

[3]    *See, e.g., How social casinos leverage Facebook user data to target vulnerable gamblers*, PBS NEWS HOUR (Aug. 13, 2019), https://bit.ly/3tSHqMI.

7.      Last year alone, consumers purchased and gambled away an estimated *$6 billion* in social casino virtual chips.[4]

8.      By utilizing Google for promotion, distribution, and payment processing, the social casinos entered into a mutually beneficial business partnership. In exchange for promoting and distributing the casino games, providing them valuable data and insight about their players, and collecting money from consumers, Google (and the other Platforms) take a *30 percent* commission off of every wager, earning them billions in revenue. By comparison, the "house" at a traditional casino only takes 1 to 15 percent, while also taking on significant risk of loss in its operation. Google's 30 percent commission, on the other hand, is guaranteed for its ability to act as a casino "host" and bankroll.

9.      The result (and intent) of this dangerous partnership is that consumers become addicted to social casino apps, maxing out their credit cards with purchases amounting to tens or even hundreds of thousands of dollars. Consumers addicted to social casinos suffer a variety of non-financial damages ranging from depression to divorce to attempted suicide.

10.     These devastating consequences are not hypothetical or hyperbole: below is an excerpt of sworn testimony from individuals describing their experience with social casinos:

- "Once I became hooked on the game, it took little or no time to burn through all the coins I bought, so I kept having to buy larger and larger bundles of coins for higher and higher prices. Before I knew it, I found myself playing and paying more than I ever thought I would in any game. . . . I'm retired now, and social casinos occupy so much of my time. My playing time varies depending on what I have going on, but on average I estimate that I play anywhere between 35 and 70 hours each week. I just can't stop playing. Overall, I believe that I have spent an excessive amount totaling more than $15,000 on social casinos. *I can't get back all the time I have spent playing social casino games, and the money I have spent should definitely have gone towards other things. But I believe these games are designed to prey on people's addictions.*" Exhibit 1, Declaration of Frances Long ¶¶ 2, 4, 5-6 (emphasis added).

- "When you buy packs of coins, it doesn't seem like too much money—the bundles can range anywhere from $20 to $100. And the more coins you buy, the more of a 'deal' it seems like you are getting. But you aren't getting a deal no matter how many coins you buy, because you'll soon run out and will have to buy more if you want to keep playing. And before

---

[4]      *SciPlay Net Income Skyrockets 127 Percent, as Social Gaming Embraced by Americans Sheltered at Home*, Casino.org, https://bit.ly/3fbn793.

long, the purchases here and there add up significantly. . . . My addiction got so bad that I couldn't stop playing and spending. I knew I couldn't stop on my own, so I reached out to Google for help. Specifically, I asked Google to block me so I couldn't make any more purchases in DoubleDown. I got no response, so I asked again and again. I got no help. I believe I have spent around $50,000 in DoubleDown Casino overall. *My addiction to DoubleDown has caused so much hardship in my life. It has strained my relationships with family and friends, because I'm drawn to play DoubleDown every free minute that I have. I feel terribly guilty when I think about how much money I have spent in DoubleDown, and I have anxiety from the financial strain that my spending has caused. It is often difficult for me to pay my bills and make ends meet because of the amount of money I spend in DoubleDown. It just looms over everything in my life.* I wish I would have never seen those advertisements on Facebook." Exhibit 2, Declaration of John Sarley ¶¶ 2-6 (emphasis added).

12. Unsurprisingly, social casinos are illegal under many states' gambling laws.

13. As the Ninth Circuit held in *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785 (9th Cir. 2018):

> In this appeal, we consider whether the virtual game platform "Big Fish Casino" constitutes illegal gambling under Washington law. Defendant–Appellee Churchill Downs, the game's owner and operator, has made millions of dollars off of Big Fish Casino. However, despite collecting millions in revenue, Churchill Downs, like Captain Renault in *Casablanca*, purports to be shocked—shocked!—to find that Big Fish Casino could constitute illegal gambling. We are not. We therefore reverse the district court and hold that because Big Fish Casino's virtual chips are a "thing of value," Big Fish Casino constitutes illegal gambling under Washington law.

14. As an instructive example, DoubleDown Casino is illegal both in Washington and here in California (where the Platforms, including Defendant Google, host it and collect their 30% commission). This year, consumers will purchase approximately $400 million worth of virtual casino chips in DoubleDown Casino. That $400 million will be divided up approximately as follows: $240 million to DoubleDown; $40 million to International Game Technology ("IGT") (a multinational slot machine manufacturer that licenses slot machine game intellectual property to DoubleDown); and—as particularly relevant here—the remaining $120 million to Google and the other Platforms (for hosting the app, driving vulnerable consumers to it, and processing the payments for those consumers' virtual chip purchases).

15. In other words, despite knowing that DoubleDown Casino is illegal, Google and the other Platforms continue to maintain a major (30%) financial interest by hosting the game, driving customers to it, and acting as the bank.

16. As such, DoubleDown, Google, and the other Platforms are all liable as co-conspirators to an illegal gambling enterprise. Moreover, DoubleDown Casino is just one of more than fifty social casino apps (the "Illegal Slots") that the Platforms illegally host, promote, and profit from.

17. Consequently, Google and the other Platforms—alongside the Illegal Slot companies—are liable as co-conspirators to an illegal gambling conspiracy.

18. Defendant Google, for its part, is a direct participant in an informal association and enterprise of individuals and entities with the explicit purpose of knowingly devising and operating an online gambling scheme to exploit consumers and reap billions in profits (the "Social Casino Enterprise").

19. This ongoing Enterprise necessarily promotes the success of each of its members: Social casino operators need Platforms like Google, Apple, and Facebook, to access consumers, host their games, and process payments. The Platforms, for their part, need developers like DoubleDown to publish profit-driven and addictive applications on their platforms to generate massive revenue streams.

20. Through this case, Plaintiffs seek to force Google to stop participating in, and to return to consumers the money it has illegally profited from, the Social Casino Enterprise.

21. Plaintiffs, on behalf of the putative Classes, bring claims for damages and for injunctive relief under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"); California's Unfair Competition Law, Business and Professions Code § 17200, *et seq.* ("UCL"); state gambling laws; state consumer protection statutes; and unjust enrichment.

## **PARTIES**

22. Plaintiff John Sarley is a natural person and a citizen of the State of California.

23. Plaintiff Renee Christian is a natural person and a citizen of the State of California.

24. Plaintiff Maria Valencia-Torres is a natural person and a citizen of the State of Alabama.

EXHIBIT B
202

25. Plaintiff Patricia McCullough is a natural person and a citizen of the State of Georgia.

26. Plaintiff Rozette Jones is a natural person and a citizen of the State of Florida.

27. Plaintiff Glenna Wiegard is a natural person and a citizen of the State of Illinois.

28. Plaintiff Ernestine Thompson is a natural person and a citizen of the State of Illinois.

29. Plaintiff Janice Williams is a natural person and a citizen of the State of Kentucky.

30. Plaintiff Jennifer Andrews is a natural person and a citizen of the State of Minnesota.

31. Plaintiff Edgar Smith is a natural person and a citizen of the State of Mississippi.

32. Plaintiff Frankie Killings-Larkin is a natural person and a citizen of the State of Mississippi.

33. Plaintiff Frances Long is a natural person and a citizen of the State of Missouri.

34. Plaintiff Barbara McFarland is a natural person and a citizen of the State of Missouri.

35. Plaintiff Sandra Meyers is a natural person and a citizen of the State of Montana.

36. Plaintiff Heather Yesuvida is a natural person and a citizen of the State of New Jersey.

37. Plaintiff Vanessa Sowell Skeeter is a natural person and a citizen of the State of New York.

38. Plaintiff Mindy Duplain is a natural person and a citizen of the State of Ohio.

39. Plaintiff Crystal Van Fleet is a natural person and a citizen of the State of Oregon.

40. Plaintiff Saundra Hegler is a natural person and a citizen of the State of South Carolina.

41. Plaintiff Deborah Steese is a natural person and a citizen of the State of South Carolina.

42.     Plaintiff Terri Bruschi is a natural person and a citizen of the Commonwealth of Virginia.

43.     Plaintiff John Dickey is a natural person and a citizen of the State of Washington.

44.      Plaintiff Shawna Konchesky-Bair is a natural person and a citizen of the State of West Virginia.

45.     Plaintiff Crystal Russell is a natural person and a citizen of the State of West Virginia.

46.     Plaintiff Judy Solomon is a natural person and a citizen of the State of Illinois.

47.     Defendant Google LLC is a corporation existing under the laws of the State of Delaware, with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google develops, markets and distributes the Google Android Operating System (OS), an open-source operating system for mobile devices. Google owns and operates the Google Play Store, which comes preinstalled on every Android device.

## JURISDICTION AND VENUE

48.     Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the proposed classes is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

49.     Federal subject-matter jurisdiction also exists under 28 U.S.C. § 1331 because Plaintiffs allege violations of 18 U.S.C. § 1962(c)-(d).

50.     The Court has personal jurisdiction over Defendant because Defendant is headquartered in this District and Defendant's alleged wrongful conduct occurred in and emanated from this District.

51.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District.

52.     Moreover, federal law—specifically, 18 U.S.C. § 1962—confers upon Plaintiffs a right of action, enforceable by this Court, to recover their alleged damages from Google.

## GENERAL ALLEGATIONS

### I.    Google Promotes, Offers, Supports, and Profits From Illegal Slot Machines

53.    Players can access Illegal Slots through mobile apps downloaded from the Google Play Store and can play at any time of day or night. The doors to these mobile casinos never close.

54.    The Illegal Slot apps each contain multiple games. For example, the DoubleDown Casino app contains over 200 total titles: 186 slot titles, 21 card game titles, and 1 bingo title.[5] The Illegal Slots derive substantially all of their revenue from their slot titles.

55.    Many of the Illegal Slots feature the same games—sporting the same graphics and music—as can be found on an electronic slot machine in a brick-and-mortar casino. For instance, International Game Technology's well-known slot game "Cleopatra" can be found both in physical casinos and through Google's DoubleDown Casino app.[6]

56.    The Illegal Slots are designed to mimic the electronic slot machines found in brick-and-mortar casinos, including many of the features designed to maximize time-on-device and money spent. For example, the Illegal Slots offer multiline betting—allowing players to wager and win on multiple pay lines—which tends to keep people playing and spending for longer.[7]

57.    There is no skill involved in the slot machine games offered at the Illegal Slots. Players can only place wagers (using virtual chips), and then press a button to "spin" the slot machine. It is impossible for players to affect the outcome of any spins.

58.    Within the Illegal Slots, players are typically given an initial allotment of virtual chips for free. Players use those chips to play the animated slot machines, choosing the amount they wager on each spin. Virtual chips are won and lost based on the outcome of those spins.

---

[5]    Form F-1/A DoubleDown Interactive Co., Ltd. at 82, https://sec.report/Document/0001193125-20-183157/.

[6]    *Id*. at 4 ("We have exclusive access to hundreds of highly recognizable, branded land-based slot titles through our partnership with IGT which enables us to deliver an authentic casino floor experience to our players.").

[7]    *See* Natasha Dow Schüll, *Addiction By Design: Machine Gambling in Las Vegas* (Princeton Univ. Press 2012).

59.     Once a player loses their initial allotment of free chips, the Illegal Slots typically alert the player that he or she has insufficient funds to continue playing that slot game. Many of the Illegal Slot games have minimum bet requirements, such that a player cannot continue playing that game if their chip balance falls too low.

60.     At this point, players have three options: (i) stop playing, (ii) wait for some period of time before receiving more free chips from the Illegal Slot; or (iii) purchase more chips to keep playing—often with just a single click. To keep playing the same game immediately, players navigate to an electronic store and purchase chip packages.

61.     Google operates as the payment processor for all in-app purchases of virtual chips in the Illegal Slots on the Google Platform. Google collects the money players spend on virtual chips, takes a cut for itself, and remits the rest to the Illegal Slots.

62.     Purchased chips extend gameplay in the Illegal Slots because they allow players to place wagers on more spins of the slot machines.

63.     Virtual chips cannot be used outside of any individual Illegal Slots app. The chips can only be used to (1) place wagers on slot machine spins, (2) place wagers on the few card game or bingo titles in the Illegal Slots app, or (3) give a "gift" of virtual chips to another account in the app. Substantially all virtual chips are used on slot machine spins.

64.     Players typically run out of virtual chips quickly—within a day or two.[8]

65.     Notably, while any legitimately operated slot machine must randomize its results, social casinos do not fully randomize their results. Instead, social casinos tailor "wins" and "losses" in such a way as to maximize addiction (and, in turn, revenues). As the CEO of DoubleDown Casino once explained, "[o]ur games aren't built to be bulletproof like you'd need to be if you're a real gambling company. We can do things to make our games more [fun] that if you were an operator in Vegas you'd go to jail for, because *we change the odds just for fun*."[9]

---

[8]     Form F-1/A DoubleDown Interactive Co., Ltd. at 72, https://sec.report/Document/0001193125-20-183157/ ("Th[e] timing difference [between virtual currency purchase and consumption] is relatively short.").

[9]     *Gambling giant IGT buying Double Down for $500M, moving into Facebook games*, GEEK WIRE (Jan. 12, 2012), https://bit.ly/3sk0nYf [emphasis added].

66. Developers of social casino games, such as Scientific Games, hold patents for "dynamic paytables" in interactive games. Paytables—coded into the Illegal Slot apps—set the payout for each possible game event. In other words, they determine how many chips players receive for various spin outcomes. Use of a dynamic paytable means that the payout for any given game event can change over the course of a game or over the course of a player's use of the app.

67. As Scientific Games explained in their patent application, "[t]he slot machine's dynamic paytable is designed to take advantage of the observation that players are more apt to play gaming machines for longer periods of time if the payout is increased as the player continues to play the game. Other slot machines change the paytable based on the amount wagered by the player."[10]

68. On information and belief, many Illegal Slots utilize dynamic paytables. In these games, players are cheated out of a legitimately randomized slot machine experience. Rather, the games adjust the potential payouts in order to maximize revenue—changing the gameplay and the odds in order to manipulate players into playing longer and spending more.

## II. Google Promotes, Hosts, and Facilitates At Least Fifty Illegal Social Casinos

69. The Platforms, including Defendant Google, have directly assisted in creating and operating the unregulated market of virtual casino games from the outset of the industry.

70. Before gaining access to these social media platforms, the Illegal Slots used methods like loyalty cards to track data on how much gamblers spent, how frequently they played, or how often they bet. The Platform partnerships upgraded their business model to an in-app payment system and provided additional user data which skyrocketed revenue by providing them with access to a whole new market of consumers.

71. The Illegal Slots rely on Platforms, like Defendant Google, to make their games available to players and to collect revenue.[11] The Illegal Slots are *only* available to play via third-

---

[10] United States Patent, *Dynamic Paytable for Interactive Games*, No. US 7,628,691 B2 (Dec. 8, 2009).

[11] Form F-1/A DoubleDown Interactive Co., Ltd. at 16, https://sec.report/Document/0001193125-20-183157/.

party Platforms, including on an app downloaded from the Google Play Store, on an app

downloaded from the Apple App Store, or on Facebook (online or mobile app).

72.     The core marketing for the Illegal Slots is accomplished in concert with the

Platforms, and their systems are inextricably linked. Here, for example, is how one social casino

maker described their partnership with the Platforms in a public securities filing:

> Our games are distributed through several main platform providers, including
> Apple, Facebook, Google, and Amazon, which also provide us valuable
> information and data, such as the rankings of our games. Substantially all of our
> revenue is generated by players using those platforms. Consequently, our
> expansion and prospects depend on our continued relationships with these
> providers[.]
> ….
>
> We focus our marketing efforts on acquiring new players and retaining existing
> players. We acquire players both organically and through paid channels. Our paid
> marketing includes performance marketing and dynamic media buying on
> Facebook, Google, and other channels such as mobile ad networks. Underlying
> our paid marketing efforts are our data analytics that allow us to estimate the
> expected value of a player and adjust our user acquisition spend to a targeted
> payback period. Our broad capabilities in promotions allow us to tailor
> promotional activity around new releases, execute differentiated multi-channel
> campaigns, and reach players with preferred creative content.
> ….
>
> Our player retention marketing includes advertising on Facebook as well as
> outreach through email, push notifications, and social media posts on channels
> such as Facebook, Instagram, and Pinterest. Our data and analytics also inform
> our retention marketing efforts. Campaigns are specially designed for each
> channel based upon player preferences for dimensions such as time of day and
> creative content. We consistently monitor marketing results and return on
> investment, replacing ineffective marketing tactics to optimize and improve
> channel performance.
> ….
>
> We employ a rigorous, data-driven approach to player lifecycle management
> from user acquisition to ongoing engagement and monetization. We use
> internally-developed analytic tools to segment and target players and to
> optimize user acquisition spend across multiple channels.
> ….
>
> We continuously gather and analyze detailed customer play behavior and
> assess this data in relation to our judgments used for revenue recognition.[12]

73.     By partnering with the Illegal Slots in marketing, distribution, and payment

processing, Defendant Google entered into a mutually beneficial business partnership with the

Illegal Slots. In exchange for pushing and distributing the social casino apps and collecting

---

[12]     *Id.* at 16, 72, 85, 91.

PLAINTIFFS' MASTER COMPLAINT

Case No. 5:21-md-03001-EJD

money from consumers, Google and the other Platforms take a 30 percent commission off of

every in-app purchase, earning them billions in revenue.

### A. The Illegal Slots

74.    Each of the following Illegal Slots offered by Google allows players to gamble on

online slot machines, even in states where such gambling is unlawful.[13]

**Figure 4 – The Illegal Slots**

| # | Game Title | Google Play URL |
|---|---|---|
| 1 | Slotomania Free Slots: Casino Slot Machine Games | https://play.google.com/store/apps/details?id=air.com.playtika.slotomania |
| 2 | Jackpot Party Casino Games: Spin Free Casino Slots | https://play.google.com/store/apps/details?id=com.williamsinteractive.jackpotparty |
| 3 | Cash Frenzy Casino - Free Slots Games | https://play.google.com/store/apps/details?id=slots.pcg.casino.games.free.android |
| 4 | Cashman Casino: Casino Slots Machines! 2M Free! | https://play.google.com/store/apps/details?id=com.productmadness.cashmancasino |
| 5 | Huuuge Casino Slots - Best Slot Machines | https://play.google.com/store/apps/details?id=com.huuuge.casino.slots |
| 6 | Vegas Slots - DoubleDown Casino | https://play.google.com/store/apps/details?id=com.ddi |
| 7 | POP! Slots - Play Vegas Casino Slot Machines! | https://play.google.com/store/apps/details?id=com.playstudios.popslots |
| 8 | House of Fun: Free Slots & Casino Slots Machines | https://play.google.com/store/apps/details?id=com.pacificinteractive.HouseOfFun |
| 9 | Lotsa Slots - Free Vegas Casino Slot Machines | https://play.google.com/store/apps/details?id=com.diamondlife.slots.vegas.free |
| 10 | DoubleU Casino - Free Slots | https://play.google.com/store/apps/details?id=com.doubleugames.DoubleUCasino |
| 11 | Slots: Heart of Vegas- Free Casino Slots Games | https://play.google.com/store/apps/details?id=com.productmadness.hovmobile |
| 12 | Lightning Link Casino: Best Vegas Casino Slots! | https://play.google.com/store/apps/details?id=com.productmadness.lightninglink |
| 13 | Caesars Casino: Casino & Slots For Free | https://play.google.com/store/apps/details?id=com.playtika.caesarscasino |

---

[13]    For the Court's convenience, a Samsung Galaxy Tablet containing Google-based versions of the Illegal Slots will be lodged with the Court as Exhibit 3. Upon request from Google's appearing counsel, a copy of the Tablet will be produced to Google.

| 14 | Quick Hit Casino Games - Free Casino Slots Games | https://play.google.com/store/apps/details?id=com.ballytechnologies.quickhitslots |
| 15 | Hit it Rich! Lucky Vegas Casino Slot Machine Game | https://play.google.com/store/apps/details?id=com.zynga.hititrich |
| 16 | Billionaire Casino Slots - The Best Slot Machines | https://play.google.com/store/apps/details?id=com.huuuge.casino.texas |
| 17 | Wizard of Oz Free Slots Casino | https://play.google.com/store/apps/details?id=com.zynga.wizardofoz |
| 18 | Gold Fish Casino Slots - FREE Slot Machine Games | https://play.google.com/store/apps/details?id=com.williamsinteractive.goldfish |
| 19 | Jackpot World - Free Vegas Casino Slots | https://play.google.com/store/apps/details?id=com.grandgames.slots.dafu.casino |
| 20 | Scatter Slots- Las Vegas Casino Game 777 Online | https://play.google.com/store/apps/details?id=com.murka.scatterslots |
| 21 | Game of Thrones Slots Casino - Slot Machine Games | https://play.google.com/store/apps/details?id=com.zynga.gotslots |
| 22 | myVEGAS Slots: Las Vegas Casino Games & Slots | https://play.google.com/store/apps/details?id=com.playstudios.myvegas |
| 23 | my KONAMI Slots - Casino Games & Fun Slot Machines | https://play.google.com/store/apps/details?id=com.playstudios.mykonami |
| 24 | Cash Tornado Slots - Vegas Casino Slots | https://play.google.com/store/apps/details?id=com.topultragame.slotlasvega |
| 25 | Club Vegas 2021: New Slots Games & Casino bonuses | https://play.google.com/store/apps/details?id=com.bagelcode.slots1 |
| 26 | Bingo Pop - Live Multiplayer Bingo Games for Free | https://play.google.com/store/apps/details?id=com.uken.BingoPop |
| 27 | MONOPOLY Slots Free Slot Machines & Casino Games | https://play.google.com/store/apps/details?id=com.scientificgames.monopolyslots |
| 28 | Slots (Golden HoYeah) - Casino Slots | https://play.google.com/store/apps/details?id=com.igs.fafafa |
| 29 | GSN Casino: New Slots and Casino Games | https://play.google.com/store/apps/details?id=com.gsn.android.casino |
| 30 | Vegas Live Slots: Free Casino Slot Machine Games | https://play.google.com/store/apps/details?id=com.purplekiwii.vegaslive |
| 31 | Willy Wonka Free Slots Casino | https://play.google.com/store/apps/details?id=com.zynga.wonka |
| 32 | 88 Fortunes Casino Games & Free Slot Machine Games | https://play.google.com/store/apps/details?id=com.ballytechnologies.f88 |

| 33 | Classic Slots - Free Casino Games & Slot Machines | https://play.google.com/store/apps/details?id=com.aaagame.aaacasino |
| 34 | Jackpot Slot Machines - Slots Era Vegas Casino | https://play.google.com/store/apps/details?id=com.murka.slotsera |
| 35 | Bingo Journey - Lucky & Fun Casino Bingo Games | https://play.google.com/store/apps/details?id=com.bingo.scape.android.free |
| 36 | Vegas Friends - Casino Slots for Free | https://play.google.com/store/apps/details?id=com.funtriolimited.slots.casino.free |
| 37 | Cashmania Slots 2021- Free Vegas Casino Slot Game | https://play.google.com/store/apps/details?id=com.zealgames.cashmania&hl=en_US&gl=US |
| 38 | Tycoon Casino Free Slots: Vegas Slot Machine Games | https://play.google.com/store/apps/details?id=com.tw.tycoon.casino |
| 39 | Hot Shot Casino Free Slots Games: Real Vegas Slots | https://play.google.com/store/apps/details?id=com.williamsinteractive.hotshotcasino |
| 40 | Jackpot Crush - Free Vegas Slot Machines | https://play.google.com/store/apps/details?id=slots.dcg.casino.games.free.android |
| 41 | High 5 Casino: The Home of Fun & Free Vegas Slots | https://play.google.com/store/apps/details?id=com.h5g.high5casino |
| 42 | Neverland Casino Slots - Free Slots Games | https://play.google.com/store/apps/details?id=com.wgames.en.neverlandcasino |
| 43 | Double Win Casino Slots - Free Video Slots Games | https://play.google.com/store/apps/details?id=com.huge.slots.casino.vegas.android.avidly |
| 44 | Ignite Classic Slots | https://play.google.com/store/apps/details?id=com.ignite.igniteslots |
| 45 | Rock N' Cash Casino Slots - Free Vegas Slot Games | https://play.google.com/store/apps/details?id=net.flysher.rockncash |
| 46 | Huge Win Slots – Free Slots Games | https://play.google.com/store/apps/details?id=com.citrusjoy.trojan |
| 47 | Casino Slots DoubleDown Fort Knox Free Vegas Games | https://play.google.com/store/apps/details?id=com.doubledowninteractive.ftknox |
| 48 | Baba Wild Slots - Slot machines Vegas Casino Games | https://play.google.com/store/apps/details?id=com.bws |
| 49 | Epic Jackpot Slots - Free Vegas Casino Games | https://play.google.com/store/apps/details?id=com.epic.slots.casino.vegas.android.avidly |
| 50 | VegasStar Casino - FREE Slots | https://play.google.com/store/apps/details?id=com.zentertain.vegasstarcasino |

75. Most or all of the Illegal Slots are also hosted and promoted by the other Platform members of the Social Casino Enterprise: Apple and Facebook.

**B. Google's Facilitation, Promotion, and Control Over the Illegal Slots**

76. Google, for its part, routinely facilitates the success of social casinos by counseling the app developers through the app launch process and providing them with resources and business tools necessary to maximize their success on the Google Play Store.

77. The Android mobile operating system ("Android OS")—which is installed on virtually every smart phone and tablet not manufactured by Apple—was originally touted as an "open system." But Google has successfully established almost-total control of the distribution of apps made to run on that Android OS. Today, nearly all applications that run on the Android OS are downloaded via the Google Play Store.

78. Prior to being published in the Google Play Store, developers must submit their app for review. In this process, Google examines whether the app violates any company policies and demands that apps comply with all relevant laws within the jurisdiction where the app is available. Apps may be, and often are, removed at Google's discretion for violating its policies and can be audited at any time.

79. Google closely monitors its gambling liability by responding to the changing market landscape when it deems necessary. For example, in response to the FTC's increasing consumer protection concerns around gambling in 2018, Google changed its policies for loot boxes, requiring games with that feature to "disclose the odds of receiving those items in advance of purchase."[14] Google likewise heavily regulates advertising in its system that involves gambling, stating "[w]e support responsible gambling advertising and *abide by local gambling laws* and industry standards."[15]

80. The Google Play Store categorizes the Illegal Slots as "Casino" games (distinct from "Arcade" and "Card" games).

---

[14]     Mariella Moon, *Google Will Force Android Apps to Show the Odds of Getting Loot Box Items*, ENGADGET (May 30, 2019), https://engt.co/31hmCCk.

[15]     Gambling and Games, Google Advertising Policies, https://bit.ly/3d3nsI7 [emphasis added].

81.    Google determines content ratings for all apps on the Google Play Store. Google uses content ratings to "[i]nform [consumers] of potentially objectionable content within an app" and to "[b]lock or filter your content in certain territories or to specific users where required." Ratings are based on factors including violence, drugs, and gambling.[16]

82.    While Google requires "real-money gambling apps" to be rated "Adult Only" and to be inaccessible to underage users, Google does not restrict minors' access to the Illegal Slots.[17]

83.    Google does instruct that ads for social casino games "should not appeal to minors."[18] And Google does not allow "ads which promote gambling, real-money games, contests, and tournaments" to be displayed on any app that "provide[s] simulated gambling content (e.g., social casino apps; apps with virtual slot machines)."[19]

84.    Google is thus keenly aware of the illegal, unfair, and deceptive nature of the Illegal Slots.

85.    Google also helps the Illegal Slots target consumers and maximize revenue, providing marketing guidance, tools, promotional offers, and more to help drive discovery of apps and in-app purchases. For example, Google offers App Campaigns to promote apps on Google Search, YouTube, Google Play, and more, and to ensure that developers' apps are shown to the consumers most likely to install and engage with (*i.e.*, spend money on) the app.[20]

86.    Google also runs promotional activities (such as offering coupons, credits, and/or other promotional incentives) for in-app transactions through Google Play. These promotional activities, which are aimed at increasing in-app purchases and Google's profits, are provided by

---

[16]    *Apps & Games content ratings on Google Play*, Google Play Help, https://support.google.com/googleplay/answer/6209544?hl=en.

[17]    *Real-Money Gambling, Games, and Contests*, Play Console Help, https://support.google.com/googleplay/android-developer/answer/9877032?hl=en#zippy=.

[18]    *Gambling and Games*, Advertising Policies Help, https://support.google.com/adspolicy/answer/6018017?hl=en.

[19]    *Real-Money Gambling, Games, and Contests*, Play Console Help, https://support.google.com/googleplay/android-developer/answer/9877032?hl=en#zippy=.

[20]    *App Campaigns*, Google Ads, https://ads.google.com/home/campaigns/app-ads/.

Google to app developers free of charge.[21]

87.     Google reassures app developers that they will work together as a team: "Your innovation is what drives our shared success, but with it comes responsibility. These Developer Program Policies, along with the Developer Distribution Agreement, ensure that together we continue to deliver the world's most innovative and trusted apps to over a billion people through Google Play."[22]

88.     The Illegal Slot companies and Google monitor the game activity and use the collected data to increase user spending. This access to data is critical for the developers: since all payment processing occurs through third-party platforms, the Illegal Slot companies have limited access to personal user data unless players login through Google or otherwise sign up for loyalty programs.[23]

89.     Because the Illegal Slots depend on the spending of a small, targeted audience, the Illegal Slot companies and Platforms work together to target and exploit high-spending users, or "whales," as Illegal Slot companies like DoubleDown refer to their top spenders.[24]

90.     The data that the Illegal Slot companies and the Platforms collect on monetization necessarily contributes to the structure and success of the Social Casino Enterprise.

91.     Google allows Illegal Slot companies to target high-spending users and activate non-spending users. Google aids in the design and direction of targeted advertising, both on Google.com, its larger Display Network, and within other apps and platforms, all aimed at driving new customers to the Illegal Slots and retaining current gamblers.

92.     Additionally, because the Illegal Slots are required to use Google's payment system to process all in-game purchases, Google collects a 30 percent service fee off of every

---

[21]     *Google Play Developer Distribution Agreement*, Google Play, https://play.google.com/about/developer-distribution-agreement.html.

[22]     *Policy Center*, Play Console Help, https://support.google.com/googleplay/android-developer/topic/9858052?hl=en.

[23]     Form F-1/A DoubleDown Interactive Co., Ltd. at 16, https://sec.report/Document/0001193125-20-183157/.

[24]     *The Journey From a Single-App to a Multi-App Company | Joe Sigrist*, YOUTUBE (Feb. 6, 2018) at 21:08, https://youtu.be/PY8gh8M6T20?t=1263 (Joe Sigrist, DoubleDown General Manager: "We track our whales").

transaction. If Google ever discovers an illegal or fraudulent transaction in breach of its terms or policies, it can deny developers from redeeming the proceeds in its active balance.

93.     Because Google acts as the "bank" for the Illegal Slots, the Platforms are entirely aware that certain consumers spend *hundreds of thousands of dollars* on the Illegal Slots.

94.     At all relevant times, Google and the Platforms have known of the unlawful nature of the Illegal Slots and nonetheless have subjected the general public to the unlawful, predatory, and addictive games in order to maximize profits at the expense of the public's health and welfare.

95.     Furthermore, on information and belief, in the wake of the *Kater* decision, the Platforms did not remove social casinos from their offerings but instead conferred with each other and decided to each continue to offer illegal social casino games. This decision was consistent with the Platforms' long history of entering into highly illegal agreements with each other as long as it is highly lucrative to do so.[24]

96.     Despite having the ability to do so, Google has not taken steps to limit access to the Illegal Slots, such as by geo-restricting games such that they can only be played in certain states. Google regularly geo-restricts other gambling games where players can "cash out." Unfortunately, with the Illegal Slots, Google used its developer tools to take advantage of users with severe gambling problems.

97.     As a result, Google has unlawfully made billions of dollars on the backs of consumers.

### III.     Players Are Harmed By the Illegal Slots Hosted by Defendant

98.     Millions of consumers access Illegal Slots through Google, and at least thousands have paid money to Google to purchase virtual chips for gambling on the Illegal Slots.

99.     These players have been injured by Google's conduct because they have lost money as a result of Google's hosting, promoting, and facilitating of illegal gambling and Google's participation in unfair and unscrupulous business practices.

100.     Many players have lost substantial sums of money to Google and the Social Casino Enterprise. Players have maxed out credit cards, spent money they could not afford, and

fallen behind on bills because they cannot stop spending money on Illegal Slots. Some players' injuries amount to tens or even hundreds of thousands of dollars.

101.    Many players feel addicted to the Illegal Slots—they try to stop, knowing that they are losing money and that they are playing too much, but they can't. As long as Google continues to offer Illegal Slots and continues to facilitate the sale of virtual chips, the victimization of these players (and the accompanying harms) will persist.

102.    Players addicted to Illegal Slots also suffer serious non-economic damages, ranging from depression to divorce to attempted suicide.

103.    Many of these harms are irreparable. After-the-fact money damages cannot fix injuries like strained marriages, unsought medical treatments, skipped meals, and anxiety and self-loathing caused by Google's and the Social Casino Enterprise's continued unlawful activity.

### FACTS SPECIFIC TO NAMED PLAINTIFFS

**I.    John Sarley**

104.    Plaintiff John Sarley, 67, is a resident and citizen of Port Hueneme, California. Mr. Sarley began playing DoubleDown Casino approximately five years ago. He plays and has made purchases in DoubleDown Casino through Google Play. Mr. Sarley is addicted to DoubleDown Casino. He has asked Google to block him from making purchases for DoubleDown Casino but Google has never done so.

105.    Mr. Sarley's addiction has put significant strain on his personal relationships and his mental well-being, as well as a significant strain on his financial well-being, including his ability to pay his bills. In total, he estimates that he has lost at least $50,000 playing DoubleDown, and estimates that he plays the game many hours each week.

**II.    Renee Christian**

106.    Plaintiff Renee Christian, 66, is a resident and citizen of Vacaville, California. Ms. Christian believes that plays and makes purchases in DoubleDown Casino, Heart of Vegas, Lightning Link Casino, House of Fun, and Jackpot Party through Google Play. She started playing social casinos more than a decade ago. Ms. Christian estimates that she plays social casinos for approximately 40 hours per week on average, and estimates that she has spent

approximately $15,000 to $20,000 in the games to date.

### III.    Maria Valencia-Torres

107.    Plaintiff Maria Valencia-Torres, 51, is a resident and citizen of Pelham, Alabama. Ms. Valencia-Torres plays and makes purchases in MyVegas Slots and Slotomania through Google Play. She started playing social casinos in approximately 2014. Ms. Valencia-Torres believes she plays social casinos for approximately15 to 20 hours per week on average, and estimates that she has spent approximately $1,500 to date playing social casinos.

### IV.    Patricia McCullough

108.    Plaintiff Patricia McCullough, 73, is a resident and citizen of Harlem, Georgia. Ms. McCullough plays and makes purchases in DoubleDown Casino through Google Play. She started playing DoubleDown Casino in approximately 2016 after seeing advertisements on Facebook. Ms. McCullough believes she plays social casinos approximately 15 hours per week and estimates that she has spent more than $4,000 to date playing social casinos.

### V.    Rozette Jones

109.    Plaintiff Rozette Jones, 62, is a resident and citizen of Clearwater, Florida. She previously resided in Georgia from 2018 through February 2021, during which time she played and made purchases in DoubleDown Casino through Google Play. Ms. Jones started playing social casinos in approximately 2014. She believes she plays the games approximately 15 hours per week and estimates that she has spent more than $4,000 playing social casinos to date.

### VI.    Glenna Wiegard

110.    Plaintiff Glenna Wiegard, 58, is a resident and citizen of Ellis Grove, Illinois. Ms. Wiegard plays and has made purchases in Goldfish Casino Slots and Jackpot Party through Google Play. She started playing social casinos in approximately 2017. Ms. Wiegard estimates that plays social casinos many hours each week, and estimates she has spent approximately $400 playing social casinos to date.

### VII.    Ernestine Thompson

111.    Plaintiff Ernestine Thompson, 52, is a resident and citizen of Chicago, Illinois. Ms. Thompson believes that, over time, she has played and made purchases in Cashman Casino,

DoubleDown Casino, Jackpot Party, and Slotomania through Google Play. She started playing social casinos in approximately 2015. Ms. Thompson believes she plays social casinos approximately 3 to 4 hours per week, and estimates that she has spent thousands of dollars to date playing social casinos.

**VIII.   Janice Williams**

112.    Plaintiff Janice Williams, 63, is a resident and citizen of Lexington, Kentucky. Ms. Williams has played Slotomania and DoubleDown Casino and has made purchases in both games through Google Play. She started playing social casinos more than a decade ago. Ms. Williams believes she plays social casinos more than 20 hours per week, and estimates that she has spent approximately $10,000 playing social casinos to date.

**IX.   Jennifer Andrews**

113.    Plaintiff Jennifer Andrews, 54, is a resident and citizen of Sauk Rapids, Minnesota. Ms. Andrews started playing social casinos around 2011 after seeing an advertisement on Facebook. She believes that, over time, she has played Caesars Slots, Cash Frenzy, Cashman Casino, Casino Jackpot Slots - Infinity Slots, Double U Casino; Heart of Vegas; Goldfish Casino Slots, Hit it Rich! Lucky Vegas Casino Slots, Jackpot Party, Jackpot Slot Machines - Slots Era Vegas Casino, Lotsa Slots, Monopoly Slots, myVEGAS Slots, Slotomania, Scatter Slots, Willy Wonka Slots, Wizard of Oz Slots, and Quick Hit Casino Games. She currently plays and makes purchases in DoubleDown Casino through Facebook. Ms. Andrews estimates that she plays social casinos for 20 hours per week on average, and estimates that she has spent approximately $80,000 playing social casinos.

**X.   Edgar Smith**

114.    Plaintiff Edgar Smith, 41, is a resident and citizen of Hattiesburg, Mississippi. Mr. Smith currently plays and has made purchases in Pop Slots and Coin Master Casino through Google Play. He started playing social casinos in approximately May 2020. Mr. Smith believes that he plays social casinos for 2 hours per week on average, and estimates that he has spent approximately $30 in the games to date.

**XI.   Frankie Killings-Larkin**

115.     Plaintiff Frankie Killings-Larkin, 52, is a resident and citizen of Toomsuba, Mississippi. Ms. Killings-Larkin used to play and make purchases in DoubleDown Casino through Google Play. She started playing social casinos in approximately 2017. Ms. Killings-Larkin played social casinos for approximately 25 hours per week on average, and estimates that she has spent approximately $30,000 in the games to date.

## XII.     Frances Long

116.     Plaintiff Frances Long, 70, is a resident and citizen of Ferguson, Missouri. Ms. Long believes she has, over time, played more than a dozen social casino games, including Double U Casino, House of Fun, Caesars Slots, Slotomania, Real Casino, Real Vegas Casino, Old Vegas through Facebook. Ms. Long believes she plays social casinos between approximately 35 and 70 hours each week, and estimates that she has spent more than $15,000 on the games to date.

## XIII.     Barbara McFarland

117.     Plaintiff Barbara McFarland, 66, is a resident and citizen of Odessa, Missouri. Ms. McFarland has Wizard of Oz Slots, Hit it Rich! Lucky Vegas and Casino Slot, and she has made purchases in those games through Google Play. She started playing social casinos in approximately 2014. Ms. McFarland believes she plays social casinos for approximately 8 hours per week on average, and she estimates that has spent approximately $5,000 to date playing social casinos.

## XIV.     Sandra Meyers

118.     Plaintiff Sandra Meyers, 71, is a resident and citizen of Helena, Montana. Ms. Meyers currently plays and has made purchases in DoubleDown Casino and My-KONAMI Real Vegas Slots through Google Play. She started playing social casinos in approximately 2017 after seeing an advertisement on Facebook. Ms. Meyers believes she plays social casinos dozens of hours per week, and she estimates that she has spent approximately $9,000 playing social casinos to date.

## XV.     Heather Yesuvida

119.     Plaintiff Heather Yesuvida, 32, is a resident and citizen of Toms River, New

Jersey. Ms. Yesuvida believes she has played Cashman Casino, Heart of Vegas, Big Fish Casino, DoubleDown Casino, and Jackpot Party, and she currently plays Lightning Link Casino. She believes she has made purchases in each of these games through Google Play. She started playing social casinos in approximately 2012. Ms. Yesuvida believes she plays social casinos for approximately 20 to 40 hours per week on average, and estimates that she has spent approximately $5,000 to $10,000 playing social casinos to date.

## XVI. Vanessa Sowell Skeeter

120.    Plaintiff Vanessa Sowell Skeeter, 65, is a resident and citizen of Bronx, New York. Ms. Skeeter has played and made purchases in Quick Hit Casino Games, DoubleDown Casino, and through Google Play. She started playing social casinos in approximately 2016 after seeing an ad on Facebook. Ms. Skeeter believes she plays social casinos 6 to 10 hours each week, and estimates that she has spent approximately $5,000 playing social casinos to date.

## XVII. Mindy Duplain

121.    Plaintiff Mindy Duplain, 52, is a resident and citizen of North Royalton, Ohio. Ms. Duplain started playing DoubleDown Casino in approximately 2011 after seeing ads on Facebook. She plays and has made purchases in DoubleDown Casino through Google Play. She believes that she has spent more than $4,000 in DoubleDown Casino to date, and estimates that she plays the game around 30 hours per week.

## XVIII. Crystal Van Fleet

122.    Plaintiff Crystal Van Fleet, 37, is a resident and citizen of Dallas, Oregon. Ms. Van Fleet began playing social casinos in approximately 2011 after seeing ads for them on Facebook. She believes that, over time, she has played and made purchases in Caesars Slots, Casino Slots DoubleDown Fort Knox, DoubleDown Casino, Goldfish Casino Slots, House of Fun, Jackpot Party, Jackpot World, Pop Slots, Scatter Slotts, Slotomania, and Zito Box through Google Play. She believes that many of these purchases were made after she saw videos promoting "Deal of the Day" virtual coin bundles outside the games in Google Play. Ms. Van Fleet estimates that she has spent approximately $1,000 in social casinos to date, and believes she plays between approximately 1 and 4 hours each day.

**XIX.  Saundra Hegler**

123.  Plaintiff Saundra Hegler, 34, is a resident and citizen of Aiken, South Carolina. She started playing social casinos in approximately 2016 after being inundated with ads for the games on Facebook. She recalls that, when clicked, those ads took her directly into Google Play so she could download the social casinos. She believes that, over time, she has played and made purchases in Billionaire Casino Slots 777, Caesars Slots, Cash Frenzy, Cashman Casino, Double U Casino, Goldfish Casino Slots, House of Fun, Lotsa Slots, Pop Slots, and Slotomania through Google Play. To date, she estimates that she has spent approximately $600 in social casinos and believes she spends many hours each week playing the games. She believes that most, if not all, of her purchases were made through promotional offers for virtual coins she received either inside the games or outside them when she logged into Google Play.

**XX.  Deborah Steese**

124.  Plaintiff Deborah Steese, 52, is a resident and citizen of Cross, South Carolina. She started playing social casinos in approximately 2011 after seeing ads for the games on Facebook. She believes she has played and made purchases in DoubleDown Casino, Heart of Vegas, Jackpot Party, Lightning Link Casino, My-KONAMI Real Vegas Slots, and Quick Hit Casino Games through Google Play. Ms. Steese believes she plays social casinos approximately 3 hours each day, and estimates that she has spent more than $1,000 to date in the games.

**XXI.  Terri Bruschi**

125.  Plaintiff Terri Bruschi, 56, is a resident and citizen of Manassas, Virginia. Ms. Bruschi began playing social casinos in approximately 2011 after seeing advertisements for the games on social media. She plays and has made purchases in DoubleDown Casino and Cash Frenzy through Google Play. She estimates that she has spent approximately $20,000 in social casinos, and believes that most of her purchases took place via in-game ads for virtual coins that were offering promotional prices. Ms. Bruschi believes she has spent hundreds of hours playing social casinos over time, and she plays between 1 and 6 hours each day.

**XXII. John Dickey**

126.  Plaintiff John Dickey, 51, is a resident and citizen of Kennewick, Washington.

Mr. Dickey plays and has made purchases in Caesars Slots, DoubleDown Casino, Goldfish Casino, Jackpot Mania, and Slotomania through Google Play. He started playing social casinos in approximately 2011 after seeing ads for the games on Facebook. He believes he plays social casinos approximately 15 to 20 hours each week, and estimates that he has spent approximately $6,000 to $7,000 on the games.

### XXIII. Shawna Konchesky-Bair

127.    Plaintiff Shawna Konchesky-Bair, 47, is a resident and citizen of Maidsville, West Virginia. She began playing DoubleDown Casino in approximately 2016 after seeing ads for the game on Facebook. She plays and has made purchases in DoubleDown Casino through Google Play. To date, she estimates that she has spent more than $1,000 in DoubleDown Casino, and believes that she made most of her purchases after seeing in-game promotions for virtual coins. Ms. Konchesky-Bair believes she plays DoubleDown approximately 7 hours per week.

### XXIV. Crystal Russell

128.    Plaintiff Crystal Russell, 34, is a resident and citizen of East Lynn, West Virginia. She began playing social casinos in approximately 2015 after seeing video ads for them on Google Play. She believes that she has played and made purchases in Coin Master, Pop Slots, My-KONAMI Real Vegas Slots, and myVEGAS Slots through Google Play. Ms. Russell estimates that she has spent approximately $10,000 in social casinos to date, and further believes that a substantial portion of this spending occurred when she was prompted to purchase coins by in-game promotions and ads that appeared when she logged into Google Play. She estimates that she plays social casinos approximately dozens of hours each week.

### XXV.  Judy Solomon

129.    Plaintiff Judy Solomon, 71, is a resident and citizen of Waukegan, Illinois. Ms. Solomon began playing social casinos in approximately 2016. She believes that over time, she has played and made purchases in more than a dozen social casinos, including Big Fish Casino, Billionaire Casino Slots 777, Cash Frenzy, Cashman Casino, DoubleDown Casino, Goldfish Casino Slots, Heart of Vegas, and Jackpot Party, through Google Play. Ms. Solomon estimates that she has spent approximately $5,000 in social casinos to date. She estimates that she plays

social casinos dozens of hours each week.

## CLASS ALLEGATIONS

130. **Class Definitions**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of themselves and Classes of similarly situated individuals, defined and represented by Class Representatives as follows:

    a. <u>California Class</u>: All persons in California who have lost money to any Illegal Slots through the Google platform. The California Class is represented by Class Representatives Renee Christian and John Sarley.

    b. <u>Washington Class</u>: All persons in Washington who have lost money to any Illegal Slots through the Google platform. The Washington Class is represented by Class Representative John Dickey.

    c. <u>Alabama Class</u>: All persons in Alabama who have lost money to any Illegal Slots through the Google platform. The Alabama Class is represented by Class Representative Maria Valencia-Torres.

    d. <u>Georgia Class</u>: All persons in Georgia who have lost money to any Illegal Slots through the Google platform. The Georgia Class is represented by Class Representatives Patricia McCullough and Rozette Jones.

    e. <u>Illinois Class</u>: All persons in Illinois who have lost money to any Illegal Slots through the Google platform. The Illinois Class is represented by Class Representatives Glenna Wiegard, Ernestine Thompson, and Judy Solomon.

    f. <u>Kentucky Class</u>: All persons in Kentucky who have lost money to any Illegal Slots through the Google platform. The Kentucky Class is represented by Class Representative Janice Williams.

    g. <u>Minnesota Class</u>: All persons in Minnesota who have lost money to any Illegal Slots through the Google platform. The Minnesota Class is represented by Class Representative Jennifer Andrews.

h.  Mississippi: All persons in Mississippi who have lost money to any Illegal Slots through the Google platform. The Mississippi Class is represented by Class Representatives Edgar Smith and Frankie Killings-Larkin.

i.  Missouri Class: All persons in Missouri who have lost money to any Illegal Slots through the Google platform. The Missouri Class is represented by Class Representatives Frances Long and Barbara McFarland.

j.  Montana Class: All persons in Montana who have lost money to any Illegal Slots through the Google platform. The Montana Class is represented by Class Representative Sandra Meyers.

k.  New Jersey Class: All persons in New Jersey who have lost money to any Illegal Slots through the Google platform. The New Jersey Class is represented by Class Representative Heather Yesuvida.

l.  New York Class: All persons in New York who have lost money to any Illegal Slots through the Google platform. The New York Class is represented by Class Representative Vanessa Sowell Skeeter.

m.  Ohio Class: All persons in Ohio who have lost money to any Illegal Slots through the Google platform. The Ohio Class is represented by Class Representative Mindy Duplain.

n.  Oregon Class: All persons in Oregon who have lost money to any Illegal Slots through the Google platform. The Oregon Class is represented by Class Representative Crystal Van Fleet.

o.  South Carolina Class: All persons in South Carolina who have lost money to any Illegal Slots through the Google platform. The South Carolina Class is represented by Class Representatives Saundra Hegler and Deborah Steese.

p.  Virginia Class: All persons in Virginia who have lost money to any Illegal Slots through the Google platform. The Virginia Class is represented by Class Representative Terri Bruschi.

q. <u>West Virginia Class</u>: All persons in West Virginia who have lost money to any Illegal Slots through the Google platform. The West Virginia Class is represented by Class Representatives Shawna Konchesky-Bair and Crystal Russell.

r. <u>Nationwide Class</u>: All persons in the United States who have lost money to any Illegal Slots through the Google platform. The Nationwide Class is represented by Class Representatives John Sarley, Renee Christian, Maria Valencia-Torres, Patricia McCullough, Rozette Jones, Glenna Wiegard, Ernestine Thompson, Janice Williams, Jennifer Andrews, Edgar Smith, Frankie Killings-Larkin, Frances Long, Barbara McFarland, Sandra Meyers, Heather Yesuvida, Vanessa Sowell Skeeter, Mindy Duplain, Crystal Van Fleet, Saundra Hegler, Deborah Steese, Terri Bruschi, John Dickey, Shawna Konchesky-Bair, and Crystal Russell.

131. The following people are excluded from any of the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

132. **Numerosity**: On information and belief, tens of thousands of consumers fall into the definition of each Class. Members of the Classes can be identified through Defendant's records, discovery, and other third-party sources.

133. **Commonality and Predominance**: There are many questions of law and fact common to Plaintiffs' and the Classes' claims, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

A. Whether the Illegal Slots are illegal under the relevant state gambling laws;

B. Whether Google, under relevant state gambling laws, is liable for managing, possessing, controlling, and/or profiting from the Illegal Slots;

C. Whether Google's participation in operating the Illegal Slots constitutes an unfair and/or unlawful business practice under relevant state consumer protection statutes;

D. Whether Google should be enjoined from further participation in the Social Casino Enterprise;

E. Whether Google is a participant in the Social Casino Enterprise; and

F. Whether Google has committed illegal predicate acts under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

134.    **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Classes in that Plaintiffs and the members of the Classes sustained damages arising out of Defendant's wrongful conduct.

135.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Classes, as Plaintiffs and each member of the Classes lost money playing the Illegal Slots. Plaintiffs also have no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Classes.

136.    **Policies Generally Applicable to the Classes**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies that Plaintiffs' challenge apply and affect members of the Classes uniformly, and Plaintiffs' challenge of these

policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs. The factual and legal bases of Defendant's liability to Plaintiffs and to the other members of the Classes are the same.

137.    **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Classes is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be difficult for the individual members of the Classes to obtain effective relief from Defendant. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

138.    Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## CAUSES OF ACTION

## <u>CLAIMS BROUGHT ON BEHALF OF THE STATE CLASSES</u>

### <u>COUNT I</u>
**Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL")**
**Unlawful and Unfair Business Practices**
**(Restitution and Injunctive Relief)**
**(Plaintiffs Renee Christian and John Sarley, On Behalf of the California Class)**

139.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

140.    Plaintiffs are each a "person" within the meaning of Cal. Bus. & Prof. Code § 17201 because they each a natural person.

141.    Plaintiffs have standing under the UCL because they suffered injury in fact and have lost money or property as a result of Google's unlawful and unfair conduct.

142.     By hosting and facilitating the Illegal Slots, Google engaged in unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200 by committing unlawful, unfair, and fraudulent business acts and practices.

143.     Slot machines have long been outlawed in California.

144.     California law recognizes that a device can be an illegal slot machine without offering users the opportunity to win money.

145.     In fact, if a gaming machine has the look and feel of a slot machine, accepts real money for gameplay, and rewards a winning spin with an "additional chance or right to use the slot machine or device," the device is an illegal slot machine.

146.     Consequently, social casinos, as described herein, are illegal slot machines under California law.

147.     California gambling law is, on this point, consistent with the laws of many other states—including Washington. In *Kater*, for example, the Ninth Circuit held that social casinos are illegal under Washington law because, while users cannot win money, social casino chips are "things of value" because they can be purchased for money, are awarded as prizes in social casino slot machines, and then can be used to allow players to keep spinning social casino slot machines.

148.     California aggressively regulates all forms of gambling. One reason it does so is to prevent consumers from being cheated by professional gambling operations.

149.     Because social casinos have previously operated as if they were not subject to gambling regulations, they do not comply with any of the regulations that govern the operation of slot machines.

150.     Notably, while any legitimately operated slot machine must randomize its results, social casinos do not randomize their results. Instead, social casinos tailor "wins" and "losses" in such a way as to maximize addiction (and, in turn, revenues).

151.     In other words, social casinos cheat players out of a legitimately randomized slot machine experience. Not only can players never actually win money, but their financial losses

are maximized by deceptive gameplay tweaks that would never be allowed in a legitimate (*i.e.*, licensed and regulated) slot machine.

152. The Illegal Slots are illegal slot machines as defined by Cal. Penal Code § 330b(d) because, among other reasons, when a player purchases and wagers virtual casino chips in the Illegal Slots, a winning spin affords the player an "additional chance or right to use" the Illegal Slots. Pursuant to Cal. Penal Code § 330b(a), Defendant Google, among other violative conduct, manufactures, repairs, owns, stores, possesses, sells, rents, leases, lets on shares, lends and gives away, transports, and exposes for sale or lease, the Illegal Slots. Google also offers to repair, sells, rents, leases, lets on shares, lends and gives away, permits the operations, placement, maintenance, and keeping of, in places, rooms, spaces, and buildings owned, leased, or occupied, managed, or controlled by Google, the Illegal Slots.

153. The Illegal Slots are illegal slot machines as defined by Cal. Penal Code § 330.1 because, among other reasons, when a player purchases and wagers virtual casino chips in the Illegal Slots, a winning spin affords the player an "additional chance or right to use" the Illegal Slots. Pursuant to Cal. Penal Code § 330.1(a), Defendant Google, among other violative conduct, manufactures, owns, stores, keeps, possesses, sells, rents, leases, lets on shares, lends and gives away, transports, and exposes for sale and lease, the Illegal Slots. Google also offers to sell, rent, lease, let on shares, lends and gives away and permits the operation of and permits to be placed, maintained, used, or kept in rooms, spaces, and building owned, leased, or occupied by Google or under Google's management and control, the Illegal Slots.

154. The Illegal Slots are also illegal lotteries as defined by Cal. Penal Code § 319. Section 319 defines a lottery as any "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property." Thus, the elements of an illegal lottery under Section 319 are a prize (or "property"), distribution by chance, and consideration.

155. The Illegal Slots satisfy all three elements because players pay valuable consideration in the form of real money to purchase virtual casino chips, use those chips to try

to win prizes in the form of additional free plays, and are awarded these prizes based on chance outcomes.

156.    California law recognizes that the duty of the operator of a game of chance to permit the winner to play further games for free is an obligation arising from contract, and the right of the winning player to continue to play for free is personal property.

157.    Google's hosting and facilitating of the Illegal Slots constitutes an unfair and unscrupulous business practice because—among other reasons—Google and the Illegal Slots work together to target and exploit vulnerable and addicted players; to deceptively tweak gameplay in order to maximize time-on-device and revenue; and to operate their online slot machines outside the bounds of licensing, regulation, and tax policy.

158.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17203, specifically authorizes this Court to issue injunctive relief to enjoin ongoing acts of unfair competition and unlawful conduct.

159.    Under the UCL, unfair competition encompasses any unlawful act, including acts made unlawful under the penal code and acts made unlawful by federal law.

160.    The UCL authorizes this Court to award restitution to the California Class and to enjoin Google's ongoing violations of Sections 319, 330b, and 330.1 of the California Penal Code, as well as violations of the federal RICO law.

161.    No plain, adequate, and complete remedy for Defendant's conduct exists at law. Consequently, the California Class is entitled to an equitable remedy under the UCL.

162.    Plaintiffs, on behalf of themselves and the California Class, seek an order from the Court awarding restitution to the California Class in an amount to be determined at trial and enjoining Google from further participation in the Social Casino Enterprise.

## COUNT II
### Unjust Enrichment
**(Plaintiffs Renee Christian and John Sarley, On Behalf of the California Class)**

163.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

164. Plaintiffs bring this claim on behalf of themselves and the California Class under the common law of unjust enrichment.

165. As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiffs and California Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

166. Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

167. These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

168. These profits were a benefit conferred upon Google by California Class Members when purchasing coins to wager in social casinos.

169. Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each California Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

**COUNT III**
**Ala. Code § 8-1-150(a)**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiff Maria Valencia-Torres, On Behalf of the Alabama Class)**

170. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

171. Plaintiff brings this claim on behalf of herself and the Alabama Class under Alabama's Civil Remedy Statute for Recovery of Gambling Losses, Ala. Code § 8-1-150(a), which was enacted to effectuate the State's public policy against gambling.

172. Ala. Code § 8-1-150(a) provides: "Any person who has paid any money or delivered any thing of value lost upon any game or wager may recover such money, thing, or its value by an action commenced within six months from the time of such payment or delivery."

173.     Accordingly, Ala. Code § 8-1-150(a) prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

174.     By purchasing coins from Google to wager on social casinos, Plaintiff and each member of the Alabama Class paid money or gambled and lost money within the meaning of Ala. Code § 8-1-150(a).

175.     Google has profited and continues to profit from each payment made by Alabama Class Members to purchase virtual coins, and therefore is in violation of Ala. Code § 8-1-150(a).

176.     Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Google's gaming platform; and (3) offers and distributes social casinos through Google Play and facilitated all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Alabama Class Members to gamble in social casinos.

177.     Plaintiff and Alabama Class Members are therefore entitled to recover from Google the amounts they lost when gambling in social casinos through Google Play.

### COUNT IV
### Ala. Code § 8-19-1, *et seq.*
### Alabama Deceptive Trade Practices Act
### (Plaintiff Maria Valencia-Torres, On Behalf of the Alabama Class)

178.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

179.     Plaintiff brings this action on behalf of herself and the Alabama Class against Google.

180.     Google, Plaintiff, and Alabama Class members are "persons" within the meaning of Ala. Code § 8-19-3(5).

181.     Plaintiff and Alabama Class members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

182.     Virtual coins and tokens used to play social casinos are "goods" within the meaning of Ala. Code. § 8-19-3(3).

183.     Google is and was engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

184.     The Alabama Deceptive Trade Practices Act ("Alabama DTPA") prohibits "deceptive acts or practices in the conduct of any trade or commerce[.]" Ala. Code §  8-19-5.

185.     The Alabama DTPA makes unlawful "engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." *Id.* § 8-19-5(27).

186.     Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Google profits from illegal gambling in connection with its operation of social casinos, for which Plaintiff and Alabama Class members purchased virtual coins and tokens. This constitutes an unconscionable act or practice and thus is in violation of the Alabama DTPA.

187.     Plaintiff and Alabama Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Google's unconscionable acts.

188.     Google's violations present a continuing risk to Plaintiff and Alabama Class members, as well as to the general public. Google's unlawful acts and practices complained of herein affect the public interest.

189.     Pursuant to Ala. Code § 8-19-10, Plaintiff and Alabama Class members seek an order enjoining Google's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Alabama DTPA.

**COUNT V**
**Unjust Enrichment**
**(Plaintiff Maria Valencia-Torres, On Behalf of the Alabama Class)**

190.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

191.    Plaintiff brings this claim on behalf of herself and the Alabama Class under the common law of unjust enrichment.

192.    As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiff and Alabama Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

193.    Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

194.    These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

195.    These profits were a benefit conferred upon Google by California Class Members when purchasing coins to wager in social casinos.

196.    Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Alabama Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

**COUNT VI**
**Ga. Code Ann. § 13-8-3**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiffs Patricia McCullough and Rozette Jones, On Behalf of the Georgia Class)**

197.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

198.    Plaintiffs bring this claim on behalf of themselves and the Georgia Class under Georgia's Civil Remedy Statute for Recovery of Gambling Losses, Ga. Code. Ann. § 13-8-3, which was enacted to effectuate the State's public policy against gambling.

199.     Ga. Code. Ann. § 13-8-3 provides: "Money paid or property delivered upon a gambling consideration may be recovered from the winner by the loser by institution of an action for the same within six months after the loss and, after the expiration of that time, by institution of an action by any person, at any time within four years, for the joint use of himself and the educational fund of the county."

200.     Accordingly, Ga. Code. Ann. § 13-8-3 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

201.     By purchasing coins from Google to wager on social casinos, Plaintiffs and each member of the Georgia Class gambled and lost money within the meaning of Ga. Code. Ann. § 13-8-3.

202.     Google has profited and continues to profit from each payment made by Georgia Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Ga. Code. Ann. § 13-8-3.

203.     Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Google's gaming platform; and (3) offers and distributes social casinos through Google Play and facilitated all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Georgia Class Members to gamble in social casinos.

204.     Plaintiffs and Georgia Class Members are therefore entitled to recover from Google the amounts they lost when gambling in social casinos through Google Play.

# COUNT VII
## Ga. Code Ann. § 10-1-390, *et seq.*
## Georgia Fair Business Practices Act
### (Plaintiffs Patricia McCullough and Rozette Jones, On Behalf of the Georgia Class)

205. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

206. Plaintiffs bring this action on behalf of themselves and the Georgia Class against Google.

207. Google, Plaintiffs, and Georgia State Class members are "persons" within the meaning of Ga. Code. Ann. § 10-1-392(a)(24).

208. Plaintiffs and Georgia Class members are "consumers" within the meaning of Ga. Code. Ann. § 10-1-392(a)(6).

209. Google is and was engaged in "trade" and "commerce" within the meaning of Ga. Code. Ann. § 10-1-392(a)(28).

210. The Georgia Fair Business Practices Act ("Georgia FBPA") prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce[.]" Ga. Code Ann. § 10-1-393(a).

211. Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Google profits from illegal gambling in connection with its operation of social casinos, for which Plaintiffs and Georgia Class members purchased virtual coins and tokens. This constitutes an unfair act or practice in violation of the Georgia FBPA.

212. Plaintiffs and Georgia Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Google's conduct.

213.    Google's violations present a continuing risk to Plaintiffs and Georgia Class members, as well as to the general public. Google's unlawful acts and practices complained of herein affect the public interest.

214.    Pursuant to Ga. Code. Ann. § 10-1-399, Plaintiffs and the Georgia Class seek an order enjoining Google's unfair and/or deceptive acts or practices, and awarding any other just and proper relief available under the Georgia FBPA.

## COUNT VIII
### Unjust Enrichment
### (Plaintiffs Patricia McCullough and Rozette Jones, On Behalf of the Georgia Class)

215.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

216.    Plaintiffs bring this claim on behalf of themselves and the Georgia Class under the common law of unjust enrichment.

217.    As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Georgia Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

218.    Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

219.    These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

220.    These profits were a benefit conferred upon Google by Georgia Class Members when purchasing coins to wager in social casinos.

221.    Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Georgia Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

**COUNT IX**
**720 Ill. Comp. Stat. Ann. 5/28-8**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiffs Glenna Wiegard, Ernestine Thompson, and Judy Solomon, On Behalf of the Illinois Class)**

222.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

223.    Plaintiffs bring this claim on behalf of themselves and the Illinois Class under Illinois' Civil Remedy Statute for Recovery of Gambling Losses, 720 Ill. Comp. Stat. Ann. 5/28-8, which was enacted to effectuate the State's public policy against gambling.

224.    720 Ill. Comp. Stat. Ann. 5/28-8 provides: "Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof, with costs, in the circuit court. No person who accepts from another person for transmission, and transmits, either in his own name or in the name of such other person, any order for any transaction to be made upon, or who executes any order given to him by another person, or who executes any transaction for his own account on, any regular board of trade or commercial, commodity or stock exchange, shall, under any circumstances, be deemed a "winner" of any moneys lost by such other person in or through any such transactions."

225.    Accordingly, 720 Ill. Comp. Stat. Ann. 5/28-8 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

226.    By purchasing coins from Google to wager on social casinos, Plaintiffs and each member of the Illinois Class gambled and lost money within the meaning of 720 Ill. Comp. Stat. Ann. 5/28-8.

227.    Google has profited and continues to profit from each payment made by Illinois Class Members to purchase virtual coins, and is the "winner" of each transaction, in violation of 720 Ill. Comp. Stat. Ann. 5/28-8.

228.    Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Google's gaming platform; and (3) offers and distributes social casinos through Google Play and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Illinois Class Members to gamble in social casinos.

229.    Plaintiffs and Illinois Class Members are therefore entitled to recover from Google the amounts they lost when gambling in social casinos through Google Play, in addition to costs of suit.

## COUNT X
### 815 ILCS 505/1, *et seq.*
### Illinois Consumer Fraud and Deceptive Business Practices Act
### (Plaintiffs Glenna Wiegard, Ernestine Thompson, and Judy Solomon, On Behalf of the Illinois Class)

230.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

231.    Plaintiffs bring this action on behalf of themselves and the Illinois Class against Google.

232.    Google, Plaintiffs, and Illinois Class members are "persons" within the meaning of 815 ILCS 505/1(c).

233.    Plaintiffs and Illinois Class members are "consumers" within the meaning of 815 ILCS 505/1(e).

234.    Virtual coins and tokens are "merchandise" within the meaning of 815 ILCS 505/1(b).

235.    Google is and was engaged in "trade" and "commerce" within the meaning of 815 ILCS 505/1(f).

236. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFDBPA") prohibits "[U]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" [815 ILCS 510/2], approved August 5, 1965, in the conduct of any trade or commerce[.]" 815 ILCS 505/2.

237. Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Google profits from illegal gambling in connection with its operation of social casinos, for which Plaintiffs and Illinois Class members purchased virtual coins and tokens. This offends public policy because it violates 720 Ill. Comp. Stat. Ann. 5/28-8. Google intended that Plaintiffs rely on its unfair practices with regard to social casinos as outlined above. This constitutes an unfair or deceptive act or practice, and thus violates the Illinois Consumer Fraud and Deceptive Business Practices Act.

238. Plaintiffs and Illinois Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Google's conduct.

239. Google's violations present a continuing risk to Plaintiffs and Illinois Class members, as well as to the general public. Google's unlawful acts and practices complained of herein affect the public interest.

240. Pursuant to 815 ILCS 505/10a, Plaintiffs and Illinois Class members seek an order enjoining Google's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Illinois CFDBPA.

## COUNT XI
### Unjust Enrichment
**(Plaintiffs Glenna Wiegard, Ernestine Thompson, and Judy Solomon, On Behalf of the Illinois Class)**

241.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

242.    Plaintiffs bring this claim on behalf of themselves and the Illinois Class under the common law of unjust enrichment.

243.    As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Illinois Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

244.    Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

245.     These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

246.    These profits were a benefit conferred upon Google by Illinois Class Members when purchasing coins to wager in social casinos.

247.    Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Illinois Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

## COUNT XII
### Ky. Rev. Stat. Ann. § 372.020
### Civil Remedy Statute for Recovery of Gambling Losses
**(Plaintiff Janice Williams, On Behalf of the Kentucky Class)**

248.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

249.     Plaintiff brings this claim on behalf of herself and the Kentucky Class under Kentucky's Civil Remedy Statute for Recovery of Gambling Losses, Ky. Rev. Stat. Ann. § 372.020, which was enacted to effectuate the State's public policy against gambling.

250.     Ky. Rev. Stat. Ann. § 372.020 provides: "If any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more, or anything of that value, and pays, transfers or delivers it, the loser or any of his creditors may recover it, or its value, from the winner, or any transferee of the winner, having notice of the consideration, by action brought within five (5) years after the payment, transfer or delivery. Recovery may be had against the winner, although the payment, transfer or delivery was made to the endorsee, assignee, or transferee of the winner."

251.     Accordingly, Ky. Rev. Stat. Ann. § 372.020 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

252.     By purchasing coins from Google to wager on social casinos, Plaintiff and each member of the Kentucky Class gambled and lost money within the meaning of Ky. Rev. Stat. Ann. § 372.020.

253.     Google has profited and continues to profit from each payment made by Kentucky Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Ky. Rev. Stat. Ann. § 372.020.

254.     Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Google's gaming platform; and (3) offers and distributes social casinos through Google Play and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Kentucky Class Members to gamble in social casinos.

255.    Plaintiff and Kentucky Class Members are therefore entitled to recover from Google the amounts they lost when gambling in social casinos through Google Play.

## COUNT XIII
**Ky. Rev. Stat. § 367.110, *et seq.***
**Kentucky Consumer Protection Act**
**(Plaintiff Janice Williams, On Behalf of the Kentucky Class)**

256.    Plaintiffs realleges and incorporates by reference all preceding allegations as though fully set forth herein.

257.    Plaintiff brings this action on behalf of herself and the Kentucky Class against Google.

258.    Google, Plaintiff, and Kentucky Class members are "persons" within the meaning of Ky. Rev. Stat. § 367.110(1).

259.    Google is and was engaged in "trade" or "commerce"" within the meaning of Ky. Rev. Stat. § 367.110(2).

260.    The Kentucky Consumer Protection Act ("Kentucky CPA") prohibits unfair, unconscionable, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce.  Ky. Rev. Stat. §§ 367.170(1) and (2).

261.     Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Google profits from illegal gambling in connection with its operation of social casinos, for which Plaintiff and Kentucky Class members purchased virtual coins and tokens. This constitutes an unconscionable act or practice and thus is in violation of the Kentucky CPA.

262.    Plaintiff and Kentucky Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Google's unconscionable acts.

EXHIBIT B
243

263. Google's violations present a continuing risk to Plaintiff and Kentucky Class members, as well as to the general public. Google's unlawful acts and practices complained of herein affect the public interest.

264. Plaintiff and Kentucky Class members seek an order enjoining Google's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Kentucky CPA.

## COUNT XIV
### Unjust Enrichment
### (Plaintiff Janice Williams, On Behalf of the Kentucky Class)

265. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

266. Plaintiff brings this claim on behalf of herself and the Kentucky Class under the common law of unjust enrichment.

267. As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiff and Kentucky Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

268. Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

269. These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

270. These profits were a benefit conferred upon Google by Kentucky Class Members when purchasing coins to wager in social casinos.

271. Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Kentucky Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

EXHIBIT B
244

**COUNT XV**
**Minn. Stat. Ann. § 541.20**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiff Jennifer Andrews, On Behalf of the Minnesota Class)**

272.   Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

273.   Plaintiff brings this claim on behalf of herself and the Minnesota Class under Minnesota's Civil Remedy Statute for Recovery of Gambling Losses, Minn. Stat. Ann. § 541.20 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

274.   The Statute provides: "Every person who, by playing at cards, dice, or other game, or by betting on the hands or sides of such as are gambling, shall lose to any person so playing or betting any sum of money or any goods, and pays or delivers the same, or any part thereof, to the winner, may sue for and recover such money by a civil action, before any court of competent jurisdiction."

275.   Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

276.   By purchasing coins from Google to wager on social casinos, Plaintiff and each member of the Minnesota Class gambled and lost money within the meaning of the Statute.

277.   Google has profited and continues to profit from each payment made by Minnesota Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of the statute.

278.   Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Google's gaming platform; and (3) offers and distributes social casinos through Google Play and facilitates all in-app purchases for social casinos in exchange for a significant

percentage of the money paid and lost by Plaintiff and Minnesota Class Members to gamble in social casinos.

279.    Plaintiff and Minnesota Class Members are therefore entitled to recover from Google the amounts they lost when gambling in social casinos through Google Play, in addition to costs of suit.

### COUNT XVI
#### Unjust Enrichment
#### (Plaintiff Jennifer Andrews, On Behalf of the Minnesota Class)

280.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

281.    Plaintiff brings this claim on behalf of herself and the Minnesota Class under the common law of unjust enrichment.

282.    As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiff and Minnesota Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

283.    Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

284.    These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

285.    These profits were a benefit conferred upon Google by Minnesota Class Members when purchasing coins to wager in social casinos.

286.    Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Minnesota Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

# COUNT XVII
## Miss. Code. Ann. § 87-1-5
## Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiffs Edgar Smith and Frankie Killings-Larkin, On Behalf of the Mississippi Class)

287.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

288.    Plaintiffs bring this claim on behalf of themselves and the Mississippi Class under Mississippi's Civil Remedy Statute for Recovery of Gambling Losses, Miss. Code. Ann. § 87-1-5 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

289.    The Statute provides: "If any person, by playing at any game whatever, or by betting on the sides or hands of such as do play at any game, or by betting on any horse race or cockfight, or at any other sport or pastime, or by any wager whatever, shall lose any money, property, or other valuable thing, real or personal, and shall pay or deliver the same or any part thereof, the person so losing and paying or delivering the same, or his wife or children, may sue for and recover such money, property, or other valuable thing so lost and paid or delivered, or any part thereof, from the person knowingly receiving the same, with costs."

290.    Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

291.    By purchasing coins from Google to wager on social casinos, Plaintiffs and each member of the Mississippi Class gambled and lost money within the meaning of the Statute.

292.    Google has profited and continues to profit from each payment made by Mississippi Class Members to purchase virtual coins, and therefore is the "person knowingly receiving" in each transaction, in violation of the statute.

293.    Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these

casinos on Google's gaming platform; and (3) offers and distributes social casinos through Google Play and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Mississippi Class Members to gamble in social casinos.

294.    Plaintiffs and Mississippi Class Members are therefore entitled to recover from Google the amounts they lost when gambling in social casinos through Google Play, in addition to costs of suit.

## COUNT XVIII
### Unjust Enrichment
**(Plaintiffs Edgar Smith and Frankie Killings-Larkin, On Behalf of the Mississippi Class)**

295.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

296.    Plaintiffs bring this claim on behalf of themselves and the Mississippi Class under the common law of unjust enrichment.

297.    As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Mississippi Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

298.    Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

299.     These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

300.    These profits were a benefit conferred upon Google by Mississippi Class Members when purchasing coins to wager in social casinos.

301.    Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Mississippi Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

## COUNT XIX
### Mo. Ann. Stat. § 434.030
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiffs Frances Long and Barbara McFarland, On Behalf of the Missouri Class)

302.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

303.     Plaintiffs bring this claim on behalf of themselves and the Missouri Class under Missouri's Civil Remedy Statute for Recovery of Gambling Losses, Mo. Ann. Stat. § 434.030 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

304.     The Statute provides: "Any person who shall lose any money or property at any game, gambling device or by any bet or wager whatever, may recover the same by a civil action."

305.     Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

306.     By purchasing coins from Google to wager on social casinos, Plaintiffs and each member of the Missouri Class gambled and lost money within the meaning of the Statute.

307.     Google has profited and continues to profit from each payment made by Missouri Class Members to purchase virtual coins, and therefore is subject to "recover[y]" for each transaction, in violation of the Statute.

308.     Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Google's gaming platform; and (3) offers and distributes social casinos through Google Play and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Missouri Class Members to gamble in social casinos.

---

PLAINTIFFS' MASTER COMPLAINT

Case No. 5:21-md-03001-EJD

309.     Plaintiffs and Missouri Class Members are therefore entitled to recover from Google the amounts they lost when gambling in social casinos through Google Play, in addition to costs of suit.

### COUNT XX
**Mo. Ann. Stat. § 407.020(1)**
**Unfair Acts and Practices in the Conduct of Trade or Commerce**
**(Plaintiffs Frances Long and Barbara McFarland, On Behalf of the Missouri Class)**

310.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

311.     Missouri's Consumer Protection Act prohibits that "[a]ny deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Ann. Stat. § 407.020(1) (referred to in this count as the "Statute").

312.     Under the Statute, an unfair or deceptive practice includes one which is unlawful.

313.     Google, Plaintiffs, and Missouri Class members are "persons" within the meaning of Mo. Ann. Stat. §§ 407.020(1) and 407.025.

314.     As set forth herein, Google violated Missouri's Civil Remedy Statute for Recovery of Gambling Losses.

315.     Google's unlawful and otherwise unfair or deceptive acts and practices occurred in the conduct of trade or commerce. Indeed, Google is responsible for making social casinos available to the public in trade and commerce.

316.     Google's acts and practices were and are injurious to the public interest because Google continuously advertises, solicits, and enables the general public in Missouri and throughout the United States to play unlawful and otherwise unfair or deceptive social casinos, all while profiting from such conduct.

317.     Such acts and practices are part of a pattern or generalized course of conduct on the part of Google that contradicts the express public policy of Missouri.

318.    As a result of Google's conduct, Plaintiffs and Missouri Class Members were injured in their business or property—i.e., economic injury—in that they lost money wagering on unlawful and otherwise unfair or deceptive games of chance.

319.    Google's unlawful and otherwise unfair or deceptive conduct proximately caused Plaintiffs' and Missouri Class Members' injuries because, but for the challenged conduct, Plaintiffs and Missouri Class Members would not have lost money wagering on illegal games of chance, which was a direct, foreseeable, and planned consequence of Google's conduct.

320.    Plaintiffs, on their own behalf and on behalf of the Missouri Class, seek to recover, as permitted by law, actual damages and multiple damages, together with the costs of suit, including reasonable attorneys' fees.

## COUNT XXI
### Unjust Enrichment
**(Plaintiffs Frances Long and Barbara McFarland, On Behalf of the Missouri Class)**

321.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

322.    Plaintiffs bring this claim on behalf of themselves and the Missouri Class under the common law of unjust enrichment.

323.    As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Missouri Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

324.    Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

325.    These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

326.    These profits were a benefit conferred upon Google by Missouri Class Members when purchasing coins to wager in social casinos.

327. Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Missouri Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

## COUNT XXII
### Mont. Code Ann. § 23-5-131
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Sandra Meyers, On Behalf of the Montana Class)

328. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

329. Plaintiff brings this claim on behalf of herself and the Montana Class under Montana's Civil Remedy Statute for Recovery of Gambling Losses, Mont. Code Ann. § 23-5-131 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

330. The Statute provides: "A person, or the person's dependent or guardian, who, by playing or betting at an illegal gambling device or illegal gambling enterprise, loses money, property, or any other thing of value and pays and delivers it to another person connected with the operation or conduct of the illegal gambling device or illegal gambling enterprise, within 1 year following the person's loss, may: (1) bring a civil action in a court of competent jurisdiction to recover the loss; (2) recover the costs of the civil action and exemplary damages of no less than $500 and no more than $5,000; and (3) join as a defendant any person having an interest in the illegal gambling device or illegal gambling enterprise."

331. Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

332. By purchasing coins from Google to wager on social casinos, Plaintiff and each member of the Montana State Class gambled and lost money within the meaning of the Statute.

333. Google has profited and continues to profit from each payment made by Montana Class Members to purchase virtual coins, and therefore is "another person" for each transaction, in violation of the Statute.

EXHIBIT B
252

334.    Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Google's gaming platform; and (3) offers and distributes social casinos through Google Play and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Montana Class Members to gamble in social casinos.

335.    Plaintiff and Montana Class Members are therefore entitled to recover from Google the amounts they lost when gambling in social casinos through Google Play, in addition to costs of suit.

### COUNT XXIII
### Unjust Enrichment
### (Plaintiff Sandra Meyers, On Behalf of the Montana Class)

336.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

337.    Plaintiff brings this claim on behalf of herself and the Montana Class under the common law of unjust enrichment.

338.    As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiff and Montana Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

339.    Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

340.    These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

341. These profits were a benefit conferred upon Google by Montana Class Members when purchasing coins to wager in social casinos.

342. Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Montana Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

## COUNT XXIV
### N.J. Stat. Ann. § 2A:40-5
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Heather Yesuvida, On Behalf of the New Jersey Class)

343. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

344. Plaintiff brings this claim on behalf of herself and the New Jersey Class under New Jersey's Civil Remedy Statute for Recovery of Gambling Losses, N.J. Stat. Ann. § 2A:40-5 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

345. The Statute provides: "If any person shall lose any money, goods, chattels or other valuable thing, in violation of section 2A:40-1 of this title, and shall pay or deliver the same or any part thereof to the winner, or to any person to his use, or to a stakeholder, such person may sue for and recover such money, or the value of such goods, chattels, or other valuable thing, from such winner, or from such depositary, or from such stakeholder, whether the same has been delivered or paid over by such stakeholder or not, in a civil action provided such action is brought within 6 calendar months after payment or delivery."

346. Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

347. By purchasing coins from Google to wager on social casinos, Plaintiff and each member of the New Jersey Class gambled and lost money within the meaning of the statute.

348. Google has profited and continues to profit from each payment made by New Jersey Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of the Statute.

349.    Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Google's gaming platform; and (3) offers and distributes social casinos through Google Play and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and New Jersey Class Members to gamble in social casinos.

350.    Plaintiff and New Jersey Class Members are therefore entitled to recover from Google the amounts they lost when gambling in social casinos through Google Play, in addition to costs of suit.

### COUNT XXV
**N.J. Stat. Ann. § 56:8-2**
**Unfair Acts and Practices in the Conduct of Trade or Commerce**
**(Plaintiff Heather Yesuvida, On Behalf of the New Jersey Class)**

351.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

352.    New Jersey's Consumer Protection Act prohibits "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." N.J. Stat. Ann. § 56:8-2 (referred to in this count as the "Statute").

353.    Under the Statute, an unconscionable practice includes one which is unlawful.

354.    Google, Plaintiff, and New Jersey Class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-2.

355.    As set forth herein, Google violated New Jersey's Civil Remedy Statute for Recovery of Gambling Losses.

356. Google's unlawful and otherwise unconscionable practices occurred in the conduct of trade or commerce. Indeed, Google is responsible for making social casinos available to the public in trade and commerce.

357. Google's practices were and are injurious to the public interest because Google continuously advertises, solicits, and enables the general public in New Jersey and throughout the United States to play unlawful and otherwise unconscionable social casinos, all while profiting from such conduct.

358. Such practices are part of a pattern or generalized course of conduct on the part of Google that contradicts the express public policy of New Jersey.

359. As a result of Google's conduct, Plaintiff and New Jersey Class Members were injured in their business or property—i.e., economic injury—in that they lost money wagering on unlawful and otherwise unconscionable games of chance.

360. Google's unlawful and otherwise unconscionable conduct proximately caused Plaintiff's and New Jersey Class Members' injuries because, but for the challenged conduct, Plaintiff and New Jersey Class Members would not have lost money wagering on illegal games of chance, which was a direct, foreseeable, and planned consequence of Google's conduct.

361. Plaintiff, on her own behalf and on behalf of the New Jersey Class, seeks to recover, as permitted by law, actual damages and multiple damages, together with the costs of suit, including reasonable attorneys' fees.

## COUNT XXVI
### Unjust Enrichment
### (Plaintiff Heather Yesuvida, On Behalf of the New Jersey Class)

362. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

363. Plaintiff brings this claim on behalf of herself and the New Jersey Class under the common law of unjust enrichment.

364. As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiff and New Jersey Class Members by

virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

365.    Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

366.    These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

367.    These profits were a benefit conferred upon Google by New Jersey Class Members when purchasing coins to wager in social casinos.

368.    Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each New Jersey Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

## COUNT XXVII
### N.Y. Gen. Oblig. Law §§ 5-419 & 5-421
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Vanessa Sowell Skeeter, On Behalf of the New York Class)

369.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

370.    Plaintiff brings this claim on behalf of herself and the New York Class under New York's Civil Remedy Statute for Recovery of Gambling Losses, N.Y. Gen. Oblig. Law § 5-419 & 5-421 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

371.    The Statute provides: "Any person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not." The statute further provides: "Every person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or

1  sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or
2  any part thereof, may, within three calendar months after such payment or delivery, sue for and
3  recover the money or value of the things so lost and paid or delivered, from the winner thereof."

4      372.   Accordingly, the Statute prohibits a person or entity from profiting from gambling
5  activity and provides for the recovery of money paid and lost due to such gambling activity.

6      373.   By purchasing coins from Google to wager on social casinos, Plaintiff and each
7  member of the New York Class gambled and lost money within the meaning of the Statute.

8      374.   Google has profited and continues to profit from each payment made by New
9  York Class Members to purchase virtual coins, and therefore is the "winner" (and/or "person to
10  whom the same shall be paid or delivered") of each transaction, in violation of the Statute.

11      375.   Google's active participation in the operation of social casinos increases its
12  winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted
13  promotional offers and more to help drive discovery and increased purchases within social
14  casinos; (2) contributes to the creation and development of social casinos by providing
15  technology, training, and other tools that allow developers of social casinos to operate these
16  casinos on Google's gaming platform; and (3) offers and distributes social casinos through
17  Google Play and facilitates all in-app purchases for social casinos in exchange for a significant
18  percentage of the money paid and lost by Plaintiff and New York Class Members to gamble in
19  social casinos.

20      376.   Plaintiff and New York Class Members are therefore entitled to recover from
21  Google the amounts they lost when gambling in social casinos through Google Play, in addition
22  to costs of suit.

### COUNT XXVIII
**Unjust Enrichment**
**(Plaintiff Vanessa Sowell Skeeter, On Behalf of the New York Class)**

25      377.   Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth
26  herein.

27      378.   Plaintiff brings this claim on behalf of herself and the New York Class under the
28  common law of unjust enrichment.

379. As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiff and New York Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

380. Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

381. These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

382. These profits were a benefit conferred upon Google by New York Class Members when purchasing coins to wager in social casinos.

383. Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each New York Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

**COUNT XXIX**
**Ohio Rev. Code § 3763.02**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiff Mindy Duplain, On Behalf of the Ohio Class)**

384. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

385. Plaintiff brings this claim on behalf of herself and the Ohio Class under Ohio's Civil Remedy Statute for Recovery of Gambling Losses, Ohio Rev. Code § 3763.02, which was enacted to effectuate the State's public policy against gambling.

386. Section 3763.02 provides: "If a person, by playing a game, or by a wager, loses to another, money or other thing of value, and pays or delivers it or a part thereof, to the winner thereof, such person losing and paying or delivering, within six months after such loss and payment or delivery, may sue for and recover such money or thing of value or part thereof, from the winner thereof, with costs of suit."

387.    Accordingly, Section 3763.02 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

388.    By purchasing coins from Google to wager on social casinos, Plaintiff and each member of the Ohio Class gambled and lost money within the meaning of Section 3763.02.

389.    Google has profited and continues to profit from each payment made by Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Section 3763.02.

390.    Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Google's gaming platform; and (3) offers and distributes social casinos through Google Play and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Ohio Class Members to gamble in social casinos.

391.    Plaintiff and Ohio Class Members are therefore entitled to recover from Google the amounts they lost when gambling in social casinos through Google Play, in addition to costs of suit.

## COUNT XXX
### Unjust Enrichment
### (Plaintiff Mindy Duplain, On Behalf of the Ohio Class)

392.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

393.    Plaintiff brings this claim on behalf of herself and the Ohio Class under the common law of unjust enrichment.

394.    As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiff and Ohio Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

395.    Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

396.    These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

397.    These profits were a benefit conferred upon Google by Ohio Class Members when purchasing coins to wager in social casinos.

398.    Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Ohio Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

## COUNT XXXI
### Or. Rev. Stat. § 30.740
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Crystal Van Fleet, On Behalf of the Oregon Class)

399.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

400.    Plaintiff brings this claim on behalf of herself and the Oregon Class under Oregon's Civil Remedy Statute for Recovery of Gambling Losses, Or. Rev. Stat. § 30.740, which was enacted to effectuate the State's public policy against gambling.

401.    Section 30.740 provides: "All persons losing money or anything of value at or on any unlawful game described in ORS 167.117[,] … 167.122[,] … and 167.127 … shall have a cause of action to recover from the dealer winning the same, or proprietor for whose benefit such game was played or dealt, or such money or thing of value won, twice the amount of the money or double the value of the thing so lost."

402.     Accordingly, Section 30.740 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

403.     ORS 167.117(7) defines "gambling" as any time a person "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under the control or influence of the person, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome."

404.     Players of social casinos risk something of value (virtual coins purchased with real money) upon the outcome of a future contingent event (the results of the social casinos) not under the players' control or influence, upon the understanding that players will receive something of value (additional coins allowing them to continue playing the game for free) in the event of a certain outcome.

405.     Thus, by purchasing coins from Google to wager on social casinos, Plaintiff and each member of the Oregon Class gambled and lost money in illegal gambling transactions within the meaning of Section 30.740.

406.     Google has profited and continues to profit from each payment made by Oregon Class Members to purchase virtual coins, and therefore is both the "dealer winning" the same and a proprietor for whose benefit social casinos were played, in violation of Section 30.740.

407.     Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Google's gaming platform; and (3) offers and distributes social casinos through Google Play and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Oregon Class Members to gamble in social casinos.

408.    Plaintiff and Oregon Class Members are therefore entitled to recover from Google double the amounts they lost when gambling in social casinos through Google Play.

**COUNT XXXII**
**Unjust Enrichment**
**(Plaintiff Crystal Van Fleet, On Behalf of the Oregon Class)**

409.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

410.    Plaintiff brings this claim on behalf of herself and the Oregon Class under the common law of unjust enrichment.

411.    As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiff and Oregon Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

412.    Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

413.    These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

414.    These profits were a benefit conferred upon Google by Oregon Class Members when purchasing coins to wager in social casinos.

415.    Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Oregon Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

**COUNT XXXIII**
**S.C. Code § 32-1-10**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiffs Saundra Hegler and Deborah Steese, On Behalf of the South Carolina Class)**

416.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

417. Plaintiffs bring this claim on behalf of themselves and the South Carolina Class under South Carolina's Civil Remedy Statute for Recovery of Gambling Losses, S.C. Code § 32-1-10, which was enacted to effectuate the State's public policy against gambling.

418. Section 32-1-10 provides: "Any person who shall at any time or sitting, by playing at cards, dice table or any other game whatsoever or by betting on the sides or hands of such as do play at any of the games aforesaid, lose to any person or persons so playing or betting, in the whole, the sum or value of fifty dollars and shall pay or deliver such sum or value or any part thereof shall be at liberty, within three months then next ensuing, to sue for and recover the money or goods so lost and paid or delivered or any part thereof from the respective winner or winners thereof, with costs of suit …."

419. Accordingly, Section 32-1-10 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

420. By purchasing coins from Google to wager on social casinos, Plaintiffs and each member of the South Carolina Class gambled and lost money within the meaning of Section 32-1-10.

421. Google has profited and continues to profit from each payment made by South Carolina Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Section 32-1-10.

422. Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Google's gaming platform; and (3) offers and distributes social casinos through Google Play and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and South Carolina Class Members to gamble in social casinos.

423.    Plaintiffs and South Carolina Class Members are therefore entitled to recover from Google the amounts they lost when gambling in social casinos through Google Play, in addition to costs of suit.

### COUNT XXXIV
**Unjust Enrichment**
**(Plaintiffs Saundra Hegler and Deborah Steese, On Behalf of the South Carolina Class)**

424.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

425.    Plaintiffs bring this claim on behalf of themselves and the South Carolina Class under the common law of unjust enrichment.

426.    As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiffs and South Carolina Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

427.    Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

428.    These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

429.    These profits were a benefit conferred upon Google by South Carolina Class Members when purchasing coins to wager in social casinos.

430.    Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each South Carolina Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

### COUNT XXXV
**Va. Code § 11-15**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiff Terri Bruschi, On Behalf of the Virginia Class)**

431.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

432.     Plaintiff brings this claim on behalf of herself and the Virginia Class under Virginia's Civil Remedy Statute for Recovery of Gambling Losses, Va. Code § 11-15, which was enacted to effectuate the State's public policy against gambling.

433.     Section 11-15 provides: "Any person who shall, by playing at any game or betting on the sides or hands of such as play at any game, lose within twenty-four hours, the sum or value of five dollars, or more, and pay or deliver the same, or any part thereof, may, within three months next following, recover from the winner, the money or the value of the goods so lost and paid or delivered, with costs of suit in civil action, either by suit or warrant, according to the amount or value thereof."

434.     Accordingly, Section 11-15 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

435.     By purchasing coins from Google to wager on social casinos, Plaintiff and each member of the Virginia Class gambled and lost money within the meaning of Section 11-15.

436.     Google has profited and continues to profit from each payment made by Virginia Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Section 11-15.

437.     Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Google's gaming platform; and (3) offers and distributes social casinos through Google Play and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Virginia Class Members to gamble in social casinos.

438.     Plaintiff and Virginia Class Members are therefore entitled to recover from Google the amounts they lost when gambling in social casinos through Google Play, in addition to costs of suit.

## COUNT XXXVI
### Unjust Enrichment
### (Plaintiff Terri Bruschi, On Behalf of the Virginia Class)

439.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

440.     Plaintiff brings this claim on behalf of herself and the Virginia Class under the common law of unjust enrichment.

441.     As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiff and Virginia Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

442.     Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

443.      These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

444.     These profits were a benefit conferred upon Google by Virginia Class Members when purchasing coins to wager in social casinos.

445.     Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Virginia Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

## COUNT XXXVII
### Wash. Rev. Code § 4.24.070
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff John Dickey, On Behalf of the Washington Class)

446.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

447.    Plaintiff brings this claim on behalf of himself and the Washington Class under Washington's Civil Remedy Statute for Recovery of Gambling Losses, Wash. Rev. Code § 4.24.070, which was enacted to effectuate the State's public policy against gambling.

448.    Section 4.24.070 provides: "All persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

449.    Accordingly, Section 4.24.070 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

450.    By purchasing coins from Google to wager on social casinos, Plaintiff and each member of the Washington Class gambled and lost money within the meaning of Section 4.24.070.

451.    "Gambling," defined by RCW § 9.46.0237, "means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence."

452.    Virtual coins and tokens used to play social casinos are "thing[s] of value" under RCW § 9.46.0285.

453.    Social casinos are illegal gambling games because they are online games at which players wager things of value (the chips) and by an element of chance (e.g., by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional chips).

454.    Google has profited and continues to profit from each payment made by Washington Class Members to purchase virtual coins, and therefore is both the "dealer winning" the same and a proprietor for whose benefit social casinos were played, in violation of Section 4.24.070.

455.    Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted

promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Google's gaming platform; and (3) offers and distributes social casinos through Google Play and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Washington Class Members to gamble in social casinos.

456.    Plaintiff and Washington Class Members are therefore entitled to recover from Google the amounts they lost when gambling in social casinos through Google Play.

### COUNT XXXVIII
### Wash. Rev. Code § 19.86.020
### Unfair Acts and Practices in the Conduct of Trade or Commerce
### (Plaintiff John Dickey, On Behalf of the Washington Class)

457.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

458.    Washington's Consumer Protection Act ("CPA") prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW § 19.86.020.

459.    Under the CPA, an unfair or deceptive act is one which is unlawful and against public policy as declared by the legislature or judiciary.

460.    Plaintiff and Washington Class Members are "persons" within the meaning of RCW §§ 19.86.020 and 19.86.090.

461.    Google violated RCW § 9.46.010, *et seq.*, which declares that it is the policy of the State of Washington to, *inter alia*, "restrain all persons from seeking profit from professional gambling activities in this state," to "restrain all persons from patronizing such professional gambling activities," and to "safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling." RCW § 9.46.010.

462.    Under RCW § 9.46.010, *et seq.*, unlawful "gambling" is defined as "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence." RCW § 9.46.0237.

463.    Virtual coins and tokens used to play social casinos are "thing[s] of value" under RCW § 9.46.0285.

464.    Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (e.g., by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning virtual coins or tokens).

465.    Google operates social casinos in conjunction with the developers of those casinos and has profited immensely from its operation of unlawful games of chance, amassing hundreds of millions of dollars from illegal gambling transactions.

466.    Google's unlawful acts and practices occurred in the conduct of trade or commerce. Indeed, Google is responsible for making social casinos available to the public in trade and commerce.

467.    Google's acts and practices were and are injurious to the public interest because Google continuously advertises, solicits, and enables the general public in Washington State and throughout the United States to play unlawful social casinos, all while profiting from such conduct.

468.    This is part of a pattern or generalized course of conduct on the part of Google that contradicts the express public policy of the State of Washington.

469.    As a result of Google's conduct, Plaintiff and Washington Class Members were injured in their business or property—i.e., economic injury—in that they lost money wagering on unlawful games of chance.

470.    Google's unlawful conduct proximately caused Plaintiff's and Washington Class Members' injuries because, but for the challenged conduct, Plaintiff and Washington Class Members would not have lost money wagering on illegal games of chance, which was a direct, foreseeable, and planned consequence of Google's conduct.

471.    Plaintiff, on his own behalf and on behalf of the Washington Class, seeks to recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

### COUNT XXXIX
### Unjust Enrichment
### (Plaintiff John Dickey, On Behalf of the Washington Class)

472.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

473.    Plaintiff brings this claim on behalf of himself and the Washington Class under the common law of unjust enrichment.

474.    As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiff and Washington Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

475.    Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

476.     These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

477.    These profits were a benefit conferred upon Google by Washington Class Members when purchasing coins to wager in social casinos.

478.    Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Washington Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

## COUNT XL
### W. Va. Code § 55-9-2
### Civil Remedy Statute for Recovery of Gambling Losses
**(Plaintiffs Shawna Konchesky-Bair and Crystal Russell, On Behalf of the West Virginia Class)**

479.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

480.     Plaintiffs bring this claim on behalf of themselves and a West Virginia State Class under West Virginia's Civil Remedy Statute for Recovery of Gambling Losses, W. Va. Code § 55-9-2, which was enacted to effectuate the State's public policy against gambling.

481.     Section 55-9-2 provides: "If any person shall lose to another within twenty-four hours $10 or more, or property of that value, and shall pay or deliver the same, or any part thereof, such loser may recover back from the winner the money or property, or in lieu of the property the value thereof, so lost, by suit in court, or before a justice, according to the amount or value, brought within three months after such payment or delivery…."

482.     Accordingly, Section 55-9-2 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

483.     By purchasing coins from Google to wager on social casinos, Plaintiffs and each member of the West Virginia Class gambled and lost money within the meaning of Section 55-9-2.

484.     Google has profited and continues to profit from each payment made by West Virginia Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Section 55-9-2.

485.     Google's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Google's gaming platform; and (3) offers and distributes social casinos through

Google Play and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and West Virginia Class Members to gamble in social casinos.

486.    Plaintiffs and West Virginia Class Members are therefore entitled to recover from Google the amounts they lost when gambling in social casinos through Google Play.

**COUNT XLI**
**W. Va. Code § 46A-6-104**
**Unfair Acts and Practices in the Conduct of Trade or Commerce**
**(Plaintiffs Shawna Konchesky-Bair and Crystal Russell, On Behalf of the West Virginia Class)**

487.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

488.    The West Virginia Consumer Credit and Protection Act ("CCPA") prohibits any person from using "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code § 46A-6-104.

489.    Conduct that is illegal under a statute other than the CCPA and that is against public policy is a per se violation of the CCPA's prohibition on unfair or deceptive acts or practices.

490.    Under West Virginia law, it is unlawful to bet or wager money or another thing of value on any game of chance. W. Va. Code §61-10-5. This prohibition is part of Article 10 of the West Virginia Code, which expressly defines violations thereunder as "Crimes Against Public Policy."

491.    Virtual casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (e.g., by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens).

492.    Google, Plaintiffs, and West Virginia Class Members are "persons" within the meaning of W. Va. Code §§ 46A-6-104 and 46A-6-106.

493.     Google operates social casinos in conjunction with the developers of those casinos and has profited immensely from its operation of unlawful games of chance, amassing hundreds of millions of dollars from illegal gambling transactions.

494.     Google's unlawful acts and practices occurred in the conduct of trade or commerce. Indeed, Google is responsible for making social casinos available to the public in trade and commerce.

495.     As a result of Google's conduct, Plaintiffs and West Virginia Class Members lost money wagering on unlawful games of chance.

496.     Google's unlawful conduct proximately caused Plaintiffs' and West Virginia Class Members' injuries because, but for the challenged conduct, Plaintiffs and West Virginia Class Members would not have lost money wagering on illegal games of chance, which was a direct, foreseeable, and planned consequence of Google's conduct.

497.     Plaintiffs, on their own behalf and on behalf of the West Virginia Class, seek to recover actual damages and treble damages up to the maximum amount allowed by law.

### COUNT XLII
**Unjust Enrichment**
**(Plaintiffs Shawna Konchesky-Bair and Crystal Russell, On Behalf of the West Virginia Class)**

498.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

499.     Plaintiffs bring this claim on behalf of themselves and the West Virginia Class under the common law of unjust enrichment.

500.     As a result of its unlawful conduct described above, Google has been and will continue to be unjustly enriched to the detriment of Plaintiffs and West Virginia Class Members by virtue of their purchase of virtual coins from Google to wager in social casinos through Google Play.

501.     Google has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

502.     These profits were obtained from illegal gambling in connection with Google's operation of social casinos.

503.     These profits were a benefit conferred upon Google by West Virginia Class Members when purchasing coins to wager in social casinos.

504.     Accordingly, because Google will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each West Virginia Class Member are entitled to recover the amount by which Google was unjustly enriched at their expense.

## CLAIMS BROUGHT ON BEHALF OF THE NATIONWIDE CLASS

### COUNT XLIII
### 18 U.S.C. § 1962(c) (RICO)
### Racketeering Activities and Collection of Unlawful Debts
### (Damages and Injunctive Relief)
### (All Plaintiffs, On Behalf of the Nationwide Class)

505.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

506.     At all relevant times, Google is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because it is capable of holding, and does hold, "a legal or beneficial interest in property."

507.     Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue as they were injured in their business and/or property as a result of the Social Casino Enterprise's wrongful conduct described herein, including but not limited to the Enterprise's (1) unlawfully taking and receiving money from Plaintiffs and the Nationwide Class; (2) never providing Plaintiffs and members of the Nationwide Class a fair and objective chance to win—they could only lose; and (3) having directly and knowingly profiting from, on information and belief, rigged and manipulated slot machines.

508.     Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

509.     18 U.S.C. § 1961(1) defines "racketeering activity" to include, among other things, (i) any act which is indictable under Title 18, Section 1084 of the United States Code (relating to the transmission of gambling information); and (ii) any act which is indictable under Title 18, Section 1955 of the United States Code (relating to the prohibition of illegal gambling businesses).

510.     Interstate gambling, including interstate internet gambling, is illegal under federal law if the gambling transaction is illegal in any states in which the transaction occurs. As relevant here, at least some portion of all alleged gambling transactions occur within California, where the alleged gambling transactions are illegal. Consequently, all alleged gambling transactions are illegal under federal law.

511.     Specifically, illegal gambling is indictable under both Section 1084 and Section 1955 of Title 18 of the United States Code, as well as under California law, and is punishable by imprisonment for more than one year.

512.     Therefore, the Social Enterprise is engaged in "racketeering activity."

513.     18 U.S.C. § 1961(6) defines "unlawful debt" as a debt "(A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof," and "(B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof."

514.     Because the Social Casino Enterprise collects debts incurred from a gambling activity in violation of California and other state law, described herein, its profits derived from its ownership and maintenance constitute "unlawful debt" as defined in Section 1961(6).

515.     Google violated 18 U.S.C. § 1962(c) and § 1962(d) by participating in, facilitating, or conducting the affairs of the Social Casino Enterprise through a pattern of racketeering activity composed of indictable offenses under 18 U.S.C. § 1084, 18 U.S.C. § 1955, California Penal Code §§ 319, 330b, and 330.1.

516.     The affiliation between the Defendant Google, the other Platforms, and the Illegal Slot companies constitutes a conspiracy to use an enterprise for the collection of unlawful debt in violation of 18 U.S.C. § 1962(d).

## **Social Casino Enterprise**

517.     RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

518.     Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

519.     The Social Casino Enterprise is an association-in-fact composed of Google, Apple, Facebook, and the Illegal Slot companies who are engaged in and whose activities affect interstate commerce, and which have affected and damaged interstate commercial activity. This Enterprise exists separately from the otherwise legitimate businesses operations of each individual participant.

520.     The pattern of racketeering activity conducted by the members of the Social Casino Enterprise is distinct from the Social Casino Enterprise itself, as each act of racketeering is a separate offense committed by an entity while the Social Casino Enterprise itself is an association-in-fact of legal entities. The Social Casino Enterprise has an informal structure of app developers and platforms with continuing functions or responsibilities.

521.     For approximately a decade, the Social Casino Enterprise has collaborated together to target and retain high-spending users in its online gambling scheme throughout the country. At the very latest, following the Ninth Circuit's March 28, 2018 holding in *Kater*, Defendant Google and the other Platforms, on information and belief, mutually agreed to continue their Enterprise through their ongoing collection of unlawful debts, functioning as a cohesive unit with the purpose of gaining illicit gambling profits.

### Structure of the Social Casino Enterprise

522.     The Social Casino Enterprise consists of dozens of Illegal Slot companies and the Platforms (Google, Apple and Facebook). Each participant agreed to conduct and carry out the affairs and goals of the Social Casino Enterprise:

---

**EXHIBIT B**
277

A.   The Illegal Slot companies agreed to conduct the affairs of the Social Casino Enterprise by developing, updating and operating the illegal slot machines: the "gambling devices." The Illegal Slot companies operate as the principals, forming the necessary business partnerships with Google, Apple and Facebook for the successful execution of their unlawful gambling scheme. The Illegal Slot companies fundamentally rely on the Platforms to host their games, access consumers, and collect revenue. Upon constructive notice of the unlawful nature of the virtual social gambling applications, the Illegal Slot companies agreed with all Enterprise participants to uphold their roles in the Social Casino Enterprise and to continue functioning as a single unit with the common purpose of collecting unlawful debts from online gambling activity.

B.   Google, Apple and Facebook agreed to conduct the affairs of the Social Casino Enterprise by serving as the gambling premises, hosting the virtual social gambling applications and processing all in-app transactions in exchange for a share in the gamblers' losses. Additionally, upon notice of the unlawful nature of the virtual social gambling applications, Google, Apple, and Facebook agreed with all participants to uphold their roles in the Social Casino Enterprise and to continue functioning as a single unit with the common purpose of collecting unlawful debts from online gambling activity.

523.   At all relevant times, each Social Casino Enterprise participant was aware of the conduct of the Social Casino Enterprise, was a knowing and willing participant in that conduct, and reaped profits from that conduct through in-app sales.

524.   The persons engaged in the Social Casino Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities.

525.   All members of the Social Casino Enterprise coordinate and maintain their respective roles in order to enrich themselves and to further the common interests of the whole.

526.   Each Social Casino Enterprise participant participated in the operation and management of the Social Casino Enterprise by directing its affairs as described herein.

527.   The wrongful conduct of the Social Casino Enterprise has been and remains part of the Social Casino Enterprise's ongoing way of doing business and constitutes a continuing threat to the Plaintiffs' and the Nationwide Class's property. Without the repeated illegal acts

and intentional coordination between all participants, the Social Casino Enterprise's scheme would not have succeeded and would not pose a threat to Plaintiffs and the Nationwide Class into the future.

<u>Pattern of Racketeering Activity</u>

528.     The affairs of the Social Casino Enterprise were conducted in such a way to form a pattern of racketeering activity. The Social Casino Enterprise's general pattern of activity consists of designing and operating illegal internet-based slot machines and repeatedly violating public policy against gambling by:

    A.  Developing illegal slot machine games and disguising them as innocuous video game entertainment;

    B.  Distributing and operating illegal slot machine games that are, on information and belief, rigged and manipulated;

    C.  Concealing the scope and deceptive nature of their gambling applications despite knowledge of their predatory design and business model;

    D.  Providing a host platform to house unlicensed gambling activity;

    E.  Injuring the public interest by continuously advertising to and soliciting the general public to play illegal slot machines;

    F.  Conspiring to uphold the Social Casino Enterprise; and

    G.  Unjustly collecting unlawful debts and retaining the profits from their illegal social gambling applications.

529.     The Social Casino Enterprise has operated as a continuous unit since at least 2010.

530.     Pursuant to and in furtherance of their fraudulent scheme, Google committed multiple predicate act violations of federal and state law as previously alleged herein.

**COUNT XLIV**
**RICO § 1962(d)**
**Conspiracy to Engage in Racketeering Activities and Collection of Unlawful Debts**
**(Damages and Injunctive Relief)**
**(All Plaintiffs, On Behalf of the Nationwide Class)**

531. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

532. 18 U.S.C. § 1962(d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

533. As described throughout, and in detail in Count II, even if it did not direct or manage the affairs of the Social Casino Enterprise, Google conspired to commit predicate acts in violation of § 1962(c), including violations of California Penal Code §§ 330b and 330.1.

534. Defendant Google acted knowingly at all times when agreeing to conduct the activities of the Social Casino Enterprise. Google agreed to and indeed did participate in the requisite pattern of racketeering activity which constitutes this RICO claim, collected unlawful debts, engaged in racketeering activities, and intentionally acted in furtherance of the conspiracy by conducting the pattern of racketeering and unlawful debt collection as described above.

535. At the very latest, Google had notice of the illegality of the Social Casino Enterprise as of the Ninth Circuit's 2018 holding in *Kater*. Google's post-*Kater* participation in the Social Casino Enterprise demonstrates its commitment to upholding and operating the structure of the Social Casino Enterprise.

536. As a result of Google's conduct, Plaintiffs and Members of the Nationwide Class were deprived of money and property that they would not otherwise have lost.

537. Under 18 U.S.C. § 1964(c), the Class is entitled to treble their damages, plus interest, costs, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter an Order:

EXHIBIT B
280

a) Certifying this case as a class action on behalf of the Classes defined above, appointing John Sarley, Renee Christian, Maria Valencia-Torres, Patricia McCullough, Rozette Jones, Glenna Wiegard, Ernestine Thompson, Janice Williams, Jennifer Andrews, Edgar Smith, Frankie Killings-Larkin, Frances Long, Barbara McFarland, Sandra Meyers, Heather Yesuvida, Vanessa Sowell Skeeter, Mindy Duplain, Crystal Van Fleet, Saundra Hegler, Deborah Steese, Terri Bruschi, John Dickey, Shawna Konchesky-Bair, Crystal Russell, and Judy Solomon as representatives of the Classes, and appointing their counsel as Class Counsel;

b) Declaring that Defendant's conduct, as set out above, is unlawful under California's UCL, Ala. Code § 8-1-150(a), Ala. Code § 8-19-1, *et seq*., Ga. Code Ann. § 13-8-3, Ga. Code Ann. § 10-1-390, *et seq*., 720 Ill. Comp. Stat. Ann. 5/28-8, 815 ILCS 505/1, *et seq*., Ky. Rev. Stat. Ann. § 372.020, Ky. Rev. Stat. § 367.110, *et seq*., Minn. Stat. Ann. § 541.20, Miss. Code. Ann. § 87-1-5, Mo. Ann. Stat. § 434.030, Mo. Ann. Stat. § 407.020(1), Mont. Code Ann. § 23-5-131, N.J. Stat. Ann. § 2A:40-5, N.J. Stat. Ann. § 56:8-2, N.Y. Gen. Oblig. Law §§ 5-419 & 5-421, Ohio Rev. Code § 3763.02, Or. Rev. Stat. § 30.740, S.C. Code 32-1-10, Va. Code § 11-15, Wash. Rev. Code § 4.24.070, Wash. Rev. Code § 19.86.020, W. Va. Code § 55-9-2, and W. Va. Code § 46A-6-104;

c) Declaring that Defendant's conduct, as set out above, constitutes racketeering activities, collection of unlawful debts, and conspiracy to engage in the same;

d) Entering judgment against Defendant Google, in the amount of the losses suffered by Plaintiffs and each member of the Classes;

e) Enjoining Defendant from continuing the challenged conduct;

f) Awarding damages to Plaintiffs and the Class members in an amount to be determined at trial, including trebling as appropriate;

g) Awarding restitution to Plaintiffs and Class members in an amount to be determined at trial,

h) Requiring disgorgement of all of Defendant Google's ill-gotten gains;

i) Awarding reasonable attorney's fees and expenses;

j) Awarding pre- and post-judgment interest, to the extent allowable;

k)      Requiring injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Classes; and

l)      Awarding such other and further relief as equity and justice require, including all forms of relief provided for under Plaintiffs' claims.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**JOHN SARLEY, RENEE CHRISTIAN, MARIA VALENCIA-TORRES, PATRICIA MCCULLOUGH, ROZETTE JONES, GLENNA WIEGARD, ERNESTINE THOMPSON, JANICE WILLIAMS, JENNIFER ANDREWS, EDGAR SMITH, FRANKIE KILLINGS-LARKIN, FRANCES LONG, BARBARA MCFARLAND, SANDRA MEYERS, HEATHER YESUVIDA, VANESSA SOWELL SKEETER, MINDY DUPLAIN, CRYSTAL VAN FLEET, SAUNDRA HEGLER, DEBORAH STEESE, TERRI BRUSCHI, JOHN DICKEY, SHAWNA KONCHESKY-BAIR, CRYSTAL RUSSELL, AND JUDY SOLOMON**, individually and on behalf of all others similarly situated,

Dated: November 22, 2021

**EDELSON PC**

By: /s/ Rafey S. Balabanian
RAFEY S. BALABANIAN (Bar No. 315962)
rbalabanian@edelson.com
TODD LOGAN (Bar No. 305912)
tlogan@edelson.com
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: 415.212.9300
Fax: 415.373.9435

JAY EDELSON*
jedelson@edelson.com
THEO BENJAMIN*
tbenjamin@edelson.com
350 North LaSalle St., 14th Floor
Chicago, IL 60654
Tel: 312.589.6370
Fax: 312.589.6378

**TYCKO & ZAVAREEI LLP**

ANDREA R. GOLD*
agold@tzlegal.com
GLENN CHAPPELL*
gchappell@tzlegal.com
1828 L Street NW Suite 1000
Washington, DC 20036
Tel:    202.973.0900
Fax:    202.973.0950

HASSAN A. ZAVAREEI (Bar No. 181547)
hzavareei@tzlegal.com
1828 L Street NW Suite 1000
Washington, DC 20036
Tel:    202.973.0900
Fax:    202.973.0950

**KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT**

KRISTEN LAKE CARDOSO*
cardoso@kolawyers.com
1 West Las Olas Boulevard, Suite 500
Fort Lauderdale, Florida 33301
Tel: 954.525.4100
Fax: 954.525.4300

**BURSOR & FISHER. P.A.**

SARAH N. WESTCOT (Bar No. 264916)
swestcot@bursor.com
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: 305.330.5512

**TOUSLEY BRAIN STEPHENS, PLLC**

CECILY C. SHIEL*
cshiel@tousley.com
1700 Seventh Avenue, Suite 2200
Seattle, WA 98101
Tel:    206.682.8600
Fax:    206.682.2992

**DOVEL & LUNER, LLP**

CHRISTIN CHO (Bar No. 238173)
christin@dovel.com

201 Santa Monica Blvd, Suite 600
Santa Monica, CA 90401
Tel:    310.656.7077
Fax:    310.656.7069

**DAVIS & NORRIS, LLP**

JOHN E. NORRIS*
jnorris@davisnorris.com
2154 Highland Avenue South
Birmingham, AL 35205
Tel:    205.930.9900
Fax:    205.930.9989

**STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP**

JILL M. MANNING (State Bar No. 178849)
235 Pine Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 421-3400
Fax: (415) 421-2234

**PEARSON, SIMON & WARSHAW, LLP**

MELISSA S. WEINER*
mweiner@pswlaw.com
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610

*_pro hac vice_ admitted and/or forthcoming

_Counsel for Plaintiffs and the Proposed Classes_